# EXHIBIT A

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION

 3    CAROL ALVAREZ,

 4          Plaintiff,        CASE NO.:  1:24-CV-24135-RKA

 5    vs.

 6    GOAT HOSPITALITY GROUP LLC,
      And WGOAT 15 LLC,
 7

 8          Defendants.

 9    _____

10    DEPOSITION OF:   LISA GONZALEZ

11    DATE TAKEN:      January 21, 2026

12    TIME:            10 a.m. - 7:06 p.m.

13    PLACE:           Everyone appeared remotely
                       via Zoom
14
      REPORTED BY:     MELISSA FERNANDEZ
15                     Court Stenographer

16
      _____
17

18

19

20

21

22

23    Everest Job No. 49341

24

25
```

```
 1    APPEARANCES:

 2         KYLE T. MACDONALD, ESQUIRE
           MacDonald Law, PLLC
 3         Suite 1118
           420 Southwest 7th Street
 4         Miami,  Florida  33130
           (786) 500-9995
 5         kyle@macdonaldemploymentlaw.com
           (Appeared via Zoom)
 6
           APPEARED ON BEHALF OF THE PLAINTIFF
 7
           TARA E. FAENZA, ESQUIRE
 8         Pathman Law, LLC
           Suite 2400
 9         2 South Biscayne Boulevard
           Miami, Florida  33131
10         (305) 379-2425
           tfaenza@pathmanlaw.com
11         (Appeared via Zoom)

12         APPEARED ON BEHALF OF THE DEFENDANTS

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   TESTIMONY OF LISA GONZALEZ

 2         Direct Examination by Mr. MacDonald            5

 3         Cross-Examination by Ms. Faenza             253

 4         Redirect Examination by Mr. MacDonald       290

 5   CERTIFICATE OF OATH                     295

 6   CERTIFICATE OF REPORTER                          296

 7   ERRATA SHEET                                     297

 8   READ & SIGN COVER PAGE                           298

 9                      - - - -

10              S T I P U L A T I O N S

11   It is hereby agreed and so stipulated by and between

12   the parties hereto, through their respective counsel,

13   that the reading and signing of the transcript is

14   expressly reserved by the Deponent.

15                   - - - - -

16              E X H I B I T S

17   PLAINTIFF'S EXHIBIT 1
          Amedned Notice                              19
18   PLAINTIFF'S EXHIBIT 2
          Employee handbook                          103
19   PLAINTIFF'S EXHIBIT 3
          EEOC Position Statement                    115
20   PLAINTIFF'S EXHIBIT 4
          FMLA form                                  175
21   PLAINTIFF'S EXHIBIT 5
          GOAT Hospitality Group form                187
22   PLAINTIFF'S EXHIBIT 6
          Medical Record/Work Release                220
23   PLAINTIFF'S EXHIBIT 7
          GOAT Hospitality Group Website             224

24   PLAINTIFF'S EXHIBIT 8
          GOAT Hospitality Group LLC Verified Responses
25        To Plaintiff's First Set of Interrogatories 227
```

```
 1    PLAINTIFF'S EXHIBIT 9
           WGOAT15 Verified Responses to Plaintiff's
     249
 2         First Set of Interrogatories

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 6 of 296

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

1          The deposition of LISA GONZALEZ, was taken pursuant to

2     notice by counsel for the Plaintiff on the 21st day of January,

3     2026, commencing at 10 a.m.  Said deposition was reported by

4     Melissa Fernandez, Court Reporter, Notary Public, State of

5     Florida at Large.

6                          *   *   *   *   *

7                          LISA GONZALEZ,

8       having been duly sworn, was examined and testified upon her

9                          oath as follows:

10               THE WITNESS:  I do.

11                     DIRECT EXAMINATION

12    BY MACDONALD:

13          Q    Good morning.  My name is Kyle McDonald.  I represent

14    Ms. Carol Alvarez in her lawsuit against GOAT Hospitality

15    Group, LLC and WGOAT15, LLC.  Thank you for being here today.

16    Can you please start by stating your full name for the record.

17          A    Lisa Gonzalez.

18          Q    Have you ever been deposed before, Ms. Gonzalez?

19          A    Yes.

20          Q    And how many times have you been deposed before

21    previously?

22          A    I'm not sure with certainty.

23          Q    Would you say it's more than five times?

24          A    Yes.

25          Q    And when were you most recently deposed?

```
 1          A     A couple of months ago.

 2          Q     And what was that in relation to?

 3          A     A lawsuit.

 4          Q     A lawsuit regarding what?

 5          A     My mortgage.

 6          Q     So even though it sounds like you've done this before

 7   I'll go over a few things just so we're both on the same page.

 8   Do you understand that you've been placed under oath and you

 9   have an obligation to testify truthfully today?

10          A     Yes.

11          Q     And do you understand that even though we're

12   conducting this deposition via Zoom and it may feel somewhat

13   informal that your testimony has the same force and effect as

14   if you were testifying in a court of law before a judge and

15   jury?

16          A     Yes.

17          Q     Now, the court reporter cannot transcribes any

18   inaudible gestures, shrugs, so just make sure to respond

19   clearly just as you have been so far.  Okay?

20          A     Understood.

21          Q     And we want to make sure that we get your best

22   testimony so if there's any question that I ask that you find

23   confusing or ambiguous you can ask me to rephrase it and I'm

24   happy to try to do that.  Okay?

25          A     Okay.
```

1      Q     And on the same note, if you do not say anything I'm

2   going to assume that you understand the question as asked.

3   Okay?

4      A     Okay.  Well, hopefully there's no assumptions if

5   we're clear today.

6      Q     If you need to take a break at any point, go to the

7   bathroom, I know you mentioned you have to go at some point for

8   lunch, we are happy to do that.  Just let me know at any point

9   and we can do that.  Okay?

10     A     Okay.  Thank you.

11     Q     Is there anything that would prevent you from

12  thinking clearly and testifying truthfully here today?

13     A     No, not that I'm aware of.

14     Q     Now, for the purpose of today's deposition I'm going

15  to refer to GOAT Hospitality Group LLC as just GOAT and WGOAT15

16  LLC as either ADDiKT or I may refer to it as the restaurant if

17  that's okay with you?

18     A     Okay.

19     Q     And, of course, if it's ever unclear you're more than

20  welcome to ask.  Okay?

21     A     Okay.

22     Q     Now, do you understand that you are here today to

23  testify on behalf of GOAT Hospitality LLC and WGOAT15 LLC?

24     A     Yes.

25     Q     And you understand your answers today are based not

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 9 of 296

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

1    on your personal knowledge but also all knowledge known and

2    reasonably available to the companies, and the companies being

3    GOAT Hospitality Group LLC and WGOAT15 LLC?

4         A    I was asked to prepare as much information as I can.

5    I've read the areas of inquiry I've reviewed so I'm here to

6    provide you the best information possible.

7         Q    And do you understand that your answers today will be

8    binding on both companies as well?

9         A    Yes.

10        Q    I'm going to show you a document.

11             MS. FAENZA:  What document are you showing?

12             MR. MACDONALD:  You'll see just in a moment.

13             MS. FAENZA:  I think you need to show it ahead of

14        time.  Even though we're by Zoom you should let me know

15        ahead of time and send them to me so that I know, just

16        like we would in a real depo.  If you could just advise.

17        So if you're showing the Notice of Deposition then just

18        tell us that and then I don't need to see it before it

19        goes up.

20             MR. MACDONALD:  Yeah, most of it should be

21        straightforward for the documents that I'm showing.

22             MS. FAENZA:  Right.  But I would ask that you tell me

23        ahead of time what you're showing, otherwise, I can't

24        really object or anything.  Right?

25    BY MR. MACDONALD:

```
 1        Q    So I'll give you a moment to review this,

 2   Ms. Gonzalez, and you let me know when you want me to scroll

 3   and I'll go through the rest of the document.  Okay?

 4        A    Do you want me to read all of it?  It's the Amended

 5   Notice of Rule 30(b)(6) deposition.

 6        Q    Have you seen this document before?

 7        A    I have seen it before.  My attorney sent it to me.

 8        Q    Okay.  Great.  So I want to draw your attention

 9   specifically to start on page 3, the section where it says

10   deposition topics, and I'll give you a moment to review that as

11   well.

12        A    Do you want me to read all of it right now?

13        Q    Well, if you looked at it right now, that's

14   sufficient.  I'm asking you a few questions right now about it.

15        A    Okay.

16        Q    You reviewed these 36 topics?  And you reviewed these

17   36 topics in advance of today, correct?

18        A    I have.  I've read through this.  It was a lot, but

19   I've read through it.

20        Q    And you are the person designated to testify on

21   behalf of GOAT Hospitality Group regarding these 36 topics,

22   correct?

23        A    Correct.

24             MS. FAENZA:  Objection.

25        A    I'm sorry, could you repeat that?
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 11 of 296

Deposition of Lisa Gonzalez                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    BY MR. MACDONALD:

 2         Q    My last question?

 3         A    Yeah.  Sorry, it cut out.

 4         Q    No, no worries.  I asked if you were the person

 5    designated to testify on behalf of GOAT Hospitality Group LLC

 6    regarding these 36 topics?

 7         A    Yes.

 8         Q    And are you the person designated to testify on

 9    behalf of WGOAT15 LLC regarding these 36 topics?

10         A    Yes.

11         Q    Okay.  So now I want to draw your attention

12    specifically to these first eight topics, and you can take your

13    time reading through them.  And my question is just:  Are you

14    prepared to give testimony regarding these eight topics,

15    numbers one through eight?

16         A    Yeah, I think I kind of addressed that in my earlier

17    answer that I have read this and I prepared to provide you the

18    best information possible.  I prepared the best I could for

19    this in order to provide you with the best information and, you

20    know, answer all of your questions to the best of my ability.

21    That's what I'm here to do today.

22              MS. FAENZA:  And I will just state a blanket

23         objection to the deposition topics one through eight.

24         Anything pertaining to any privileged information we would

25         presume counsel is not asking and so by stating that she's
```

```
 1              here to give responses that clearly would involve

 2              privileged discussions, any privileged discussions would

 3              be excluded from the corporate representative's testimony.

 4              We would just make that objection.  The witness is

 5               instructed not to respond to anything that is privileged.

 6    BY MR. MACDONALD:

 7         Q    Okay.  Now, looking at the second page here on the

 8    topics are you prepared to give testimony regarding topics

 9    numbers nine through 18?

10              MS. FAENZA:  Same objection.

11         A    So I want to be mindful of everybody's time here.  I

12    feel like it should work as a two-way streak here.  I said I

13    reviewed this document in its entirety.  You already said it's

14    36 areas of inquiry.  I have read them.  I have done the best I

15    can to prepare to answer all of your questions on one through

16    36.  Some of these I do think, you know, might call for a legal

17    conclusion here or there, ask for privileged information, but

18    I'm here to answer any of your questions about these areas.  So

19    are we just going to go through each of these saying did I

20    prepare?  I thought I had already addressed that.

21    BY MR. MACDONALD:

22         Q    So it's standard practice to go through the list of

23    corporate representative topics and clarify whether you're

24    prepared to give testimony regarding them.  So if we want to

25    expedite things, I'll go back to my question here.  So are you
```

1    prepared to testify on topics nine through 18?

2            MS. FAENZA:  Objection.

3        A    Doesn't that apply with the notice that I'm here

4    today and I'm under oath that --

5    BY MR. MACDONALD:

6        Q    I'm not here to answer questions.  Again, I'll

7    reiterate my last question, are you prepared to give testimony

8    regarding topics number nine through 18?

9            MS. FAENZA:  Objection.

10       A    Asked and answered.  I'm not trying to be smart with

11   you.  Like, I can say it again for a third or fourth time, I

12   have read it.  I have prepared for all the topics on here.  If

13   they weren't previously objected to, I'm here to talk about it

14   as best I can and provide you the best information possible.

15   So I do have questions about these areas of inquiry.

16   BY MR. MACDONALD:

17       Q    Okay.  So, again, I'm just asking about these

18   specific topics, whether you're prepared.  It sounds like you

19   are based on what you just stated a moment ago, but I just want

20   to clarify for the record that you're prepared to give

21   testimony on these topics, number nine through 18.

22           MS. FAENZA:  Objection.

23       A    As I said again, I'm prepared to give you my best and

24   honest answers to the areas of inquiry for one through 36.

25   BY MR. MACDONALD:

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 14 of 296

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1          Q    So that would include numbers nine through 18, right?

 2          A    Logically it does.

 3               MS. FAENZA:  Objection.

 4    BY MR. MACDONALD:

 5          Q    I would also ask that, and your counsel can, of

 6    course, object on your behalf, you as the witness should not be

 7    objecting to questions.  Of course, your counsel is more than

 8    welcome to.  I just want to clarify that for the record as

 9    well.

10               MS. FAENZA:  Objection.

11          A    I didn't object.  I didn't hear the word object.

12    BY MR. MACDONALD:

13          Q    You said asked and answered a moment ago.

14               MS. FAENZA:  Objection.  I'm going to make a standing

15          objection.  You will not harass this witness, sir.

16               MR. MACDONALD:  I'm not harassing anyone.  Let's go

17          ahead and move on.

18               MS. FAENZA:  Do not instruct the witness how to

19          respond substantially.  If you have an issue with the

20          response, then you have your remedies available to you.

21    BY MR. MACDONALD:

22          Q    Okay.  All right.  So are you prepared to give

23    testimony regarding topics nine through -- 19 through 28?

24               MS. FAENZA:  Objection.  Asked and answered.

25               MR. MACDONALD:  I have not asked that question
```

```
 1          previously.

 2                  MS. FAENZA:  Objection.  Asked and answered.  In

 3          fact, you did, sir, you asked regarding one through 36,

 4          which she already responded and then I believe five times

 5          stated that she has reviewed this one through 36.

 6   BY MR. MACDONALD:

 7          Q    Okay.  The question stands.

 8                  MS. FAENZA:  Same objection.

 9          A    I am prepared and I don't see how this is a great use

10   of anybody's time here when I've said one through 36 multiple

11   times.  And you can take that use that sound bite against me

12   all you want.  I'd be embarrassed if a judge read this

13   transcript.

14   BY MR. MACDONALD:

15          Q    Okay.  So that's a yes, correct?

16                  MS. FAENZA:  Objection.  Misstates testimony.

17          A    I said yes to one through -- I said yes that I

18   prepared for one through 36 multiple times now.

19   BY MR. MACDONALD:

20          Q    Okay.  So moving on.

21          A    And there's no rule that you have to ask me in chunks

22   like this.

23          Q    Well, we're almost done so the sooner we can get

24   through these, the sooner we can continue.

25                  MS. FAENZA:  Objection.
```

```
 1    BY MR. MACDONALD:

 2         Q    Are you prepared to give testimony regarding topics

 3    numbers 29 through 36?

 4         A    I'm prepared to give testimony as to all the areas on

 5    your amended notice for Rule 30(b)(6), Notice of Deposition.

 6         Q    That would include the ones I just showed you,

 7    numbers --

 8              MS. FAENZA:  Objection.

 9         A    As part of the notice, yes.

10    BY MR. MACDONALD:

11         Q    Are there any topics listed in the notice that you

12    are not prepared to give testimony on today?

13         A    We'll say there's some where I don't think I have all

14    of the information, but I would need you to like ask me a

15    specific question about that area.  I've done all I can to look

16    into those and provide you the best information, but I can't

17    sit here and predict what questions you're going to ask me

18    about these areas.

19         Q    Okay.  Are there any particular topics that you feel

20    that you are not prepared to testify on today?

21              MS. FAENZA:  Objection.  Asked and answered.

22         A    No, I've told you I'm prepared today and I have

23    reviewed for today.  Do I know every single thing, that's a

24    different question, but I am prepared today.

25    BY MR. MACDONALD:
```

1     Q     What documents did you review to prepare for today's

2  deposition?

3          MS. FAENZA:  Objection.  Instruct the witness not

4      to respond to anything privileged including any

5      communications between herself and her attorney.

6     A     I have reviewed this notice.  I reviewed the

7  interrogatories.  I reviewed the Request for Production.  I

8  reviewed the Request for Production responses.  I reviewed the

9  Amended Complaint.  I believe those were the main documents I

10 reviewed.

11 BY MR. MACDONALD:

12    Q     And did you review the Defendants' Answer and

13 Affirmative Defenses -- or, sorry, strike that.  Did you review

14 the Defendant --

15    A     Yeah, I don't think I reviewed --

16    Q     Did you review the Defendants' discovery responses in

17 this case?

18         MS. FAENZA:  Objection.  Asked and answered.

19 BY MR. MACDONALD:

20    Q     I'm waiting for your response, Ms. Gonzalez.

21    A     Yes, I told you I reviewed the interrogatories and

22 Request for Production.

23    Q     Did you review any emails produced in this case?

24         MS. FAENZA:  Objection.  Instruct the witness not to

25      respond to any privileged information.

 1        A    I reviewed what was in the response to production.

 2    BY MR. MACDONALD:

 3        Q    Did you review any financial records of GOAT

 4    Hospitality Group to prepare for today's deposition?

 5             MS. FAENZA:  Objection -- I'm sorry, strike that.

 6        A    I don't recall if there was any financials in that

 7    off the top of my head.  I don't particularly recall seeing

 8    financials for GOAT.

 9    BY MR. MACDONALD:

10        Q    Did you review any financial records for WGOAT15 in

11    advance of today's deposition?

12        A    I reviewed what was in the response to production.

13        Q    Anything outside of those documents produced in

14    response to the Plaintiff's discovery request?

15        A    I don't believe so in terms of financials.  I don't

16    see how that would have helped me like better prepare for today

17    to review a bank statement.  So, no, I didn't like go look for

18    a P&L or anything like that.  Like that wouldn't have assisted

19    me, I believe, to answer any of the areas of inquiry or any of

20    the causes of actions in the Complaint.

21        Q    And I'm still sharing my screen.  Do you see topic

22    number 33 there?

23        A    Uh-huh.

24        Q    And you did not believe that reviewing financial

25    records would be helpful in preparing your testimony for topic

```
 1   number 33?

 2        A    So knowledge of financial integration between GOAT

 3   and WGOAT, I don't need to go full, you know, balance sheets to

 4   know that there's no financial integration between the

 5   companies.

 6        Q    That would include who exercises financial control

 7   and the other records included there in that topic?

 8             MS. FAENZA:  Objection.

 9        A    Yeah, like a bank statement or a P&L or a ledger is

10   not going to tell me who exercises financial control of these

11   companies, so, no.  And it's not going to tell me about

12   financial -- like I know that they're separate companies so

13   that isn't going to provide me with more information regarding

14   financial integration.

15   BY MR. MACDONALD:

16        Q    Okay.  And do you see topic number 34?

17        A    Uh-huh.

18        Q    Do you see where it request testimony regarding the

19   accounting systems or methods Defendants used to track revenue

20   and expenses, whether Defendants file tax returns and what

21   records support those filings, whether Defendants maintain bank

22   accounts and how transactions are recorded?  Do you see that

23   part?

24             MS. FAENZA:  Objection.

25        A    Yes, my knowledge of them, yes.
```

```
 1    BY MR. MACDONALD:

 2         Q    Okay.  And you didn't think it would be helpful to

 3    review financial records to prepare your testimony for that

 4    topic?

 5              MS. FAENZA:  Objection.

 6         A    I have knowledge of those so I don't think reviewing

 7    any of those are going to provide me like additional

 8    information to go seek out.  So, no, I didn't necessarily go

 9    and get those because I don't think it was going to provide me

10    with any additional information outside of my already area of

11    knowledge of these.

12    BY MR. MACDONALD:

13         Q    Okay.  We're going to mark those as Exhibit 1.

14              (Whereupon, Plaintiff's Exhibit 1 was marked for

15         identification.)

16         A    And just, sorry, to caveat, continue kind of the

17    answer, that's if they did exist, either like if they were

18    within the company's care, custody, or control to go and get

19    those and be able to read those to prepare for today.

20    BY MR. MACDONALD:

21         Q    And you were in attendance at Derek Gonzalez's

22    deposition in this case, correct?

23              MS. FAENZA:  Objection.

24         A    For part of it.  I guess I should say for parts.  I

25    did not have a good connection that day and I kept getting
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 21 of 296

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    kicked out or the audio would just delete.  Actually, you saw

 2    that I entered and exited the Zoom room like several times, not

 3    intentionally, but I kept getting kicked off.  And then there

 4    would be periods of times when there was just like zero audio.

 5    BY MR. MACDONALD:

 6         Q    And did you discuss Mr. Gonzalez's deposition

 7    testimony with him?

 8              MS. FAENZA:  Objection.  Instruct the witness not to

 9         respond under privilege objection.

10              MR. MACDONALD:  Under which privilege?

11              MS. FAENZA:  Ms. Gonzalez is the general counsel,

12         outside general counsel through her law firm of Lisa S.

13         Gonzalez, P.A.  Those discussions between the witness,

14         Derek Gonzalez, and herself would fall under privileged.

15    BY MR. MACDONALD:

16         Q    And is Mr. Gonzalez individually a client of yours or

17    is it through GOAT Hospitality Group that you are claiming that

18    privilege, or that relationship, I should say?

19         A    I'm counsel for GOAT and for him.  It depends on the

20    matter, but, yes.

21         Q    And do you formally represent GOAT Hospitality Group

22    in the fee agreement, for example, in place?

23              MS. FAENZA:  Objection.

24         A    I represent them.  I don't think payment is relevant

25    to representing them.
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1   BY MR. MACDONALD:

 2        Q    Okay.  So that would be a no then?

 3             MS. FAENZA:  Objection.  Misstates testimony.

 4        A    Please don't like rephrase my answer.  I represent

 5   them.  I mean, would it be appropriate for someone to ask you

 6   how much your clients pay you or how they pay you or how their

 7   structure is?

 8   BY MR. MACDONALD:

 9        Q    My question was whether there's a fee agreement in

10   place?

11             MS. FAENZA:  Objection.  Same objection.

12        A    Again, that's how you get paid so whether I chose to

13   do the work pro bono or get paid, I think is also -- I don't

14   remember seeing that one in here as an area of inquiry.

15   BY MR. MACDONALD:

16        Q    Well, you're asserting a privilege.  That's why I'm

17   asking.  You're declining to answer whether you have a fee

18   agreement in place.

19             MS. FAENZA:  Objection to Plaintiff questioning

20        narrowly close to areas of privilege is inappropriate.

21   BY MR. MACDONALD:

22        Q    I'm waiting for your response, Ms. Gonzalez.  I need

23   to understand the scope of the privilege that's being asserted.

24   I'm just simply asking whether there's a fee agreement in place

25   between you and GOAT Hospitality Group or Mr. Gonzalez
```

```
 1    individually?

 2              MR. FAENZA:  Objection.  That is not a scope of

 3         the privilege.  The privilege exist when there is the

 4         existence of an attorney-client relationship, end of

 5         story.  Now you're actually asking about the

 6         attorney-client relationship and the payment terms

 7         relating to that.  Same objection.

 8              MR. MACDONALD:  I'm not asking for payment terms.

 9         I'm simply asking whether there is a fee agreement that

10         exist between you and GOAT Hospitality Group.  That's the

11         question.

12              MS. FAENZA:  Okay.  And I will reassert it.  A fee

13         agreement determines the conditions and the payment terms

14         between the attorney and the client.  Mr. MacDonald --

15              MR. MACDONALD:  If I asked about the details of it.

16              MS. FAENZA:  Mr. MacDonald --

17              THE WITNESS:  You're interrupting.

18              MS. FAENZA:  -- you literally are, one, interrupting,

19         two, smiling.  It's not funny.  And, three, you're

20         literally asking about any written agreement pertaining to

21         a privileged relationship.  So I don't know what the

22         purpose of this is, but we have asserted the privilege --

23              MR. MACDONALD:  Your speaking objections have got to

24         stop.  I understand you can object, but these are speaking

25         objections at this point.  All I'm simply asking -- hold
```

1        on.  All I'm simply asking is whether there's a fee

2        agreement in place.  I'm not asking about the details of

3        that fee agreement.  I'm not asking you what it says.

4        I'm just simply asking you is there a fee agreement in

5        place between you and your firm and GOAT Hospitality Group

6        LLC.

7             MS. FAENZA:  Same objection.

8        A    Mr. MacDonald, it's just rude.  You're just telling

9   her you've got to stop like she's a child.  Please don't.  Like

10  we're all professionals here.  Without waiving my attorney's

11  objection I can answer the original question before we went

12  down this rabbit hole.  I did not speak with Mr. Gonzalez after

13  his deposition.  I had no need to so we didn't speak after it

14  and about it.

15  BY MR. MACDONALD:

16       Q    Okay.  But my question was:  Is there a fee agreement

17  in place between you and your firm and GOAT Hospitality Group

18  LLC?  Not the terms of that, just simply whether there is an

19  agreement.

20            MS. FAENZA:  Asked and answered.  I am just going to

21       instruct the witness not to respond at this point.

22            MR. MACDONALD:  On what basis are you instructing the

23       witness not to respond?

24            MS. FAENZA:  I've already given the basis.  It's a

25       privilege objection.  And there is this bizarre dance,

1    Mr. MacDonald, that you ask me to justify my objection.

2    I then state it and then you accuse me of making a

3    speaking objection.

4         MR. MACDONALD:  No.  I'm only asking because -- hold

5    on.  Let me explain.  I'm only asking because you have

6    instructed her not to answer the question so the only

7    valid basis to instruct her not to answer would be that

8    the question itself ask for privileged information.    Are

9    you claiming that the existence of a fee agreement    without

10   the terms or details is privileged information?   Is that your

11   objection right now?

12        MS. FAENZA:  Yes.

13        MR. MACDONALD:  Okay.

14   A    And from my understanding that was like a tangential

15   thing -- tangent you went off on because of the original

16   question, whether or not I spoke to Mr. Gonzalez and I answered

17   that.

18   BY MR. MACDONALD:

19   Q    Did you interview Derek Gonzalez to prepare for these

20   topics?

21        MS. FAENZA:  Objection.  That is privilege and I will

22   object on the purpose of privilege.

23        MR. MACDONALD:  That's not privileged information.

24   Preparation for a 30(b)(6) deposition, that is not

25   privilege, but, okay.

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 26 of 296

Deposition of Lisa Gonzalez                                  Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1          A    I didn't interview him, no.

 2     BY MR. MACDONALD:

 3          Q    Did you interview Eric Garcia to prepare for these

 4     topics today?

 5               MS. FAENZA:  Same objection.

 6          A    I did not interview him.

 7     BY MR. MACDONALD:

 8          Q    Did you speak to him?

 9               MS. FAENZA:  Objection.

10          A    I have spoken to him in the past so I didn't need to

11     interview him to prepare for today's deposition.

12     BY MR. MACDONALD:

13          Q    When is the last time you spoke to Mr. Garcia?

14               MS. FAENZA:  Objection.  Same objection as to

15          privilege.  She has already responded to the question as

16          to the 30(b)(6) deposition that she didn't speak with him

17          to prepare for this deposition, therefore, you are

18          actually just explicitly --

19               MR. MACDONALD:  Speaking objection.

20               MS. FAENZA:  It doesn't matter.  I am instructing my

21          witness not to respond.

22               MR. MACDONALD:  Not to respond as to whether she

23          spoke at all with Eric Garcia?  You're claiming that's a

24          privilege?

25               MS. FAENZA:  Read the record back, Madam court
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 27 of
296
Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

 1    reporter as to the last question asked which I believe

 2    is did you speak with him and I believe that refers to

 3    after she clarified that she did not need interview

 4    Mr. Garcia but she had previously spoken with him before

 5    this deposition.  So there was no discussion for this

 6    deposition.  And then you asked her when was the last time

 7    you spoke.  Let's just go ahead and have the court

 8    reporter state the last question to keep it nice and

 9    neutral.

10          (The court reporter read back.)

11          MS. FAENZA:  And that is going to be a privilege

12    objection considering she has answered the question

13    affirmatively or negatively as to whether she spoke to him

14    to prepare for this deposition.  You then --

15          MR. MACDONALD:  Okay.

16          MS. FAENZA:  -- were asking as counsel when was the

17    last time she spoke to Mr. Garcia.

18          MR. MACDONALD:  Okay.  Asking someone when they last

19    spoke to someone, even an attorney, is not privileged.  I

20    could ask you, for example, when you last spoke with the

21    client.  That is not privileged information.  To object is

22    improper and it's something we're going to take up with

23    the court if you're going to maintain that objection.

24    I'm simply asking when was the last time she spoke with

25    Mr. Garcia.  This should be not be this difficult.  I

 1         mean, really, this is a simple question.  I would just

 2         like to move forward and be respectful of your time.  So

 3         I'm going to restate the question.

 4    BY MR. MACDONALD:

 5         Q    Ms. Gonzalez, when is the last time you spoke with

 6    Mr. Garcia?

 7              MS. FAENZA:  Same objection.  The witness can

 8         determine if she wants to respond.

 9         A    I agree that you're going off on a tangent here.

10    It's not reasonably related to like any sort of discovery for

11    any matters in this case.  But I think that the response it's

12    just so -- it doesn't really matter.  I've spoken to Mr. Garcia

13    probably a couple of weeks ago.  And your next question is

14    probably what was it about and really just nothing in general.

15    Not a lot of substance.  Generalities.

16    BY MR. MACDONALD:

17         Q    Okay.  You don't think your conversation --

18         A    It wasn't about GOAT and it was about WGOAT and it

19    was not about Ms. Alvarez.

20         Q    Okay.  What was it about?

21              MS. FAENZA:  Objection.  Outside the scope.

22         A    I knew that was what you were going to ask.  I spoke

23    to him about -- it was generalities.  I can't even remember the

24    substance of the conversation because it wasn't anything in

25    particular, but I know it wasn't this case, WGOAT, GOAT

```
 1   Hospitality, or Ms. Alvarez.

 2        MS. FAENZA:  I will state the objection that it is

 3     outside the scope of the deposition topics one through 36.

 4        A    It's just me in my personal life, like not here as a

 5   corporate representative.  I just spoke with him as a person.

 6   BY MR. MACDONALD:

 7        Q    Okay.  And do you remember anything about the

 8   generalities that you just referenced about what you spoke

 9   about with Mr. Garcia?

10        MS. FAENZA:  Objection.  Outside the scope of the

11   deposition topics one through 36 and asked and answered.

12        A    Yeah, I provided you that information.  It was

13   generalities.  Nothing specific.  Nothing specific that I can

14   remember.  I've tried to provide you the best information I can

15   so I can be respectful of everyone's time on the call.  Again,

16   that's always been my intent here and how I prepared and how I

17   came today and I know I had something, but I just feel that

18   respect is not being met mutually.

19   BY MR. MACDONALD:

20        Q    And you did not discuss any aspect of this case with

21   Mr. Garcia during that conversation, correct?

22        MS. FAENZA:  Objection.  Asked and answered.

23        A    I just told you like twice.

24   BY MR. MACDONALD:

25        Q    Okay.  I'm just confirming for the record.  I'm
```

```
 1    waiting for your response.

 2              MS. FAENZA:  Objection.

 3         A    The record had been made.  Ms. Fernandez I'm sure is

 4    an amazing stenographer here who has everything -- captured

 5    everything, and we're on Zoom and most stenographers usually

 6    have a back-up.  I'm sure she got everything down for the

 7    record.

 8    BY MR. MACDONALD:

 9         Q    Well, your commentary on the questions and everything

10    is just going to make things go longer.  You're more than

11    welcome to do so, of course, but I'm just simply asking about

12    what you spoke about.  But we'll move along.  How many times

13    have you spoken to him prior to that date?

14              MS. FAENZA:  Objection as to anything privileged.

15         Again, outside the scope of the deposition topics.

16         A    I couldn't tell you how many times.

17    BY MR. MACDONALD:

18         Q    What was the most recent time --

19              MS. FAENZA:  Objection.  Asked and answered.

20              MR. MACDONALD:  Please let me finish my question.

21    BY MR. MACDONALD:

22         A    When was the last time that you spoke with Mr. Garcia

23    prior to the time you just described a moment ago?

24              MS. FAENZA:  Objection.  Object to the witness

25         answering anything that would fall into an attorney-client
```

```
 1        privilege.  To the extent that it does, she is instructed

 2        not to respond.

 3        A    I already told you I don't remember.  I don't have a

 4   log of every particular time that I've ever seen Mr. Garcia and

 5   written it down like in a journal here where I have all of

 6   this.  I don't remember and I've already stated that.

 7   BY MR. MACDONALD:

 8        Q    Did you interview Abelardo Vargas to prepare for

 9   today's deposition?

10             MS. FAENZA:  Objection.

11        A    No, I did not interview him.

12   BY MR. MACDONALD:

13        Q    Did you speak with him?

14             MS. FAENZA:  Objection.

15        A    No, I haven't spoken with him.

16   BY MR. MACDONALD:

17        Q    Ever?

18             MS. FAENZA:  Objection to the extent it calls for

19        attorney-client privilege, instruct the witness not to

20        respond.

21   BY MR. MACDONALD:

22        Q    I'm sorry, I didn't hear your response.

23        A    No.  I have spoken with him in my lifetime.  I didn't

24   interview him as part of my preparation for today's deposition.

25   I think I answered what I did to prepare for today's
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 32 of 296

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    deposition.

 2         Q    Okay.  Thank you for clarifying.  Did you interview

 3    Jose Carvallo regarding -- or in preparation for today's

 4    deposition I should ask?

 5              MS. FAENZA:  Objection.

 6         A    Jose?

 7    BY MR. MACDONALD:

 8         Q    Yes, Jose Carvallo.

 9         A    No.

10         Q    Okay.  Did you speak with anyone at all besides your

11    attorney to prepare for today's deposition that we have not

12    discussed already?

13              MS. FAENZA:  Objection.

14         A    I did speak with my attorney in preparation for

15    today's deposition.

16    BY MR. MACDONALD:

17         Q    My question was:  Did you speak to anyone outside of

18    your attorney and the individual that we already covered today

19    to prepare for today's deposition?

20         A    No.  I reviewed the documents.

21         Q    Is anyone aware that you're having your deposition

22    taken today?

23              MS. FAENZA:  Objection.  Calls for speculation.

24         A    Yes, I do believe a few people are aware of my

25    deposition today.
```

 1    BY MR. MACDONALD:

 2        Q    Who did you inform about your deposition?

 3            MS. FAENZA:  Objection.  Instruct the witness not to

 4        respond as to anything privileged, including any

 5        communications with any attorneys with any other legal

 6        matters which may exist.

 7        A    We already went over this before the start of the

 8    deposition I think before we were on the record so I guess we

 9    can put it on the record.  I do have a meeting today and I

10    needed those individuals to move and to accommodate my

11    deposition so I did tell them I'm in a deposition so that they

12    also knew I was unreachable, right.  So I'm not taking phone

13    calls, I'm not answering text messages so that they would know.

14    So, yes, there are a few people that do know that I'm being

15    deposed.  What case, what matter, topics, none of that was

16    discussed.  It was just so that they knew I'm unavailable

17    because I'm focused here and I'm present with you answering all

18    of your questions to the best of my ability.

19    BY MR. MACDONALD:

20        Q    And did you inform Mr. Gonzalez of your deposition

21    today?

22            MS. FAENZA:  Objection.

23        A    Yes, he's aware so that I can be incredibly focused

24    on you here today.

25    BY MR. MACDONALD:

```
 1        Q    Okay.  Who has an ownership interest in GOAT

 2   Hospitality Group LLC?

 3        A    Derek Gonzalez.

 4        Q    Anyone else?

 5        A    No.

 6        Q    Has anyone else ever had an ownership interest

 7   besides Mr. Gonzalez in GOAT Hospitality Group LLC?

 8        A    No.

 9        Q    And who has an ownership in WGOAT15 LLC?

10        A    Lisa Gonzalez.

11        Q    That's you, correct?

12        A    Yes.

13        Q    And do you own 100 percent of that entity?

14        A    Yes.

15        Q    Have you always owned 100 percent of that entity?

16        A    Yes.

17        Q    Is Mr. Gonzalez in any way involved in the ownership

18   or management of WGOAT15 LLC?

19             MS. FAENZA:  Objection.  Asked and answered.

20        A    No.

21   BY MR. MACDONALD:

22        Q    Has he ever been involved in the ownership or

23   management of WGOAT15 LLC at any time?

24             MS. FAENZA:  Objection.

25        A    No.
```

Deposition of Lisa Gonzalez                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    BY MR. MACDONALD:

 2        Q    Does GOAT Hospitality Group LLC have a designated

 3    manager?

 4        A    GOAT Hospitality -- manager in terms of like because

 5    it's an LLC manager or manager in terms of actual management of

 6    the day-to-day business?

 7        Q    Yeah, to clarify, a manager in terms of the LLC

 8    ownership structure.

 9        A    The only owner so I believe he would be the member

10    and manager if, I believe, without providing a legal opinion

11    there, would be Derek Gonzalez, because he's been the only one.

12    There been no other manager from my knowledge.  He was the only

13    person operating GOAT Hospitality.

14        Q    And, similarly, have there ever been any managers

15    that were hired or utilized in the ownership structure of

16    WGOAT15 LLC?

17        A    No, WGOAT has always been mine.

18        Q    What is the physical address for GOAT Hospitality

19    Group LLC?

20        A    Actually, hold on.  I need to back up, I'm sorry,

21    because I don't want to give you inaccurate information.  I

22    think at one point in time I was listed on Sunbiz for GOAT but

23    I didn't have any ownership or any management on there and that

24    was changed to Derek, because it always should have been Derek

25    and always was Derek.
```

```
 1        Q     What role did you have with GOAT Hospitality Group
 2   LLC at one time?
 3        A     Their attorney.
 4        Q     So when you refer to Sunbiz are you referring to your
 5   reference of you being the attorney for the organization?
 6              MS. FAENZA:  Objection.
 7        A     No, because it's not like that on Sunbiz.  You don't
 8   like fill out whose your attorney on there like you would on a
 9   docket, but I think my name had appeared on there, but I was
10   never the manager for that company.  I never provided any
11   managerial services.  I provided attorney services for GOAT and
12   it's always been fully owned by Derek.
13   BY MR. MACDONALD:
14        Q     Did you have a title listed on those Sunbiz records
15   that you're referring to?
16        A     I think it says manager.  That's the only reason I
17   was asking because I've never managed GOAT.  I've never owned
18   any part of GOAT.  So it's always been him.  But it was on
19   Sunbiz for some reason at one point, but it was amended.  So I
20   think if you were to go back and then -- because I have a
21   feeling I know what you're going to do with all of my answers,
22   so I wanted to be clear here that I think it did appear but
23   that was not an accurate thing and it was amended.
24        Q     And in what year was that that you were listed as a
25   manager?
```

```
1        A    I think it's public information.  I think you can go

2    to Sunbiz.org and see it.

3        Q    Do you know?

4        A    No, I don't know the dates off the top of my head.

5        Q    So you don't know when you were listed as a manager?

6             MS. FAENZA:  Objection.  Asked and answered.

7        A    I just said that.  I don't know the dates.  So I

8    don't know when it was and I don't know when it was changed off

9    the top of my head, but your question had sparked my memory as

10   to that so I wanted to clarify my answer there, though.

11   BY MR. MACDONALD:

12       Q    Who submitted those records to the Florida Division

13   of Corporations?

14             MS. FAENZA:  Objection.  Outside the scope of the

15        deposition topics.

16       A    I'm not sure.  Like I said, your question in asking

17   about the word "manager," because it can have different

18   meanings, had sparked my memory to it so that's why I just

19   wanted to alert you to it and clarify my answer, though, that

20   the actual like LLC manager should have always been Derek

21   because it always was Derek and as well as ownership was always

22   Derek.

23   BY MR. MACDONALD:

24       Q    Have you ever submitted records to the Florida

25   Division of Corporations on behalf of GOAT Hospitality Group
```

```
 1    LLC?

 2            MS. FAENZA:  Objection.  We're going to assert a

 3         privilege.  To the extent any of this involves privileged

 4         communications, she's instructed not to answer.  Anything

 5         nonprivilege, she can.

 6         A    As I said, I did represent them so I think whether or

 7    not what I submitted would fall under that attorney-client

 8    privilege.

 9    BY MR. MACDONALD:

10         Q    Whether you submitted records to the Florida Division

11    of Corporations would be privileged?

12            MS. FAENZA:  We're not going to -- Mr. MacDonald,

13         objection as to privilege.  The witness has responded.

14         A    Like what work you do for your client as an attorney,

15    whether you submit it or not, I realize it's probably

16    innocuous, but I think it's beyond the scope of what you should

17    really ask an attorney, like work you do from them.  And, plus,

18    then secondary, what does that do for you to answer that in

19    this scenario?  Like why do I need to break that privilege to

20    provide that to you here today on behalf of Ms. Alvarez?

21    BY MR. MACDONALD:

22         Q    Would that be a matter of public record if you had

23    submitted those records to the Florida Division of

24    Corporations?

25            MS. FAENZA:  Objection.  Calls for speculation.
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        A    If it is, wonderful, and you can go get it.

 2   BY MR. MACDONALD:

 3        Q    Okay.  So you're not sure?

 4             MS. FAENZA:  Objection.

 5        A    Yeah, I'm not sure.  If it's public record who

 6   submitted it, there you go.  And I, you know, I'm here to

 7   answer your questions on the best of my ability but at the same

 8   time I also don't want to -- I can't put that privilege in a

 9   box.

10   BY MR. MACDONALD:

11        Q    Okay.  Do you know how many years you were listed as

12   a manager for GOAT Hospitality Group LLC for?

13        A    I just said I don't remember how long it was so now

14   you're asking me -- like I said, I don't remember when it

15   started or when it ended so I don't know the duration of it so

16   I couldn't tell you.  And you're now saying it's years.  I

17   don't know.

18        Q    Okay.  I'm asking you the duration but I understand

19   you don't know.

20        A    Yeah, I had said that before I didn't know when it

21   was put on and I couldn't tell you off the top of my head when

22   it was taken off so I don't know the duration.

23        Q    Did you take on any duties as the listed manager for

24   GOAT Hospitality Group LLC?

25             MS. FAENZA:  Objection.
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

1        A    I answered that before.  It was on there as an error

2    and I never did.  So it's obviously on Sunbiz.  Like you can

3    see it there, but it was never accurate as to providing the

4    manager.  I was not the manager.  Derek was always the manager

5    and it was always Derek's company.  And WGOAT was my venture.

6    I've answered that.

7    BY MR. MACDONALD:

8        Q    Does GOAT Hospitality Group have any listed

9    procedures or policies regarding the duties of the manager of

10   the LLC?

11            MS. FAENZA:  Objection.

12       A    Like in an operating agreement?

13   BY MR. MACDONALD:

14       Q    In any document.

15       A    It's Derek's.  So, no, I don't believe there's any

16   particular document that states that.  It's his own company.

17       Q    Okay.  So that's no, correct?

18            MS. FAENZA:  Objection.

19       A    I gave you my answer.  I know you didn't like it so

20   you're going to rephrase it to just a simple no, but I gave you

21   my answer.

22   BY MR. MACDONALD:

23       Q    Okay.  Well, could you repeat your answer then to

24   clarify for me?

25            MS. FAENZA:  I'm going to object.  Have the court

```
 1          reporter read her answer back.

 2     BY MR. MACDONALD:

 3          Q    Well, I'm going to repeat the question.  Is there any

 4     written policies or procedures that dictate the duties of the

 5     manager of the LLC for GOAT Hospitality Group?

 6               MS. FAENZA:  Objection.  Asked and answered.

 7     BY MR. MACDONALD:

 8          Q    I'm waiting for your response, Ms. Gonzalez.

 9               MS. FAENZA:  Could I have the court reporter read the

10          response back first?  If you have a follow-up question --

11          MR. MACDONALD:  We're just delaying things by doing

12          this.  Sure.

13          MS. FAENZA:  Respectfully, it is literally the same

14          question because I'm transcribing as I'm hearing but I

15          can't give mine.  It would be the court reporter.  If

16          there's something unclear, feel free.

17               (The court reporter read back.)

18     BY MR. MACDONALD:

19          Q    Okay.  When you say I don't believe I'm trying to

20     clarify if you're not certain whether there is policies and

21     procedures regarding the manager of the LLC.  Are you certain

22     that there isn't any policies or procedures regarding the

23     manager of the LLC?

24               MS. FAENZA:  Objection.

25          A    That I'm aware of there's no policies and procedures
```

```
 1    for the manager as a manager of the LLC because, no, it's just

 2    Derek's company so it's just his.

 3    BY MR. MACDONALD:

 4         Q     What is the physical address for GOAT Hospitality

 5    Group LLC?

 6         A     At what point in time?

 7         Q     Currently.

 8         A     Currently I would say -- well, it's operating more

 9    remote right now, but like a mailing address --

10         Q     Yeah, the official address.

11         A     3990 Kumquat Avenue, Miami, Florida 33133, as we sit

12    here today.

13         Q     And how long has that address been the primary

14    address for GOAT Hospitality Group LLC?

15              MS. FAENZA:  Objection.

16         A     Well, I can't tell you exactly when.

17    BY MR. MACDONALD:

18         Q     Do you have an approximate amount of time that it's

19    been the primary address for?

20              MS. FAENZA:  Objection.

21         A     I don't.

22    BY MR. MACDONALD:

23         Q     What is the primary address for WGOAT15 LLC?

24         A     WGOAT15?

25              MS. FAENZA:  Objection.
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1         A     Right now it's 3990 Kumquat for a mailing address.

 2    BY MR. MACDONALD:

 3         Q     Is there a corporate telephone phone for GOAT

 4    Hospitality Group LLC?

 5         A     It would be Derek's cell phone.

 6         Q     So there's no separate telephone number dedicated to

 7    the business, correct?

 8               MS. FAENZA:  Objection.

 9         A     No, I don't think GOAT has ever had like a phone

10    system like that, no.  It's always been Derek's cell phone.

11    BY MR. MACDONALD:

12         Q     Okay.  And does WGOAT15 have a telephone number

13    that's designated for the company?

14         A     It would just be my cell phone number.

15         Q     So there's no official company number for that entity

16    either, correct?

17               MS. FAENZA:  Objection.

18         A     That entity closed so right now it's just wrapping

19    everything up.  And, yeah, the way to get ahold of the owner of

20    WGOAT would be to call the owner's cell phone.

21    BY MR. MACDONALD:

22         Q     So that would be a no, there's no separate number,

23    correct?

24               MS. FAENZA:  Objection.

25         A     The number is my cell phone.
```

```
 1    BY MR. MACDONALD:

 2         Q     Are there any other numbers for the business?

 3               MS. FAENZA:  Objection.

 4         A     At this time, no, not at this time.

 5    BY MR. MACDONALD:

 6         Q     Does GOAT Hospitality Group utilize an email service?

 7         A     They do have emails.

 8         Q     Do they utilize a particular service to manage their

 9    email, for example, like Gmail or Outlook?

10         A     I think that's an individual preference.  I don't

11    think that -- the company doesn't mandate whether you use Gmail

12    or Safari or Outlook to check your email.

13         Q     But is the domain for the company managed through a

14    particular provider like Gmail or Outlook?

15               MS. FAENZA:  Objection.

16         A     I don't think those -- to my knowledge those are not

17    like providers.

18    BY MR. MACDONALD:

19         Q     Okay.  Does GOAT Hospitality Group use Gmail?

20         A     Like I said, I think that's just like how you would

21    check it, like which app you're going to use on your phone.  I

22    don't think that's the service.  So I couldn't tell you how

23    GOAT Hospitality employees all like check their email.

24         Q     So it's your testimony that they don't use any

25    particular service, as a company that is?
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 45 of 296

Deposition of Lisa Gonzalez                           Carol Alvarez v. Goat Hospitality Group LLC, et al.

1          MS. FAENZA:  Objection.

2      A    No, not for like you check it, like how you prefer to

3  check your email.  Like whether you use Outlook calendar or

4  iCalendar or Outlook versus Gmail to do that, no.

5  BY MR. MACDONALD:

6      Q    So to clarify my question, I'm not referring to just

7  checking your email.  I'm saying the email posting platform.

8  You know, for example, for a business might use Gmail and

9  employees would use that to log in or access their email

10  accounts.  That's what I'm asking about specifically.

11     A    So to my knowledge Outlook is like what you would use

12  to get to the app.  You don't like have -- well, I mean, you

13  could, I guess, have like a dot Outlook email, but, no, that's

14  not it.  And I feel like Gmail you'd have to like individually

15  make a Gmail, like make individual Gmail accounts for people.

16     Q    What email service does Derek Gonzalez use?

17         MS. FAENZA:  Objection.  Outside the scope of the

18     deposition topics.

19     A    IT is not my area of expertise.  Email service, could

20  you elaborate on that?

21  BY MR. MACDONALD:

22     Q    Yeah.  What platform does he check his email on?

23         MS. FAENZA:  Objection.  Outside the scope -- I'm

24     sorry.  Objection.  Outside of the scope of the deposition

25     topics.

```
 1    BY MR. MACDONALD:

 2         Q    Okay.  So it's your testimony that you don't know

 3    what Gmail service your spouse uses?

 4              MS. FAENZA:  Objection.  Hold on.  Objection.

 5         Outside the scope of the deposition topics.  Ms. Gonzalez

 6         is being deposed as a corporate representative for GOAT

 7         Hospitality Group LLC, WGOAT15 LLC.  She is not here in

 8         her personal capacity to testify as to her husband.

 9              MR. MACDONALD:  Okay.  That's a speaking objection.

10         You can certainly note your objection, outside the scope,

11         but the question stands.

12         A    He uses his iPhone to check his email.

13    BY MR. MACDONALD:

14         Q    Okay.  What application?

15              MS. FAENZA:  Objection.  Outside the scope of

16         deposition topics.

17    BY MR. MACDONALD:

18         Q    What application?

19              MS. FAENZA:  Same objection.

20         A    I think -- mind you, I don't check his email for him

21    and I don't peer over his shoulders, what are you doing, let me

22    read all your emails, especially as a corporate representative

23    doing that.  I believe he uses the little icon that's like blue

24    and it has a little white envelope.  You click that one; your

25    email is there.
```

```
 1    BY MR. MACDONALD:

 2         Q    And you're aware that topic 29 of the topics you're

 3    designated to testify for was knowledge of Defendants'

 4    electronically stored information systems and retention

 5    policies, email, SMS, iMessage, and it goes on to list several

 6    different platforms.  It says relevant data sources and

 7    custodians, preservation steps taken after notice of the loss

 8    and collection methods used for this litigation.  Are you aware

 9    of that?

10         A    Yes.

11              MS. FAENZA:  Objection.

12         A    We discussed that at length, these areas of inquiry,

13    and I did the best I can to prepare what I would reasonably

14    think are all the questions related to that area of inquiry.

15    And how Mr. Gonzalez uses his iPhone and what he uses to check

16    his email I have some knowledge of, but that definitely wasn't

17    one of the things that came to mind, I really should prepare to

18    know which application Mr. Gonzalez uses on his iPhone to check

19    his email.

20    BY MR. MACDONALD:

21         Q    Okay.  So just I understand correctly, because you

22    were designated for that topic, what electronically stored

23    information system is used for employees at GOAT Hospitality

24    Group to access their email?

25         A    So they're provided it's goatgrp.com emails.  How
```

 1   they check those emails is up to them, like whether they use

 2   Outlook or whether you load that into your Gmail.  From my

 3   understanding you can, you can use other like domains and put

 4   them into Gmail if you like that format.  Same thing with

 5   Outlook, it provides a different like format, or if like your

 6   calendar as iCal versus Outlook versus like another platform,

 7   that would be on them that there's no particularly assigned

 8   application.

 9        Q     Where are the emails stored?

10              MS. FAENZA:  Objection.

11        A     In the Cloud.

12   BY MR. MACDONALD:

13        Q     Okay.  What do you mean by in the Cloud?

14        A     I believe they're stored through the email server if

15   they're there.

16        Q     And who hosts that email server?

17        A     For -- we're still talking about GOAT Hospitality,

18   correct?

19        Q     Correct.

20        A     Okay.  GOAT Hospitality uses GoDaddy.

21        Q     And does GoDaddy provide the email service for GOAT

22   Hospitality Group LLC?

23        A     Yes, they provide that domain, the goatgrp.com.

24        Q     I'm asking you specifically about the email.  Does

25   GoDaddy provide the email service for the company?

```
 1        A    Yes, through that domain.

 2        Q    Okay.  And does GoDaddy store all of the email

 3   messages for employees of the company as well then?

 4        A    I believe a certain amount of them are saved on

 5   there.  The exact amount, in terms of that, I'm not sure, but

 6   they're stored on GoDaddy.

 7        Q    And if an employee wants to access those emails on

 8   GoDaddy how do they do that?

 9             MS. FAENZA:  Objection.

10        A    They log in using their email address and their own

11   unique password.

12   BY MR. MACDONALD:

13        Q    But there's a company domain I'm assuming that's

14   assigned to each employee; is that right?

15             MS. FAENZA:  Objection.

16        A    Not a company domain to each.  They're assigned like

17   their unique email address.

18   BY MR. MACDONALD:

19        Q    Okay.  And they share a common domain, I'm guessing,

20   correct?  Like for example, John at the company's name dot com

21   with the domain you mentioned; is that correct?

22             MS. FAENZA:  Objection.

23        A    Yes.

24   BY MR. MACDONALD:

25        Q    And so when an employee wants to log in using those
```

```
 1    credentials that you just mentioned where do they go?
 2              MS. FAENZA:  Objection.  Asked and answered.
 3         A    So that's where they can go wherever they want to go.
 4    That's whatever application they want to use.
 5    BY MR. MACDONALD:
 6         Q    Okay.  So an employee could use any email service in
 7    the world to log in with the credentials from GoDaddy?
 8              MS. FAENZA:  Objection.
 9         A    No, that was not my testimony.  I said any, not any
10    in the world.  I think that's expansive.  I'm sure there's a
11    variety of servers and applications they could use with
12    GoDaddy.  Like, for example, I like Outlook.  I use Outlook.
13    But then I also -- when I'm on my desktop.  But I use the same
14    little icon that Mr. Gonzalez uses on my phone.  I don't like
15    Outlook on my phone.  It's how you view it.  That as the
16    corporate representative for GOAT Hospitality makes no
17    difference for GOAT Hospitality on how the employee is viewing
18    their email, so long as they're getting their email and they're
19    responding to their email, that type.
20    BY MR. MACDONALD:
21         Q    What website would an employee go to if they wanted
22    to check their email on a computer?
23         A    That could go to numerous ones, but, I mean, if you
24    just want -- I think GoDaddy has like webmail.godaddy.com, and
25    if you wanted to type in your email and your password there it
```

Deposition of Lisa Gonzalez                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    would pull it up.  And you could use whatever service you
 2    wanted, whether you're using Safari or Chrome or on Windows,
 3    whatever it may be, whatever your preference is.
 4         Q    So when a new employee is onboarded are they referred
 5    to a specific website to log in with those credentials or are
 6    they told to access any number of platforms?
 7              MS. FAENZA:  Objection.
 8         A    Any platform they want.  So, typically, like you go
 9    into GoDaddy.  You put in someone's first and last name and
10    their email, whatever it may be, and you send it to them.
11    Maybe it's their Gmail or whatever their personal one is.  They
12    get an email, your email has been created.  They click on it
13    and they create their own password and then they can access it
14    however they want.  And that's where they choose, you know,
15    Outlook, Gmail, the application on your phone.
16    BY MR. MACDONALD:
17         Q    Do you have a GOAT Hospitality Group email address?
18         A    I have a goatgrp.com email address, yes.
19         Q    And what is that email address?
20         A    Lisa@goatgrp.com.
21         Q    And how do you access your email?
22         A    I believe I just told you.  I prefer Outlook on my
23    desktop, but I like the other application on my phone.
24         Q    What's the name of the other application you use on
25    your phone?
```

1    A    I don't know or I would use it if I knew the exact

2    term for it.  Is it iMail?

3    Q    You're referring to the --

4    A    Yes, the one I described.  I would have just used the

5    name and not described it if the name came to me sooner.  I

6    think it's iMail.

7    Q    Does GOAT Hospitality Group have any kind of HR

8    database or system?

9    A    GOAT Hospitality, no.  I mean, they would use their

10   payroll provider and if any documents needed to be loaded into

11   anything about a particular person it was loaded into the

12   storage on the payroll provider -- or payroll servicer.

13   Q    Who's the payroll provider?

14   A    I believe it was ADP.

15   Q    You're not sure?

16   A    Hold on.  Let me look at the documents to see if I

17   can answer that unequivocally if it says it on here.  I don't

18   know if there have been numerous ones or just my memory is

19   confusing payroll providers, but I'm pretty certain it was ADP

20   for GOAT.  I was just trying to look through my documents here

21   to confirm, but I'm fairly certain.  But I don't know why I'm

22   second-guessing that answer.  I just want to make sure I'm

23   providing you accurate information, though.  I don't see it on

24   here.  Can we come back to that one?  Whatever the name of it

25   was, like that's how anything for HR would have been stored,

Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1   with that person, drop down on their profile, you store it in
 2   there.
 3        Q    And did GOAT Hospitality Group contract directly with
 4   ADP for those services?
 5             MS. FAENZA:  I did not hear the question.  Could I
 6        hear it back from the court reporter?
 7             MR. MACDONALD:  I can repeat it.
 8   BY MR. MACDONALD:
 9        Q    Did Goat Hospitality Group contract directly with
10   ADP, the payroll provider?
11        A    For their payroll services, yeah.
12        Q    Not for any of the clients of GOAT Hospitality Group?
13        A    No.
14        Q    Has GOAT Hospitality Group ever used WhatsApp,
15   Signal, or Slack or anything similar for company communication
16   between employees?
17        A    Have they specifically advised employees to use those
18   types of communications, is that your question?  Sorry, could
19   you repeat it?
20        Q    Yes.  Has the company generally ever used any of the
21   services I mentioned to communicate with employees, whether
22   officially advised or not?
23        A    Has the company.  I mean, so I know Derek has used
24   text messages and WhatsApp to communicate with the employees of
25   GOAT, but that's not like a company policy to communicate on
```

```
 1    any particular platform.  There was no like preferred platform

 2    or like a preferred chat or something like that.  Like you

 3    might have like a channel on Slack or something, there was not

 4    that.  I think Teams has something too.

 5         Q    And did GOAT Hospitality Group use any type of

 6    accounting system or bookkeeping system?

 7         A    From my understanding GOAT Hospitality was using

 8    QuickBooks.

 9         Q    And who managed that QuickBooks software?

10         A    That was mainly managed by Ana.

11         Q    What was the last name?  Could you repeat it?

12         A    Rangel, R-A-N-G-E-L.

13         Q    Thank you.  Who is Ana?

14         A    She was an accounting manager for GOAT.

15         Q    Does she still work for GOAT Hospitality Group?

16         A    No, not at this time.

17         Q    When did she stop working for GOAT?

18         A    I don't have that date in front of me.

19         Q    Do you know what year she stopped working for GOAT?

20         A    Was it -- not 2026.  I don't know if it was -- I'd be

21    guessing so I'd have to look at the documents.

22         Q    Does GOAT Hospitality Group still use QuickBooks?

23         A    At this time I think they're not using QuickBooks.

24         Q    Are they using a different software?

25         A    Right now, no, there's not a particular accounting of
```

```
 1    software.  There's just not enough volume of anything to use

 2    any software.

 3         Q    When is the last time the company used QuickBooks?

 4         A    Last year potentially.  I think it was last year.

 5         Q    And would that have been Ana accessing that last year

 6    or someone else?

 7         A    Yeah, it would have been Ana.

 8         Q    So then Ana likely worked there at some point last

 9    year I'm guessing?

10              MS. FAENZA:  Objection.

11         A    I mean, I think the software stayed longer than she

12    did.

13    BY MR. MACDONALD:

14         Q    But a moment ago I asked you who was the last to

15    access it and you told me Ana, correct?

16         A    Yeah.  Yeah, but just because she was the last one to

17    access it doesn't mean that the company didn't still have the

18    software for a period of time.

19         Q    Okay.  But you said it was last accessed last year,

20    correct?

21         A    I believe it was last year.  Again, I don't have the

22    exact date.  As it stands today they're not using QuickBooks

23    just because there's not the volume, there's not the same

24    clientele, the same reason there's just not the same level of

25    employees anymore.  It doesn't have the same business flow and
```

```
 1    needs.  You know, it doesn't have the clientele.  So I'm

 2    telling you the best of my knowledge that I believe that that

 3    was last accessed by probably Ana and the time it would have

 4    been last year probably.  So I would assume that Ana had left

 5    GOAT probably last year.  Again, I can't tell you these exact

 6    dates off the top of my head.  I wasn't anticipating like the

 7    specific date, what was the last date of Ana's employment.

 8         Q    Does GOAT Hospitality Group keep employment records?

 9              MS. FAENZA:  Objection.  Asked and answered.

10         A    So they kept employment records through, I'm 90

11    percent sure it's ADP.  So they kept records through there and

12    they would save things for like HR as we discussed and ADP.  So

13    that would have been at ADP.

14    BY MR. MACDONALD:

15         Q    Okay.  So just to clarify, the HR records that you

16    mentioned, you're saying those are also stored in ADP or those

17    are stored separately?

18              MS. FAENZA:  Objection.  Asked and answered.

19         A    Like I said, so if there's any sort of HR form, let's

20    say, this is an example, an HR form where you save it if an

21    ex-employee signs it.  You'd sign it at ADP.  It has storage in

22    there.  You'd save it in there.  There wasn't like a separate

23    like server or something like of that nature.  It was in ADP.

24    BY MR. MACDONALD:

25         Q    Were the records stored anywhere else, like for
```

Deposition of Lisa Gonzalez                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    example, or just generally for use?

 2              MS. FAENZA:  Objection.  Asked and answered.

 3        A    No, if there were like additional records like, for

 4    example, to like search for something if somebody had like

 5    emailed something, okay, I could grab it from an email, but

 6    like I don't have all of the ADP records.

 7    BY MR. MACDONALD:

 8        Q    Who has access to those ADP records?

 9              MS. FAENZA:  Objection.

10        A    ADP.

11    BY MR. MACDONALD:

12        Q    Could those be requested from ADP?

13              MS. FAENZA:  Objection.

14        A    Could you request them, sure.  Will they give them to

15    you, I don't know.

16    BY MR. MACDONALD:

17        Q    Okay.  And did GOAT Hospitality make a diligent

18    search to find employment records from ADP or elsewhere?

19        A    Yes, I believe some of them were turned over in the

20    request for production, what we had.  All floating from ADP is

21    a very like daunting task.  Like they don't make it easy for

22    you to like leave their software.  That's part of probably how

23    they get you, that they're like we're going to help you onboard

24    so easily then all your information is going to be on here, but

25    when you want to leave there's no like download files and like
```

Deposition of Lisa Gonzalez                                   Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    here you go, no.

 2         Q    Okay.  But you said there was a search conducted and

 3    that some records were obtained as part of this litigation,

 4    correct?

 5         A    Yes, and everything that I was able to find was

 6    turned over.

 7         Q    Okay.  Who conducted the search?

 8              MS. FAENZA:  Objection.

 9         A    I know I had searched.

10    BY MR. MACDONALD:

11         Q    Did you search for the ADP records, though,

12    specifically?

13         A    I searched for every document that I could that was

14    responsive to the request for production.

15         Q    I'm asking you specifically if you accessed ADP or

16    contacted ADP to obtain records for this litigation?

17         A    For the litigation, I don't think so.  I think ADP

18    was shut down by then and they won't give you the records.

19    Like if I just called, they wouldn't give them to you.  That's

20    why when you said when you request them.  I don't know, if you

21    were to hit them with a subpoena would they answer, hopefully

22    they would, right, but as just like calling as a corporate

23    representative, they are going to say too bad so sad.

24         Q    Okay.  So then did you contact ADP to obtain the

25    records that you mentioned?
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1            MS. FAENZA:  Objection.  Do not discuss anything
 2        that would be privileged, if there's anything.
 3        A    I produced everything I could.  I know I contacted
 4    ADP to ask them for things and I know I've gotten a response of
 5    like your account is closed, you're closed out.
 6    BY MR. MACDONALD:
 7        Q    That's not responsive to my question so I'm going to
 8    have to object.  Okay.  I'm asking you -- you mentioned that
 9    there were documents obtained or produced in this litigation.
10    So I'm asking you did you contact ADP or use ADP's platform to
11    access or retrieve those documents for this litigation?
12            MS. FAENZA:  I'm going to make an objection.  That
13        was asked and answered.  I would request the court
14        reporter to please read back and I would caution you to
15        please be polite and respectful to the witness.
16    Ms. Fernandez --
17            MR. MACDONALD:  There's no need to read back the
18        question.
19            MS. FAENZA:  I'm asking for the response to be read
20        back because I believe that this has been responded to.
21            MR. MACDONALD:  I'm trying to be respectful of
22        everyone's time, but we can certainly read it back if
23        you'd like.
24            (The court reporter read back.)
25    BY MR. MACDONALD:
```

1    Q    That was not responsive to my question.  I know you

2    contacted ADP but I'm asking you did you contact ADP or use

3    their platforms to retrieve the documents that you mentioned as

4    part of this litigation?

5         MS. FAENZA:  I will respectfully assert the exact

6         same objection.

7    A    So I'm trying to remember back because I feel like

8    it's been a while since and whether it was for this litigation

9    potentially, for the EEOC charge that was before the

10   litigation.  I know I have requested and done a diligent search

11   for those and I'm trying to remember, I know I've looked and

12   I've contacted ADP, and like I said they won't give you the

13   records, but, and I know I'm under oath here so I'm trying to

14   answer very truthfully whether when I contacted them it was for

15   the EEOC charge, whether it was for the litigation.  I can't

16   exactly remember the specific purpose for contacting them, but

17   I know I have.  And when your account is closed, it's closed.

18   So, you know, I'm answering to the best of my ability there,

19   like what was the purpose I called them for.  I wish I had an

20   exact answer.  It would be much easier to give you an exact

21   answer to say, yes, this was the intent of why I was calling

22   them, but I know I have and I know it's been closed out.

23   BY MR. MACDONALD:

24   Q    Okay.  So your answer was a bit unclear, from my

25   perspective at least.  Did you at any point contact ADP or use

```
 1   their platforms to retrieve documents as part of this

 2   litigation?

 3            MS. FAENZA:  I'm going to instruct the witness not

 4        to answer.  Asked and answered.  Respectfully at this

 5   point    it's harassing.

 6            MR. MACDONALD:  Okay.  You can't instruct her not to

 7        answer on that basis.  I need to know the answer to that

 8        question.  We can certify it to the judge if you want.  I

 9        can guarantee you that this is a very basic question.

10   BY MR. MACDONALD:

11        Q    I'm simply asking -- if you don't know, that's okay.

12   If you don't know or you don't remember, that's fine.

13        A    You're not listening to me, that's the problem.

14   You're not hearing my response.  Like I'm giving you probably

15   too much information.  Like I don't know why you're not

16   processing it, but, in short, I don't know.  And I know you

17   want to take that sound bite, but that's not the entirety of my

18   answer.  It was I know I have contacted ADP.  I know for

19   certain I have.  I know I've asked them for records.  When you

20   contact them, regardless of what my purpose was for that phone

21   call and emailing or however I contacted them, I'm telling you

22   I don't remember at the time, but I know I've called them and I

23   know I have requested the records and I know they have told me

24   no.  So whether -- I can't say.  Your question was very

25   specific as to whether it was this litigation.  I don't
```

Deposition of Lisa Gonzalez                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    remember if it was for litigation or if it was for the EEOC
 2    charge.  And I just told you I wish I actually had a better
 3    memory because I could give you a much better clearer answer,
 4    but I am under oath here and I don't particularly remember.
 5    And you don't like that response so you're going to ask me
 6    again and then add some caveat about being respectful of
 7    people's time.  That's not accurate.
 8         Q    Okay.  You understand you had a duty to be aware of
 9    that information today, correct?
10              MS. FAENZA:  Objection.  Asked and answered.
11         A    I have a duty to prepare for today, check that box
12    just fine.  I read your areas of inquiry.  I've given you the
13    best information I can and I know I'm under oath.  So when you
14    ask that specific question, I know I've contacted ADP.  I know
15    I have.
16    BY MR. MACDONALD:
17         Q    But you don't know if it's part of this litigation,
18    correct?
19              MS. FAENZA:  Objection.  Asked and answered multiple
20         times.
21    BY MR. MACDONALD:
22         Q    Go ahead.
23         A    Oh, my God.  I've contacted them numerous times and
24    I've requested information and I know the response is no.
25         Q    Okay.  What did you do to prepare for today's
```

 1   deposition in regards to retrieval of information and documents

 2   and the information related to the diligent search that was

 3   conducted?  How did you prepare to testify on that topic?

 4          MS. FAENZA:  Objection.  Asked and answered.

 5      Instruct the witness not to respond as to any privileged

 6      communications between herself and her attorney.

 7      A    So I told you earlier how I prepared for this

 8   deposition.  What are you saying -- like I don't understand

 9   your question in terms of like document retrieval.  Was there

10   like -- I told you what I reviewed.  I told you how I prepared.

11   What document search was I supposed to do prior to today's

12   deposition?  I'm not understanding your question.  Like which

13   document search are you saying I didn't do?

14   BY MR. MACDONALD:

15      Q    So I'm just asking you what you did to prepare, for

16   example, to answer questions about let's say retrieving

17   documents from ADP that you testified you don't know.  What did

18   you do to prepare for that testimony?

19          MS. FAENZA:  Objection.  Asked and answered.

20      A    I did the best I could to prepare for the areas of

21   inquiry here.  I obviously don't -- you didn't give me like a

22   list of questions you're going to ask of me, right.  So I

23   reasonably interpreted questions from these areas of inquiry.

24   That specific questions, I'm sorry, I couldn't give you like an

25   exact -- I don't even think I could because I know I've called

Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    ADP, but I couldn't give you more information on that.  So
 2    there you go.  Maybe you could subpoena ADP.  Maybe it will be
 3    better.  Maybe they will respond to you.
 4    BY MR. MACDONALD:
 5        Q    When did you last contact ADP?
 6        A    I just said I don't remember because I feel like then
 7    I could at least narrow it down.  Probably it was during
 8    litigation, okay, I could say, yeah, I contacted them.  If it
 9    was prior maybe I contacted them just for the EEOC charge to
10    pull everything, but I can't remember one way or the other.
11    Like I'm giving you the best information I can.  I know I have
12    contacted them.  I also like drilling this is definitely -- I
13    don't see how that further advances you in any way, shape, or
14    form.
15    BY MR. MACDONALD:
16        Q    And do you recall if it was via phone or email?
17        A    I know I've called them.
18        Q    Do you know if you called them in regards to this
19    specific request regarding retrieving documents?
20            MS. FAENZA:  Objection.  Asked and answered multiple
21        times.
22        A    I would like to get off this answer wheel.  I've
23    already answered this numerous times.
24    BY MR. MACDONALD:
25        Q    My question was:  Do you recall if it was via phone
```

```
 1    or email specifically when you reached out about retrieving the

 2    documents like you mentioned?

 3           MS. FAENZA:  Objection.  Asked and answered.

 4        Response was I know I have called them.  We need to have

 5          the court reporter to repeat the answer.

 6           MR. MACDONALD:  She has called them.

 7    BY MR. MACDONALD:

 8        Q    And I'm asking did you call them or email them

 9    specifically when you reached out about the documents?  Simple

10    question.

11           MS. FAENZA:  Asked and answered.

12    BY MR. MACDONALD:

13        Q    Okay.  I'm waiting for your response, Mr. Gonzalez.

14        A    I don't know that you're listening to me.  Is the

15    connection okay?

16        Q    I'm waiting for your response, Ms. Gonzalez.

17        A    I'm giving you responses and I feel like you don't

18    like my responses so then you're like honing in on something

19    else, but like I am answering these questions and I'm giving

20    you as much information as I can.  When you don't like that I

21    give you information, you're like shortening it, is that a yes,

22    is that a no, is that an I don't know.  But I am truly sitting

23    here trying to give you the best information.  I wish I could

24    answer this question with like a very simple answer and we can

25    get over this and move on to the next one.  I gave you as much
```

            

```
 1    information as I can.  I know I have contacted ADP.
 2         Q    Okay.  If you don't know that's a perfectly
 3    acceptable response, but I did not get a response to my
 4    question which was:  When you reached out to request these
 5    document at some point, regardless of the date, do you know if
 6    it was via phone or email?
 7              MS. FAENZA:  Objection.
 8         A    I know I've called them.  And, again, I said I
 9    called.  I said that.
10    BY MR. MACDONALD:
11         Q    Okay.  So you know for a fact that you've called them
12    when you reached out to request these documents?
13         A    You're really not listening and this is really not
14    fair.  This is just rude and harassment at this point.  If I
15    was sitting at the other end of the table -- like I don't know
16    how you're sitting there with a straight face saying, oh, you
17    called, do you know who you called.  This is not an
18    interrogation.
19         Q    None of that answers my question.  I'm waiting for a
20    response.
21         A    I want to take a break.  You're being very rude to
22    me.  I would like to take a break right now.  I need to use the
23    restroom anyway.  And maybe you can cool off and maybe think
24    about these specific questions and interpret what I've
25    answered.  I know you don't like my answers right now.  Maybe
```

```
 1    the court reporter can give you some of those back.  I would
 2    like to take a break.
 3        Q    Okay.  Well, I'll ask you the question one more time
 4    and we can take a break right after.  You did not respond to my
 5    question.  I'll just object.  It was nonresponsive.  Okay.  I'm
 6    just asking you, I understand you called ADP at some point, I
 7    understand that's part of your testimony.  I'm asking you when
 8    you reached out regarding documents to retrieve them was that
 9    specific conversation or interaction conducted via phone or
10    email or you don't know?
11        A    No, I'm not answering this again.  You need to go
12    back and read it three, four, five times.  The stenographer is
13    tired of writing it down.  I said I called.
14        Q    Is everything okay?  Do you want to take a break?
15        A    I would like to take a break.  I already said that.
16    Again, you're asking me things that I've already said.  I told
17    you I would like to take a break.  I told you I have to use the
18    restroom.  You're just asking me things again and again and
19    again and again.
20             MR. MACDONALD:  Okay.  Let's take a break then.
21             THE WITNESS:  Thank you so much.  I really appreciate
22        it.
23             (A recess was taken.)
24             MR. MACDONALD:  Back on the record.
25    BY MR. MACDONALD:
```

```
 1        Q    Okay.  Going back to the question I asked you before

 2   the break.  At any point did you reach out to ADP or use ADP's

 3   portals or services to specifically retrieve documents for this

 4   case?

 5             MS. FAENZA:  Objection.

 6        A    We've already gone over this.  I answered everything

 7   before we went on break.  I told you I even had to use the

 8   restroom.  Then you still asked the question.  I answered your

 9   question before we went on the break.

10   BY MR. MACDONALD:

11        Q    Ms. Gonzalez, the court reporter is taking down every

12   word and the record will show that you have really not answered

13   that question whether you made a specific request for documents

14   from ADP.  I'm not asking you about whether you've spoken to

15   ADP in the past, which you did tell me you spoke to them on the

16   phone.  I'm asking you did you contact ADP to request documents

17   or use their services to request documents for this case?

18             MS. FAENZA:  Objection.  Asked and answered.

19        A    I have sufficiently answered your question to the

20   best of my ability and the court reporter I'm sure has

21   everything down.

22   BY MR. MACDONALD:

23        Q    And what is your belief that she has down in regards

24   to your answer?

25             MS. FAENZA:  Objection.
```

```
 1        A    Everything I said.

 2   BY MR. MACDONALD:

 3        Q    Okay.  So you're here as the corporate representative

 4   and as an attorney and you're going to decline to answer that

 5   question whether --

 6        A    I am not declining to answer any of your questions.

 7   I have answered them is the difference.  Your questions have

 8   been answered.

 9        Q    Okay.

10             MS. FAENZA:  And I'm going to make an -- hold on.

11        Hold on.  I'm going to make an objection as to the

12        reference as to whether Ms. Gonzalez is an attorney

13        respectfully.  I am going to make my objection.  If it

14        continues to happen I will state something more.  I will

15        ask respectfully, Mr. MacDonald, that we read back the

16        answer.  If you have any follow-up questions, you're a

17        hundred percent entitled to ask any follow-up questions.

18   BY MR. MACDONALD:

19        Q    Okay.  Here, let me phrase it this way.  You said

20   you've spoken to ADP on the phone before, correct?

21             MS. FAENZA:  Objection.  Asked and answered.

22        A    I've answered that.

23   BY MR. MACDONALD:

24        Q    Okay.  And what did you answer?

25             MS. FAENZA:  Objection.  Asked and answered.
```

Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        A    We can ask Ms. Fernandez to read it back.

 2   BY MR. MACDONALD:

 3        Q    We're not going to ask Ms. Fernandez to read it back.

 4   I've asked you several times.  I'm going to have to object

 5   because it's a nonresponsive answer.  I'm asking you, you have

 6   stated in your testimony that you have spoken to ADP in the

 7   past on the phone but you are refusing to answer whether you

 8   have contacted them specifically to retrieve documents.  You

 9   have not answered that question.  If you have, then please

10   point me to the record because there is nowhere in there that

11   says a response to that question.  Okay.  I'm going to ask you

12   again, Ms. Gonzalez.  Can you please answer that question for

13   me.  Yes, no, or I don't know.  Have you ever spoken to ADP to

14   get documents as part of this litigation?

15        MS. FAENZA:  Objection.  Please pause.  And, again,

16        Mr. MacDonald, you're raising your voice.  I am putting

17        that down on the record.  Do not yell at my witness.

18        MR. MACDONALD:  I didn't raise my voice.  That is

19        false.  That is blatantly false.

20        MS. FAENZA:  Please do not interrupt me.

21        MR. MACDONALD:  Tara, that's not true.

22        MS. FAENZA:  Please do not refer -- okay.  That's

23        fine to have your perspective and you can simply wait

24        until I'm done speaking and state your record as I did for

25        you.  Please don't refer to me by first name.  There needs
```

 1     to be a level of formality in these proceedings.  It

 2     doesn't exist here.  And I will point to the record, sir.

 3     I will point to the record.  And I will point also that I

 4     have instructed my witness not to respond to anything that

 5     would trigger a privilege objection.

 6           There was a question, did you contact ADP for this

 7     litigation.

 8           Answer:  I'm trying to remember back on whether it

 9     was for this litigation or the EEOC charge before the

10     litigation.  I know I have requested and done a diligent

11     search and they won't give you the records.  I am

12     answering whether it was for the EEOC.  I am unsure as to

13     whether it was for the EEOC charge or the litigation.  I

14     can't exactly remember the reason why, but when your

15     account is closed, it is closed.  Okay?

16           MR. MACDONALD:  That's a clear answer.

17           MS. FAENZA:  And it was answered quite some time ago.

18     And it says, your answer, sir, was a bit unclear.  Hold

19     on a second because I'm referring to the record and I'm

20     not as good as Ms. Fernandez but I can type.  Okay?

21     Explain this question.  And the response was:  You're not

22     listening to me and you're not hearing my response.  I

23     don't know why you are not processing.  You want to take

24     that sound bite and that's not the entirety of my answer.

25     I know I have asked for the records, regardless of what my

Deposition of Lisa Gonzalez                      Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        purpose was.  I don't remember at the time and I know I
 2        requested the records and I know they said no.  I'm under
 3        oath and I don't remember.
 4             MR. MACDONALD:  We'll move on.  Since you're refusing
 5        to give me a clear response, I'm just going to note for
 6        the record.
 7             MS. FAENZA:  Respectfully --
 8             MR. MACDONALD:  Can I please finish?  You're
 9        interrupting me.  Please let me finish.  I just want to
10        state my statement that that was not responsive.  You're
11        here as the corporate representative so I'm noting for the
12        record we will have to bring this to the court's
13        attention.  You're more than welcome to speak.
14             MS. FAENZA:  So, respectfully, just to be clear,
15        Mr. MacDonald, you addressed me personally and you asked
16        me to say where in the record was that said.  I'm simply
17        responding because you asked.  I found it and the record
18        reflects that you said on the record that answer was clear
19        and then I went on to the very next question you gave
20        which said that was unclear.  So you literally just
21        acknowledged, Mr. MacDonald, that Ms. Gonzalez's response
22        was clear and responsive.
23             MR. MACDONALD:  You're making arguments and you
24        shouldn't be.  Okay?  I understand what you're saying.
25        Let's move on.
```

```
 1            MS. FAENZA:  I don't need you, sir, to tell me what I
 2       should or shouldn't do.  You asked.
 3            MR. MACDONALD:  The court will.
 4            MS. FAENZA:  I provided the information.  The court
 5       reporter's record will stand.  Again, should you have a
 6       follow-up --
 7            MR. MACDONALD:  Okay.
 8            MS. FAENZA:  Hold on, sir.  Stop interrupting me.
 9       Should you have a follow-up -- I'm trying to help.  Okay?
10       If you have a follow-up, hearing the answer back sometimes
11       lets you know I want this specific portion of your answer
12       sharpened.  But some of the questions are literally the
13       exact same question.  So that's part of the reason we read
14       back the answer because it may be you want something
15       specific and you're absolutely entitled to follow up on an
16       answer and say when you said this I'm asking what you mean
17       by that.  Okay?  If that's what you'd like to do you're
18       more than welcome to do it, but I will put on the record
19       there has been no refusal to respond until the question
20       was answered multiple times with clarity.  Should you
21       disagree, that's your business, but I'm offering you the
22       opportunity now listen to any answer from the court
23       reporter and follow up with something different.
24            MR. MACDONALD:  All right.  Like I said, we'll move
25       on.  I noted my objection for the record.
```

```
 1    BY MR. MACDONALD:

 2         Q     Did you contact any companies like QuickBooks to

 3    obtain documents as part of this litigation?

 4         A     Documents from QuickBooks.  Oh, my God.  You're going

 5    to -- we're going to go through this again.  Sorry, it just

 6    disappeared from my screen.  I thought I got disconnected.  I

 7    was like, no, I was in the middle of that.  It's not like I was

 8    leaving.  It just minimized.  I'm so sorry.

 9         I know I have gone to QuickBooks and, like I said, it's

10    closed too.  The purpose, and this is where I want it to be

11    very clear, whether I went for this litigation, I can't say for

12    certainty.

13         Q     And you understand that as part of your duty to

14    prepare for this deposition you had an obligation to be able to

15    answer that question as to whether you contacted these

16    companies to retrieve that information?

17              MS. FAENZA:  Objection.  Asked and answered.

18         A     I disagree with you there.  I had a responsibility to

19    be prepared for these areas of inquiry here today.  I had a --

20    well, because I was a corporate rep and I signed off on the

21    interrogatories and I did provide some requests for production

22    as a corporate rep.  I had a duty to provide those, right.

23    Those are my duties.  I know I have gone to QuickBooks.  I know

24    the QuickBooks checked out.  We already said that before.

25    We've gone through that matter before, because there's no
```

1   volume there so the software is not there.  And I couldn't tell

2   you even when the QuickBooks was shut down.  That was before.

3   So I wish I could say the exact purpose and the exact last day

4   of everything, but I couldn't tell you.  So I did the best of

5   my ability to prepare for these areas of inquiry and I don't

6   recall seeing like QuickBooks specifically on your areas of

7   inquiry.  I've got it up in front of me.  I don't see

8   QuickBooks in here.

9   BY MR. MACDONALD:

10       Q    I'm going to share Exhibit 1 with you here.

11       A    I know 34 says accounting systems, what accounting

12   systems or methods were used.  I accurately provided you what

13   accounting systems were used.  When was the last time I

14   accessed it and for what purpose I accessed it, I'm sorry, I

15   can't tell you that exact answer.  And I do wish I could tell

16   you exactly because I don't enjoy this harassment from you so I

17   hate to say that I don't --

18       Q    Okay.  This not harassment.  You are here today as

19   the corporate representative so I have to respond to that.  No

20   one is harassing you.  You are simply here to answer

21   questions -- hold on.  Hold on.  Let me finish, please.  You

22   are here today to answer questions as the corporate

23   representative.  There is no harassment taking place.  And, in

24   fact, this case involves factual allegations of harassment.  So

25   I do not think that that's a terminology that you can use in

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1   this case.  Okay?  I'd like to get through my questions and
 2   that will expedite things here regardless of your responses.
 3        MS. FAENZA:  I'm going to make an objection.  You are
 4        not to respond and argue with the witness.  If the witness
 5        gives an answer, she gives an answer.  You may choose
 6        to argue, if you wish, sir, -- do not interrupt me,
 7        Mr. MacDonald.  Do not argue with my client.  Do not
 8        threaten her as a member of the Bar.  Stop smiling.  Stop
 9        yelling.
10        MR. MACDONALD:  No one is threatening her.
11        MS. FAENZA:  This is not okay.  And if she says
12        something -- do not shush me.  That is beyond
13        disrespectful.
14        MR. MACDONALD:  No one shushed you.
15        MS. FAENZA:  Beyond disrespectful.  Okay.  So as to
16        the question, let's move on to whatever question you have.
17        Whatever the witness says you are not to engage in
18        arguing with her.
19        MR. MACDONALD:  I can certainly state for the record
20        and I will when a witness says that she is being harassed
21        because I'm asking questions, I will essentially respond
22        to that.  Okay?  I wish I didn't have to, but I'm
23        certainly going to respond.  I have a right and an
24        obligation to respond to allegations like that.  So I'm
25        going to continue with my questions.
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1              MS. FAENZA:  And you are in fact --
 2              MR. MACDONALD:  And we can respectfully disagree.
 3              MS. FAENZA:  Sir, you are arguing with the witness.
 4              MR. MACDONALD:  I was accused of harassment.  I was
 5      clarifying for the record that I am not, in fact,
 6      harassing the corporate representative of the Defendants
 7      in this case.
 8              MS. FAENZA:  And, sir, respectfully, the corporate
 9      representative feels she is being harassed when she's
10      being asked the same question again and again, when she's
11      being yelled at, when she is being asked the same
12      question --
13              MR. MACDONALD:  Yelled at?
14              MS. FAENZA:  Sir, I'm speaking.  You don't even allow
15      me --
16              MR. MACDONALD:  Wow.
17              MS. FAENZA:  -- to speak.  And you interrupted with a
18      wow while I'm speaking.  I feel bad for the court
19      reporter.  Let's just get through this.  That's what she
20      said.  If you do not feel you are harassing her, well,
21      then that's your opinion, but let's end this arguing with
22      the witness.
23              MR. MACDONALD:  No one is arguing with anyone.  Okay?
24      I was noting for the record --
25              MS. FAENZA:  And respectfully, sir, --
```

```
 1              MR. MACDONALD: I'm speaking.  I'm speaking.  You just
 2         interrupted me.
 3              MS. FAENZA:  Hold on.  Hold on.
 4              MR. MACDONALD:  You just interrupted me.  You just
 5         interrupted me.
 6              MS. FAENZA:  Sir.
 7              MR. MACDONALD:  Interrupt me again.
 8              MS. FAENZA:  Sir, not only did you argue with her but
 9         you told her that this is a case that involves harassment
10         with your client.  That is arguing.  Okay?  She's already
11         had to take a break once before.  You've asked, well, when
12         did you answer this before.  I come back.  We read the
13         record.  The court reporter has read the record.  Let us
14         move forward.
15              MR. MACDONALD:  Again, I'm going to state for the
16         record just like she did, she's certainly welcome to note
17         her beliefs of harassment.  I'm going to respond to that.
18         I'm entitled to.  That's all I'm simply saying.  Okay?
19         I'm entitled.  I also must note that you just said
20         yelling.  No one has yelled at anyone in this deposition.
21         Okay?  Neither you nor me.  So I want to clarify that as
22         well.  If you think to the contrary, we can explore that,
23         but, again, that has not happened.  I would like to
24         continue with questioning.  I was just simply noting for
25         the record I have not harassed anyone.
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 79 of 296

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1              MS. FAENZA:  And, Mr. MacDonald, I do believe there
 2         was yelling.  Ms. Gonzalez did state that.  If you don't,
 3         agree, you don't agree.  That's it.
 4              MR. MACDONALD:  When was there yelling?
 5              MS. FAENZA:  I mean, I guess because you think this
 6         is a fee shifting case that it's appropriate to waste time
 7         and engage vexatiously.  Back when I put on the record
 8         you're yelling at my witness, please stop, and at that
 9         time you said there was no yelling.
10              MR. MACDONALD:  I've never yelled at the witness.
11              MS. FAENZA:  And then we were done.  Ms. Gonzalez did
12         say, yes, you were yelling.  We move on and then you bring
13         it up again.  This is not an opportunity to argue with my
14         client.
15              MR. MACDONALD:  You're the one arguing.  I'm the
16         questioner, not you.  You're the one arguing.
17              MS. FAENZA:  Do not speak to me in that manner.  Do
18         not speak to me in that manner.
19              MR. MACDONALD:  Okay.  Let's move on.
20    BY MR. MACDONALD:
21         Q    So going back to my question.  Have you accessed
22    QuickBooks for this litigation specifically at any point?
23              MS. FAENZA:  Objection.
24         A    It's the worst case of deja vu.  I told you GOAT
25    Hospitality used QuickBooks.  QuickBooks had been closed.  We
```

```
 1   already established that.  The date, I'm sorry, I don't recall
 2   the exact date that it was closed.  Then I told you I have
 3   accessed it before, but, I'm sorry, I didn't know which exact
 4   date was the last date I went to the QuickBooks and I don't
 5   remember the exact intent or purpose of when I went to it.  So
 6   I'm giving you all the information that is available to me
 7   right now to be able to answer your question.  So that's what
 8   I'm giving you.  And in terms of the areas of inquiry, because
 9   I am here as a corporate rep, it says what accounting systems.
10   I am providing you with what the system was at one point in
11   time but it doesn't exist today.  So I don't know that -- well,
12   I didn't reasonably expect to say when was the last time you
13   accessed it and for what purpose.  So that's what I can tell
14   you about that.
15   BY MR. MACDONALD:
16       Q    And looking at topic number 29, do you see that one
17   there?
18            MS. FAENZA:  Objection.  Asked and answered.
19   BY MR. MACDONALD:
20       Q    Do you see topic number 29?
21            MS. FAENZA:  Objection.
22       A    I see topic number 29 on the screen.
23   BY MR. MACDONALD:
24       Q    Okay.  Did you believe that that encompassed
25   information regarding your efforts to retrieve financial
```

1    records as you understood that topic?

2            MS. FAENZA:  Objection.

3        A    I did not understand number 29 for like financial

4    topics, no.  It says electronically stored information systems,

5    retention policies.  And then it has examples, I'm assuming, in

6    parenthesis here.  That's the way I interpreted it.  Examples

7    being like which says email, SMS/iMessage, WhatsApp/Signal,

8    Slack/Teams, HR databases and payroll systems.  So that's not

9    financial records to me.  I saw or predicted more financial

10   questions would come under 34 when I was preparing, which says

11   accounting systems.  It says your knowledge of Defendants'

12   representations that they possess no financial records or

13   corporate documents and what systems were used.  I'm telling

14   you what systems were used.  I'm telling you that they've since

15   been closed.  So I expected that under 34.

16   BY MR. MACDONALD:

17       Q    Does anyone have access to the QuickBooks system

18   currently?

19       A    It's closed.

20           MS. FAENZA:  Objection.

21   BY MR. MACDONALD:

22       Q    Could it be accessed if you or someone else requested

23   it?

24           MS. FAENZA:  Objection.  Calls for speculation.

25       A    Not that I'm aware of.

```
 1    BY MR. MACDONALD:

 2         Q    And when you contacted QuickBooks you don't recall

 3    the manner in which you contacted them; is that correct?

 4              MS. FAENZA:  Objection.

 5         A    The last time I accessed the QuickBooks, no, I don't

 6    recall.

 7    BY MR. MACDONALD:

 8         Q    Who is responsible for conducting the document

 9    searches as part of this litigation?

10              MS. FAENZA:  Objection.

11         A    I'm sorry, you cut out.

12    BY MR. MACDONALD:

13         Q    Who is responsible for handling the document searches

14    as part of this litigation?

15         A    For the corporate representative, I'm here as the

16    corporate representative and I was in charge of that for this

17    purpose.

18         Q    Okay.  So in preparing, for example, responses to

19    Plaintiff's discovery requests you were responsible for

20    searching for documents?

21              MS. FAENZA:  Objection.  Asked and answered.

22         A    Yes.  I signed the interrogatory responses.  You see

23    my name on there.

24    BY MR. MACDONALD:

25         Q    What exactly did you do to search for financial
```

   

```
 1   records as part of the responses to Plaintiff's discovery

 2   request?

 3           MS. FAENZA: Objection.  And instruct the witness not

 4       to respond to anything that is privileged.

 5       A    So the QuickBooks was closed.  Like I said, I

 6   explained to you before, the business slowed for GOAT and it

 7   was closed.  For bank statements, the bank account was also

 8   closed because there was no financial activity.  It's been

 9   stagnant for a while.  For WGOAT, I mean, that business came to

10   a screeching halt.  And the same thing with that.  So the

11   QuickBooks closed.  The bank account was closed because it also

12   kept going negative on the WGOAT one.  So WGOAT bank account is

13   closed so I don't have those financial records to be able to

14   search for them, get them.  They are not in my possession.

15   BY MR. MACDONALD:

16       Q    Did you make any efforts to search for the documents

17   besides what you just mentioned?

18       A    So I was able to pull some because I did do a

19   diligent search of like what I had, right.  So if there was

20   something there, I was able to produce it.  For example, I

21   searched my, technically, my personal Dropbox.  I searched my

22   personal Dropbox, did I have anything that would at least be

23   responsive for anything, and was able to produce what I had or

24   searching through email, if there was a document that was

25   attached or something like that.  So I was able to provide some
```

```
 1   documentation, but I don't necessarily have all of those

 2   because, like I said, the accounts were closed.

 3       Q    I understand that you weren't able to find some

 4   documents, but I'm asking specifically about what efforts you

 5   took besides the ones that you just previously told me about.

 6   Were there any others?

 7            MS. FAENZA:  Objection.

 8       A    Those are the ones that I recall.  I just explained

 9   to you how I did it, what I did.

10   BY MR. MACDONALD:

11       Q    And which documents did you obtain specifically from

12   your personal Dropbox?

13            MS. FAENZA:  Objection.

14       A    I don't recall as we sit here today which ones

15   potentially like came from my personal Dropbox.  I didn't like

16   keep a record of that.

17   BY MR. MACDONALD:

18       Q    Do you still have access to that account?

19       A    My Dropbox?  My personal Dropbox?

20       Q    Do you still have access to your personal Dropbox?

21            MS. FAENZA:  Objection.  Outside the scope.

22       A    I do as Lisa Gonzalez have access to my personal

23   Dropbox.

24   BY MR. MACDONALD:

25       Q    In advance of this deposition could you have checked
```

```
 1    to see which documents came from your personal Dropbox?
 2              MS. FAENZA:  Objection.  Outside the scope.
 3        A    I don't know because I would have to have known what
 4    was in my Dropbox at that time versus like something else I
 5    would have saved.  Maybe there would be a way, but I don't
 6    know.
 7    BY MR. MACDONALD:
 8        Q    Did you normally store company documents in your
 9    personal Dropbox?
10              MS. FAENZA:  Objection.
11        A    So my Dropbox is linked to my computer.  So somehow
12    it was like I save it to my desktop.  My Dropbox backs up.  So
13    if I were to spill something on my computer here today and I
14    only had it stored on my computer, you know, I wouldn't have
15    anything.  So it backs up some of those.  Do I know exactly how
16    it backs up, what it backs up, I believe it backs up the
17    desktop, but beyond that, I don't know.
18              MS. FAENZA:  Hold on.  I do need just a basic
19         objection as it relates to anything privileged.  The
20         witnesses is instructed not to respond.  Anything else you
21         can that doesn't fall within that.
22    BY MR. MACDONALD:
23        Q    So you're not sure what documents came from your
24    personal Dropbox if I understand you correctly?
25              MS. FAENZA:  Objection.
```

1          A    I gave my answer.

2     BY MR. MACDONALD:

3          Q    I'm clarifying.

4               MS. FAENZA:  Objection.

5          A    I know.  I feel like you just want me to like

6     rephrase it because you don't like the way I phrased my answer

7     so you keep doing this to me.  You're like, so, and then you

8     like simplify my answer.  And while I wish some of these had

9     like a very short yes or no response, trust me, I would give it

10    to you.  They just like don't.  And I'm trying to give you as

11    much information as I can to answer the questions you're asking

12    me.  And some of them just don't have that like yes or no.  I

13    might know part of the answer but not part of the other and I

14    feel like you don't like those responses so then you just wrap

15    them up in a nice tidy bow, but that's not the response.  And I

16    am trying to give you as much as I can.

17    BY MR. MACDONALD:

18         Q    Okay.  But your commentary on these questions is just

19    going to prolong things.  I want to make you aware of that.

20    I'll rephrase my question, okay, because you requested a yes or

21    no.  Are you aware of what documents that were produced in this

22    litigation came from your personal Dropbox, yes or no?

23              MS. FAENZA:  Objection.  Asked and answered.  And I

24         will instruct the witness as to anything privileged you're

25         not to respond.  And you are free to respond as you wish.

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 87 of
296
Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1              MR. MACDONALD:  Tara, I have to request --

 2      Ms. Faenza, I apologize.  I have to request that you stop

 3      with the long-winded instruction.  I think Ms. Gonzalez is

 4      aware of how privilege works.  You can certainly object

 5      on privilege grounds, but it's difficult for me to

 6      continue my line of questions so I'm just respectfully

 7      asking if you can try to --

 8              MS. FAENZA:  Okay.  I would like the court reporter

 9      to read back the question that begins with:  Which

10      document did you specifically obtain from your personal

11      Dropbox because I do have a response that reads:  I

12      don't recall which ones specifically came from my personal

13      Dropbox.  I didn't keep a record of that.  Could the court

14      reporter please read that back.

15              MR. MACDONALD:  What does that have to do with -- I'm

16      saying the privilege objections that you're making that

17      are very long-winded.  I'm just asking you to maybe

18      shorten those to just objecting on the grounds of

19      privilege like you're supposed to.  That all I'm asking.

20      Okay?  That has nothing to do with the question.

21              MS. FAENZA:  I would ask the court reporter to read

22      it back.  I also object as to asked and answered.  Read it

23      back.  It's like the fourth time the question has been

24      asked.

25              MR. MACDONALD:  Again, this has nothing to do with
```

```
 1        the question.  I was asking you personally something, but
 2        it's fine.
 3             MS. FAENZA:  If we can please have the court reporter
 4        read it back.  If you have a follow-up question to that
 5        then I have no issue with you asking a follow-up.
 6             MR. MACDONALD:  Sure.  Let's read it.
 7             (The court reporter read back.)
 8   BY MR. MACDONALD:
 9        Q    So I'm going to continue with my questioning.  This
10   is just taking too much time.  So do you have a company Dropbox
11   account related to GOAT Hospitality Group or WGOAT15 LLC?
12             MS. FAENZA:  Objection.
13        A    No.
14   BY MR. MACDONALD:
15        Q    As a matter of practice did you routinely store
16   company documents on your personal Dropbox?
17             MS. FAENZA:  Objection.
18        A    I would as counsel like if I stored something like
19   for GOAT.
20   BY MR. MACDONALD:
21        Q    What kinds of thing would you store for GOAT?
22             MS. FAENZA:  Objection.  Instruct the witness not to
23        answer.  The witness has just identified that she only
24        stored those documents in the course of her work as
25        counsel.  Anything not privileged, you can answer.
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 89 of
296
Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    BY MR. MACDONALD:

 2         Q    I'm asking broadly about the categories, just to

 3    clarify, not anything specific or identifiable.

 4              MS. FAENZA:  Okay.  And, again, I will reassert the

 5         privilege.

 6         A    I didn't have like a routine procedure, like, okay,

 7    let me go and get X statement or Y this.  Like I didn't have a

 8    routine procedure there so I couldn't say routinely certain

 9    things.

10    BY MR. MACDONALD:

11         Q    Now, previously I believe you mentioned that the bank

12    account for GOAT Hospitality Group is closed; is that correct?

13              MS. FAENZA:  Objection.

14         A    Yes.

15    BY MR. MACDONALD:

16         Q    Okay.  What bank was that bank account with?

17         A    Bank of America.

18         Q    Whose name was that account in as a signer

19    specifically?

20         A    The signer on the account is what you're asking,

21    because the account was GOAT Hospitality's account.  Like it

22    was a company account.  But the only signer on the account was

23    Derek Gonzalez.

24         Q    And when was that account closed?

25              MS. FAENZA:  Objection.
```

```
 1        A    I don't know.

 2   BY MR. MACDONALD:

 3        Q    When is the last time you were aware of the account

 4   being active?

 5             MS. FAENZA:  Objection.

 6        A    I would know it was closed the last time it was

 7   active, so I don't know.

 8   BY MR. MACDONALD:

 9        Q    Well, how do you know that there's a bank account

10   that exist at Bank of America?

11             MS. FAENZA:  Objection.

12        A    I know as the corporate representative GOAT did have

13   a bank account and had a bank account at Bank of America and

14   know I Derek was the signer because Derek is the signer.

15   BY MR. MACDONALD:

16        Q    And did anyone try to request financial records from

17   Bank of America as part of this litigation?

18             MS. FAENZA:  Objection.

19        A    With what we could, yes, and it wasn't available

20   because the account is closed.

21   BY MR. MACDONALD:

22        Q    You were told by Bank of America that there was no

23   records they could give you because the account was closed?

24             MS. FAENZA:  Objection.  Misstates testimony.

25        A    No, but you don't have access to anymore.  They took
```

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    away the access to it.
 2    BY MR. MACDONALD:
 3         Q    Okay.  Did Bank of America state that you could not
 4    access those records just because your account was closed?
 5         A    When you log in online that's what it says.
 6         Q    Okay.
 7         A    It's not there.
 8         Q    Okay.  But did anyone contact the bank at any point
 9    to try to verify that information?
10         A    You would have to ask Derek that.  He's the signer on
11    that account.
12         Q    You're here as the corporate representative so I must
13    ask you, actually, and it's designated as part of these topics.
14    I can point it out if you'd like.  So I have to ask you again.
15    If you don't know, that's okay, but I need to know.  Did you or
16    anyone else verify that those records could not be accessed
17    simply because the account was closed?
18         A    I did not call Bank of America for the records.
19         Q    Are you aware of anyone else contacting Bank of
20    America for those records?
21         A    You would have to ask Derek.
22         Q    So you're not sure?
23         MS. FAENZA:  Objection.
24         A    Bank of America is not going to answer a corporate
25    representative.  Like they don't acknowledge that.
```

```
 1    BY MR. MACDONALD:

 2         Q    Okay.  So you're not sure?

 3              MS. FAENZA:  Objection.

 4         A    The signer on the account would have to be the one to

 5    request those.

 6    BY MR. MACDONALD:

 7         Q    That wasn't my question.  Did anyone else try to

 8    contact Bank of America to get those records?  If you don't

 9    know you can say as such.

10              MS. FAENZA:  Objection.

11         A    Okay.  I don't know.

12    BY MR. MACDONALD:

13         Q    Okay.  And you mentioned the online portal where

14    those records could be accessed.  How do you know that they

15    couldn't be accessed?

16              MS. FAENZA:  Objection.

17    BY MR. MACDONALD:

18         Q    Or phrased differently --

19         A    When you log into the online portal.

20         Q    And did you try doing that?

21         A    For GOAT I have and it's not there.

22         Q    And you tried as part of this litigation, I'm

23    guessing?

24              MS. FAENZA:  Objection.

25         A    I'm going to go -- the same thing I've gone back to
```

```
 1   it.  Could I tell you the exact intent of the exact last time I
 2   went whether it was for this litigation or for a different
 3   purpose, I'm unsure, but all roads still lead to it's closed,
 4   you can't access it.
 5   BY MR. MACDONALD:
 6        Q    Are you aware that you can access financial
 7   statements from a closed bank account?
 8             MS. FAENZA:  Objection.
 9        A    If Bank of America turns off the portal and turns off
10   the access, then I don't have it.  If you can, wonderful, but
11   not that I'm aware of.
12   BY MR. MACDONALD:
13        Q    And you didn't contact them to try that?
14             MS. FAENZA:  Objection.  Asked and answered.
15        A    I told you I did not.
16   BY MR. MACDONALD:
17        Q    Do you believe that contacting the bank if you could
18   not access them on the portal was part of a diligent search?
19             MS. FAENZA:  Objection.
20        A    Like I said, I tried to do everything I can.
21   BY MR. MACDONALD:
22        Q    But do you believe that was part of a diligent
23   search?
24             MS. FAENZA:  Objection.
25        A    I believe I did a diligent search of everything I
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    could provide and provided it.

 2    BY MR. MACDONALD:

 3         Q    Are there any other financial systems that GOAT

 4    Hospitality Group uses besides the ones we discussed already,

 5    for example, a POS system or any other kind of monetary

 6    software for the business?

 7              MS. FAENZA:  Objection.

 8         A    No.  GOAT doesn't use a POS because they're not a

 9    restaurant.

10    BY MR. MACDONALD:

11         Q    And what does GOAT Hospitality Group do in terms of

12    its services?

13              MS. FAENZA:  Objection.

14         A    I would best describe it as a consulting company.

15    They provide like oversight and management services for the

16    hospitality sector.

17    BY MR. MACDONALD:

18         Q    You said oversight and management?

19         A    Generally.

20         Q    Does that include payroll services?

21         A    So they would take that information and help input it

22    into like a payroll service or a payroll provider, like an ADP,

23    Paychex, Paylocity, like those types of software programs.  So

24    they would help as the intermediary take the information from

25    those and make sure that they're inputted into there and like
```

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    if an employee was onboarded onto that because there's a whole

 2    lot of steps for things like that.

 3         Q    So they would assist in onboarding a client's

 4    employee into a third-party payroll provider; is that fair to

 5    say?

 6              MS. FAENZA:  Objection.

 7         A    You keep doing this.  You keep rephrasing.  Yes, you

 8    could say that they assisted and they kind of bridged that gap

 9    so that they would help there because some of the employees

10    aren't able to access it the same way.  Not everybody sitting

11    in front of a computer doing that, something like that.  So how

12    to access it, how to go in there, like to help the employee to

13    be able to do that, like sit down with them.  So that was like

14    part of what they did for their payroll providing services.

15    BY MR. MACDONALD:

16         Q    Did they handle any other onboarding aspects let's

17    say for a new employee of a client?

18              MS. FAENZA:  Objection.

19         A    Through like whatever ADP required.  Okay.  So like

20    you need to click here, you need to input here to help them

21    with stuff like that so that way all the employees could be

22    properly onboarded into those.  So that way when you went to go

23    run payroll you had all your employees there, you had all your

24    socials there.  If you needed an I-9, that was in there, stuff

25    like that.
```

```
 1    BY MR. MACDONALD:

 2        Q    Did that include going over like policies and

 3    procedures for these clients with new employees?

 4             MS. FAENZA:  Objection.

 5        A    The policies and procedures was in there, but they

 6    weren't necessarily teaching the employees the policies and

 7    procedures of the restaurant.  So they would show you, this is

 8    how you onboard, this is where your address is, okay, here's

 9    where the documents are.  If you needed up to upload documents,

10    they would help check that.  So like, for example, like I-9

11    verifications, I can't think of what the exact documents are

12    off the top of my head like which ones you need to show.  Okay,

13    here's my driver's license or passport or my social security,

14    all those types of things.  Okay, what are they.  Verify them,

15    take pictures of them.  Like those types of things, but not

16    like your day-to-day duties or your job schedule, stuff like

17    that.  That was the manager of the restaurant or bar, whatever

18    it may be, of the client of GOAT.  Those are the people that

19    would handle that.

20    BY MR. MACDONALD:

21        Q    And who from GOAT Hospitality Group was responsible

22    for the steps you just described?

23        A    Which steps?  I described a lot of steps.

24        Q    So, for example, the training or payroll onboarding

25    that you mentioned in terms of entering information for the new
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 97 of
296
Deposition of Lisa Gonzalez                                Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    employee.

 2              MS. FAENZA:  Objection.

 3        A    So a lot of times that would be Eric who would help

 4    because that's more of like an HR thing.  So Eric would assist,

 5    okay, a person, hey, I need you to log on, I need you to go in

 6    here, here's where you click.  Sometimes it wasn't the easiest

 7    of things to navigate.  So here, click here, click here.  Okay.

 8    Now you need to click on these three steps to upload your

 9    social and now you need to enter it over here on this page

10    physically.  So different stuff like that that would be -- Eric

11    would help lot of the employees, make sure that they were

12    onboarded.  And a lot of them, too, are doing it on their

13    phones and making sure that it was matching.

14              MR. MACDONALD:  Let's go ahead and go off the record

15        for a moment.

16              (A recess was taken.)

17    BY MR. MACDONALD:

18        Q    So before we took a break I think I was asking about

19    some of the services that GOAT Hospitality Group provides and

20    you had mentioned oversight and management, I believe, payroll

21    as well if I remember correctly.

22        A    Yes, payroll assistance.

23        Q    Does GOAT Hospitality Group provide marketing

24    services to its clients?

25              MS. FAENZA:  Objection.
```

```
 1          A    Yes.

 2    BY MR. MACDONALD:

 3          Q    Go ahead.

 4          A    Yes.

 5          Q    Okay.  What kind of marketing services does it

 6    provide?

 7          A    Social media I know is one of the big marketing

 8    things that they provide.  Assistance with advertising as well.

 9          Q    Does GOAT Hospitality Group provide any culinary

10    services?

11               MS. FAENZA:  Objection.

12          A    No.

13    BY MR. MACDONALD:

14          Q    None at all?

15               MS. FAENZA:  Objection.

16          A    No.

17    BY MR. MACDONALD:

18          Q    Have they ever provided it to clients in the past?

19               MS. FAENZA:  Objection.

20          A    No, I don't believe that they ever provided culinary,

21    specifically, like cooking, anything like that, no.

22    BY MR. MACDONALD:

23          Q    Do they provide any kind of operational support to

24    its clients?

25               MS. FAENZA:  Objection.
```

1        A      Yeah, you can say that.

2    BY MR. MACDONALD:

3        Q      What kind of operations do they provide?

4        A      Generally assistance like with business management.

5        Q      What specifically with business management?

6        A      For example, like you could say assistance with

7    forecasting.

8        Q      So financial forecasting I'm guessing you're

9    referring to, right?

10           MS. FAENZA:   Objection.

11       A      I think a component is financial, but I think also a

12   component also could potentially be operations, too, and

13   ordering and this and that.  You know, like there's a component

14   to kind of predicting the future of your business.

15   BY MR. MACDONALD:

16       Q      And does that include things like inventory, for

17   example?

18       A      Yeah, but I would say GOAT didn't do like inventory

19   management, though, or anything like that.  It was more like

20   maybe seasonality of things like on a higher level.

21       Q      And when you say seasonality are you referring to the

22   forecasting or something else?

23       A      It does relate to the forecasting.  So, for example,

24   Miami, summer is slow so what are you going to do.  You need to

25   start tapering down potentially before summer.  Okay, hey, as

```
 1    we head into the holidays we should taper up.  We should

 2    also -- these are examples, stuff like that.  Like what do you

 3    do with your menu, you know, things are getting tight.

 4    Forecasting, okay, let's cut some of the low sellers off the

 5    menu.  Like helping to provide assistance like that, maybe like

 6    from like a bird's-eye view, rather than when you're in the

 7    trenches and in the kitchen worried about smaller details.

 8         Q    Does GOAT Hospitality Group provide human resources

 9    services to its clients?

10         A    Yes, those are provided by Eric Garcia.

11         Q    What human resources services were provided

12    specifically?

13         A    So they're general human resources and it's a third

14    party so if anybody from any of the clients had, you know, any

15    complaints, anything like that, they could go to Eric and they

16    could go to him for that as a neutral third party.  Managers

17    would do stuff like scheduling for that type of like human

18    resources, but like general human resources were dealt with

19    with Eric.

20         Q    Did that include medical leave or other forms of

21    leave?

22         A    If needed that would have fallen under him.  If they

23    need -- if an employee needed leave or needed things like off,

24    they would immediately go to their manager, though, and then I

25    think if it would be above that, then, yeah, it would go to
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    Eric if it was a particular -- something specialized like that,
 2    like you said, a medical leave.
 3         Q    Okay.  And did that include any training related to,
 4    let's say, policies or procedures for employees?
 5         A    So each of the clients of GOAT have their own
 6    handbooks, right, because they run differently.  So GOAT would
 7    do training like in general but not to like all of the staff.
 8         Q    What kind of training would GOAT handle?
 9         A    So, for example, Eric is going to make sure that the
10    managers, like, hey, I'm going to train you to make sure you
11    guys know for payroll we need all of these things done, make
12    sure you're doing that.  We need -- when you onboard somebody I
13    need you to make sure you're hiring people and they have
14    appropriate paperwork and stuff like that.  Not telling you who
15    to hire, but make sure they bring X, Y, Z paperwork with them
16    so that they can be fully onboarded, make sure we have X, Y, Z
17    information so that they can appropriately clock in and clock
18    out, stuff like that, training like that, but other things
19    would be in like the company handbook.
20         Q    Did GOAT ever handle complaints of discrimination or
21    harassment for its clients?
22         A    If there were complaints and those went to GOAT,
23    yeah.
24         Q    What do you mean if they went to GOAT?
25         A    So I know Ms. Alvarez had an issue.  Those went to
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 102 of 296

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

 1    GOAT.

 2         Q    Are there multiple avenues for an employee to go?

 3         A    Go to GOAT?  If it's HR related, no.  It's going to

 4    go directly to GOAT.  Maybe if it was like a payroll or like,

 5    hey, I think my hours are wrong, they could go to Eric or maybe

 6    sometimes they would even go to Ana.  Ana was the accounting

 7    manager so sometimes they might notify either Ana or Eric, but

 8    Eric was the one like inputting that, stuff like that.

 9         Q    Was that the case for all of GOAT's clients?

10         A    Yeah, you could say that because that's like a

11    generality between those two employees for GOAT.

12         Q    Does that include requests for accommodations?

13              MS. FAENZA:  Objection.

14         A    If there were requests for accommodations those would

15    have been direct towards Eric.

16    BY MR. MACDONALD:

17         Q    And that would be the case for all of GOAT's clients?

18              MS. FAENZA:  Objection.

19         A    Yeah.

20    BY MR. MACDONALD:

21         Q    And I know you mentioned there was different policies

22    for the various clients.  Did GOAT Hospitality Group assist

23    with drafting those policies or those were separate?

24         A    I can't recall if they were drafted entirely

25    separately or not.

1      Q    Was that offered as a service generally for GOAT,

2  like assisting with writing policies, for example?

3      A    I mean, GOAT has a database, right, and so do all

4  like the payroll companies and stuff that like, so if you

5  needed something there was a database of stuff.  Those

6  generally came from like ADP and stuff like that so that you

7  stayed up-to-date with stuff.  So it wasn't like GOAT developed

8  these policies, but they would help you to, hey, get that from

9  the payroll company who maybe flagged, hey, something changed,

10  minimum wage changed, like to make sure that that was being

11  communicated.

12      Q    I'm going to show you a document.

13           MS. FAENZA:  I'm sorry, I didn't hear the question.

14           MR. MACDONALD:  I'm going to how her a document.

15           MS. FAENZA:  Okay.  Which document are you sharing?

16           MR. MACDONALD:  It's from the Defendants' production.

17           MS. FAENZA:  What is it?

18           MR. MACDONALD:  It's titled Employee Handbook.

19           MS. FAENZA:  Okay.

20  BY MR. MACDONALD:

21      Q    Can you see my screen?

22      A    I can see it.

23      Q    Awesome.  Okay.  So it's about 18 pages.  I'm happy

24  to scroll if you would like, but I'm going to ask you specific

25  questions about the handbook but I can scroll through as needed

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    too.

 2         A    Okay.

 3         Q    You can tell me if you want me to stop.

 4         A    Well, I mean, I'm not going to like just re-read the

 5    whole thing right now.  Is that what you're asking me to do?

 6         Q    No.  No.  I'm just trying to show it to you so you

 7    know which document I'm showing you.

 8         A    Okay.  I see it.  I see it's the handbook.  I see

 9    what version, the version for this company.

10         Q    Do you recognize the document I'm showing you?

11         A    Yes, that's the employee handbook.

12         Q    And what is this the employee handbook for or who?

13         A    So it says Mia, but that is for ADDiKT, WGOAT15.

14    There was going -- it was intended that we would remodel and

15    rename it Mia, but that never happened.

16              MR. MACDONALD:  And, for the record, we'll mark this

17         as Plaintiff's Exhibit 2, and it's Defendants' Bates label

18         41 through 58.

19              (Whereupon, Plaintiff's Exhibit 2 was marked for

20         identification.)

21    BY MR. MACDONALD:

22         Q    What is M-I-A?  Is that what you said?

23         A    Mia?

24         Q    Yeah, Mia.  What is Mia?

25         A    So Mia is ADDiKT.  That's the restaurant.  We were
```

Deposition of Lisa Gonzalez                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
1    going to rebrand it and open it as Mia, but that never

2    happened.  It always operated as ADDiKT.

3        Q    Okay.  So is there a separate restaurant that ever

4    existed called Mia?

5        A    No.

6        Q    And this Mia handbook was the one distributed to

7    employees of ADDiKT, the restaurant?

8        A    Yes.

9        Q    Okay.  So is it accurate to say this was the handbook

10   for WGOAT15 LLC?

11       A    Yes.

12       Q    And who drafted this handbook?

13           MS. FAENZA:  Objection.  Instruct the witness not to

14       respond to anything privileged, otherwise, you may

15       respond.

16       A    So I know a lot of the information did come from like

17   ADP because they provide all that as part of their services,

18   and then it was put together for Mia.  I can't remember

19   Exactly -- well, Mia, ADDiKT, who put it together, right,

20   because a lot of the things are going to be consistent from

21   like what ADP gives you as like an example, right.  Okay, here

22   is the Americans with Disabilities Act.  So they give you

23   language for that, for handbooks, but then like what is

24   something that would be specific to us there was in the

25   beginning the seven eye, right.  So you kind of can piece those
```

Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    together or from like what ADP gives you.

 2    BY MR. MACDONALD:

 3         Q    And that's how this handbook was developed?

 4         A    Yes.

 5         Q    Did you assist with this handbook or no?

 6              MS. FAENZA:  Objection.  Privilege.

 7         A    I believe I did because that's how I know it was

 8    developed, taking parts of this like from ADP's examples

 9    language, which, you know, are supposed to -- you know, they're

10    held out to you as they comply with everything so you need to

11    include these things.  These are the things you need to abide

12    by, and then distributed to staff.  But then, of course,

13    like -- and there's like other like smaller examples which are

14    more fine-tuned to like your operations.

15    BY MR. MACDONALD:

16         Q    And these policies that begin on Defendants' Bates

17    label 45 and go through 47 to 48, are these policies the

18    discrimination and harassment policies for WGOAT15 LLC?

19              MS. FAENZA:  Objection.

20         A    Yes, the ones that are in the handbook.

21    BY MR. MACDONALD:

22         Q    And these were in effect when Carol Alvarez worked at

23    the company?

24         A    Yes.  I think this example in the handbook is the one

25    signed by Carol.
```

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        Q    In this handbook are there any policies regarding the
 2   Pregnant Workers Fairness Act?
 3             MS. FAENZA:  Objection to the extent it calls for a
 4        legal opinion.
 5        A    I don't have it memorized so I'll scroll through it
 6   again.  I don't see from my cursory review a specific section
 7   regarding the Pregnant -- you said the Pregnant Workers Act,
 8   I'm sorry?
 9   BY MR. MACDONALD:
10        Q    The Pregnant Workers Fairness Act.  Do you see any or
11   are you aware of any policies specific to pregnancy?
12        A    Yeah, ADDiKT would accommodate employees who were
13   pregnant.
14        Q    But is there any specific pregnancy-related policies
15   in the handbook?
16        A    I said I didn't see anything related to the pregnancy
17   act.  I don't see a pregnancy section.
18        Q    Are there any other policies that are not in this
19   handbook related to pregnancy that existed at the time of
20   Ms. Alvarez's --
21        A    I mean, as it specifically related to pregnancy.  So,
22   I mean, if she needed time off she would just need to talk to
23   her manager.  If she needed an accommodation all she had to do
24   was ask for it.  But I don't think that's necessarily -- like
25   those things aren't necessarily specific to pregnancy.  That
```

Deposition of Lisa Gonzalez                                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

1   would be for any worker, right.  Like, for example, somebody, I

2   don't know, hurt their back jumping on a trampoline over the

3   weekend.  When they come to work they're like, I'm so sorry,

4   like I really strained my back could I have X accommodation, I

5   imagine it would be the same like if you needed something as a

6   pregnant person.

7        Q    And was that memorialized anywhere?

8        A    I think that's under in the policy like to ask for

9   anything.  For example, here it just said notify -- if you get

10  ill or hurt notify your supervisor immediately, I guess, if

11  you're running late or anything like that.  If your pregnancy

12  requires you to have additional appointments that would fall

13  under there.

14       Q    But there's no specific references to pregnancy in

15  these sections, right?  You were referring to the general

16  disability or I guess for attendance policies in this handbook,

17  correct?

18            MS. FAENZA:  Objection.

19       A    I am.  There's not a specific like pregnant worker

20  section in here.

21  BY MR. MACDONALD:

22       Q    Did GOAT Hospitality Group or WGOAT15 offer any

23  training related to pregnancy or pregnancy-related

24  accommodations?

25       A    Not that I'm aware of.  Like specific pregnancy

```
 1   training, no.

 2        Q     And that's for both Defendants?

 3        A     Yes.

 4        Q     Was there any training offered for either Defendant

 5   or the employees of either Defendant regarding the handling of

 6   pregnancy-related complaints or discrimination complaints?

 7             MS. FAENZA:  Objection.

 8        A     I believe there's a policy for discrimination in the

 9   handbook so that would have been reviewed.  So there's like it

10   says discrimination is prohibited.

11   BY MR. MACDONALD:

12        Q     And were employees of GOAT Hospitality Group or

13   WGOAT15 given training regarding the policy and how it's

14   implemented?

15             MS. FAENZA:  Objection.

16        A     So from my understanding Eric had the training and

17   had the credentials to do that.

18   BY MR. MACDONALD:

19        Q     And do you know if he did, in fact, give any training

20   regarding these policies?

21        A     He had reviewed the handbook with employees at times

22   and I know he's done it for different clients where he's like,

23   hey, these are the procedures, just to make everybody aware of

24   them.  And he's done like group ones before.  He's done

25   individual ones before to like go over these policies.
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

1      Q     And when Mr. Garcia conducted those were those one

2   circumstances or was he doing that on a regular basis for

3   example when an employee is onboarded?

4      A     So he does go over them when an employee is

5   onboarded.  He like shows them this is the handbook, things

6   like that.  He shows them where everything is, where they can

7   find any information.  You know, if they need to contact them

8   he provides them with that as he does like the HR onboarding.

9   And then the manager doing like, this is your clock in, this is

10  your, you know, the specific duties, more or less.  Like this

11  is your clock in, this is your number, this is the POS system

12  you clock in, like those onsite ones.  But like the

13  generalities of the handbook, that would have been Eric.

14     Q     And was Eric required to give the training in regards

15  to the handbook section on discrimination or harassment?

16        MS. FAENZA:  Objection.

17     A     He wasn't necessarily required.  Like he did and he

18  would go over to make sure that the employees knew the policies

19  and procedures, stuff like that.  Like, for example, here like

20  the smoking, like there's a lot of staff that smoke.  One, it's

21  not good for your health, that's our advice, but it doesn't

22  matter, if you want to smoke just don't do it in front of the

23  door.  Don't do it here.  Like you have to smoke in designated

24  areas.  Like all those general policies he would go over, but I

25  don't think they're like -- there wasn't like a checklist for

```
 1   him to say you are a hundred percent required to tell every

 2   single one this, but he would go over it with them.  If they

 3   had any questions he was always there.

 4   BY MR. MACDONALD:

 5       Q    And under these policies in the handbook to whom is

 6   an employee's first report as to discrimination or harassment

 7   if they were to experience it?

 8       A    I believe it says it.  Okay.  So for sexual

 9   harassment, for example, under that policy it says every

10   employee is encouraged to raise any question or concern with

11   his or her immediate supervisor, designated manager, or human

12   resources.  So under like discrimination, if you believe an

13   employment issue has been made that does not conform to our

14   commitment you should promptly bring the matter up to the

15   attention of your immediate supervisor or human resources.

16       Q    And in this case human resources would be

17   Mr. Garcia?

18       A    Yes.

19       Q    And in the case of Ms. Alvarez, who would her

20   immediate supervisor be?

21           MS. FAENZA:  Objection.

22       A    Like as a line cook or report it to the chef in the

23   kitchen.

24   BY MR. MACDONALD:

25       Q    And do you know who the chef was at the time when
```

1  Ms. Alvarez worked for either of the Defendants?

2       A    So during the time period that she was there I

3  believe she was there with Max and with Tito Abelardo, I should

4  say.  I shouldn't be so casual, I'm sorry.  Maximillian and

5  Abelardo.

6       Q    And earlier I asked you about the services that GOAT

7  Hospitality Group provides.  How would you describe the line of

8  business that WGOAT15 LLC in services they provide?

9       A    WGOAT15 was a restaurant.

10      Q    I'll stop sharing my screen.  And were the other

11 clients of GOAT Hospitality Group at the time WGOAT15 was a

12 client were they all restaurants as well?

13           MS. FAENZA:  Objection.

14      A    No.

15 BY MR. MACDONALD:

16      Q    So let's say at the time that WGOAT15 was a client of

17 GOAT Hospitality Group who were the other clients that GOAT

18 Hospitality Group had?

19           MS. FAENZA:  Objection.

20      A    There was a bar.  There was a fast casual restaurant.

21 There was another one that did have food, a fast casual

22 restaurant and it kind of had a lot more night life to it.

23 BY MR. MACDONALD:

24      Q    What were the names of those?

25           MS. FAENZA:  Objection.

Deposition of Lisa Gonzalez                        Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        A    So you're going to have Nathan's, Pilo's Street

 2   Tacos, Pilo's Tequila Garden.

 3    BY MR. MACDONALD:

 4        Q    Any others?

 5        A    I believe that's all.

 6        Q    And you said Nathan's I believe is the first one; is

 7   that right?

 8        A    Uh-huh.  Yes.

 9        Q    And what is Nathan's?

10        A    Nathan's operated as a bar.

11        Q    And then you said Pilo's Tacos and Pilo's Tequila

12   Garden; is that right?

13        A    Correct.

14        Q    Are you aware of any other clients besides those

15   three?

16             MS. FAENZA:  Objection.  Asked and answered.

17        A    That's all I can think of.

18   BY MR. MACDONALD:

19        Q    And did GOAT Hospitality Group provide the same

20   services that we just went over a moment ago to Nathan, Pilo's

21   Tacos, and Pilo's Tequila Garden?

22             MS. FAENZA:  Objection.

23        A    Yes, for the most part.

24   BY MR. MACDONALD:

25        Q    How did that differ if at all?
```

```
 1              MS. FAENZA:  Objection.

 2        A     Well, like you said, for marketing.  Marketing on all

 3   of those across the board are going to vary differently on what

 4   their needs are.  You know, budgeting for each of them are all

 5   very different.  So there's different needs there.  And, you

 6   know, because they have different business plans so they have

 7   different needs.  But I would say in general, yes.  Like, okay,

 8   did all of them need like HR support.  Yeah, some more than

 9   others.  And sometimes, you know, it ebbed and flowed.  But,

10   like, obviously it also depended on the number of employees and

11   stuff too.  And like payroll, yes, inputting all of that, it

12   was across the board inputting so that each company had their

13   payroll processed.

14   BY MR. MACDONALD:

15        Q     Did GOAT Hospitality Group offer any culinary

16   services for any of these entities that we went over?

17              MS. FAENZA:  Objection.  Asked and answered.

18        A     Yeah, you asked me.  They didn't provide culinary

19   services.

20   BY MR. MACDONALD:

21        Q     Did GOAT Hospitality Group offer any of these

22   businesses, Nathan's, Pilo's Tacos or Pilo's Tequila Garden?

23        A     All three of them, no.

24        Q     I'm going to share a document.

25              MS. FAENZA:  What document are you showing?
```

```
 1                    MR. MACDONALD:  Give me one second.

 2                    MS. FAENZA:  Can you tell me what you're showing

 3          first?

 4                    MR. MACDONALD:  This specifically is the physician

 5          statement.

 6                    MS. FAENZA:  The what?

 7                    MR. MACDONALD:  Physician statement.

 8                    MS. FAENZA:  Okay.

 9     BY MR. MACDONALD:

10          Q    Do you see my screen what I'm sharing with you?

11          A    Yes.

12          Q    Do you want a moment to look through the document?

13     And I can scroll.

14          A    I read it.

15          Q    Okay.  Do you recognize this document?

16          A    Yes, it's a letter from Wanda Fisher.

17          Q    Would you agree that this is the physician statement

18     provided by WGOAT15 LLC and GOAT Hospitality Group LLC to the

19     equal employment opportunity --

20                    MS. FAENZA:  Objection.

21          A    Yes, I believe that's what it's called.

22     BY MR. MACDONALD:

23          Q    You would agree this was provided by those two

24     entities, correct?

25                    MS. FAENZA:  Objection.
```

```
 1        A     Uh-huh.

 2   BY MR. MACDONALD:

 3        Q     I want to draw your attention, for the record this is

 4   Exhibit 3.

 5              (Whereupon, Plaintiff's Exhibit 3 was marked for

 6         identification.)

 7   BY MR. MACDONALD:

 8        Q     I want to draw your attention to the second page,

 9   second paragraph here.  I'll give you a moment to read that.

10        A     The second paragraph on this page?

11        Q     That's correct.

12        A     You want me to read it out loud?

13        Q     No, just let me know when you've read it.

14        A     Okay.

15        Q     And do you see in that second paragraph where it says

16   that GOAT is a restaurant providing advertising, marketing,

17   culinary, operational, human resources slash payroll, and other

18   services to the restaurant?  Do you see that?

19        A     Yes, uh-huh.

20        Q     So does GOAT Hospitality Group provide culinary

21   services?

22        A     It provides consulting services in regards to

23   culinary.  It doesn't actually like provide culinary services.

24   Like it's not cooking.  You asked me do they provide culinary

25   services.  They're not cooking.  They're not making you a meal,
```

 1    but they're providing you oversight on that, the same for

 2    direction in terms of that because you're overseeing places

 3    that do provide culinary services.  The same thing with like

 4    advertising.  They're not actually doing necessarily like the

 5    advertising for you but they're providing you with like, hey,

 6    this restaurant we think these are your target audience here,

 7    how do we advertise for them.  Okay, your target audience is

 8    best fit through Instagram.  Okay, we should run ads on

 9    Instagram.  Like that's providing you consulting for

10    advertising but they're not actually doing the advertising.  At

11    the end of the day Instagram is doing the advertising.  Or if

12    you were to put a billboard up on the side of a bus.  Like

13    they're saying, hey, this would be a good spend here on your

14    advertising to do it this way.  So to like oversee your

15    culinary, but they're not actually providing any culinary

16    services.

17         For the bar, for example, for a while we provided some

18    oversight from GOAT to -- they provided some bar food.  It was

19    a hit.  Tater tots sold out.  They're not cooking it.  They're

20    not providing with culinary services there, but like, hey,

21    could we gain more revenue if we did this.

22    BY MR. MACDONALD:

23         Q    But in that paragraph specifically where it says GOAT

24    is a restaurant culinary group providing, and it list a couple

25    of things and then it says culinary and other services to

1    restaurants.  Would you agree that that's stating that they

2    provide culinary services?

3         MS. FAENZA:  Objection.  Asked and answered.

4    A    I feel like I elaborated on what type of culinary.

5    And maybe I didn't understand your question before when you

6    said culinary services, but it's a consulting company for

7    hospitality.  So ideas and things like that are going to be in

8    relation to food, into things that are culinary, but they're

9    not actually providing the culinary services for you.  They're

10   not getting in the kitchen.  They're not cooking for you.

11   That's why I said they don't have a POS.  They're not selling

12   food or anything like that.  They're simply providing the

13   consulting services regarding the culinary services.

14   BY MR. MACDONALD:

15   Q    So what consulting are they providing regarding the

16   culinary services?

17        MS. FAENZA:  Objection.  Asked and answered.

18   A    I think I just gave you a really good example.  It

19   was a very simple, very tangible example.  There's a bar and

20   there's a missed opportunity coming from high level, looking at

21   your bar, looking at revenue, this your target market, what can

22   we do to potentially increase revenues, you're not spending

23   enough.  Looking at all the things in the totality that example

24   of like, hey, bar, you should get someone to fry some tater

25   tots in the back and you'll sell out.  So that's like obviously

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 119 of 296

Deposition of Lisa Gonzalez                           Carol Alvarez v. Goat Hospitality Group LLC, et al.

1    a very simple example.  Sometimes it's more complex than that.

2    Like with ADDiKT it's going to be more complex.  It's a bigger

3    restaurant.  You have more hours to cover.  But for that, that

4    was a great example of GOAT providing consulting on culinary

5    services.

6    BY MR. MACDONALD:

7         Q    Would GOAT provide consulting on the items on the

8    menu, for example?

9         A    Yes, to an extent.  So, for example, like tater tots,

10   like what it was that should be sold.  You know, let's do

11   something different other than French fries, I don't want to

12   compete and have soggy French fries or have French fries that

13   don't match up to McDonald's.  Everybody knows what McDonald's

14   French fries taste like.  But we want something that can be in

15   the freezer.  It can be frozen all week and it doesn't matter.

16   You can heat it up very fast.  It can be served fast.  It can

17   be eaten easily.  A lot of thought does into that, what's on

18   the menu.  So, yes, they would provide in general.  Would they

19   do full menu development, no.  We worked with -- like ADDiKT

20   worked with another company for full menu development but GOAT

21   would provide services on that.  That company came in, provided

22   a menu development.  As sales are ongoing, hey, we can see

23   trends.  No one is ordering X.  Like we should definitely cut

24   X.  Hey, this one menu item is really weighing down the menu

25   because the cost of whatever ingredient has skyrocketed so now

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

1    really that menu item isn't so great to have.  So GOAT would be

2    like, hey, we recommend cutting this.

3        Q    And would GOAT Hospitality provide any culinary

4    consulting in regards to, let's say, the staffing of the

5    culinary staff or number of culinary employee to hire?

6            MS. FAENZA:  Objection.

7        A    I think across the board it was to obviously keep

8    labor down.  That was always the goal.  Labor is a really big

9    cost in hospitality for all restaurants and you don't want your

10   labor to be outside of, you know, whatever you budgeted.  So if

11   you budget 20 percent, 40 percent, whatever it may be of your

12   revenue, you don't want to go outside of that.  So GOAT would

13   try and help and look at that, like, hey, here's your payroll,

14   we just helped you process your payroll, and, look, for that

15   same time period your revenue was whatever.  Hey, manager, look

16   at your scheduling.  You need to tighten up.  But they weren't

17   doing the scheduling for them but would potentially help to

18   call those to the attention of the manager, hey, you guys are

19   scheduling too heavily, last payroll was high relative to

20   sales.

21   BY MR. MACDONALD:

22       Q    And do you agree that Ms. Alvarez was not employed by

23   GOAT Hospitality Group like it states in the second paragraph

24   there?

25       A    Yeah, Ms. Alvarez was employed by WGOAT15.

```
 1        Q     And it's your position that at no time she was
 2   employed by GOAT Hospitality Group; is that correct?
 3        A     Correct.
 4        Q     Now, briefly going back to the document we identified
 5   previously, who has an ownership interest in Nathan's?
 6              MS. FAENZA:  Objection.  Beyond the scope.
 7        A     Nathan and Derek.
 8   BY MR. MACDONALD:
 9        Q     And who is Nathan?
10        A     Nathan Smith.
11        Q     And is that an employee of GOAT Hospitality Group or
12   someone else?
13              MS. FAENZA:  Objection.
14        A     No, he's not an employee of GOAT Hospitality Group.
15   He's the partner of Nathan's.  You just asked me who the
16   partners of Nathan were.
17   BY MR. MACDONALD:
18        Q     And what percentage of Nathan's does Mr. Gonzalez
19   own?
20              MS. FAENZA:  Objection.  Beyond the scope.
21        A     I'd have to check.  I don't remember off the top of
22   my head.
23   BY MR. MACDONALD:
24        Q     Do you know if it's more than 50 percent?
25              MS. FAENZA:  Objection.
```

```
 1          A    I just said I don't know.

 2    BY MR. MACDONALD:

 3          Q    Do you know how much Nathan owns of the business?

 4               MS. FAENZA:  Objection.  Beyond the scope.

 5          A    There's two owners.  I told you that.  I told you I

 6    don't remember how much Derek owns so I don't know how much

 7    Nathan owns by default.

 8    BY MR. MACDONALD:

 9          Q    Have you ever provided legal services for Nathan's?

10               MS. FAENZA:  I'm sorry, I didn't hear the question.

11    BY MR. MACDONALD:

12          Q    Have you ever provided legal services for Nathan's?

13          A    I have.  I think that's also outside the scope of

14    this.  If I, Lisa Gonzalez, have ever provided legal services

15    to a company that's not involved in this, not on the areas of

16    inquiry, that's definitely outside the scope there.

17          Q    I would ask that you let your attorney object on your

18    behalf if there are any objections.

19          A    That's my answer.  I didn't say objection.  That's my

20    answer.

21          Q    And who has an ownership interest in Pilo's Tacos?

22               MS. FAENZA:  Objection.  Beyond the scope.

23          A    I don't know off the top of my head.

24    BY MR. MACDONALD:

25          Q    You don't know?
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 123 of
296
Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1                 MS. FAENZA:  Objection.  Beyond the scope.

 2        A    Did it cut out?  Yeah, I said I don't know.

 3   BY MR. MACDONALD:

 4        Q    You don't know how much your spouse owns of this

 5   restaurant?

 6                 MS. FAENZA:  Objection.  Beyond the scope.

 7        A    As Lisa Gonzalez, the spouse of Derek Gonzalez, here

 8   for the deposition?

 9   BY MR. MACDONALD:

10        Q    Yes.

11        A    I just told you I don't know off the top of my head.

12        Q    Okay.  And do you know the owner -- who has an

13   ownership interest in Pilo's Tequila Garden?

14                 MS. FAENZA:  Objection.  Beyond the scope.

15        A    I don't know off the top of my head.

16   BY MR. MACDONALD:

17        Q    Did you do any preparation to determine that

18   information?

19                 MS. FAENZA:  Objection.

20        A    No, that's outside the areas of inquiry.  Like I

21   didn't go and look at the corporate governing documents for a

22   client completely -- of GOAT unrelated to this litigation at

23   hand completely unrelated to the areas of inquiries.  No, I

24   didn't go familiarize myself with that for today.

25   BY MR. MACDONALD:
```

```
 1        Q    Does Mr. Gonzalez own an ownership interest in every

 2   client of GOAT Hospitality Group?

 3             MS. FAENZA:  Objection.  Beyond the scope.

 4        A    No.

 5   BY MR. MACDONALD:

 6        Q    Which clients of the GOAT Hospitality Group does

 7   Mr. Gonzalez not have an ownership interest in?

 8             MS. FAENZA:  Objection.  Beyond the scope.

 9        A    For example, WGOAT15, we've gone over this, he has no

10   ownership interest in WGOAT15.

11   BY MR. MACDONALD:

12        Q    Are there any clients of GOAT Hospitality Group that

13   you or Mr. Gonzalez do not have an ownership interest in?

14             MS. FAENZA:  Objection.  Beyond the scope.

15        A    Not that I can think of for like long-term clients.

16   BY MR. MACDONALD:

17        Q    Are there any short-term clients you can think of?

18             MS. FAENZA:  Objection.  Beyond the scope.

19        A    No.

20   BY MR. MACDONALD:

21        Q    At any point during Ms. Alvarez's employment did

22   Mr. Garcia have any role in handling employee discipline for

23   client employees?

24             MS. FAENZA:  Objection.

25        A    In what manner?  Like what do you mean a role in
```

Deposition of Lisa Gonzalez                                   Carol Alvarez v. Goat Hospitality Group LLC, et al.

1    discipline?

2    BY MR. MACDONALD:

3         Q    Was Mr. Garcia or GOAT Hospitality Group ever

4    involved in handling employee discipline for clients?

5              MS. FAENZA:  Objection.

6         A    No, they wouldn't handle the employee discipline.

7    They might like make a recommendation.  Like if he did an

8    investigation as a third party he might recommend something,

9    but it would be up to the individual client to whether or not

10   those things were implemented or done.  So, for example, if

11   he -- I don't know.  This is an example, investigated some

12   things, I don't know, you should terminate these ten staff

13   members.  Like, okay, he'd like go to the company, after

14   investigation these ten staff members, they've all been

15   stealing and my recommendation is to fire all of them.  Like,

16   okay, he brought his investigation, now it's up to the company

17   whether or not they want to do that.

18   BY MR. MACDONALD:

19        Q    And was Mr. Garcia responsible for handling

20   investigations as you described?

21             MS. FAENZA:  Objection.

22        A    Yeah, when they were brought to him he would.

23   Sometimes a manager might do their own investigation of stuff,

24   but like if something was brought to him he would do his due

25   diligence to investigate it.

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    BY MR. MACDONALD:

 2         Q    And during Ms. Alvarez's employment did she ever have

 3    any issues with performance or disciplinary issues?

 4              MS. FAENZA:   Objection.

 5         A    To my understanding is she did have issues with her

 6    performance.

 7    BY MR. MACDONALD:

 8         Q    Can you tell me about those?

 9         A    I know she was not meeting health standards with some

10    of her cooking so I know that there was at least some

11    corrective measures where her supervisors went back to her and

12    said, hey, food can't go out the line like this.  I don't think

13    she was -- she wasn't like punished for it or something, but

14    like made known that she's not cooking at par and not cooking

15    at safe standards.

16         Q    And when did that happen, where there was issues with

17    Ms. Alvarez's cooking?

18         A    I cannot recall the exact date.  I believe it's in

19    the paperwork, though.

20         Q    How many times were there issues with Ms. Alvarez's

21    cooking?

22         A    I know of one like firm example because I happened to

23    be the patron that received the raw burger.  And this is not

24    only not what I ordered, but it's not okay to eat this.  It's

25    ground beef.  You can't eat it raw like this.  So I know I sent
```

1   that back and I also wanted to know who was on the line, what

2   was happening back there that this is what's being served.

3   Like I'm happy it was me so that it wasn't a bad customer and a

4   bad review and continued on, but, that, yeah, her supervisors

5   went back to her and said we need to work or your training, we

6   need to work on your skills, you can't cook like that.

7        Q    And was there any incidents like that except for the

8   one that you just described?  Were there any other occasions

9   where that occurred?

10        A    I know there was one instance I was also told that

11   she needed correction, and this I'm hearing from the

12   supervisors because it wasn't an incident that I was involved

13   in, but that, yeah, she did need correction and oversight for

14   her cooking.

15        Q    Do you know what specifically they stated she needed

16   correction or oversight for?

17        A    So as a line cook it's not like cooking at your

18   house, like I'm just going to throw a little bit of this and

19   that.  Like you have a recipe.  You have an order that comes in

20   and you need to follow it.  You need to follow those steps and

21   you need to follow them in the correct order and the correct

22   measurements every single time, right.  Like McDonald's serves

23   you that same hamburger and you go there for consistency for a

24   reason.  I'm not saying we're McDonald's, but just to give you

25   an example of, you know, this is what your customers expect.

Deposition of Lisa Gonzalez                                   Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    Every time they come they do want the same thing so we need to
 2    stick to this.  It also affects the business as a whole if you
 3    are serving more of something, extra protein or whatever, well,
 4    that affects the cost of the meal now versus what the customer
 5    is paying.  Like there's a lot of things.  Well, now it's also
 6    affecting my inventory if every time you're cooking and you're
 7    cooking too much of something or too little of something.  Like
 8    it affects so many other things down the stream so it's very
 9    important to be very consistent with what you're doing and
10    cooking.
11         Q    And is that what Ms. Alvarez needed correction for?
12         A    I believe she did, yeah, that she was not following
13    those same procedures all the time so that the supervisors were
14    having to correct her.
15         Q    And this was told to you?
16         A    Yes, that was told to me.
17         Q    Who told you that?
18         A    Abelardo.  And Eric had also told me after his
19    investigation as well that like she did need correction and
20    additional oversight.
21         Q    And was this just once that you were told by Abelardo
22    and Eric regarding these issues or was it more than one time?
23         A    So I guess it would have had to have been more than
24    one time because I knew of an instance firsthand with raw and
25    undercooked food not meeting health safety standards and I have
```

Deposition of Lisa Gonzalez                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

1   heard it from Eric when he did his investigation.  And then I

2   guess I would have heard it from Abelardo.  So I guess I would

3   have heard it from three different ways that like she needed

4   to, you know, work on her training.

5       Q    So it was a total of three times you were notified of

6   that, the first being when you were served food, and then the

7   other two times would be in a conversation of some sort with

8   Abelardo and then another with Derek; is that fair?

9           MS. FAENZA:  Objection.

10      A    Yeah, those are three instances I can think of.

11  BY MR. MACDONALD:

12      Q    Can you think of any others?

13          MS. FAENZA:  Objection.

14      A    No.

15  BY MR. MACDONALD:

16      Q    Were the conversations with Abelardo and Eric

17  regarding those corrections, did those occur before or after

18  the incident that you were served food?

19      A    I can't recall because I can't recall what day that

20  incident occurred on.  I just know that I have heard

21  conversations generally with them about the issues, but that

22  could be corrected.  Like the job was not -- shouldn't have

23  been too difficult, but training should have been sufficient,

24  you know, a little extra training to say, hey, this is how

25  long -- this is how you need to make the burger, this is how

Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    this food needs to go out.  It should have corrected it.  It

 2    should have resolved everything.  I mean, she wasn't there for

 3    very long and it wasn't like we talked to her every day.

 4         Q    Did you first learn of the issues with Ms. Alvarez

 5    when you were served food?

 6         A    I can't say when I first became aware.  I'm not sure

 7    of the exact date.

 8         Q    Were the issues brought to your attention by Abelardo

 9    and Eric ever documented?

10         MS. FAENZA:  Objection.

11         A    Eric had documented some things and I believe all his

12    documentation was provided and that documentation was done by

13    him.

14    BY MR. MACDONALD:

15         Q    Was any documentation provided or created by Abelardo

16    or you in relation to these correction incidents?

17         A    I know I did not.  I don't believe Abelardo did.

18         Q    And was Eric Garcia's documentation on these issues

19    created before -- or, sorry, strike that.  Was the

20    documentation created by Eric Garcia created close in time to

21    Ms. Alvarez's departure from the company?

22         A    I think everything was close in time from her

23    departure.  She wasn't there very long.

24         Q    At any point did Ms. Alvarez make any complaints

25    regarding discrimination or harassment?
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1              MS. FAENZA:  Objection.

 2        A     Repeat that.  Sorry.

 3   BY MR. MACDONALD:

 4        Q     At any point during Ms. Alvarez's employment did she

 5   ever make any complaints regarding discrimination or

 6   harassment?

 7        A     From my understanding, no.  She did speak with Eric,

 8   but it wasn't like discrimination, harassment.  It was she

 9   didn't like the oversight.  She like didn't want to be told

10   what to do.

11        Q     And this is what Eric had relayed to you?

12              MS. FAENZA:  Objection.

13        A     Yes, that was my understanding.

14   BY MR. MACDONALD:

15        Q     So it's your understanding and testimony that there

16   was never a complaint of discrimination of any kind by

17   Ms. Alvarez during her employment?

18              MS. FAENZA:  Objection.  Misstates testimony.

19        A     Correct, not specifically discrimination or

20   harassment from her.  I know she had also wanted like

21   additional time off.  I know there were some issues there like

22   she didn't want to provide notice so I know Eric had kind of

23   stepped in with her.  And, so, for example, like texting her,

24   like, hey, are you going to come back.  Like, you know, just

25   inquisitory from a neutral third party.
```

```
 1    BY MR. MACDONALD:

 2        Q    Did Ms. Alvarez ever request pregnancy-related

 3    accommodations during her employment?

 4             MS. FAENZA:  Objection.

 5        A    What was relayed to me and what I had discussed with

 6    Eric was that when she -- she wanted obviously to take leave,

 7    maternity leave, which would be accommodated for her, like

 8    leave and then she'd have a position ready when she came back

 9    and we could provide accommodations for her like a lactation

10    room.  And we had discussed where we would put the lactation

11    room to make sure it met all requirements and that she would

12    have that accommodation.  I know in the past I was not given

13    that accommodation so it was important for me to make sure that

14    that accommodations for her pregnancy and for, you know,

15    postpartum were accommodated for her.

16    BY MR. MACDONALD:

17        Q    Did Ms. Alvarez at any point during her employment

18    request time off due to her pregnancy?

19             MS. FAENZA:  Objection.

20        A    I believe she had requested time off.  Like I know

21    she had provided some doctors notes, but I don't know at what

22    point in time she had like disclosed that it was pregnancy

23    related or was it.  I don't know.  I don't think the doctors

24    notes like say anything.  I think they just say like return to

25    work.
```

```
 1    BY MR. MACDONALD:

 2         Q    Okay.  So you don't know if Ms. Alvarez made

 3    pregnancy-related requests for time off?

 4              MS. FAENZA:  Objection.  Misstates testimony.

 5         A    I know she had requested time off because she had

 6    doctor appointments which were always accommodated as a

 7    company, whether or not you're pregnant.  If you have a

 8    doctor's appointment, or if you have a medical issues, of

 9    course.  But I don't know the exact point in time that it was

10    communicated that she was pregnant and that it was a pregnancy

11    thing.  I know she had provided medical notes to like excuse

12    her from work or whatever day or return to school,

13    return-to-work notes, but none of them said like pregnancy or

14    cannot lift, cannot stand, you're on bed rest.  Like there

15    wasn't additional information provided on the note or from her.

16    BY MR. MACDONALD:

17         Q    Who were those requests provided to?

18         A    Which requests?  Sorry.

19         Q    Any of the ones you mentioned.  Who were they

20    provided to from Ms. Alvarez?

21         A    Ms. Alvarez provided them to Eric.

22         Q    And did Eric document those requests when they were

23    made?

24         A    For a leave?

25         Q    Any pregnancy-related request.
```

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1              MS. FAENZA:  Objection.

 2       A    I know he had spoken to me about the lactation room

 3   and we were saying, okay, what can we do.  Like, for example,

 4   like my office had a glass door.  Not going to work.  So to

 5   make sure that we were planning for that for her.  And I think

 6   that was -- that I know we had discussed -- I don't think we

 7   discussed it via email or any other like documentation

 8   pregnancy related, but he would keep everything typically in

 9   the ADP file like if she provided something.

10   BY MR. MACDONALD:

11       Q    Were any of the requests made for leave by

12   Ms. Alvarez made in relation to her pregnancy?

13              MS. FAENZA:  Objection.

14       A    So I don't know -- I don't think they were.  I think

15   she had like provided a couple of medical notes like return to

16   work or you were seen on X date.  So I think in the request for

17   production there's two that she provided, one from Coral Gables

18   Hospital that's like a return to work.  They were seen at the

19   hospital on one day.  Nothing else.  Like return to work on the

20   15th.  Nothing else was provided.  And then there's another

21   one, Coral Gables Hospital.  They were seen at the facility

22   February 7th and they returned to work on February 12th.  Okay.

23   I don't think she was forced to work during those periods.

24   BY MR. MACDONALD:

25       Q    So I'm trying to understand specifically the
```

Deposition of Lisa Gonzalez                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

1    company's position on these requests.  So regardless of the

2    documentation it's important that I clarify and important that

3    you have knowledge of, of course, whether the requests that

4    were made by Ms. Alvarez were made in relation to her

5    pregnancy.

6              MS. FAENZA:  Objection.

7        A    The only request that I was aware of was the

8    lactation room and that was being accommodated.

9    BY MR. MACDONALD:

10       Q    So you're not aware of any other pregnancy-related

11   requests?

12             MS. FAENZA:  Objection.

13       A    Not that I'm aware of.

14   BY MR. MACDONALD:

15       Q    So what was the company's understanding of what the

16   leave requests were for, for example, when Ms. Alvarez made

17   those?

18             MS. FAENZA:  Objection.

19       A    She had asked for time off.  I mean, employees ask

20   for time off for all different reasons.

21   BY MR. MACDONALD:

22       Q    So the company did not know at the time what the

23   requests were made for?

24             MS. FAENZA:  Objection.

25       A    I mean, Eric is going to ask without being intrusive

 1   on you.  Like, if you had a medical note and you said I need to

 2   stay home, like I can't work this week, and you have a medical

 3   note, is everything okay, like all is good, okay, but he's not

 4   going to force you to come out, oh, well, it's because you got

 5   some weird rash all over your face.  Like I'm not saying that

 6   happened, but he's not going to like force it out of you.  You

 7   would need to -- you as the employee would need to like tell

 8   your supervisor or human resources and that's kind of why like

 9   Eric was there.  It's like a third-party neutral, hey, I had

10   something happen to me, it's a little embarrassing, I don't

11   want to tell everyone, but I have whatever.  I'm not saying

12   pregnancy is embarrassing, but that was just an example.

13   BY MR. MACDONALD:

14       Q    So I know a moment ago you were telling me generally

15   about how Eric would handle those.  Was the company ever aware

16   of the reason for Ms. Alvarez's leave request or time off

17   requests?

18            MS. FAENZA:  Objection.

19       A    I mean, at some point, yes, the company knew she was

20   pregnant and she had provided that and shared that information.

21   BY MR. MACDONALD:

22       Q    And do you know when that was?

23            MS. FAENZA:  Objection.

24       A    I don't know exactly when she provided that

25   information.

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    BY MR. MACDONALD:

 2         Q    Do you know how many requests she made following her

 3    disclosure of her pregnancy?  And when I say request I mean

 4    request for time off or other accommodations.

 5         A    I don't know that specific pregnancy requests were

 6    made other than the lactation room.

 7         Q    Right.  What I'm asking is after she disclosed her

 8    pregnancy were requests for time off or other accommodations

 9    made generally, regardless of whether she re-brought up her

10    pregnancy?

11              MS. FAENZA:  Objection.

12         A    I'm going to object as to whether she re-brought up

13    her pregnancy part of that question.  Were her accommodations

14    met, yes.  The company did the best that they could to provide

15    accommodations, pregnant or not, disability or not.  You know,

16    the company did our best to provide her with just being

17    reasonable, being a human being.  So you need to go to the

18    bathroom more, regardless.  I don't know.  You don't want to

19    say it versus pregnancy.  Like whatever it may be.  You a

20    stomachache.  I have a terrible stomach.  You need to go the

21    bathroom more, go ahead.  It wasn't like, stop, no, you only

22    get two bathrooms breaks a day, you better figure it out.  No.

23    Okay.  You need extra, cool, but you do got to let everybody

24    know or somebody know who can take over because orders come in.

25    So that's it.  You just can't leave the line unattended.  But
```

1   as many bathroom breaks as you need, the bathroom is right

2   there.

3        Things like that were accommodated.  I mean, in the past,

4   for example, an accommodation Eric made for a different GOAT

5   was a staff member who has cerebral palsy.  He's low muscle

6   tone.  He needs to sit down a lot.  What are we going to do.

7   And he's a runner.  We can up with a solution.  We're going to

8   put a stool here where he can run orders but he can sit in

9   between.  He doesn't need to stand all day.  Typically you do

10  stand at the line, but we rearranged, figured it out, made it

11  so it was still a safe work environment.  It wasn't in the way

12  came.  Came up with an accommodation for him that was super

13  reasonable for everybody and didn't harm anybody to put the

14  chair in a way that wasn't in the way, stuff like that.

15  BY MR. MACDONALD:

16       Q    My question specifically was about how many leave

17  requests, if any, did Ms. Alvarez make following the disclosure

18  of her pregnancy?  If you don't know you can say.

19       A    I don't know exactly.

20       Q    Would you agree that she did make leave requests

21  following the disclosure of her pregnancy?

22            MS. FAENZA:  Objection.

23       A    Sorry, can you repeat that?

24  BY MR. MACDONALD:

25       Q    Would you agree that Ms. Alvarez made a request for

1    leave or time off following the disclosure of her pregnancy?

2        A    I don't know because I don't know like the order.

3    You're like wanting me to narrow down the order and that would

4    have to -- I would have to defer to Eric to the exact order.

5        Q    So the issue with that, though, is for the record,

6    the entire purpose of a corporate representative deposition is

7    so that you cannot defer to someone else.  So because you have

8    an obligation to know the order, if there is one, to any

9    accommodation requests, that's why I'm asking you.  So you do

10   not know --

11           MS. FAENZA:  Objection.

12   BY MR. MACDONALD:

13       Q    -- the order --

14           MS. FAENZA:  Objection.

15       A    I'm sure I can review the documents.  I know Eric

16   provided a very like detailed account.  Can I take a break and

17   review that and pause and come back on the record?

18   BY MR. MACDONALD:

19       Q    Yeah.  We can take a break to review the documents.

20   If you'd like, we can keep going for a bit and then we can take

21   a break and revisit if you'd like?

22       A    Well, I can I also have a bathroom break?  I'm sorry.

23   So either way we can knock it out with a break and everybody

24   can take a moment to do something else and come back?

25           MR. MACDONALD:  Sure.  Well do like ten minutes.

```
 1        Okay?

 2              MS. FAENZA:  Is that enough?

 3              THE WITNESS:  Can we do 15 or, sorry, 20?  Let me

 4        review this.  Twenty minutes.

 5              MR. MACDONALD:  We'll go off the record.

 6              (A recess was taken.)

 7   BY MR. MACDONALD:

 8        Q    Did you review any documents on the break,

 9   Ms. Gonzalez?

10        A    Yes, the document I reviewed to better refresh my

11   recollection of the timeline, I reviewed the timeline of Eric

12   Garcia because it has a lot of specific dates and it was

13   written closer in time to the events.  And I believe the last

14   thing you asked me about was when she disclosed her pregnancy.

15        Q    So I had asked if, or how many, if any at all,

16   requests were made after she disclosed her pregnancy

17   regarding --

18        A    So I -- sorry, I didn't mean to cut you off.  So I

19   don't see the exact date that she disclosed her pregnancy.  I

20   believe it would have had to have been at least after, from my

21   understanding of the timeline here, it would have been after

22   January, at least January 9th.  And I don't believe she like --

23   even if she disclosed it, I don't see specific dates for any

24   requests for accommodations for it.  I think it was just known

25   there.  So I don't think there was a particular documentation
```

Deposition of Lisa Gonzalez                           Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    to say, hey, this person is pregnant.  Okay.  Lots of pregnant
 2    people can perform their jobs.  Like a line cook generally
 3    could unless for some reason you couldn't, right?  Like every
 4    pregnancy is different.  So that's what I see from the
 5    documentation.
 6         Q    Okay.  So you're saying that she disclosed her
 7    pregnancy after January 9th; is that correct?
 8              MS. FAENZA:  Objection.  Misstates testimony.
 9         A    From my understanding of the documents it would have
10    been at least after that, but I don't have the specific dates.
11    BY MR. MACDONALD:
12         Q    Does the company have specific dates?
13              MS. FAENZA:  Objection.
14         A    No.  No.
15              MS. FAENZA:  Could I ask a point of clarification.
16         She's the corporate rep for two different companies so I'm
17         not sure which company you're referring to.
18    BY MR. MACDONALD:
19         Q    Does either company have that information?
20         A    As I sit here at the moment I don't have the exact
21    date.
22         Q    Does either company have that information at all?
23         A    As I sit here today I don't have that.
24         Q    But since you're the corporate representative it's
25    safe to assume that if you do not have that information it does
```

Carol Alvarez v. Goat Hospitality Group LLC, et al.

1   not exist, correct?

2       A    Yeah, correct.  I don't have it today.  I mean, it

3   would only be in my benefit to be able to like, here you go,

4   this is the date, here's the accommodation request.  Like it

5   would only be better for you.

6       Q    Following Ms. Alvarez's disclosure of her pregnancy

7   did she make any request for time off or leave, whether

8   pregnancy related or not?

9       A    There were two instances where she requested time off

10  and she was provided that time off.  I don't believe that

11  either of those were specific pregnancy-related requests.

12      Q    Are you certain of that or are you not sure?

13          MS. FAENZA:  Objection.

14      A    I just said I don't believe that they were pregnancy

15  related and the documentation she provided has nothing to that

16  effect.

17  BY MR. MACDONALD:

18      Q    And you said two different times she made some sort

19  of request for time off or leave, correct?

20      A    Yes.

21      Q    When were those times?

22      A    I have those as January 10th through January 15th of

23  2024, which was provided to her, and then February 7th through

24  February 12th of 2024, which was provided to her.

25      Q    And for those two instances of leave or time off what

```
 1    was the company's understanding for the reason of the request

 2    if not pregnancy, for example?

 3              MS. FAENZA:  Objection.  Asked and answered.  And

 4         which company?

 5    BY MR. MACDONALD:

 6         Q    Was either company -- what was the reason either

 7    company was aware of the request?

 8         A    I don't have a documented reason, but from either

 9    company's perspective if you needed any sort of medical time

10    off, like I said, if you wanted to disclose it or not, the

11    companies would do as much as they could to provide you with

12    that time.

13         Q    Was either of those instances classified as medical

14    leave?

15              MS. FAENZA:  Objection.

16         A    She provided doctor's notes for those two.  I think

17    the two doctor's notes are provided in the request for

18    production.

19    BY MR. MACDONALD:

20         Q    Okay.  So they were both classified as requests for

21    medical leave of some sort?

22              MS. FAENZA:  Objection.  Misstates testimony.

23         A    She asked for the time off and she did provide a

24    doctor's note so it was alleged medical reasons.

25    BY MR. MACDONALD:
```

```
 1        Q    And did GOAT Hospitality Group at the time have --

 2   well, actually strike that.  Did WGOAT15 have different types

 3   of leave for employees?

 4        A    From like the company's perspective leave was leave.

 5   It was respected whether it was for a broken ankle, whether you

 6   are pregnant, whether you needed something, the leave was, you

 7   know, it was accommodated the best you could.  People have

 8   asked for leave off, they were moving.  People have asked for

 9   leave off for mental health reasons.  Okay.  Like the company

10   is going to work with them.

11        Q    So in WGOAT15 LLC's eyes were, let's say, time off

12   for a vacation the same as time off for medical leave?

13             MS. FAENZA:  Objection.

14        A    The company did its best to respect that employees

15   have a life outside of work, right, to accommodate the best

16   they could.  If you said I'm going on a four-month vacation and

17   I'll be back in four months, my job is still going to be here,

18   we would be like, wait a second.  Although that never occurred,

19   especially if we could accommodate leave and you wanted to take

20   it, it was great.  Like, obviously, we might ask you if you

21   were to take off a particular event that was like, we need you,

22   like we might say something, are you sure, we really need you

23   on that day.  No.  You still have vacation plans, you have

24   vacation plans.

25   BY MR. MACDONALD:
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        Q    Did WGOAT15 have different categories of leave?

 2             MS. FAENZA:  Objection.

 3        A    I think there are different categories of leave, but

 4   as a company if you needed leave for whatever reason that the

 5   company did its best to respect that leave, whether it was

 6   medical leave, mental wellness.  You know, I know an employee

 7   came to me, they were going through a really hard time and a

 8   lot of life was happening to them.  Okay.  Like, you know, they

 9   asked for a particular, not an extended amount of time, like

10   can I have this, I have a lot going on with this family member

11   and that.  Okay.  Deal with what you need to deal with so you

12   can come back to the job so you can come back a hundred percent

13   too.  Like it doesn't really do me any good if you are there

14   and you constantly need to be like dealing with something,

15   right.  Like I have to step out, I have to do this.  Just as a

16   company in general it doesn't benefit you.

17   BY MR. MACDONALD:

18        Q    Right, but you're describing how the company

19   responds.  I'm just simply asking you, did the company classify

20   different types of requests for leave, for example, as medical

21   leave or maybe paid time off or a different type.  Did the

22   company do that --

23             MS. FAENZA:  Objections.

24   BY MR. MACDONALD:

25        Q    -- WGOAT15?
```

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1              MS. FAENZA:  Objection.  Sorry.  Objection.

 2       A    So what you're asking me, like this pen, if I call it

 3    a pen or writing utensil, like does it matter the

 4    classification?  It's still blue.  It still writes on paper.

 5    Like I feel like you're asking me that.  Can I call it a --

 6    like you're asking for the classification, and like

 7    technically,  yes, there are different classifications.  Yes,

 8    there are different classifications of leave, there are, but as

 9    a company we respected our employees and would reasonably

10    accommodate them for any reasonable request.

11    BY MR. MACDONALD:

12       Q    But I'm asking about the company, like the

13    categorization like you just mentioned.  Did the company

14    specifically characterize leave requests?

15              MS. FAENZA:  Objection.

16       A    Like in the payroll processing drop down, leave,

17    yeah, there are different categories.

18    BY MR. MACDONALD:

19       Q    Anywhere.

20       A    Yes, there are different categories.

21       Q    Okay.  And what were the categories?

22       A    I don't know all of them.

23       Q    Do you know any of them?

24       A    Medical leave.

25              MS. FAENZA:  Objection.
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    BY MR. MACDONALD:

 2         Q    Any others?

 3         A    Types of leave?

 4         Q    Yes.

 5         A    Vacation.

 6         Q    Any others?

 7         A    I don't know.

 8         Q    Well, you're here to testify as to that information.

 9    So you don't know whether there's other categories of leave

10    that were afforded to employees?

11              MS. FAENZA:  Objection.  Asked and answered.

12         A    You asked me that and now you're just like being

13    rude, you don't know, you're the corporate representative.  I

14    already answered that.  Now you just find another way just to

15    ask me just to be rude.

16    BY MR. MACDONALD:

17         Q    No one is being rude.  You're here as --

18         A    It is rude.

19         Q    -- a corporate representative -- excuse me.  Please

20    let me finish my statement.  No one is being rude.  I'm just

21    simply asking you about a question which you were designated to

22    testify on which is the types of leave afforded to employees,

23    the different types of leave afforded to employees, and you

24    stated you did not know all of the categories so I'm clarifying

25    for the record.  You do not know the types of leaves afforded
```

```
 1    to employees as you are required to testify to, yes or no?
 2              MS. FAENZA:  Objection.  Misstates testimony and
 3         argumentative with the witness.  And, additionally, I was
 4         just going to state on the record I didn't hear any
 5         testimony about 42 employees.
 6         A    I didn't hear anything about 42 employees either.
 7    What did I miss?
 8              MS. FAENZA:  What is that, Mr. MacDonald?  Is there
 9         something in the record that spoke about there being 42
10         employees?
11              MR. MACDONALD:  I was saying afforded to employees.
12              MS. FAENZA:  Afforded to.  I'm sorry, it sounded like
13         42.
14         A    Okay.  I didn't hear 42 and I was like I missed
15    something.  So I don't know where I'm required to know that,
16    like every different type of leave.
17    BY MR. MACDONALD:
18         Q    I'm just asking with the leave benefits afforded to
19    employees of WGOAT15 were there different types of leave
20    afforded?  You mentioned medical leave and vacation leave, I
21    believe, and then you said you didn't know the other
22    categories.  So I'm asking you, you do not know the other
23    categories of leave?
24         A    Yes, it's been established.  I said I didn't know
25    every type of --
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 149 of 296

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1              MS. FAENZA:  Objection.  Asked and answered.
 2       Argumentative.
 3       A    You're clearly being rude.  You don't know?  You
 4  don't know?
 5  BY MR. MACDONALD:
 6       Q    No one is being rude.
 7       A    Yes, you are.  You're being incredibly rude.  I said
 8  I don't know five minutes ago.  Then you said, well, name them.
 9  I named you two that I could and then you're like, I can't
10  believe you don't know them, you're the corporate
11  representative.  You're required to know that.  You told me I
12  was required to.  Nothing in here says -- I'm looking here
13  again through the various things and I told you I prepared the
14  best I could and I'm like where is it required off the top of
15  my head every different types of leave possible.  I'm sorry, I
16  didn't memorize that list.
17       Q    Are there any written policies regarding leave for
18  employees of WGOAT5 LLC?
19              MS. FAENZA:  Objection.
20       A    We've also gone over this.  We've gone over the
21  handbook.
22  BY MR. MACDONALD:
23       Q    I'm not asking about the handbook.  I'm saying are
24  there any policies regarding medical leave or any other forms
25  of leave for employees of WGOAT15?
```

```
 1              MS. FAENZA:  Objection.

 2       A    The policies of the company for WGOAT are in the

 3   handbook that we already went over.

 4   BY MR. MACDONALD:

 5       Q    Okay.  Are there policies regarding leave in there?

 6       A    The handbook speaks for itself.

 7       Q    No.  I'm asking you as the corporate representative

 8   were there any policies regarding leave?

 9              MS. FAENZA:  Objection.  Asked and answered.

10          Badgering the witness.

11              MR. MACDONALD:  I'm not badgering the witness.

12          I'm asking a very simple question about whether there were

13          policies regarding medical leave.  I mean, this is really

14          out there for our corporate representative.  It's a simple

15          simple question.

16   BY MR. MACDONALD:

17       Q    Were there policies for medical leave for

18   employees?

19              MS. FAENZA:  Objection.

20       A    You're being even more rude.  It's a simple question,

21   it's really out there for a corporate representative.  Your

22   commentary is unnecessary.

23   BY MR. MACDONALD:

24       Q    Okay.  I'm waiting for your response.

25              MS. FAENZA:  If you would wish to -- I believe the
```

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        witness has stated that it's in the handbook if you wish

 2        to put that on the screen to refresh the recollection so

 3        we can get to the substance of your answer.  I'm not

 4        trying to interfere, but that might be helpful.

 5   BY MR. MACDONALD:

 6        Q    That's fine.  That's fine.  Would that be helpful,

 7   Ms. Gonzalez?

 8        A    I'm looking through it myself.

 9        Q    I'm happy to pull it up.

10        A    So there's holidays, attendance, punctuality.

11   There's not a specific section that says leave.

12        Q    Whether included in this document or not are you

13   aware of any policies regarding leave for employees at WGOAT15

14   LLC?

15        A    I just told you two examples of types of leave.

16        Q    Okay.  So my question is:  Is there a written policy

17   that would dictate, for example, those different types of

18   leave?

19             MS. FAENZA:  Objection.  Asked and answered.

20        A    For a leave the policy it says talk to your

21   supervisor.

22   BY MR. MACDONALD:

23        Q    Okay.

24        A    Which would need to be done regardless of the type of

25   leave.  You have to let the company know.
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 152 of 296

Deposition of Lisa Gonzalez                                                      Carol Alvarez v. Goat Hospitality Group LLC, et al.

1      Q     Okay.  Are there any policies regarding leave that

2   are not included in that handbook?

3          MS. FAENZA:  Objection.  Asked and answered.

4      A     So you're saying what's not included?

5   BY MR. MACDONALD:

6      Q     No.  Are there any policies that aren't included in

7   that handbook, for example, maybe it's written somewhere else

8   in a different document?

9      A     No, that's the document.

10     Q     Okay.  And which section of the handbook are you

11  referring to specifically, just so I know?

12     A     Time off.  If you would like time off it must be

13  approved by your supervisor.  Time off should be discussed and

14  planned and approved by your supervisor it says in one month's

15  notice.  That's for vacation time off.  That's under time off

16  for vacations.

17     Q     Which page is that on?  Do you have it?

18     A     It ends in 56.

19     Q     Did WGOAT15 have any policies regarding the Family

20  Medical Leave Act?

21          MS. FAENZA:  Objection.

22     A     No, there's nothing in here about that.

23  BY MR. MACDONALD:

24     Q     And I know I asked you previously about the policies

25  for WGOAT15.  Just to shift gears, I'm going to be asking about

```
 1    GOAT Hospitality's policies.  Okay?  Does GOAT Hospitality

 2    Group have a written handbook for employees or has it had a

 3    written handbook for employees?

 4         A    I don't recall.  I can't picture it off the top of my

 5    head.  That doesn't mean no.  I don't recall at this moment.

 6         Q    Well, again, I have to remind you that you are here

 7    to testify as to that information so if you can't recall,

 8    that's something we'll note, but, obviously, if you can't

 9    recall you can't recall.  Did you search for those documents to

10    prepare for today's deposition?

11              MS. FAENZA:  Objection.  Asked and answered.

12         A    I didn't by specific name go search for that one, but

13    like the Mia one, it's colorful.  I can picture it.  I can't

14    picture it for GOAT.  I don't remember seeing it.

15    BY MR. MACDONALD:

16         Q    Regardless of whether you can picture it, has there

17    ever been an employee handbook for GOAT Hospitality Group or

18    can you not recall?

19         A    I can't recall.  That's what I'm saying, like I can

20    picture that one.  I was giving you an example as to like why,

21    but I can't picture one for GOAT.

22         Q    Okay.  And you understand you had a duty to prepare

23    that information prior to today?

24              MS. FAENZA:  Objection.  Respectfully, this is -- I

25         don't know many times you continue to advise her that she
```

```
 1    had a duty.  The answer is the answer.

 2             MR. MACDONALD:  Okay.  That's a very fair question

 3    that I'm allowed to ask.

 4             MS. FAENZA:  You've asked it multiple times.

 5             MR. MACDONALD:  I haven't, not for this specific --

 6             MS. FAENZA:  Hold on.  Sir, I'm speaking.  You can't

 7    just every time you don't like an answer come in and say

 8    you know had a duty.  If the person says they can't

 9    recall, they can't recall.  You can follow up and get

10    smaller questions to try to get the information you have

11    but to continue to do what comes off as a veil threat is

12    grossly inappropriate.  It's not the first or second or

13    even the third time you get an answer and then you say,

14    well, you had a duty to prepare here today.

15             MR. MACDONALD:  The only time I've said it is when

16    she said she doesn't know the answer to a question.

17    That's part of the topics.

18             MS. FAENZA:  It doesn't matter.  If you have a

19    question you can follow up.  Do not chastise my witness.

20    You do not argue with the witness.  If you have a question

21    and you want to get smaller and smaller, I have no issues

22    with asking questions, but attempting to intimidate a

23    witness, attempting to chastise her or comment is not

24    appropriate.  Let the record reflect Mr. MacDonald is

25    laughing.  This not funny.  It's not the first time this
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 155 of 296

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1          has come up.
 2                  MR. MACDONALD:  Wow.  Threatening a witness, that is
 3          a gross mischaracterization.  No one has threatened
 4          anyone.  I simply pointed out that you had a duty to
 5          prepare her for her testimony.
 6    BY MR. MACDONALD:
 7          Q    And I'll ask you, are you aware of the text Rule
 8    30(b)(6), Ms. Gonzalez?
 9                  MS. FAENZA:  Objection.
10          A    No, I don't have it memorized and I don't have it in
11    front of me.
12    BY MR. MACDONALD:
13          Q    Okay.  And are you aware that you had a duty to
14    reasonably prepare regarding specifically the employment
15    handbook for GOAT Hospitality Group to the extent it exist?
16                  MS. FAENZA:  Objection.  Argumentative.  Asked and
17          answered.
18          A    I see where you're saying in the book is under the
19    area of inquiry and I made sure I was aware and re-read the
20    handbook for WGOAT and I did my best to prepare.  I didn't look
21    at the handbook for GOAT because Ms. Alvarez was never an
22    employee of GOAT so I availed myself to that one and re-read
23    that one in preparation for this.  I can't picture the GOAT
24    one.  I didn't re-read it.  I'm not sure if it exist because I
25    didn't read it beforehand so I do apologize on that one, that
```

```
 1    I'm not able to answer your question there.  I read the ADDiKT
 2    one.
 3    BY MR. MACDONALD:
 4        Q    And you understand that you are here as a corporate
 5    representative for GOAT Hospitality Group as well, correct?
 6            MS. FAENZA:  Objection.  Asked and answered.  Move on
 7        with your questions, sir.
 8        A    Yeah.  We have, I do know that.
 9            MS. FAENZA:  Asked and answered.
10        A    I see where you're saying that.  I don't know and I'm
11    telling you what I did and I told you what I did to prepare.  I
12    don't recall seeing that one.  So, I mean, you need -- what do
13    you want, to suspend this deposition until I go make sure that
14    there's a GOAT handbook and read it?
15    BY MR. MACDONALD:
16        Q    No, I'm just confirming whether you reasonably
17    prepared for the deposition which sounds like you didn't.
18            MS. FAENZA:  Objection.
19        A    That's your opinion.  I read through everything and I
20    told you what I read through.  I told you what I did to prepare
21    so I disagree.
22            MS. FAENZA:  Objection.
23    BY MR. MACDONALD:
24        Q    Fair enough.  Let me ask you a question.  You
25    understand that as part of those topics you had to search for
```

```
 1   and review or reasonably prepare the handbook and policies for

 2   GOAT Hospitality Group LLC specifically, correct?

 3           MS. FAENZA:  Objection.  Asked and answered multiple

 4        times.  You're badgering the witness at this point.

 5        Mr. MacDonald, move on.

 6   BY MR. MACDONALD:

 7        Q    You can answer.

 8        A    I don't know if one even exist.  I'm telling you I

 9   didn't read it before this deposition and I told you I didn't.

10        Q    That's your testimony?

11        A    Yes, I'm saying I don't know.  If there's a line of

12   questioning that's going to come from this handbook do you want

13   to suspend this deposition?  Do you want to bring me back here

14   to ask all those questions, I can.  And I don't think that it's

15   for a lack of diligence on here.  I'm telling you I re-read all

16   the handbook for ADDiKT.  Ms. Alvarez was an employee of

17   ADDiKT.

18        Q    Okay.  So you mentioned the two leave requests that

19   Ms. Alvarez had made during her employment.  Did she make any

20   other accommodation requests or any sort of request for leave

21   for her pregnancy during her employment?

22           MS. FAENZA:  Objection.  Asked and answered.

23        A    Yeah, that question like compounded a lot of things.

24   I don't think she made any --

25   BY MR. MACDONALD:
```

```
 1        Q    I can rephrase it.
 2        A    I mean, I've answered, but, go ahead.  Ask me.  Ask
 3   something else.
 4        Q    Did Ms. Alvarez make any pregnancy-related
 5   accommodation requests during her employment besides the two
 6   requests that you mentioned?
 7             MS. FAENZA:  Objection.
 8        A    She made a request from my understanding for a
 9   lactation room that was being provided should she had not quit,
10   that she would have been provided a lactation room when she
11   came back, and I believe she requested the Family Medical Leave
12   Act time off, specifically.  But I don't think there were other
13   pregnancy-related accommodations that were requested.
14   BY MR. MACDONALD:
15        Q    Is there something in front of you?
16        A    I do have the Request for Production documents up.
17        Q    Is that what you were looking at a moment ago?
18        A    Yes.
19        Q    Any other leave requests besides the lactation room,
20   the two leave requests you identified, and then the Family
21   Medical Leave Act request you referenced?
22             MS. FAENZA:  Objection.
23        A    I believe those were the only requests and they were
24   provided to her were the two time periods off and a lactation
25   room would be available to her.
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    BY MR. MACDONALD:

 2         Q    And a moment ago you were looking at the Request for

 3    Production you said?

 4         A    Yeah.

 5         Q    Okay.

 6         A    I'm sorry, she did request FMLA leave, but she didn't

 7    qualify for that.

 8         Q    Okay.  And you're looking at a digital copy of that

 9    document or are you looking at a paper copy?

10         A    A digital copy.

11         Q    Okay.  I'm going to ask that you not look at any

12    other applications or screens.  If you need to you can

13    certainly let me know, but I would ask as a general matter that

14    you not be on your application or any other screens.

15         A    I mean, I do have that up.  If you want to go by just

16    my memory it's a lot to go off of and you are asking like very

17    specific things.  So you don't want me to rely on any

18    documents?

19         Q    No, we can at certain points, but it's difficult for

20    me to know what exactly you might be looking at.  So if you do

21    need -- if you say I need to look at a document you can

22    certainly do that.  I just would ask that you not do it as you

23    testify.

24         A    Okay.  I have it up on my screen.

25         Q    You have what up on your screen?
```

```
 1        A    The Request for Production documents.  I have those

 2   up on my screen.

 3        Q    Do you have anything else up on your screen?

 4        A    Zoom.

 5        Q    And are you on a desktop computer?

 6        A    I'm on a laptop.

 7        Q    And you're not communicating with anyone, right?

 8        A    Nope.

 9        Q    So you were saying the Family Medical Leave Act.

10   What were you referring to?

11             MS. FAENZA:  Objection.

12        A    The Family Medical Leave Act.  What am I referring

13   to, the Family Medical Leave Act.  Like I don't know what

14   specific --

15   BY MR. MACDONALD:

16        Q    I just asked you about Ms. Alvarez's leave request

17   and you mentioned Family Medical Leave Act, correct?

18             MS. FAENZA:.  Objection.

19        A    From my understanding she asked Eric for

20   accommodations, for FMLA accommodations, but she didn't meet

21   those qualifications for those.  The company didn't nor did

22   she.

23   BY MR. MACDONALD:

24        Q    What specific --

25        A    That is my understanding.
```

```
 1        Q    Sorry, I didn't mean to cut you off.  What
 2   specifically did Ms. Alvarez request that was regarded as an
 3   FMLA request?
 4             MS. FAENZA:  Objection.
 5        A    I'm sorry, repeat that.
 6   BY MR. MACDONALD:
 7        Q    What specifically did Ms. Alvarez request that was
 8   regarded as an FMLA request?
 9        A    So I don't have her exact request since it wasn't
10   communicated specifically to me.  What I have documented was
11   that I think she essentially wanted paid time off under the
12   FMLA, Family Medical Leave Act, that she wanted 12 weeks paid
13   off, but the company isn't I guess required to under the --
14   like the size of company isn't as well as the fact that she
15   hadn't worked there long enough to qualify for those potential
16   like receiving pay.
17        Q    So it's your understanding that Ms. Alvarez requested
18   time off and that was interpreted as an FMLA leave request?
19             MS. FAENZA:  Objection.
20        A    No, that's not what I said at all.
21   BY MR. MACDONALD:
22        Q    Please verify.
23             MS. FAENZA:  Objection.
24        A    I think she wanted paid time off from the company and
25   I don't think -- she wasn't eligible for paid time off.
```

        

```
 1    BY MR. MACDONALD:

 2         Q    Okay.  And did she specifically mention the FMLA?

 3              MS. FAENZA:  Objection.

 4         A    I believe she did.  Again, the specific request

 5    wasn't to me; it was to Eric of HR.

 6    BY MR. MACDONALD:

 7         Q    All right.  And you are here to testify on behalf of

 8    the company which would include Eric, just for the record.

 9              MS. FAENZA:  Objection.

10         A    I'm not testifying on behalf of anyone else.  I'm

11    testifying on behalf of the company.  Mr. Garcia --

12    BY MR. MACDONALD:

13         Q    Which is comprised of --

14              MS. FAENZA:  Objection.

15         A    I can't testify for the exact conversations that

16    happened between other people that, one, the company was not

17    present for nor was I present for so I can't testify exactly as

18    to what happened.  I can testify as to what the company has

19    documented.

20    BY MR. MACDONALD:

21         Q    Okay.  You can only testify as to what the company

22    has documented?

23              MS. FAENZA:  Objection.

24         A    Yes, or the information that's been collected.

25    That's all I have.
```

```
 1    BY MR. MACDONALD:

 2         Q    Did you collect information from Mr. Garcia?

 3              MS. FAENZA:  Objection.  Asked and answered.

 4         A    It documented.  His information is documented in his

 5    Declaration.

 6    BY MR. MACDONALD:

 7         Q    Right, but I'm asking you specifically about these

 8    topics.  Did you speak with Mr. Garcia to prepare your

 9    testimony?

10              MS. FAENZA:  Objection.  Asked and answered multiple

11         times.

12         A    We went over this.

13    BY MR. MACDONALD:

14         Q    I'm asking you because you don't know.  That's why

15    I'm trying to clarify.

16         A    I never said I didn't know.  I told you I spoke to

17    him several weeks ago.  We talked about it being generalities.

18    Do you remember this conversation earlier today?

19         Q    What I was referring to to clarify was what she

20    requested, Ms. Alvarez, when she made her leave request and you

21    deferred to Mr. Garcia so I was just trying to clarify if you

22    had spoken to him regarding that topic so I can understand how

23    you prepared.  That was my question.

24              MS. FAENZA:  Asked and answered.  Objection.  And I

25         can refer to earlier part of the testimony.
```

```
 1          Unfortunately, I hope the court reporter does not have to
 2          pull this because this was a point of discussion.
 3               Did you interview Eric Garcia?
 4               I did not interview him.
 5               Did you speak with him?
 6               I spoke with Mr. Garcia.
 7               When was the last time?
 8               And then we went on about --
 9          MR. MACDONALD:  Okay.  I don't need you to read back
10     the transcript.
11          MR. MACDONALD:  Again, I don't need you to read back
12     the transcript.
13          MS. FAENZA:  Please don't interrupt me, sir.  You
14     have asked that question already.
15          MR. MACDONALD:  You're actually interrupting my line
16     of questioning, but, okay.
17          MS. FAENZA:  No, sir.  No, sir.
18          MR. MACDONALD:  Going back to the question.  Please
19     let me finish.
20          MS. FAENZA:  I'm in the midst of an objection.  I'm
21     in the midst of an objection.
22          MR. MACDONALD:  That's not an objection.
23          MS. FAENZA:  It is an objection.  Please stop
24     interrupting me, Mr. MacDonald.  Whether you like me or
25     not is not relevant.  This court reporter needs to write
```

Case 1:24-cv-24135-RKA  Document 39-1  Entered on FLSD Docket 02/23/2026  Page 165 of 296

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

1    everything down, okay, so you can say whatever you want

2    when I'm done, but the issue was this was asked and

3    answered and there were multiple questions specifically

4    as to how she prepared for the deposition that we went

5    through and then your question was, did you speak to

6    Mr. Garcia to prepare for this deposition.  It's the same

7    question again.

8          MR. MACDONALD:  And you're just typing all that out?

9          MS. FAENZA:  I'm sorry?

10         MR. MACDONALD:  You're typing all this stuff out?

11         MS. FAENZA:  You want to know what I'm typing, sir?

12   That would be attorney-client privilege and it would be

13   attorney work product.  You are not entitled to ask a

14   nondeponent opposing counsel what it is they're typing.

15         MR. MACDONALD:  Okay.  Because it seems pretty

16   accurate.

17         MS. FAENZA:  Sir, I am sitting here typing but what

18   I'm typing and the content of what I'm typing is not

19   discoverable.  It is attorney work product.  So we can

20   have the court reporter pull it if you want, but it's

21   quite some time.  It's in the first part of the

22   deposition.  I have never had an opposing counsel ask me

23   what I am typing in the creation of my notes for

24   deposition, but I'm more that happy to have the court

25   reporter pull it if you would prefer that.

```
 1    BY MR. MACDONALD:

 2         Q    Okay.  So going back to my question.  Did Ms. Alvarez

 3    specifically request FMLA leave when she made that request for

 4    time off?

 5              MS. FAENZA:  Objection.  Asked and answered.

 6         A    From my understanding she did because she wanted paid

 7    time off.

 8    BY MR. MACDONALD:

 9         Q    Do you know --

10         A    That's what I have documented.

11         Q    sorry, I didn't mean to cut you off.  Do you know if

12    the FMLA offers paid time off to employees?

13              MS. FAENZA:  Objection.

14         A    From my understanding that if the company size and

15    you meet the -- the company meets the requirements and if the

16    individual meets the requirements there might be paid time off,

17    but I don't think that she met the requirements nor did the

18    company.

19    BY MR. MACDONALD:

20         Q    I'm going to show you a document.

21              MS. FAENZA:  And what document are you showing?

22              MR. MACDONALD:  I'll pull it up.

23              MS. FAENZA:  Just like a regular deposition that you

24         would show it to counsel first before you put it on the

25         screen just let them know the document.
```

```
 1              MR. MACDONALD:  It's the FMLA form.

 2      BY MR. MACDONALD:

 3          Q    Can you see what I'm showing you, Ms. Gonzalez?

 4          A    Yes.

 5          Q    I'll stop on these two pages.  This is the second

 6      page.  Have you ever seen these two pages in this document

 7      here?

 8          A    I did see them during Mr. Gonzalez's deposition.

 9          Q    Okay.

10              THE WITNESS:  Sorry, can we pause before you ask your

11          next question?  Somebody is knocking on the door here.

12          Sorry, just one second.

13              MR. MACDONALD:  Well, I'm going to ask that we finish

14          my line of questioning here --

15              THE WITNESS:  Somebody literally -- I understand.  I

16          didn't invite them in, but I have somebody knocking on the

17          door.

18              MR. MACDONALD:  I'm going to ask that you not take a

19          break right now unilaterally?

20              THE WITNESS:  Oh, my God.  Talk about harassment and

21          discrimination.  I'd like a break --

22              MR. MACDONALD:  Discrimination.  Wow.

23              MS. FAENZA:  Do not argue -- Mr. MacDonald, stop

24          arguing with my client.  That is unacceptable conduct.  We

25          are not having this discussion here.  We are not.
```

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1              MR. MACDONALD:  Your client just accused me of

 2         discrimination.  I mean, how ridiculous.

 3              MR. FAENZA:  We are not having this discussion.

 4              MR. MACDONALD:  You can yell all you want.

 5              MR. FAENZA:  I'm not yelling.  We're not having a

 6         discussion with this.

 7              MR. MACDONALD:  You are.

 8              MS. FAENZA:  Okay.  You know what, you want to start

 9         an argument with me it's going to have to happen some

10         other time.  It's not happening during a deposition, sir.

11              THE WITNESS:  Okay.  See, very easy.  Somebody

12         knocking on the door.

13    BY MR. MACDONALD:

14         Q    Okay.  Have you ever seen these documents before,

15    these pages?

16              MS. FAENZA:  Objection.  Asked and answered.

17         A    Yes, I told you.

18    BY MR. MACDONALD:

19         Q    Besides at Mr. Gonzalez's deposition have you seen

20    these documents?

21         A    I don't believe I had seen them before that.  I don't

22    believe so.  I do remember seeing them then.

23         Q    And looking at this document at the top it says

24    Designation Notice Under the Family Medical Leave Act, correct?

25              MS. FAENZA:  Objection.
```

1        A     That's what the document says.

2    BY MR. MACDONALD:

3        Q     And under Section 1 for employer, do you see where it

4    first list the date February 9th, 2024?

5        A     Okay.  February 9th, 2024, yes.

6        Q     Okay.  And do you see under that where it says from

7    GOAT Hospitality Group, the employer?

8        A     I do see it says from and I see in parenthesis it

9    says employer so it was from GOAT Hospitality Group but because

10   Eric filled it out and he works for GOAT, filled out GOAT

11   Hospitality, but probably this should have said employer

12   WGOAT15 LLC.

13       Q     Do you know for a fact that's why Mr. Garcia filled

14   it out in that matter?

15       A     I'm fairly certain that that's why.  I can't get

16   inside Mr. Garcia's intent here, but I could also reasonably

17   see why it was written that way when it says from and that's

18   the company he works for so he wrote from GOAT.

19       Q     Have you spoken to Mr. Garcia about that

20   specifically?  You know that for a fact?

21             MS. FAENZA:  Objection.

22       A     I don't know if I've spoken to him specifically about

23   that.

24   BY MR. MACDONALD:

25       Q     Are you speculating when you say that that's why he

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    filled it out in this manner?
 2              MS. FAENZA:  Objection.
 3        A    I thought I just clarified that.  I couldn't get in
 4    his mind to know exactly why, but that's what I could foresee
 5    if he wrote from and he's from GOAT.
 6    BY MR. MACDONALD:
 7        Q    Did you consider asking him?
 8              MS. FAENZA:  Objection.
 9        A    I mean, I don't know what that would do for me.  He
10    wrote it.  You know, it's there.  To know his intent.
11    BY MR. MACDONALD:
12        Q    Right.  Did you ever consider speaking to him to
13    understand his intent?
14              MS. FAENZA:  Objection.  Asked and answered.
15        A    I haven't, no.
16    BY MR. MACDONALD:
17        Q    Okay.  And on the next line do you see where it says
18    Carol Alvarez and then employee in parenthesis?
19        A    Yes.
20        Q    And under it it looks like it says the date again,
21    February 9th, 2024; is that correct?
22              MS. FAENZA:  Objection.
23        A    Yes.
24    BY MR. MACDONALD:
25        Q    Was this FMLA form given from Mr. Garcia to
```

```
 1    Ms. Alvarez?

 2         A    That's my understanding of what this document is,

 3    yes.

 4         Q    And on the reason for request for leave the box it

 5    says the birth of a child or placement of a child with you for

 6    adoption or foster care and to bond with the newborn or newly

 7    placed child, that box is checked, correct?

 8              MS. FAENZA:  Objection.

 9         A    Yes, it appears that it's checked, two check marks.

10    BY MR. MACDONALD:

11         Q    And then towards the bottom it looks like under the

12    additional information needed section it says:  If you have any

13    questions please contact, and it list Eric Garcia, in

14    parenthesis name of employer, FMLA representative. Is that

15    right?

16         A    Yes.  Uh-huh.

17         Q    Was Mr. Garcia the FMLA representative for WGOAT15?

18              MS. FAENZA:  Objection.

19         A    He wasn't specifically designated as such, but it was

20    his responsibility to see how like the types of general HR

21    matters.

22    BY MR. MACDONALD:

23         Q    And was Mr. Garcia designated by GOAT Hospitality

24    Group as an FMLA representative?

25              MS. FAENZA:  Objection.
```

Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        A    Yes, he would have handled the HR for GOAT

 2   Hospitality Group as well as handle such things.  So there you

 3   go, maybe he used a form that he used for GOAT in the past, I

 4   don't know.

 5   BY MR. MACDONALD:

 6        Q    Well, I understand he might have handled those things

 7   in the course of business, but was he designated by GOAT

 8   Hospitality Group specifically?

 9             MS. FAENZA:  Objection.

10        A    He would be the individual to handle it for GOAT

11   Hospitality Group as he also provided HR for GOAT, the company

12   he worked for.

13   BY MR. MACDONALD:

14        Q    But did GOAT Hospitality Group have an official FMLA

15   representative?

16             MS. FAENZA:  Objection.

17        A    No, not specifically designated, no.  I also see it

18   says not approved and there's like a check mark next to that

19   too.  Not approved.  Select as appropriate.  Check the box.

20   The FMLA does not apply to leave request.  Check the box.  As

21   of the date the leave is to start you do not have any FMLA

22   available to you.  I see that checked too.

23   BY MR. MACDONALD:

24        Q    Is this form accurate?

25             MS. FAENZA:  Objection.
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

 1      A    No.  No, it's not because if the employer was

 2   supposed to go on that line, that's not accurate.

 3   BY MR. MACDONALD:

 4      Q    Was Mr. Garcia violating GOAT Hospitality Group's

 5   policies by filling out this form?

 6           MS. FAENZA:  Objection.

 7      A    I don't think it was a violation of policy because

 8   like we said we don't have an FMLA policy in place so he

 9   wouldn't have violated it.  Is it an error and a typo, yeah,

10   the same way somebody makes a bad burger and you need training.

11   You know, you can have corrective action, hey, got a typo on

12   this form here, make sure the next one is all set and ready.

13   Okay.  Perfect.  Like where it's not like necessarily like you

14   have to take disciplinary actions or how about just correction.

15   BY MR. MACDONALD:

16      Q    And is the same true for WGOAT15?

17      A    Yeah.

18           MS. FAENZA:  Objection.

19   BY MR. MACDONALD:

20      Q    And then looking at the second page it looks like it

21   list the same date as well and it says notice of eligibility

22   and rights of responsibility and it list Family Medical Leave

23   Act; is that right?

24      A    Where are we at?  Which part?  I'm sorry, I had it

25   zoomed in so you moved and now I'm on the wrong spot now.

Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        Q    Can you see it now?

 2             MS. FAENZA:  What section are you referring to,

 3        Mr. MacDonald?

 4             MR. MACDONALD:  It's the title.

 5        A    The notice of eligibility and rights and

 6   responsibilities, that title under the Family Medical Leave

 7   Act?  Do not send to the Department of Labor, provide to

 8   employee.

 9   BY MR. MACDONALD:

10        Q    Have you seen this specific page of this document

11   before?

12             MS. FAENZA:  Objection.

13        A    Okay.  We went over this.  I do recall seeing

14   this during Mr. Gonzalez's depo.  I don't recall if I had seen

15   this before that.

16   BY MR. MACDONALD:

17        Q    Now, this page looks like it says February 9, 2024

18   looks like it's filled in there, we learned you need leave

19   beginning on February 10, 2024 for one of the following

20   reasons.  Do you see that?

21        A    Yes.

22        Q    Looks like the same check box is checked there,

23   correct?

24        A    Yeah, and according to this Eric -- maybe that would

25   be the date that he learned of the request for her leave.  I
```

1    don't know if that's the date she made Eric aware of her

2    pregnancy, but she needed to leave the very next day.

3        Q    And it looks like for the notice of eligibility she

4    was deemed not eligible just like the last one we looked at,

5    right?

6            MS. FAENZA:  Objection.

7        A    It does say at the bottom not eligible for FMLA leave

8    because, only one reason needs to be checked, you have not met

9    the FMLA 1,250 hour service requirement.  As of the date of

10   service you requested leave you only have 627 hours towards

11   this requirement.

12   BY MR. MACDONALD:

13       Q    Is this form accurate?

14           MS. FAENZA:  Objection.

15       A    In part.

16   BY MR. MACDONALD:

17       Q    Which aspect is correct?

18       A    The hours she worked are correct from my

19   understanding that she wouldn't qualify for FMLA, that would be

20   correct.  Her name was Carol Alvarez.  From my understanding

21   the date it was filled out was correct, the date she requested

22   it, one day, 24 hours notice.  I think the biggest thing to me

23   that would be incorrect would be the name of the employer and

24   again here it says from.  It should say the actual employer,

25   WGOAT15.

Deposition of Lisa Gonzalez                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        Q    That was a mistake?

 2             MS. FAENZA:  Objection.

 3        A    That was my understanding, yeah.  She never worked

 4   for GOAT.

 5             MR. MACDONALD:  And for the record, we'll mark this

 6        as Exhibit 4.

 7             (Whereupon, Plaintiff's Exhibit 4 was marked for

 8        identification.)

 9   BY MR. MACDONALD:

10        Q    Now, a moment ago you referenced the burger incident

11   we spoke about earlier.  What date did that occur when you came

12   into the restaurant and --

13             MS. FAENZA:  Objection.  Asked and answered.

14        A    I'm sorry, what date did I come into the restaurant?

15   BY MR. MACDONALD:

16        Q    Yes.

17        A    Oh, I did see that in here.  It was asked and

18   answered.  I don't know, but I did see it in the document.

19   Where is it?  November 7th, 2023.

20        Q    And you were visiting the restaurant that day as a

21   patron?

22             MS. FAENZA:  Objection.

23        A    Yes, that day I ordered as a regular customer.

24   BY MR. MACDONALD:

25        Q    And were you with anyone?
```

Deposition of Lisa Gonzalez                              Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        A    I know I wasn't eating alone, but I can't recall who

 2   I was with.

 3        Q    What time of day was it?

 4        A    I recall that being for lunch.

 5        Q    And what exactly happened in terms of the food

 6   service and the issues that arose?

 7             MS. FAENZA:  Objection.  Asked and answered.

 8        A    I ordered a burger, a smash burger, and what I

 9   received was an incredibly raw patty in between two buns, which

10   is not at all how it's supposed to be cooked.  We don't -- by

11   policy also we don't serve any of the burgers raw.  It's not

12   that -- it's not -- the ground beef we order is not intended to

13   be eaten raw.  There are different qualities of meat.  Some is

14   meant -- you can eat raw like if you were to eat like a

15   carpaccio or something like that.  This was not.  This is

16   ground beef so you do want to make sure it's cooked thoroughly.

17   And the specific style and preparation of a smash burger, it's

18   supposed to be cooked all the way through.  Like there wouldn't

19   even be the opportunity for you to say, do you want it well

20   done, do you want it rare?  Like it's supposed to be done.

21   BY MR. MACDONALD:

22        Q    Who was your server that day?

23        A    I can't recall who the server was because it wasn't a

24   service issue so it doesn't stand out to me who the server was.

25        Q    But you did have a server?  You didn't like, for
```

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    example, bring out the food yourself?
 2              MS. FAENZA:  Objection.
 3         A    No.  I don't think I paid for it.  I think I sent it
 4    back.
 5    BY MR. MACDONALD:
 6         Q    When you would eat at the restaurant did you normally
 7    like comp the meals as in receive it for free?
 8              MS. FAENZA:  Objection.  Outside the scope.
 9         A    I mean sometimes I would.  I didn't eat there every
10    day.
11    BY MR. MACDONALD:
12         Q    Okay.  But when you would eat there you would
13    sometimes comp the meal?
14              MS. FAENZA:  Objection.  Asked and answered.
15         A    Sometimes, yeah, I'd comp the meal for the company I
16    owned, yeah.
17    BY MR. MACDONALD:
18         Q    And you don't recall if you did this particular day,
19    correct?
20              MS. FAENZA:  Objection.  Asked and answered.
21         A    But in no event would I have charged somebody for
22    that burger that was received.  Whether you're a patron or
23    myself I wasn't going to charge anybody for that.  So that
24    would have gone as, so it was properly accounted for, as like a
25    send back.  So, no, I mean, nobody was going to pay for that.
```

```
 1    BY MR. MACDONALD:

 2         Q    Once you received the burger that was undercooked

 3    what did you do exactly?

 4              MS. FAENZA:  Objection.  Asked and answered.

 5         A    I had notified the managers and I definitely notified

 6    the chef and said, hey, look, this is not okay.  Thank goodness

 7    I was the one who caught this so it didn't go to any other

 8    customers and we get any bad reviews.  You can't do anything

 9    about those bad reviews on Yelp or Google or anything like

10    that.  They stick there.  So, thankfully, I was the one who

11    caught it and, you know, nothing happened from it.  And, hey,

12    we need to tighten up, that we need more training in the back

13    and to make sure that all the staff -- I saw it as a training

14    opportunity, hey, here's a perfect example.  Thankfully I was

15    the example that we need to tighten up on everything that's

16    being done and what's going out to have consistency following

17    all of the recipes and making sure that, I mean, number one is

18    safety, food safety, but everything else needs to be followed

19    as well.  And also make sure, what if you did have somebody

20    with heaven forbid an allergy or something like that that we

21    need to cook within certain parameters.

22    BY MR. MACDONALD:

23         Q    Who are the managers that spoke to you?  You have to

24    look at a document for that?

25         A    Yeah, because I can't -- in November it would have
```

1    been Max would have been there and so would have -- Max and

2    Richard would have been in the kitchen then.

3        Q    Who would be in the front of the house, if anyone?

4             MS. FAENZA:  Objection.

5        A    It wasn't a front of the house issue because that's

6    also something I, hey, is it a front of house issue, let me

7    look at the ticket.  Like if I ordered something with no cheese

8    but by default it comes with cheese, right, it's up to the

9    server to put it on your ticket no cheese on this order.  I've

10   had that happen.  This is an example for me because I don't eat

11   dairy.  So if I order something without cheese, well, my first

12   thing is I'm going to look at the ticket, did you plug it in

13   correctly.  Then I know it's a service issue.  That's not the

14   back of the house.  They cooked what they received.  That was a

15   service issue.  For this one it wasn't because it was

16   undercooked.  No one is going to write please undercook this so

17   severely that it's sent back.  That's not a service issue.  It

18   has nothing to do with my server.

19   BY MR. MACDONALD:

20       Q    There was no front of house manager, correct?

21            MS. FAENZA:  Objection.

22       A    There was a front of house manager.

23   BY MR. MACDONALD:

24       Q    But they weren't involved in the interaction?

25       A    No, because it wouldn't have been for them to correct

Deposition of Lisa Gonzalez                           Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    at all because it didn't have anything to do with service.

 2         Q    And the two managers in the back of house were

 3    Carvallo and then --

 4         A    And then Richard Fuentes.  Richard Fuentes was less

 5    of a manager, though, because he wasn't a direct employee of

 6    WGOAT.  He was hired for like menu development and stuff like

 7    that, creating the recipes.  He did work in the kitchen as

 8    oversight to make sure that recipes and stuff were being

 9    followed and stuff because they did originate from him and the

10    company he worked for so he was in the back and he did provide

11    leadership to the back, but it would probably have more fallen

12    under Max.

13         Q    And which company did Mr. Fuentes work for?

14         A    Oh, gosh, I can't remember.

15         Q    Did he work for GOAT Hospitality Group?

16         A    No, he worked for a third party.  I cannot think --

17    I'm sorry, I can't think of the name of the exact company that

18    he was an employee of and we had hired that company for like

19    very specific menu development.

20         Q    Okay.  And Mr. Carvallo, he's accused of sexual

21    harassment in this case; is that correct?

22              MS. FAENZA:  Objection.

23         A    If that's what your complaint says.

24    BY MR. MACDONALD:

25         Q    Are you aware of the fact, though, of the allegation?
```

```
 1              MS. FAENZA:  Objection.  Instruct the witness not to

 2         respond to anything privileged.

 3    BY MR. MACDONALD:

 4         Q    Are you looking at documents?

 5         A    I pulled up the Amended Complaint.

 6         Q    Well, I'm just asking you generally.  I would ask

 7    that you not look at any document unless you need to look like

 8    you said before.  If you don't recall you can let me know.

 9              MS. FAENZA:  Same objection.

10         A    I do recall there being allegations against Max.

11    BY MR. MACDONALD:

12         Q    Were there allegations against Mr. Fuentes as well?

13              MS. FAENZA:  Objection.

14         A    There's seem to be a theme where there were

15    allegations against every male.

16    BY MR. MACDONALD:

17         Q    A theme?  What do you mean by theme?

18              MS. FAENZA:  Objection.

19         A    From my understanding there were allegations against

20    Max; there were allegations against Abelardo; there were

21    allegations against Eric.  Like she accused everybody.

22    BY MR. MACDONALD:

23         Q    By "she" you're referring to Ms. Alvarez?

24         A    Yes.

25         Q    So when you spoke to Mr. Carvallo and Mr. Fuentes
```

1    what did they say in regards to the issue with the burger?

2         A    That there needed to be additional training on that.

3    You don't serve burgers like that.  Everybody agreed that that

4    wasn't appropriate to undercook the food so severely.

5         Q    Did you speak to Ms. Alvarez when this happened?

6         A    I didn't speak to her directly because I was not the

7    one providing her with the training and oversight for her

8    position so I let her manager handle that.

9         Q    Do you know for a fact that someone at WGOAT15 spoke

10   with her regarding this incident?

11        A    From my understanding, yes, that I believe someone

12   did speak to her about it.

13        Q    Do you know for certain?

14             MS. FAENZA:  Objection.

15        A    From my understanding, yes, that there was a

16   conversation had with her, hey, you at least need more

17   training, you at least need more oversight, don't send any

18   other burgers out like that.

19   BY MR. MACDONALD:

20        Q    Who spoke to Ms. Alvarez about that?

21        A    I believe Max or Richard or both.

22        Q    You don't know?

23             MS. FAENZA:  Objection.

24        A    I'm looking here.

25   BY MR. MACDONALD:

1       Q    Again, I would not ask that you search through the

2   documents as you testify here.  If you need to look to recall

3   I'm happy to let you do that, but as a routine matter I ask

4   that you not be looking at the screen while you're testifying

5   here today.  Okay?

6            MR. FAENZA:  Objection.

7       A    Off the top of my head I don't recall exactly who

8   spoke to her for that particular incident.

9   BY MR. MACDONALD:

10      Q    Was it documented at the time?

11           MS. FAENZA:  Objection.  Asked and answered.

12      A    I don't have like a write-up record from it.

13  BY MR. MACDONALD:

14      Q    Was there any kind of written reprimand or anything

15  of that issue as to Ms. Alvarez?

16           MS. FAENZA:  Objection.  Asked and answered.

17      A    Could you repeat that?

18  BY MR. MACDONALD:

19      Q    Were there any disciplinary actions or any kind of

20  written reprimand issued to Ms. Alvarez to document this

21  incident when it happened?

22      A    I don't have like a formal write-up.

23      Q    And are you aware of any that exist, any kind of

24  written documentation of this?

25      A    I don't have a formal disciplinary action in my file

Deposition of Lisa Gonzalez                         Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    for her so I'm not aware of one.

 2         Q     And just to clarify, you don't mean personally, you

 3    mean you're not aware of one on behalf of the company, correct?

 4         A     Correct.

 5         Q     Okay.  Was there any witnesses to the burger being

 6    undercooked specifically besides you, of course?

 7         A     I mean, I know I had sent it back to the kitchen.  I

 8    know I sent it to the manager.  I just can't remember if it was

 9    Richard or Max to say, hey, look at it, like use this as an

10    example, use this as a learning opportunity, don't do this.

11    This is not okay.  Things do happen in the kitchen by example.

12    So this is how you chop an onion, this is how you prepare

13    something.  Okay.  This is an example of what not to do.

14         Q     Was this a serious issue in your mind when this

15    happened?

16         A     Yeah, because it's food safety and that's number one.

17    So number one is food safety.  Number two is getting at least

18    the order right, stuff like that.  But number one is always

19    food safety.

20         Q     The number one priority?

21         A     Yeah.

22         Q     If food safety is so crucial and this was such a

23    major incident why wouldn't this be documented?

24               MS. FAENZA:  Objection.

25         A     It wasn't documented as a write-up.  I can't say why.
```

 1    Again, thankfully, it was to me and it was, like I said, a nice

 2    learning opportunity rather than saying to disciplinary, like

 3    discipline someone.  I mean, I even take that approach with my

 4    kids.  I'm not just going to kind of come down on you and

 5    constantly like defeat you like here's a disciplinary action.

 6    What do you learn from it?  Go to time out.  No, come here, I'm

 7    going to show you how you fold your clothes and put them away,

 8    you know.  I think you learn more from it.

 9    BY MR. MACDONALD:

10         Q    Was that issue that day a fireable offense in your

11    mind?

12         A    Probably.  Because you failed to meet basic health

13    standards, but I also think that people can be given second

14    chances and opportunities and people can learn and I feel like

15    it's something that you can learn from and continue.  Is it

16    fireable that you completely did that?  Well, you got someone

17    sick.  Would that person who received the burger and got sick

18    think that's a fireable offense, yeah.

19         Q    Did you consider firing Ms. Alvarez?

20         A    Like I said, my perspective as an employer and, you

21    know, as a leader is to provide opportunities and at the same

22    time too if things go wrong I have to say, well, how are we

23    going to fix them in the future.  If I just fired you would

24    that necessarily, no, but if I train you and I think that

25    you're someone that can be trainable and can do it, great.

```
 1   Like that's I think a better way forward, but I do think it was

 2   probably a fireable offense and she didn't get fired for it.

 3        Q    Was Ms. Alvarez ever fired?

 4        A    No.

 5        Q    Despite her poor permission in your mind?

 6             MS. FAENZA:  Objection.

 7        A    She didn't, but I also think that people can come

 8   back.  I think people have bad times.  Even sitting here

 9   answering questions for a lawsuit like you can say I choose the

10   positive side.

11   BY MR. MACDONALD:

12        Q    I'm going to show you a document.  This has been

13   produced by Defendants.  It's a form.

14             MS. FAENZA:  What is the document you're showing?

15             MR. MACDONALD:  It's a form produced by Defendants.

16             MS. FAENZA:  Okay.  You need to state what you're

17        going to produce first.  Okay?

18             MR. MACDONALD:  Okay.  I just did.

19             MS. FAENZA:  I just ask exactly as you do in a

20        regular deposition let me know what you're going to show.

21        That's it.  Then you put it up.

22             MR. MACDONALD:  Sorry.  That's all --

23             MS. FAENZA:  Not on this one.  I think on the other

24        one, but each time I ask.

25   BY MR. MACDONALD:
```

```
 1        Q    So I'll give you a moment to review this document.
 2   And this is Exhibit No. 5.
 3            (Whereupon, Plaintiff's Exhibit 5 was marked for
 4        identification.)
 5        A    Okay.  I can see it on your screen.
 6   BY MR. MACDONALD:
 7        Q    Do you recognize this document?
 8        A    It's a GOAT Hospitality form, yes.
 9        Q    Have you seen it before, though?
10        A    I have.
11        Q    And you recognize it as a form from GOAT Hospitality
12   Group LLC; is that right?
13            MS. FAENZA:  Objection.
14        A    Yes.
15   BY MR. MACDONALD:
16        Q    And is this a form that's routinely used by GOAT
17   Hospitality Group LLC at the time of its creation?
18        A    Yes.
19        Q    What is it used for?
20        A    To document types of action.  So you can see under
21   there it has some things to document about this employee, and
22   this particular employee was Ms. Carol Alvarez.
23        Q    And it list Ms. Alvarez specifically as the employee
24   on this form, correct?
25        A    Yes, on the top left it says employee name Carol
```

1    Alvarez.

2         Q     And under that it says location 123 ADDiKT.

3         A     Uh-huh.

4         Q     Do you know what the 123 indicates?

5         A     That was a code assigned by ADP.  I don't know why

6    123 ADDiKT.

7    BY MR. MACDONALD:

8         Q     And is that referring to the location of GOAT

9    Hospitality Group?

10        A     No, it ADDiKT, the location ADDiKT.  That's the

11   client from GOAT.  That's what this pertains to, ADDiKT, but

12   was prepared by Eric who works for GOAT so he's using a GOAT

13   form.  But the 123 part was assigned by ADP.  Like that doesn't

14   have any significance for GOAT or for WGOAT.  It was just the

15   number assigned.

16        Q     And the date at the top is February 12, 2024?

17        A     Yeah, it says effective date Monday, February 12,

18   2024.

19        Q     And is this the employment form that was used, the

20   primary form that was used generally?

21             MS. FAENZA:  Objection.

22        A     Well, it was to document things.  It was a form that

23   GOAT used.

24   BY MR. MACDONALD:

25        Q     To document employment actions, correct?

Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1              MS. FAENZA:  Objection.

 2        A    I mean, you could say that, yeah.

 3  BY MR. MACDONALD:

 4        Q    In this form there's a few boxes that listed under

 5  type of action.  There's job change, leave of absence, payroll

 6  change, transfer, and other slash resignation and then there's

 7  one for termination that appears to be checked; is that right?

 8        A    That is correct.

 9        Q    Was Ms. Alvarez terminated?

10              MS. FAENZA:  Objection.  Asked and answered.

11        A    Her termination and termination reason, if you go

12  down to the bottom of it above the signature, termination

13  reason, employee decided to end employment.  Quit.

14  BY MR. MACDONALD:

15        Q    Where are you seeing this?

16        A    Above the signatures.  It's in bold.  Termination

17  reason, employee decided to end employment.  So that's what was

18  documented.  There was a termination of the employee's

19  employment.  The reason for the termination was she decided to

20  end it, a/k/a quit.

21        Q    okay.  So she was terminated because she quit?

22              MS. FAENZA:  Objection.

23        A    Yeah.

24  BY MR. MACDONALD:

25        Q    And then under that in those boxes it looks like
```

```
 1    there's option for title, department, operating location, full
 2    time, part-time, there's a box for current and changed year.
 3    Is that right?
 4         A    Yes.
 5         Q    So is this form used for changing things like title,
 6    department, property location, full time or part-time then?
 7         A    Looks like it can be, yes.
 8         Q    And under leave of absence it looks like there's a
 9    couple of different categories.   There's medical, family,
10    personal, and other.   Do you see that?
11         A    Yes.
12         Q    And then these signatures here, do you know who the
13    director is that signed this form?
14         A    I'd be guessing if I told you who those exact
15    signatures would be.   It's not like somebody like handwrote.
16    They're two scribbled signatures.
17         Q    Was there someone that was a director?
18         A    So I'm not sure who signed under the director and
19    executive chef ones.   I would assume the human resources one is
20    Eric, but, honestly, I don't see an E and I don't even see a G
21    in that signature.   There may be slightly a G for Eric Garcia
22    on that one.   So I can't say unless I would see something else
23    like the individuals have signed.
24         Q    Do you know if this form was used for any of
25    Ms. Alvarez's leaves of absence that we discussed earlier?
```

1        A     Not that I'm aware of.  This is the only form I had

2    for her for this one.

3        Q     And was that in accordance with the companies, either

4    company, being WGOAT15 or GOAT Hospitality Group LLC's policies

5    that it was not filled out for the medical leaves of absence or

6    was that in error?

7              MS. FAENZA:  Objection.

8        A     No, I just don't think it was done.  They had her --

9    she had provided her documentation for her leave so I don't

10   think we needed extra documentation for her leave and then it

11   was just documented her reason for leaving as of February 12th

12   and everybody signed off on February 16th that, yes, that was

13   her reason for her termination of employment with the company

14   was that she chose to end it.

15   BY MR. MACDONALD:

16       Q     Now, if WGOAT15 LLC was Ms. Alvarez's employer why

17   was GOAT Hospitality Group producing this form?

18             MS. FAENZA:  Objection.

19       A     Because they were overseeing those types of HR

20   functions so they were assisting with that.  They did not fire.

21   Nobody was fired in this case.

22   BY MR. MACDONALD:

23       Q     They were assisting with things like fire?

24             MS. FAENZA:  Objection.

25       A     No.

```
 1              MS. FAENZA:  Asked and answered.

 2       A     They wouldn't make the decision to fire any employees

 3   for any of their clients.  They could potentially like

 4   recommend, hey, this is what I would recommend but they aren't

 5   and they don't have the ability to fire anyone.  It would be up

 6   to the management.  So, for example, I don't know, serving

 7   really terribly undercooked food, a fireable offense, but

 8   management chose not to.

 9   BY MR. MACDONALD:

10       Q     But a moment ago you told me that GOAT Hospitality

11   Group assist with these kinds of actions.  So is it fair GOAT

12   Hospitality Group assisted with the termination here?

13              MS. FAENZA:  Objection.

14       A     No, they documented it.  They didn't assist with any

15   sort of -- they documented it and to me that would be

16   assistance to keep track of it.  So they put it on their form

17   and I can't say for certainty that those would be Max and

18   Richard.  The top one does look like an R.  There could be an M

19   in the middle there too, but, you know, documentation that.

20   That's what happened.

21   BY MR. MACDONALD:

22       Q     Did they make a recommendation in this case regarding

23   this employment action?

24              MS. FAENZA:  Objection.

25   BY MR. MACDONALD:
```

```
 1        Q     They being GOAT Hospitality Group.

 2        A     No, nobody made any recommendation.  She quit.  What

 3   do you recommend someone to quit?  I've never seen that

 4   recommendation.  I recommend the employee quit.

 5        Q     Did Ms. Alvarez ever make any requests to not lift

 6   any items in the workplace?

 7        A     Not that I'm aware of.

 8        Q     Did GOAT Hospitality Group or WGOAT15 have any

 9   policies regarding pregnant workmen's inability to perform

10   certain physical functions of their jobs?

11        MS. FAENZA:  Objection.  Asked and answered.

12        A     If you had a physical inability to perform any

13   function of your job, and especially if it changed from when

14   you were hired, you know, such as, hey, I'm pregnant and I have

15   now -- my needs have now physically changed, you would need to

16   let people know.  And like I said, GOAT and WGOAT would make

17   reasonable accommodations.  And I gave you some examples before

18   of people that like needed accommodations and I gave you one

19   example of somebody making it work for everybody.  Both

20   companies would do that.  And then Eric was also in a position

21   to birds-eye view how do I meet the needs -- the managers have

22   their duties and tasks, how do I meet the needs that the

23   customers and the employee, everybody's, you know, needs are

24   being met and we're making the appropriate accommodations for

25   what they're asking for.  And he's that neutral third party
```

```
 1   that if you needed to say something without saying it

 2   necessarily to your superior you could and, you know, if

 3   something needed to be kept confidential it would be.

 4   BY MR. MACDONALD:

 5        Q    So if I understand you correctly, it's the

 6   Defendants' position that there was no request made for

 7   Ms. Alvarez to not lift any kind of heavy objects; is that

 8   correct?

 9             MS. FAENZA:  Objection.

10        A    I don't have any documentation of that request.  I

11   also don't -- like just knowing her role and responsibilities

12   as a corporate rep and an owner of that company that as a line

13   cook like what really heavy objects she would be lifting.  So

14   if she needed to not lift something that was, I don't know,

15   five pounds, something like that I would consider light that

16   was definitely not brought to anyone's attention so they could

17   accommodate her during that period of need because she wasn't

18   assigned to bring in the inventory.  The vendors would bring it

19   in on pallets and she wasn't assigned to open the boxes, move

20   the boxes, or even put away the inventory.  So to me those are

21   the tasks for lifting that wasn't even necessary as part of her

22   job duties but if there was something within her job duties

23   that was too heavy to her she needed to have communicated that

24   and I have no documentation of it.

25   BY MR. MACDONALD:
```

1    Q    She needed to communicate her restrictions on her

2    ability to lift heavy objects; is that what you're saying?

3           MS. FAENZA:  Objection.  Misstates testimony.

4    A    I do think that she would have needed to communicate

5    that.  Well, first, I don't think there was any heavy objects

6    necessarily in her job description at all so she wouldn't

7    necessarily been asked, but if what she was lifting was too

8    heavy for her prior to her pregnancy or prior to some point in

9    time when her needs changed, I don't know how anybody would

10   have read her mind to know that she needed to lift less.  Like

11   she never made an accommodation to ask for that.

12   BY MR. MACDONALD:

13   Q    Do you know if Ms. Alvarez was visibly pregnant at

14   the time?

15           MS. FAENZA:  Objection.

16   A    No, not that I know of.

17   BY MR. MACDONALD:

18   Q    Were any restrictions placed on Ms. Alvarez's ability

19   to use the bathroom at any point during her employment?

20   A    No.  There was no restrictions.  She could always go

21   to the bathroom.  The only thing was you had to tell your other

22   team members, tell your supervisor, I need to leave the line, I

23   have to go take care of my business, got to go, unlike sitting

24   in this deposition, can't take a break.  You can take a break

25   at work, don't worry.

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
1        Q    So if I understand you correctly you had to ask in

2   advance of using the bathroom to use the bathroom?

3            MS. FAENZA:  Objection.

4        A    You just can't leave the line unattended.  So it's

5   not necessarily that you have to ask, but you have to let

6   somebody know, hey, I'm stepping away, I'll be right back.  And

7   it wasn't that like I have to ask you, can I please go to the

8   bathroom, please, no, but I can't leave everything unattended.

9   BY MR. MACDONALD:

10       Q    And was it considered a violation of WGOAT15's

11  policies if an employee did not give that advance notice?

12           MS. FAENZA:  Objection.

13       A    Yes.  And the same thing with a server, you just

14  can't disappear, but you can use the bathroom any time you need

15  to use the bathroom but the people are like where did you go,

16  are you coming back.  You just can't leave unattended.

17  BY MR. MACDONALD:

18       Q    Do you know if Ms. Alvarez was ever confronted about

19  her ability to use the bathroom or the notice that she was

20  giving in regards to the bathroom?

21           MS. FAENZA:  Could you repeat the question?

22       A    Yeah, I'm sorry, I didn't hear it.

23  BY MR. MACDONALD:

24       Q    Was Ms. Alvarez ever confronted or was there any

25  issue made of her using the bathroom at any point during her
```

```
 1   employment?

 2        A    From my understanding she was taking breaks and using

 3   her cell phone and that would be a violation of company policy

 4   just to leave and go talk on the phone in the hallway and leave

 5   your shift unattended and not say anything.  That would be a

 6   violation.  If you have an emergency call you just need to tell

 7   your supervisor I've got an important call, I'm so sorry.  Hey,

 8   she has a kid now.  If my kid's school is calling me I'm

 9   picking this up.  I know what that's like.  If you need to,

10   yes, but, you know, of course, being on your phone during work

11   was -- you know, it's limited, only if you absolutely had to

12   and even then just tell your supervisor.  Handle what you need

13   to handle and get back to work.

14        Q    So if I understand you correctly, Ms. Alvarez had

15   issues with using her phone on the line or she was taking

16   breaks to use her phone?

17        A    From my understanding she was taking incredibly long

18   breaks and she'd go in the halls and just be on her cell phone.

19   She wasn't like using the restroom and then she's like I have

20   to use the restroom.  Well, of course, no one is going to say

21   no, use the restroom.  You need to go.  But then if you walk

22   down the hallway and you see her just on her phone then the

23   supervisor is like you just told me you need to use the

24   restroom but you're out here forever on your phone.  Like

25   that's not okay because now everybody else is having to pick up
```

1    the slack for you.

2        Q    And who made you aware of those instances that you

3    described?

4        A    I had heard about those instances through Eric.

5        Q    Were there ever any issues with Ms. Alvarez's use of

6    breaks, for example, to eat a meal or do anything else really?

7        A    No, everybody was given meal breaks.  Again, though,

8    you had to let people know.  You can't just disappear and let

9    nobody know when you're coming back.  You know, customers

10   always seem to come like you might be empty and then all of a

11   sudden full.  So if you turned around, where's the line cook,

12   where are the orders, they're all stocked and all jammed up and

13   a whole bunch of angry customers outside, it's bad for

14   everybody.  But everybody works as a team.  So you need to use

15   the restroom just say something.  So guess what, now the server

16   knows to tell the customer, you know, it's going to be a little

17   bit longer and manage expectations.

18       Q    And Ms. Alvarez was not giving the advance notice and

19   that was the issue; is that right?

20            MS. FAENZA:  Objection.

21       A    From my understanding they had corrected her several

22   times saying, yes, use the bathroom, but you're abusing these

23   bathroom breaks because you're being on your cell phone.

24   BY MR. MACDONALD:

25       Q    Was Ms. Alvarez using her cell phone in the bathroom?

```
 1           MS. FAENZA:  Objection.

 2      A    It was more in the hallways that she was using them.

 3 I wasn't necessarily told in the bathroom so that's how the

 4 supervisors knew.  And I will point to the handbook, there is a

 5 personal electronic usage which mirrors exactly what I said.

 6 It says:  It is the policy of Mia that employees may not

 7 maintain or use their personal cell phones during a shift but

 8 if you have an emergency and you need to use your personal

 9 device please notify your supervisor first.

10      So if you needed to handle something all it took was to

11 say I really have to handle this right now rather than being

12 half there, half not.

13 BY MR. MACDONALD:

14      Q    At any point did Ms. Alvarez have to miss work, not a

15 standard leave request, but miss work on short notice because

16 of her pregnancy?

17      A    I was told that she was having issues with the

18 short-term.  Like the policy was three hours and that she

19 didn't even want to provide that and so our staffing was

20 difficult for the line because we needed to know whether

21 they're showing up or not.  If you're trained to make all the

22 recipes, I need to make sure either somebody can come in that's

23 who's trained there because I didn't have a ton of back-up

24 staff for that position to be trained for that.  You know, and

25 a lot of the staff worked multiple jobs so if you missed your
```

 1    shift and I were to call in back-up they might have already

 2    taken another shift at another place, you know, of the time

 3    that would happen.

 4         Q    How many times did that occur?

 5         A    I don't know if I have the exact number.

 6         Q    Is anyone aware of that exact number from the

 7    company, either GOAT Hospitality Group or WGOAT15?

 8         A    Probably a combination of Eric, Max, and Abelardo.  I

 9    couldn't get you a more definite number of that.

10         Q    And you understand you were under an obligation to

11    gather that information in advance of today's deposition?

12              MS. FAENZA:  Objection.

13         A    You throw in my face like all these like obligations,

14    the exact people I should have talked to about the exact topics

15    I should have talked to them about based on your areas of

16    inquiry.  I wasn't under an obligation to call Max, to call

17    Abelardo, and call Eric and say can you please tell me exactly

18    how many times Carol was caught in the hallways just talking on

19    her phone and not at the line.

20    BY MR. MACDONALD:

21         Q    Really?

22              MS. FAENZA:  Mr. MacDonald, we are not doing this

23         again.  We are not.

24    BY MR. MACDONALD:

25         Q    Okay.  And where do you get that information from

```
 1    regarding your obligations that you just mentioned?
 2              MS. FAENZA:  Absolutely not.  Mr. MacDonald, you are
 3         terminating this harassment of this witness.
 4              MR. MACDONALD:  No one is harassing the witness.
 5         You've got to stop with the discrimination and harassment.
 6         It's disrespectful to use those terms for a standard
 7         deposition question.  No one is harassing or
 8         discriminating against anyone.  I'm just asking her a
 9         question that she might disagree with but it's just a
10         single question.
11              MS. FAENZA:  It's a question.  It's not a single
12         question.  It's the same question that's been posed
13         multiple times and it's used for intimidation techniques.
14         If the witness doesn't know, the witness doesn't know.  It
15         is very clear that the issues in this deposition have
16         really nothing to do with this case, but, in fact, an
17         attack either on me personally as to whether I prepared my
18         client which is inappropriate, or, two, whether or not the
19         witness is prepared according to what you think, try to
20         obtain the information the best that you can.  You've
21         asked her multiple times whether or not she was aware --
22              MR. MACDONALD:  Can you stop with the speaking
23         objections?
24              MS. FAENZA:  Do not interrupt me, sir.  It is really
25         egregious.  It is really egregious.  Let the record
```

 1    reflect that the opposing attorney is shaking his head no.

 2    It's not the first time you've asked that.  Whether or not

 3    she's aware of her obligations as a corporate

 4    representative has been clearly established.  If you don't

 5    think she is meeting those --

 6         MR. MACDONALD:  Stop.

 7         MS. FAENZA:  You've already stated --

 8         MR. MACDONALD:  I'm allowed to ask questions as the

 9    questioning attorney and you don't have to -- get to do

10    speaking objections for ten minutes about how you disagree

11    with it.  Okay?  You can object just like to that

12    question.  You're more than welcome to do that but it's

13    improper and you've repeatedly made speaking objections

14    and I'm entitled to ask her about her preparation for this

15    deposition.  If you disagree then you can object.  That's

16    noted for the record.  You do not get to go on ten minutes

17    speaking objections.  So I'll go back to my question.

18         MS. FAENZA:  Mr. MacDonald --

19         MR. MACDONALD:  I'll go back to my questions, please.

20         MS. FAENZA:  If this continues with harassing this

21    witness with the same questions again and again we are

22    going to get to a point where I simply instruct her not to

23    answer.  The number of times you've asked her if she's

24    aware of her obligations as a corporate representative is

25    more than four or five.  And it's not a question.  It's a

```
 1          point of intimidation and it's a point of expressing

 2          displeasure.  That is not appropriate.

 3               MR. MACDONALD:  No, it's a matter of the obligations

 4          of the witness under the Federal rules of civil procedure.

 5          It's not a matter of my opinion.  It's a matter of her

 6          preparation, her legal obligation to be prepared, but I

 7          don't want to argue with you anymore.  I'd like to go back

 8          to my questioning.  Okay?

 9     BY MR. MACDONALD:

10          Q    Now, I was asking a moment ago about the issues that

11     you claim Ms. Alvarez had.  Would Ms. Alvarez still have needed

12     to give advance notice for breaks if it was medically necessary

13     for her to take them quickly or frequently?

14               MS. FAENZA:  Objection.

15          A    Yes, because you can't just disappear.  If you needed

16     frequent breaks the accommodation could have been met, but you

17     can't just disappear from your position.  And that's with all

18     staff.  So that's why it's in the handbook.  It says if you

19     need to do something just notify your supervisor.  That was it.

20     Notify.  It wasn't, please ask for permission.  I need to go to

21     the bathroom.  Thank you.  Like whatever reason.

22     BY MR. MACDONALD:

23          Q    For the issues that you discussed with Ms. Alvarez

24     using the bathroom or being on her phone, was she ever written

25     up or given any kind of written memorialization of those
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 205 of 296

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    issues?

 2              MS. FAENZA:  Objection.

 3         A    I don't have any write-ups for her on that, but it

 4    was she was corrected numerous times by numerous people.

 5    BY MR. MACDONALD:

 6         Q    Do you know who those individuals were who corrected

 7    her?

 8              MS. FAENZA:  Objection.

 9         A    Max, Abelardo, and Eric in regards to tardiness,

10    timeliness, you can't eat in the kitchen over somebody else's

11    food.  Like you can eat as much as you want and if you need to

12    eat more frequently that's also okay, too.  I don't know, maybe

13    you have a blood sugar issue.  Whatever it may be, like the

14    accommodation can be met but you can't do it in that manner and

15    she was doing a lot of things that were not in the appropriate

16    manner.  So you can't just disappear and go to the bathroom.

17    You need to let somebody know that you're not there.  Hey, I'll

18    be back real quick, I need a few more minutes, whatever it is.

19    Just let somebody know.  Same thing, if you needed an emergency

20    and maybe it was personal, I really have to take this call,

21    it's an emergency.  Okay, take your call, deal with what you

22    need to deal with.  All of those things could have been dealt

23    with appropriately, but like it says in the handbook, provide

24    notice.  Notice wasn't being provided.  Those were easy things

25    to correct.  So there was no like write-up over it.  You would
```

```
 1   think that, hey, let me just explain this to you and you'd

 2   correct it and move on.  That's how most employees function.

 3   BY MR. MACDONALD:

 4        Q    Were any of the incidents that you described

 5   involving Ms. Alvarez, did any of them require her being

 6   written up per company policy for either company?

 7             MS. FAENZA:  Objection.

 8        A    I don't think they were required and, you know, it

 9   was provided as a training opportunity, but then at a certain

10   point like it was persisting with her.  But it was provided as

11   a training.  Like, okay, I'm going to tell you again, maybe we

12   didn't go over it the first time, this is the policy for

13   bathroom breaks, like let me know, don't leave the line.  Oh,

14   you need to eat more, okay.  Let me remind you of the policy.

15   The policy, you can't eat here in the kitchen over the

16   customer's food that you're making.  We have to eat elsewhere.

17   BY MR. MACDONALD:

18        Q    Was that a separate issue, the eating food over other

19   like patron's food?

20        A    Yeah, because you can't eat in the back like that.

21        Q    When did that occur?

22        A    I don't have the exact date, but I was told that

23   about eating and you can't eat in the kitchen.  You need to go

24   to the break room.  You need to leave.  You can't eat there.

25        Q    And that was --
```

```
 1        A    Could you imagine?  It wasn't.  It was a training
 2   opportunity to let her know this is what it is again, you can't
 3   eat here.  Could you imagine --
 4        Q    Which was --
 5             MS. FAENZA:  Excuse me.  Allow the witness --
 6        A    -- eats with a fork, puts it down somewhere back
 7   there and then that fork ends up on your plate.  Like, no.
 8   BY MR. MACDONALD:
 9        Q    Was that ever memorialized?
10             MS. FAENZA:  Objection.  Asked and answered.
11        A    I don't have it memorialized, I don't, but it was
12   consistent and I know Eric would check on her frequently
13   because like these things kind of kept up with her.  And he
14   would check on her, how is it going, how is the training going,
15   right, because it's not always necessarily downstream.  So Eric
16   is that third party there too to say is the correct training
17   being provided.  We have an employees who's not following the
18   procedures or whatever you want to say.  They're not following.
19   Okay.  Eric is down there checking it out.  At the same time
20   he's like why aren't they following direction.  I have to look
21   upstream.  Are they getting the direction they need.  Are they
22   being explained to properly, hey, bathroom breaks, go ahead,
23   but this is what it should be.  So Eric was that neutral party
24   checking on that.  He wasn't necessarily performing the
25   training, though, but like ensuring that everybody was
```

```
 1    following along that too.  Hey, supervisor, it's okay if she

 2    takes bathroom breaks, we just have to know so that everybody

 3    was following the same set of rules.

 4    BY MR. MACDONALD:

 5        Q    Was Ms. Alvarez ever verbally counseled about these

 6    issues that you're describing?  Someone spoke to her about

 7    them?

 8             MS. FAENZA:  Objection.

 9        A    Yes, those would be Max, Abelardo, and Eric spoke to

10    her on numerous times.

11    BY MR. MACDONALD:

12        Q    And were any of those documented?

13             MS. FAENZA:  Objection.  Asked and answered.

14        A    No, it was verbal.

15    BY MR. MACDONALD:

16        Q    And at one point did Eric Garcia conduct an

17    investigation of some sort; is that right?

18        A    Yes, and his notes were provided that he did November

19    6 and 8.  Those are in the request for production, his

20    handwritten notes.

21        Q    What was the investigation regarding?

22        A    So she, according to his notes --

23        Q    Do you know without reviewing any documents?

24        A    No, I don't have it memorized.  That she -- he wrote,

25    Carol starts a conversation by saying that two weeks ago chef
```

 1    Max was constantly checking on her work, so overseeing her

 2    work, making sure she put out, you know, consistent quality

 3    food product, and that, you know, was what started his

 4    investigation.  He spoke to everyone in the kitchen, even I

 5    believe he spoke to Reina, another female who was in the

 6    kitchen to see if any other females or any other people were

 7    having these problems, if they were coming potentially from

 8    supervision or from the employee.  Like where are these

 9    problems coming from.

10         Q    And so that investigation was initiated because of

11    Ms. Alvarez's complaint regarding the chef; is that right?

12         A    Let me see which happened first.  This is November.

13    Yes, she complained to Eric about Max.

14         Q    And what was that complaint about you mentioned

15    briefly a moment ago?

16              MS. FAENZA:  Objection.  Asked and answered.

17         A    That Ms. Alvarez alleged that Max -- it says, wanted

18    her and complained that his level of supervision was too close

19    and he was checking her work too much.

20    BY MR. MACDONALD:

21         Q    What does "wanted her" mean?

22         A    I didn't hear it from her so I couldn't speculate as

23    to the specifics of that.

24         Q    Well, what does that statement mean as you understand

25    it now as you sit here?

Deposition of Lisa Gonzalez                           Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1          A    As a corporate representative that's the
 2     documentation I had.  Personally, I don't know.
 3          Q    I'm asking your interpretation.
 4               MS. FAENZA:  Objection.
 5     BY MR. MACDONALD:
 6          Q    I'm asking what is your interpretation of that phrase
 7     in that context that she wanted her?  What do you understand
 8     that to mean?
 9          A    I'm not entirely sure.
10          Q    You have no idea?
11               MS. FAENZA:  Objection.
12          A    I didn't say I have no idea.  I said I'm not sure
13     what it means.
14     BY MR. MACDONALD:
15          Q    Have you ever heard that phrase before?
16          A    I have heard the terms and the words wanted her.
17     What it means I think is different to everybody, though, so I
18     don't know.
19          Q    What do you understand that term to mean is my
20     question?
21               MS. FAENZA:  Objection.
22     BY MR. MACDONALD:
23          Q    No.  You told me a moment ago that there was a
24     different interpretation so I'm just asking what is your
25     interpretation?
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1                    MS. FAENZA:  Objection.

 2        A     And I'm saying I don't know.

 3   BY MR. MACDONALD:

 4        Q     So you don't know what that phrase means at all then

 5   in the English language?

 6                    MS. FAENZA:  Objection.

 7        A     I'm going to terminate this deposition.  I've asked

 8   you repeatedly, I give you an answer, you don't like it, you

 9   rephrase it and then like try and throw it back at me.  No.  I

10   said what I said.  You ask the same question over and over and

11   again as if you're trying to get a different answer because you

12   don't like it or you need some level of control.  Like it's

13   ridiculous.  You ask Ms. Faenza what her objections are and

14   then you proceed to interrupt her in the middle of her

15   objection and then tell her how she can't have speaking

16   objections.

17   BY MR. MACDONALD:

18        Q     That's the rules.  That's not me.

19                    MS. FAENZA:  Do not argue with the witness, sir.

20   BY MR. MACDONALD:

21        Q     Okay.  That statement that you just mentioned, he

22   wanted her, was that referring to sexual harassment,

23   Ms. Gonzalez?

24                    MS. FAENZA:  Objection.  Asked and answered.

25                    MR. MACDONALD:  It was not asked and answered, but
```

```
 1            whatever.
 2       A    I don't have an interpretation of the words "wanted
 3    her."  That's what I have documented on behalf of the
 4    companies.
 5    BY MR. MACDONALD:
 6       Q    And as the company understood it was that an
 7    allegation of sexual harassment that it received at the time?
 8            MR. FAENZA:  Objection.
 9       A    I don't think -- I wouldn't call it sexual
10    harassment.
11    BY MR. MACDONALD:
12       Q    What would you call it?
13       A    Let's say somebody liked you, I don't know if you get
14    this too often if anybody likes you, but if somebody likes you
15    maybe, that doesn't necessarily make it sexual harassment.
16       Q    Okay.  Are you referring to liking someone
17    romantically or what are you referring to?
18       A    I think even in general.
19       Q    Okay.  What do you mean by in general?
20       A    I can't provide any sort of information as to what
21    she meant by wanted it.  She didn't even provide additional
22    information at that time.  Maybe it would have been more
23    helpful to provide more information at that time, but what I
24    have documented from Mr. Garcia was that Ms. Alvarez did not
25    want to provide more details or any specific comments even
```

```
 1    though he inquired.  So it could just be somebody liking you.

 2         Q    Earlier you reviewed --

 3              MS. FAENZA:  I'm sorry, let the witness finish.

 4         A    I apologize, I'll give you that one.  But it doesn't

 5    rise to the level of like sexual harassment.

 6    BY MR. MACDONALD:

 7         Q    So earlier you reviewed a policy that discussed

 8    sexual harassment.  So my question is:  As the company

 9    understood that complaint was that a complaint of sexual

10    harassment per the policy that we reviewed?

11              MS. FAENZA:  Objection.  Asked and answered.

12         A    I'm sorry, it cut out.  Can you repeat it?

13    BY MR. MACDONALD:

14         Q    Sure.  Earlier we reviewed a policy regarding sexual

15    harassment for WGOAT15 LLC.  So my question is:  When that

16    complaint was received from Ms. Alvarez was that considered a

17    complaint of sexual harassment under that policy?

18              MS. FAENZA:  Same objection.

19         A    I don't know if it was received necessarily under

20    that policy, but it was a complaint, and that's what the

21    purpose of having this neutral was.  If he receives a complaint

22    he's going to investigate it.  It's not for him to necessarily

23    decide, okay, your complaint doesn't have any merit, I'm not

24    going to do anything further.  He's going to look into it.  So

25    that's what he did, and whether -- wherever it leads you,
```

```
 1   right, in your investigation.

 2   BY MR. MACDONALD:

 3       Q    Was that considered a complaint of sexual harassment

 4   is my question?   Was that considered --

 5            MS. FAENZA:  Objection.

 6   BY MR. MACDONALD:

 7       Q    -- under that policy?

 8       A    She said wanted her.  She didn't say somebody

 9   sexually harassing me, so I couldn't tell you.  She said

10   somebody wanted her.  That's what's documented.

11       Q    Okay.  Under the policy do you have to say the words

12   sexually harassed or sexual harassment?

13            MS. FAENZA:  Objection.

14       A    No, but like I said, her complaint was taken

15   seriously.  She complained, right?  She could have said I don't

16   like him.  Her complaint was taken as valid and it was taken

17   seriously by GOAT.  Eric did a thorough investigation and

18   didn't find that it led to that or led to that level.  So

19   whether or not it was the action that as a company we're still

20   taking it serious.

21   BY MR. MACDONALD:

22       Q    And that was GOAT Hospitality Group?

23            MS. FAENZA:  Objection.

24       A    GOAT, yeah, took it seriously, because that's where

25   the complaint was made.  Not that WGOAT didn't take it
```

```
 1    seriously to the flip side of that.

 2    BY MR. MACDONALD:

 3         Q    And was this the same investigation that uncovered

 4    the performance issues you discussed with me earlier?

 5              MS. FAENZA:  Objection.

 6         A    No, there were some performance issues still with

 7    her.  And then Eric had stayed kind of close to make sure like

 8    what's going on, nothing happened, not just like, oh, I closed

 9    my investigation.  He would continue to go down there.  He'd

10    continue to drop in see what's happening and make himself

11    available should there need to be something else.

12    BY MR. MACDONALD:

13         Q    But did his investigation uncover any new performance

14    issues with Ms. Alvarez?

15              MS. FAENZA:  Objection.

16    BY MR. MACDONALD:

17         Q    Are you checking a document?

18         A    Yeah, because I didn't do the investigation so I have

19    documentation as to it.

20         Q    May I ask what document you're looking at?

21         A    The response to request for production reading Eric's

22    investigation, like what he wrote.  Sorry, his handwriting is

23    tough for me.  Sorry, can you repeat the initial question

24    again?

25              MR. MACDONALD:  Can you read it back, Ms. Fernandez.
```

```
 1              (The court reporter read back.)

 2        Q    I don't think that particular investigation unveiled

 3   any new performance issues.  For example, this started November

 4   6, right, not knowing that she had this complaint or that there

 5   was even a start of an investigation, because Eric was just

 6   starting so he doesn't necessarily make people aware of any

 7   like allegations until he comes to a resolution and does

 8   everything he can, so the next day is when I brought to the

 9   attention to the staff her performance issue by serving

10   undercooked food.  So one had nothing to do with the other

11   because I didn't even know about this complaint.  I didn't know

12   about this investigation at the time because he had kept it

13   confidential.  And then performance issues raised themselves.

14   So they were completely independent.

15   BY MR. MACDONALD:

16        Q    So the incident involving the burger, that occurred

17   after the investigation?

18        A    Yes.  So November 6 is when Carol, Ms. Alvarez,

19   sorry, complains, and November 7th is when I ate at the

20   restaurant and received the burger.  So they were independent

21   because I did not know of any investigation.

22        Q    The next day is when that happened?

23        A    Yeah.  And I didn't know she made the complaint nor

24   did I know Eric was investigating anything.

25        Q    When did you find out there was a complaint regarding
```

 1    what Ms. Alvarez had alleged?

 2         A    I couldn't tell you the exact date I officially like

 3    became aware of her complaint.

 4         Q    Was Ms. Alvarez ever told any derogatory comments

 5    about her pregnancy that you're aware of?

 6         A    No, I have no complaint of derogatory pregnancy

 7    comments.  I have no record of anybody making any derogatory

 8    comments to her about her pregnancy.

 9         Q    Are you familiar as the owner of WGOAT15, or were you

10    familiar at the time, I should say, of the Pregnant Workers

11    Fairness Act?

12              MS. FAENZA:  Objection.

13         A    I don't know the exact date I became aware of that

14    at.

15    BY MR. MACDONALD:

16         Q    Do you know what it is as you sit here today?

17              MS. FAENZA:  Objection.

18         A    I don't know everything that's included in that act,

19    I don't.

20    BY MR. MACDONALD:

21         Q    Do you know anything about it?

22              MS. FAENZA:  Objection.  Instruct the witness not to

23         respond to anything privileged.

24         A    No.

25    BY MR. MACDONALD:

```
 1        Q    You said no?

 2        A    No.

 3        Q    I'm going to show you a document.

 4             MS. FAENZA:  What document are you showing?

 5             MR. MACDONALD:  It's a medical record of Ms. Alvarez.

 6             MS. FAENZA:  Which one?  Have you produced it?  Is it

 7        a new document I haven't seen?

 8             MR. MACDONALD:  I'm not sure if you've seen this.  It

 9        will be produced, of course.

10             MS. FAENZA:  Okay.  So if you've got anything you

11        have not produced to me you need to send it to me by email

12        and show me first.  You can just pop me an email.  I'll

13        open it up straightaway.  Okay?  This is not -- we haven't

14        received -- as far as I know we haven't seen any discovery

15        yet.  It's almost five.  We have a deposition tomorrow.

16             MR. MACDONALD:  I'm going to get it to you, of

17        course, as soon as we're done.

18             MS. FAENZA:  Okay.  But in the deposition just make

19        sure I can see it before especially I don't have the

20        opportunity to look at any of this beforehand.

21        A    Yeah, I haven't seen this so this would be --

22   BY MR. MACDONALD:

23        Q    You've never seen this before?

24        A    No.

25        Q    Okay.
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 219 of
296
Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        A     I actually -- I don't even know what the term
 2   expected date confinement means.
 3        Q     You've never heard the term confinement?
 4              MS. FAENZA:  Objection.
 5        A     I just said I don't know.
 6   BY MR. MACDONALD:
 7        Q     And do you see on this form here it looks like it's
 8   from Jackson Memorial Hospital for Carol Alvarez?
 9        A     I do.
10        Q     Do you see where it says --
11        A     What?  Sorry, go ahead.
12        Q     No, sorry, I didn't mean to interrupt you.
13        A     So when I look at this handwriting, comments, patient
14   needs frequent breaks, no prolonged standing, no heavy lifting.
15   This isn't what I was provided, though.  What I have is -- is
16   this supposed to be the date?  I don't know why it's like
17   02/05/24.  It's like blank 2, blank 5/'24.  So I'm assuming
18   based on what her first doctor's note with actual requests.  So
19   the doctor's note I thought covers that period.  Hold on.
20        Q     So my question is:  Was anyone at GOAT Hospitality or
21   WGOAT15 provided this document as far as you're aware?
22        A     No.  And I don't know why she wouldn't have provided
23   this but then she provides me something from -- hold on.  So
24   January 10, 2024, an emergency, return to work the next day
25   1/15.  And that was from Coral Gables Hospital.  And then I
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 220 of 296

Deposition of Lisa Gonzalez                        Carol Alvarez v. Goat Hospitality Group LLC, et al.

1    have another note from Coral Gables Hospital from 2/7.  So I

2    don't know why she would have provided me something -- she

3    already had this in possession if the date is 2/5/2024 from

4    Jackson that says don't do these.  It says patient needs

5    frequent breaks, whatever, but then she turns into me something

6    from the following time, 2/7/24, may return to work February

7    12th.  Like why would you give me that from a different

8    provider and a different hospital than this one if that's in

9    fact what you wanted.  Like it would have been accommodated.

10        Q    Was Ms. Alvarez required to provide medical

11   documentation for her request for accommodations, any of them?

12        A    No, she wouldn't have had to and the company did

13   provide her with what she had requested.  I don't think there

14   was any time where anybody has told her you must lift heavy

15   objects, you're going to get fired.  Nobody said never take a

16   break.  No one even said don't take frequent breaks.  It was

17   just a matter of communicating that.  But it doesn't make sense

18   if she already had this in her possession on 2/5 and she's at

19   the hospital and then apparently she goes to a different

20   hospital two days later.

21        Q    I believe this is Exhibit 5.

22             MS. FAENZA:  I'm sorry, I didn't hear what you said,

23        Mr. MacDonald.

24             MR. MACDONALD:  This is Exhibit 5.  Hold on.  We'll

25        change it if it's incorrect.

```
 1              THE COURT REPORTER:  I think it might be 6.

 2              MR. MACDONALD:  Exhibit 6.

 3              (Whereupon, Plaintiff's Exhibit 6 was marked for

 4         identification.)

 5              MS. FAENZA:  Just let the record reflect that has not

 6         been produced and we don't have any documents yet to be --

 7         that have been produced to us.  Is it going to be produced

 8         today, Mr. MacDonald?

 9              MR. MACDONALD:  Absolutely.

10              MS. FAENZA:  At what time because I have another

11         obligation tonight and we have a deposition tomorrow

12         morning so I had asked before five and it's 4:55.

13              MR. MACDONALD:  Right.  I'm going to get you that,

14         of course, but being in a deposition but I'll be sure to

15         get them as soon as we conclude.

16              MS. FAENZA:  I can't wait until the end of this

17         deposition.  Do you have the documents ready to go?

18              MR. MACDONALD:  It's going to have to wait until the

19         end of the deposition just because -- I'll be done soon,

20         though.  I'll stop sharing my screen.  We can go off the

21         record.

22              (A recess was taken.)

23              MR. MACDONALD:  Back on the record.

24    BY MR. MACDONALD:

25         Q     I'm going to jump around a little bit on the topics
```

 1    just because I want to hit a few different things before I

 2    conclude.  The first thing I want to show you a document

 3    quickly and this is the screenshot I showed Mr. Gonzalez during

 4    his deposition, Ms. Faenza, from the website.

 5              MS. FAENZA:  Okay.  Which website?  Are you talking

 6         about GOAT?

 7              MR. MACDONALD:  GOAT Hospitality.

 8              MS. FAENZA:  Okay.

 9    BY MR. MACDONALD:

10         Q    And this is two pages, but it's really just the first

11    page for the question I'm asking.  Just let me know when you've

12    had a chance to read it.

13         A    I didn't realize there was anything pending.  Okay.

14         Q    Have you seen this website before that's reflected in

15    the document?

16         A    I have seen it in the deposition of Mr. Gonzalez.  I

17    don't remember actually seeing this one live.  I don't remember

18    like the purple background or anything.  I don't remember or

19    recall seeing it live.

20         Q    You would agree that this is a representation of the

21    website for GOAT Hospitality Group, correct?

22              MS. FAENZA:  Objection.

23         A    It's what it appears to be.

24    BY MR. MACDONALD:

25         Q    Did you have any reason to dispute the authenticity

```
 1    of it?

 2         A    I mean, I didn't do it so I can't -- I feel like I

 3    can't say one way or the other, no, that is not my work.  I

 4    didn't do it, but what's written in there is inaccurate.

 5         Q    You don't dispute this is from the GOAT Hospitality

 6    website, right?

 7              MS. FAENZA:  Objection.  Asked and answered.

 8         A    I didn't do the website so I can't say one way or the

 9    other.  That was outsourced.

10    BY MR. MACDONALD:

11         Q    Right.  I'm not asking whether it was outsourced.

12    I'm just asking you do you have any reason to dispute that this

13    is just a screenshot or a printout from the website?  That's

14    all I'm asking.

15         A    I saw it in the last deposition.  I have not seen

16    this live so I can't say one way or the other.

17         Q    Okay.  Would you prefer that I check the live

18    website?  Would that make a difference to you in terms of the

19    authenticity of this?

20         A    I'm saying I can't dispute it one way or the other.

21         Q    Okay.  Fair.  And this appears to be the about us

22    page from GOAT Hospitality website; is that right?

23              MS. FAENZA:  Objection.

24         A    That's what I see, yes.

25    BY MR. MACDONALD:
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

1        Q    And it says that the main heading unveiling a vision

2   of hospitality of excellence from Derek Gonzalez, correct?

3             MS. FAENZA:   Objection.

4        A    That's what it says.

5   BY MR. MACDONALD:

6        Q    And then in that first paragraph it says GOAT

7   Hospitality Group with the at symbol for the user name, is the

8   creation of Derek Gonzalez.  GHG is the umbrella brands that

9   aims to provide the best of hospitality for service to the

10  customers at each of our concepts.  Mr. Gonzalez wholly owns

11  the intellectual properties of the brands and owns and operates

12  the businesses.  Do you see that?

13       A    I can read that, yes.

14       Q    Is that accurate?

15       A    No.

16       Q    Why is it not accurate?

17       A    Okay.  So if we break it down, GOAT Hospitality Group

18  and the at symbol for that, that's the Instagram, is a creation

19  of Derek, fact.  GHG, short for GOAT Hospitality Group, is the

20  umbrella brands.  It's not the umbrella brands, but it does aim

21  to provide the best in hospitality for service to their

22  customers at each of the concepts.  That would be true.

23  Mr. Gonzalez does not wholly own the intellectual property for

24  the brands and he doesn't own and operate all the businesses,

25  so not accurate.  I don't even know why somebody would talk

Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1   about intellectual property rights anyway.  Like this was done
 2   by whoever created this website.  So, yeah, those are not true
 3   which we've gone over.  And so some of the next brands in the
 4   next one, GOAT Hospitality has a portfolio.  Okay.  GOAT does
 5   have a portfolio of its clientele, Pilo's Street Tacos, Pilo's
 6   Tequila Garden, Pilo's Beach Club, Champion room, Nathan's
 7   Beach Club.  The brand is expanding with Lunasol and Mia's
 8   Steakhouse and they're planning to open at the end of 2024.  So
 9   which Lunasol exist.  Mia never got off the ground.  And
10   additionally GOAT Hospitality had a home office base located on
11   the 49th and a half floor of a Miami hotel.  It did have an
12   office space there.  So this was outsourced to another company
13   and I think they put this in there and filled it, but, yeah,
14   it's not entirely accurate.
15           MR. MACDONALD:  And for the record, we'll mark this
16       as Exhibit 7.
17           (Whereupon, Plaintiff's Exhibit 7 was marked for
18       identification.)
19   BY MR. MACDONALD:
20       Q    Who owns the intellectual property for the brands if
21   not Mr. Gonzalez?
22           MS. FAENZA:  Objection.
23       A    Whatever partners, which, again, I didn't look at all
24   the breakdown of that.  For example, we talked about Nathan and
25   how Nathan and Derek own that.  They own the IP so there you
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 226 of 296

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    go.  I mean, it's literally in Nathan's name.

 2    BY MR. MACDONALD:

 3        Q    So and it's not true that Mr. Gonzalez operates the

 4    businesses as it says here, correct?

 5             MS. FAENZA:  Objection.

 6        A    He doesn't -- I don't know how you could operate all

 7    of those at once anyway, but, no, he oversees them and provides

 8    just a general management oversight.  He is not there doing the

 9    day-to-day operations.

10    BY MR. MACDONALD:

11        Q    Does he own all of the businesses?

12        A    We discussed these and he has an ownership interest

13    in those with obvious exception is Mia's Steakhouse.  So that

14    he had no ownership in, which if I were the website designer,

15    he took a stab at writing something, some true, some his

16    interpretation, but like this didn't like come from the

17    company.

18        Q    Who is the website designer?

19             MS. FAENZA:  Objection.  Outside the scope.

20        A    There have been a couple, but one of them that we

21    probably had for the longest his name is Suji (phonetic).  I

22    mean, like he's a remote person that helps with like limited IT

23    that's needed.

24    BY MR. MACDONALD:

25        Q    And would anyone be responsible for approving the
```

```
 1    content that's published on the website of GOAT Hospitality

 2    Group?

 3         A    No, there's no like standard operating procedure for

 4    this, which is probably how if I'm going to take your word that

 5    it was posted, how it got posted.

 6         Q    Does anyone from GOAT Hospitality Group regularly

 7    check the website content?

 8         A    It's not required of anybody to regularly check the

 9    website.  It's not something that changes all the time.  Like

10    we're selling a product on here like we need to go on the

11    website, we need to make sure it says out of stock, we need to

12    change a price on something on our website.  Like it's also not

13    something that necessarily drives business one way or the other

14    either so, you know, not heavily checked for accuracy either

15    because it's not make or breaking GOAT Hospitality's book of

16    business.

17         Q    Looking at the second page would you agree that GOAT

18    Hospitality Group has a portfolio of vendors?

19         A    I think that's one way to say it, yeah, you have a

20    portfolio of clients, you have a portfolio of venues.  I think

21    that's one way.

22         Q    Even though they're just clients, those venues; is

23    that correct?

24              MS. FAENZA:  Objection.

25         A    I think that's one way to say it.  I don't think
```

```
 1    that's entirely accurate.  I told you which parts that I
 2    thought -- or not that I thought, that I believed to be
 3    inaccurate, but like the vision, not entirely inaccurate.
 4    Yeah, at GOAT Hospitality our vision is to redefine hospitality
 5    by creating unforgettable and diverse experiences for every
 6    guest, yeah.  We aspire to be the leading name in the industry
 7    recognized for our commitment to excellent innovation and
 8    exceptional service, also not inaccurate.  Our mission at GOAT
 9    Hospitality is to delight our guests with a portfolio of unique
10    and vibrant venues that care to a wide range of tastes and
11    preferences, that's a fair statement.  We strive to exceed
12    expectations through our dedication of quality continuous
13    innovation and unwavering commitment to exceptional customer
14    service, also accurate.  We aim to create memorable moments
15    that turn every interaction to a special location, also fine, a
16    fair statement.  Like I believe you heard from Mr. Gonzalez
17    like GOAT's true mission an vision which isn't what Derek said.
18    So this was the website designer.
19    BY MR. MACDONALD:
20        Q    Okay.  All right.  Now, I'm going to show you another
21    document that isn't just in the interrogatories.  This first
22    one we'll mark this as Exhibit.
23             (Whereupon, Plaintiff's Exhibit 8 was marked for
24        identification.)
25    BY MR. MACDONALD:
```

```
 1         Q    And I'll go through them in a moment.  Do you

 2    recognize the document that I'm showing you right now that

 3    we're marking as Exhibit 8, which is -- Plaintiff's first set

 4    of interrogatories?  Actually, sorry, that's not Exhibit 8.

 5    Hold on one second.  We'll mark this as Exhibit 8, which is

 6    Defendant's GOAT Hospitality Group LLC's Verified Responses to

 7    Plaintiff's First Set of Interrogatories.

 8         A    Okay.

 9         Q    Have you seen this document before?

10         A    I have.

11         Q    Okay.  And you would agree it's the verified

12    responses to the interrogatories propounded by the Plaintiff

13    what it states?

14         A    That is exactly what it says.

15         Q    And scrolling to the bottom here, on this

16    verification page here, is this you verifying the accuracy of

17    these responses?

18         A    Yes, and it's notarized.  I did see a typo.  When I

19    was reviewing there was -- I had included a couple of typos in

20    there, but I don't think they changed from my recollection.

21    There was a year one and there was another one that like

22    duplicated somebody's name I want to say.

23         Q    Where are those typos, if you're aware?

24         A    I can't remember if it was this one or the other one.

25    Hold on.  One said something in like January or February of
```

```
 1    2023, but it should have been I think January 2024, one of the

 2    things that I saw was a typo.  We're on the GOAT one, right?

 3          Q    What was that?

 4          A    We're on the GOAT ones, correct?

 5          Q    That is correct.

 6          A    Okay.  I can't remember if it was on GOAT or WGOAT.

 7    It must have been on WGOAT where I saw the typo.  I don't think

 8    it changed -- really I don't think it changed the substance of

 9    the response.

10          Q    Okay.

11          A    I can't find it at this moment.

12          Q    Okay.  I'm just going to go through this quickly.  If

13    you look at number 21, I want to draw your attention to this

14    one and I just want you to review it and confirm this is

15    accurate for the response.

16          A    Okay.

17          Q    Is that accurate?

18          A    My answer?

19          Q    Yeah, the response.

20          A    The response.  I agree with the objections and, yeah,

21    that time off was granted by WGOAT because GOAT doesn't grant

22    or not, and the work -- the letter she provided didn't have

23    restrictions on her work.  You showed me that today.

24          Q    In looking at number 20, I'll give you a moment there

25    to review it.
```

```
 1        A     Yes, exactly what I said that I have no records of
 2   disciplinary actions.  Verbally counseled, exactly.
 3        Q     And that there were no written disciplinary actions
 4   at any time, right?
 5             MS. FAENZA:  Objection.  Asked and answered.
 6        A     Correct, she was corrected verbally.
 7   BY MR. MACDONALD:
 8        Q     And the verbal counseling that it list here is
 9   limited just to looks like the cellular telephone use during
10   working hours?
11        A     No, I don't think that's what it meant.  Plaintiff
12   was also verbally counseled so she was verbally counseled on
13   her cooking skills.  She was also verbally counseled as for
14   taking frequent breaks to use her cell phone during working
15   hours, not quick breaks.  And, yeah, I don't have record of her
16   being disciplined only that -- or for her frequency or duration
17   of restroom or meal breaks.  She wasn't disciplined for that.
18   She was given corrective actions, rehabilitative actions.
19        Q     Looking at number 18 --
20        A     Eighteen, okay.
21             MS. FAENZA: I will object.  Asked and answered.
22        A     Okay.  What's the question about these?
23   BY MR. MACDONALD:
24        Q     The question for this one is:  Do you agree that
25   Plaintiff, Ms. Alvarez, did not present any doctor's notes?
```

```
 1        A    She only presented doctor's note saying that she

 2   couldn't attend work those days.

 3        Q    Okay.  Would you agree that that was a request for

 4   accommodation?

 5             MS. FAENZA:  Objection.

 6        A    No, not necessarily.

 7   BY MR. MACDONALD:

 8        Q    Why not?

 9             MS. FAENZA:  Objection.

10        A    It was just time off and she was provided it.

11   BY MR. MACDONALD:

12        Q    So we consider it just time off when she requested

13   time off due to her pregnancy?

14             MS. FAENZA:  Objection.

15        A    It would have been -- okay.  Whatever the reason, we

16   went over this, if you needed time off for something

17   embarrassing and you didn't want to say for whatever reason,

18   you requested it, accommodation was provided.  It wasn't a

19   problem, you know what I mean?  What are we doing here today.

20   If you want to call that a request for accommodation, it was

21   met.  So then where is the problem between the employer and

22   employee?  I don't see it.

23   BY MR. MACDONALD:

24        Q    I'm just asking if you considered it, the company,

25   that is, GOAT Hospitality Group or WGOAT15 considered it to be
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

 1   an accommodation, simply that?

 2           MS. FAENZA:  Objection.  Asked and answered.  And

 3       you're referring to this document.  I believe this is from

 4       GOAT.  So either you're focused on the document here or

 5       you're asking a question.  I'm not clear what you're doing

 6       there.

 7           MR. MACDONALD:  Sure.

 8   BY MR. MACDONALD:

 9       Q    I mean, we can limited it to just GOAT Hospitality

10   Group for purposes of this question.  Did GOAT Hospitality

11   Group consider that request for the leave to be an

12   accommodation request?

13           MS. FAENZA:  Objection.  Asked and answered.

14       A    I guess you could see how it could be called an

15   accommodation I think under like a general definition of what

16   an accommodation is, I need the day off, I need you to

17   accommodate me with a day off, okay.  And that was provided.

18   It was provided by WGOAT15 because that was her employer.  Her

19   employer wasn't GOAT Hospitality.  GOAT Hospitality could not

20   have provided her with that accommodation but should that

21   request have been made to GOAT Hospitality, it would have been

22   communicated to WGOAT, right, as their client to say, hey, this

23   client has asked for confidential reasons a day off.  Okay.

24   WGOAT would have said, great, we need to re-adjust the

25   schedule.  I mean, with it -- if you were like going on

 1    vacation, right, you know you're going on vacation.  If you

 2    have a death in the family you don't know you have a death in

 3    the family, like if there's something that happens, right.  You

 4    can't necessarily request that in advance.  But, yeah, just

 5    making that known and then it was provided.  So if you want to

 6    call that an accommodation, okay.  Two accommodations were --

 7    two specific periods, mind you, because those notes had end

 8    dates to them, they didn't say don't ever return to work.  It

 9    said return to work on this date.  And we're complied with,

10    either company.

11    BY MR. MACDONALD:

12        Q    Again, that was not my question.  My question is

13    simply just, was that considered an accommodation request by

14    GOAT Hospitality Group LLC?  That's it.  Yes?  No?  I don't

15    know?

16             MS. FAENZA:  Objection.  Objection.  Asked and

17        answered and the witness may respond as she chooses.

18             MR. MACDONALD:  Of course.  I'm just trying to make

19        this more quickly.

20             MS. FAENZA:  Right, but you can't instruct a witness

21        to say only yes, no, or I don't know.  So I've made my

22        objection.  The witness is free to answer.

23        A    I don't know -- I don't know if that would have been

24    an accommodation.  I think you're seeking a legal conclusion

25    here, but --

Deposition of Lisa Gonzalez                              Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    BY MR. MACDONALD:

 2         Q    Earlier --

 3         A    Whether or not I considered it it doesn't matter

 4    because my -- like does my mens rea really matter here, like my

 5    intent.  Even if I thought it was baloney and I said your

 6    doctor's note is actually forged, it's garbage, you are still

 7    afforded the time off and nothing was held against you for

 8    that.  So whether or not the company thought that I don't think

 9    matters.  You were still afforded it, that's what matters, the

10    action.  So you were afforded it and nothing held against you

11    for taking that time off.  Your job was still there.  Your

12    hours were still there.

13         Q    You're discussing the relevance of the question I'm

14    asking, which is not the answer to my question.  Again, I'm

15    just simply asking you -- you're talking about the mens rea and

16    whether it matters what the intent was of the company or you

17    and, my question is just simply, did GOAT Hospitality Group LLC

18    consider those requests to be an accommodation request?  That's

19    it.

20              MS. FAENZA:  Objection.  And I am going to repeat --

21         A    Same answer.

22              MS. FAENZA:  Asked and answered.

23    BY MR. MACDONALD:

24         Q    Okay.  Well, I'm going to have to ask it again.  It's

25    nonresponsive.  I'm really trying -- I'm really not trying to
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1   be difficult here.  I'm really just trying to understand.
 2        Did the company, GOAT Hospitality Group, consider this to
 3   be an accommodation request?
 4             MS. FAENZA:  Objection.  Asked and answered.
 5        A    Same answer.  I'm not answering.  I think I've
 6   actually overly answered.  I think these responses I've overly
 7   answered.
 8   BY MR. MACDONALD:
 9        Q    Okay.  I'm going to have to object because it was
10   nonresponsive.  You've talked about the relevance.  You've
11   talked about the mens rea.  You have not addressed whether --
12        A    When did we talk about the relevance?
13        Q    Hold on.  Hold on.  You have not answered whether the
14   company considered the accommodation -- or these requests,
15   rather, to be an accommodation request.  If you have, then
16   please let know what it was.
17             MS. FAENZA:  Would you read --
18        A    I don't think they were.
19             MS. FAENZA:  We can go ahead and read back.
20   BY MR. MACDONALD:
21        Q    Okay.  Thank you.
22        A    The same answer -- I want to preface with the same
23   answer with, also, I don't think it was an accommodation.  You
24   did ask for time off and you were provided time off.
25        Q    Okay.  That's all I wanted to know.
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        A     Whether my interpretation of your request for time

 2   off for those X number of days was an accommodation, though,

 3   you still got the accommodation.

 4        Q     Okay.

 5        A     And if she was able to make the accommodation request

 6   why didn't she make the other things that she apparently

 7   needed?

 8        Q     And do you agree with 16 and 17 here?  I'll give you

 9   time.

10        MS. FAENZA:  Objection.  Asked and answered.

11        A     I still agree with 16.  Yeah, I still stand by 17.

12   BY MR. MACDONALD:

13        Q     And you believe that Ms. Alvarez fabricated her

14   allegations related to be excused from heavy lifting under

15   number 14?

16        MS. FAENZA:  Objection.

17        A     I have no record of it.  I didn't say she fabricated

18   it.  So my answer as written there that I signed off on,

19   Defendant has no records.

20   BY MR. MACDONALD:

21        Q     Number 14 states, Defendant asserts that Plaintiff's

22   assertions pertaining to the same are fabricated.

23        A     I'm sorry, yes.  Yeah.  Sorry.  Yeah, I stand by

24   that.

25        Q     Okay.
```

1    A    A lot of the things to her that are fabricated like

2    that note you just put up on the screen.  I hope you double

3    checked it.

4        Q    It's fabricated?

5            MS. FAENZA:  Objection.

6        A    There's two different handwritings on it with dates

7    like missing, kind of blacked out.  I don't know.

8    BY MR. MACDONALD:

9        Q    Are you stating that it is?

10           MS. FAENZA:  Objection.

11       A    It doesn't appear to be legitimate.

12   BY MR. MACDONALD:

13       Q    How do you know that?

14           MS. FAENZA:  Objection.

15       A    I just told you why.

16   BY MR. MACDONALD:

17       Q    The handwriting?

18           MS. FAENZA:  Objection.

19       A    Yeah, it's very strange.  What -- like it has

20   multiple handwritings.

21   BY MR. MACDONALD:

22       Q    Strange.

23       A    Yeah.

24           MS. FAENZA:  Objection.  I'm so sorry, I'm going to

25       step in right now.  There will be no arguing with the

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        witness.
 2             MR. MACDONALD:  No one is arguing.
 3             MS. FAENZA:  Yes, sir, you are.  You literally just
 4        said, oh, strange, why do you think that is.
 5             MR. MACDONALD:  Sorry, I should have waited until you
 6        finished.  I'm sorry.
 7             MS. FAENZA:  If you have a question, sir, please ask
 8        it.
 9   BY MR. MACDONALD:
10        Q    Okay.  What else do you believe is fabricated?
11             MS. FAENZA:  Objection.
12        A    Hold on.  Was there a response?  Hold on.  I'm
13   looking in here.
14             MS. FAENZA:  I was making a general objection to
15        that.
16        A    At all times Ms. Alvarez was considered an exemplary
17   employee who had a history of positive performance, that's not
18   accurate.
19   BY MR. MACDONALD:
20        Q    Do you believe that was fabricated?
21        A    I don't think it's accurate.  I think maybe you wrote
22   this and you were provided that information, but it's not
23   accurate.  Again, you wrote it in here that she was an
24   exemplary employee.  No.
25        Q    Is there anything else that you believe is
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1   fabricated?

 2             MS. FAENZA:  Objection.  Outside the scope.

 3        A    Oh, there's a lot.  Celebrating Ms. Alvarez's

 4   pregnancy, I don't have obligations of anybody celebrating

 5   anybody's pregnancy.  I think saying that Richard and Max

 6   reacted angrily towards her when they found out she was

 7   pregnant, I think that's fabricated.  I don't think Max or

 8   Richard ever accused her of lying.  I don't think her timeline,

 9   her dates and all her letters and when she actually decided to

10   produce a letter is a little strange.  That Max dramatically

11   cut her scheduled work hours, that's not true.  That's --

12             MS. FAENZA:  And I'm going to object to continuing

13        the line of questioning with which would require the

14        corporate representative to simply go through and state

15        every single fact in this case which could be disagreed

16        with.  If you want to ask question you can go ahead, but

17        that's not appropriate, Mr. MacDonald.

18             MR. MACDONALD:  Not appropriate?  I'm simply asking

19        her about the interrogatory response which says that

20        some of the allegations are fabricated so I'm simply

21        asking her what allegations were fabricated.

22             MS. FAENZA:  No, you're not.  I'm sorry, sir, let me

23        read the interrogatory:  Describe every communication

24        between Eric Garcia and Ms. Alvarez regarding her request

25        to be excused from heavy lifting including the date and
```

Deposition of Lisa Gonzalez                                         Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
1        substance of Mr. Garcia's response to her.  The response,

2        Answer:  Defendant has no records pertaining to any

3        request from Plaintiff to Mr. Garcia to, quote, be

4        excused from heavy lifting, end quote.  Defendant asserts

5        that Plaintiff's assertions pertaining to same are

6        fabricated like much of her complaint and amended

7        complaint.

8             That is the substance of the response.  These are

9        verified responses, and, so, no, respectfully your

10       question, anything else fabricated, does not pertain to

11       interrogatory number 4 and is simply asking a corporate

12       representative to go through and tell you each and

13       everything she believes is made up or false.  So if you

14       have a question, and right now you have this up on the

15       screen, I can't control what you ask, although, I'll

16       remind you these are verified responses.

17            Mr. MACDONALD:  I think the witness was in the middle

18       of her answer.

19   BY MR. MACDONALD:

20       Q    Are you finished, Ms. Gonzalez, or was that it?

21       A    I think your allegations for count one that

22   Defendants subjected Ms. Alvarez to discriminatory treatment,

23   that's fabricated.  I don't think there was any discriminatory

24   treatment.  Retaliation, there was nothing done to her in

25   retaliation.  She quit.  Hostile work environment, I also
```

```
 1    believe there was no hostile work environment.  Eric is a

 2    neutral third party who did an investigation, asked numerous

 3    people, been there numerous times, went back numerous times,

 4    and he has no reason to provide anything other than the truth

 5    of what he finds.  I also -- her discrimination claims, nobody

 6    discriminated against her for being pregnant or for any other

 7    reason.  She I believe -- I don't know.  She was not

 8    discriminated against.  That's what we say on behalf of the

 9    company.  There was no retaliation against her on behalf of the

10    company.  Again, no other discrimination against her.  No

11    retaliation against her.  There was no hostile work

12    environment.  Again, through all of these.

13         Q    And you mentioned earlier that you believe you were

14    being discriminated against?

15              MS. FAENZA:  Objection.

16    BY MR. MACDONALD:

17         Q    Is that correct?

18              MS. FAENZA:  Misstates testimony.

19         A    What's the question?

20    BY MR. MACDONALD:

21         Q    Is that true?

22              MS. FAENZA:  Objection.  Misstates testimony.

23         A    Okay.  Yeah, I mean, unfair treatment,

24    discrimination, yeah.  I think that's happened here today in

25    this line of questioning.
```

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 243 of 296

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    BY MR. MACDONALD:

 2         Q     In your deposition?

 3         A     Yes.

 4         Q     But Ms. Alvarez did not experience discrimination,

 5    correct?

 6               MS. FAENZA:  Objection.  Do not argue with the

 7         witness, Mr. MacDonald.

 8               MR. MACDONALD:  That's just a question.  It's not

 9         argument.

10               MS. FAENZA:  It is indeed argument.

11         A     None of my records show that there was any

12    discrimination or any hostile work environment directed towards

13    Ms. Alvarez.  If anything, she was given chance after chance

14    after chance.  Never even provided disciplinary actions when

15    she should have been.  But she was given the opportunity for

16    more training as using it as a learning opportunity.  She

17    wasn't given that.  We didn't even do that to her.  Nobody

18    discriminated against her.  If you wanted her out of there,

19    like her frequent tardiness all could have been reasons to fire

20    her.  Why not just fire her?  No.  We're giving her the

21    opportunity to learn.  We hired her.  We invested in her to be

22    part of the team.  These are all coachable moments.

23    BY MR. MACDONALD:

24         Q     On what basis do you believe you've been

25    discriminated against?
```

```
 1              MS. FAENZA:  Objection.  I'm going to terminate this.

 2         It's outside the scope.  You're engaging in arguments in

 3         communications, Mr. MacDonald.

 4              MR. MACDONALD:  Nobody is arguing with her.

 5              MS. FAENZA:  I am going to instruct the witness --

 6         you are to cease and deist arguing with this witness,

 7    sir.  Even on the notice --

 8              MR. MACDONALD:  I'll move on.

 9              MS. FAENZA:  -- sir, I'm speaking.  The notice of

10         30(b)(6) deposition how the deponent feels subjectively so

11         that you can so that you can begin to use your position

12         as a deposing attorney to argue with her about how she

13         subjectively feels about this deposition.  Let's focus

14         on this case.

15              MR. MACDONALD:  Okay.  I'll move on, but I must note

16         for the record that I'm entitled to ask her questions

17         outside the scope of the notice.  Okay?  And if you don't

18         believe me I'm happy to point you to the case law with

19         Southern District of Florida.

20         A    I'll answer that question.

21              MR. MACDONALD:  I'll move on.

22         A    Your foul treatment of me today, you using your

23    position of superiority here to tell me when to stop talking,

24    tell me what to say, tell me how to say it multiple times,

25    you've shoved down my face, these are your requirements, did
```

```
 1   you know your requirements, did you know your duties for today,

 2   cutting me off, cutting off my attorney, recategorizing,

 3   recharacterizing any of my testimony.  Yeah, all of that.

 4   BY MR. MACDONALD:

 5        Q    Okay.  So moving on.  Okay.  Now, looking at

 6   number 7.

 7             MS. FAENZA:  Objection.

 8             MR. MACDONALD:  There's no question pending.

 9             MS. FAENZA:  I've stated an objection.

10   BY MR. MACDONALD:

11        Q    Have you reviewed number 7, Ms. Gonzalez?

12        A    Number 7?  I'm sorry, I didn't even hear the

13   question.  I didn't hear anything.  What's the question?

14        Q    Number 7 I was asking if you reviewed that on the

15   form?

16        A    Sure.  What's the question?

17        Q    Do you agree that no manager was aware of

18   Ms. Alvarez's pregnancy at the time she was hired?

19             MS. FAENZA:  Objection.

20        A    Yeah, I said that earlier.  I don't know when anybody

21   necessarily first became aware of her pregnancy.  I don't have

22   documentation of it.

23   BY MR. MACDONALD:

24        Q    And you would agree that she was visibly pregnant

25   within a short period after she started to work?
```

```
 1        A    No.

 2             MS. FAENZA:  Objection.

 3        A    I disagree.  Wait.  Hold on.  Wait.  Defendant was

 4   unaware of the managers who were aware of her pregnancy.  She

 5   was visibly pregnant within a short time after beginning work

 6   according to her.  And according to her paperwork she could

 7   have been close to five months pregnant at hiring.  And it's

 8   unclear if WGOAT knew at the time she was hired she was

 9   pregnant.  That's what I'm saying.  At the time she was

10   pregnant -- or at the time she was hired I don't know if she

11   was pregnant or not.  And guess what, maybe we did know.  We

12   didn't discriminate against her.  We still hired her.  We gave

13   earlier many, many chances despite many disciplinary actions on

14   her record and many inconsistencies where she wasn't

15   performing.  Not performing because of anything medical or

16   pregnancy related or hostile work environment.  She just wasn't

17   performing.  And then I know that people did become aware of

18   her pregnancy.  I don't know on what date.

19   BY MR. MACDONALD:

20        Q    You would agree she was visibly pregnant a short

21   period of time after beginning to work?

22             MS. FAENZA:  Objection.  Asked and answered.

23        A    As in the interrogatory.

24   BY MR. MACDONALD:

25        Q    You agree, yes, as in the interrogatory?
```

```
 1                MS. FAENZA:  Objection.

 2        A    I signed it.

 3   BY MR. MACDONALD:

 4        Q    I'm just confirming the accuracy is all I'm doing.

 5                MS. FAENZA:  Objection.  Asked and answered.

 6   BY MR. MACDONALD:

 7        Q    And looking at number 6, Richard Fuentes was a

 8   contractor with WGOAT15 LLC?

 9        A    No.

10                MS. FAENZA:  Objection.

11        A    It's the opposite.  It says he was not.  So he was an

12   independent contractor, yes.  The way he was an independent

13   contractor is he got paid through another company.  And that's

14   the company I can't remember the name of.  But he was an

15   independent contractor, not an employee of WGOAT.

16   BY MR. MACDONALD:

17        Q    Did WGOAT pay Mr. Fuentes as a 1099 contractor?

18        A    No.

19                MS. FAENZA:  Objection.

20        A    I think we paid that other company because he was an

21   employee of that company and he also had another boss.

22   BY MR. MACDONALD:

23        Q    You don't recall the name of that company today?

24        A    That's the one I can't recall.

25        Q    Do you share in profits of GOAT Hospitality Group
```

```
 1    LLC?

 2              MS. FAENZA:  Objection.

 3         A    GOAT Hospitality.  Does Lisa Gonzalez share in the

 4    profits of GOAT Hospitality Group?  No, not individually.

 5    BY MR. MACDONALD:

 6         Q    Do you share in the profits in a different way?

 7              MS. FAENZA:  Objection.

 8         A    In a different what?

 9    BY MR. MACDONALD:

10         Q    In a different way because you said individually.

11         A    No.  You're asking me.  I'm the corporate

12    representative here for two different companies so I was

13    clarifying.

14         Q    And the profit from that business would not flow to

15    you even despite your marriage to Mr. Gonzalez?

16              MS. FAENZA:  Objection.  Outside the scope.

17         A    I mean, I guess if theory, right, to the marriage,

18    but, no, it went to him and his company.  And what he brought

19    into our marriage I think is outside the scope of this

20    deposition.

21    BY MR. MACDONALD:

22         Q    Do you and Mr. Gonzalez file taxes jointly?

23              MS. FAENZA:  Objection.  Outside the scope.

24         A    We have.

25              MS. FAENZA:  This is a deposition of a corporate rep,
```

1        Mr. MacDonald.  You may not just go ham and start asking

2        Ms. Gonzalez about her personal taxes.

3        A    Yeah, I really feel like that's invasive and

4   intrusive line of questioning to ask about my personal taxes.

5   I think I've given you enough and I also think I've given you

6   enough information as to the corporate structure that I am

7   sitting here under oath telling you who owns what company.

8             MR. MACDONALD:  And you can certainly object,

9        Ms. Faenza.

10  BY MR. MACDONALD:

11       Q    But if I understand correctly, you said you have in

12  the past; is that right?

13            MS. FAENZA:  Objection.  Outside the scope.

14       A    Yeah.  You don't deserve that information, but I'm

15  still answering it because I would like to get done with.

16  BY MR. MACDONALD:

17       Q    I don't deserve it, is that what you said?

18            MS. FAENZA:  Do not --

19       A    You don't get to know about my personal finances with

20  my husband.  I'm here as a corporate representative for WGOAT15

21  and GOAT Hospitality Group.  You don't get to know how I file

22  my taxes with my husband.

23            MS. FAENZA:  Could I ask Ms. Fernandez --

24  BY MR. MACDONALD:

25       Q    I'm going to show you another --

```
 1              MS. FAENZA:  Hold on a second.  Could I ask
 2        Ms. Fernandez what's the time on the record as of now?
 3              THE COURT REPORTER:  5:50.
 4              MS. FAENZA:  What's the time on the record?
 5   BY MR. MACDONALD:
 6        Q    I'm going to show you --
 7              MS. FAENZA:  And what document are you placing on the
 8        screen?
 9              MR. MACDONALD:  The other set of interrogatories
10        which is Exhibit 9.  We'll mark it as Exhibit 9.  Excuse
11        me.
12              (Whereupon, Plaintiff's Exhibit 9 was marked for
13        identification.)
14   BY MR. MACDONALD:
15        Q    Have you ever seen this document before?  It's titled
16   Defendant WGOAT15 LLC's Verified Responses to Plaintiff's First
17   Set of Interrogatories?
18              MS. FAENZA:  Objection.
19        A    I have seen these before.  I think if you scroll to
20   the signature page you'll see I verified them.
21   BY MR. MACDONALD:
22        Q    And like you said, that's your signature there on the
23   verification, correct?
24              MS. FAENZA:  Objection.
25        A    Yes.
```

```
 1    BY MR. MACDONALD:

 2         Q    Okay.  Looking at number 22.

 3         A    Uh-huh.  Yes.

 4         Q    I'll give you an opportunity to review.  Is that

 5    response true that ADDiKT asserts that Defendant GOAT provided

 6    any and all the training?  Is that statement true?

 7         A    That Defendant GOAT provided any and all training and

 8    that the employee manual was distributed and required for each

 9    employee to read, yes.  ADDiKT asserts that Eric -- well, you

10    moved.  But, yes, that Eric was not the manager of ADDiKT,

11    correct.  Still accurate.

12         Q    And is it true that as the corporate representative

13    for Defendants that it's the company's position that no

14    harassment took place for Ms. Alvarez, correct?

15              MS. FAENZA:  Objection.  Asked and answered.

16         A    Yes.  If I'm answering for WGOAT versus GOAT last

17    time, GOAT, WGOAT, both companies, there was no harassment

18    towards Ms. Alvarez.

19    BY MR. MACDONALD:

20         Q    The response we reviewed previously regarding the

21    visibly pregnancy aspect, that's true for WGOAT15 as well based

22    on number 7; is that correct?

23         A    Sorry, which part?

24         Q    Number 7 where it ask about Plaintiff's disclosure of

25    her pregnancy in the third line there and then the visibly
```

1    pregnant aspect.

2        A    So going through the response that Defendant didn't

3    have any records pertaining to written notification that

4    Plaintiff was pregnant to any manager at ADDiKT.  I said that

5    earlier.  Still true.   Defendant GOAT --

6        Q    WGOAT15 as well?

7        A    It says to ADDiKT.  I mean, GOAT too, but it says

8    ADDiKT in that sentence for number 7.  And then it says:

9    Defendant GOAT does not possess any specific records as to the

10   date that Defendant advised she was pregnant.  I said a

11   earlier.  Still accurate as we sit here right now at 5:54 p.m.

12   You're moving so I guess we can move on.  I don't care.  These

13   are your questions.  Go.  You don't want to hear.  That's my

14   answer.  I signed these.  I signed them.

15       Q    I'm just confirming the accuracy of those.  What was

16   Ms. Alvarez's rate of pay, do you know?

17       A    I'd have to double check the records.

18       Q    Do you have those records?

19       A    There was some.  I don't remember seeing the number.

20   I don't remember.

21       Q    Do you know how much line cooks are paid generally at

22   WGOAT15?

23            MS. FAENZA:  Would anything refresh your

24       recollection?

25       A    I want to say somewhere maybe around like $18 an

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    hour, $22, $18.  Like somewhere like in there, but I don't -- I
 2    can't -- I don't remember seeing her rate of pay when I was
 3    reviewing.
 4    BY MR. MACDONALD:
 5         Q    And are there -- looking at number 1, individuals
 6    listed here, and I can scroll through them, are you aware of
 7    any other individuals with knowledge pertaining to the case
 8    that are not listed?
 9         A    No, and I think we've been through so many things.
10    The only names you've heard me say are the individuals on this
11    list.
12         Q    So, no, you're not aware of anyone else, correct?
13              MS. FAENZA:  Objection.
14         A    Correct.
15              MS. FAENZA:  Asked and answered.
16              MR. MACDONALD:  Okay.  All right.  Those are all the
17         questions I have I believe.
18              THE WITNESS:  No, you heard it, Ms. Fernandez.  You
19         got that on the record, he said that was his last
20         question.  No more.
21              MS. FAENZA:  Unfortunately, I do have a few
22         questions.
23              MR. MACDONALD:  One second.
24              THE WITNESS:  No.  No, you can't change it.  No take
25         backs.
```

```
 1   BY MR. MACDONALD:

 2        Q    Last question I think I have for you.  Did any of

 3   Ms. Alvarez's requests or accommodation requests posed an undue

 4   hardship in the company's opinion?

 5             MS. FAENZA:  Objection.

 6        A    There wasn't a request made.  If there was a request

 7   made I would be speculating as to what the request was so.

 8   Would months and months off, yeah, with just being leaving the

 9   line, yeah, that does create an undue hardship in the kitchen.

10   If you don't want to tell me what when you're coming into work,

11   that does create undue hardship.

12             MR. MACDONALD:  Those are all the questions I have

13        for you.  I believe Ms. Faenza has questions she wants to

14        go over.  Thank you for your time today.

15                         CROSS-EXAMINATION

16   BY MS. FAENZA:

17        Q    So I'm just going to kind of refresh and start.  I'll

18   go in order.  I'd like to ask some questions directed towards

19   GOAT Hospitality, which I'll follow Mr. MacDonald's lead and

20   just refer to it as GOAT.  Is GOAT Hospitality operational at

21   this moment?

22        A    GOAT Hospitality, yeah.  It's Derek's company.  It

23   doesn't have any employees.  It's still open.  It's still his,

24   but it's -- yeah, I mean, it's still operating.  Not making

25   money, but operating.
```

1    Q    Okay.  And at this particular time does it have any

2    bank accounts open?

3    A    No.  As I said, I guess it's operating, but it's not

4    making any money.

5    Q    Okay.  What do you mean by operating?  And let the

6    record reflect the witness has placed her fingers in quotation

7    marks while stating the word operating.

8    A    The company is open.  It hasn't been shut down for

9    that one, but as it stands today it has no clients.

10   Q    So does it have a lease anywhere for office space or

11   other space?

12   A    No, it has no office space.  I think I gave the

13   addresses before.

14   Q    Okay.  And so it has -- I think you said it had no

15   employees, no clients, no office space, and I believe you

16   testified that Derek Gonzalez's cell phone number is available.

17   By operating do you mean that it's available should a client

18   wish to retain GOAT?

19   A    Yes.

20   Q    Okay.  Otherwise, is there any revenue coming in?

21   A    No.

22   Q    And for how long approximately would you say that

23   that were the case?

24   A    It's been quite some time now.

25   Q    More than one year?

1      A     Probably going on one year.

2      Q     Okay.  So during the pendency that GOAT was open you

3   testified earlier that it maintained a bank account at Bank of

4   American; is that correct?

5      A     Yes.

6      Q     Did ADDiKT, which would be WGOAT15, use the bank

7   account that GOAT had at Bank of America or did it have a

8   separate bank account?

9      A     It had a separate bank account with a separate

10  signatory.

11     Q     Do you know which bank the WGOAT15 account was at?

12     A     It was at Bank of America.

13     Q     Do you know who the signatory was for ADDiKT?

14     A     Lisa Gonzalez.

15     Q     Okay.  And did Derek Gonzalez have signatory

16  authority on that account for ADDiKT?

17     A     No.

18     Q     I'm going to go back to GOAT.  When GOAT received

19  revenue during the period of time that it was functioning and

20  receiving revenue did that revenue flow to any other company?

21     A     For GOAT's revenue?

22     Q     Correct.

23     A     No, it went to GOAT.

24     Q     And for WGOAT15, when WGOAT15 received revenue did

25  that revenue flow in any form of share to any other company?

```
 1        A    No, it did not share to any other company.

 2        Q    Did GOAT and ADDiKT share revenues?

 3        A    No.

 4        Q    Did they share bank accounts?

 5        A    No.

 6        Q    Did they share any owners in common?

 7        A    No.

 8        Q    Did they share any managers in common?

 9        A    No.

10        Q    And during the time that GOAT was operational and had

11   office space did it share office space in common with ADDiKT?

12        A    No.  ADDiKT operated on the 15th floor and GOAT

13   operated on the 49th and a half floor.

14        Q    And what was on the 15th floor?

15        A    That was the restaurant.  The restaurant, the

16   kitchen, that was on the 15th floor.  And there was storage on

17   the 14th floor.

18        Q    Okay.  I want to ask you a couple of questions about

19   ADDiKT.  As to ADDiKT, throughout your discovery responses

20   which have been referenced by opposing counsel, Mr. MacDonald,

21   I see the word Marriott in there.  Could you please describe

22   the relationship  between ADDiKT and Marriott, if any?

23        A    So to expand a little about ADDiKT being a

24   restaurant, it's a hotel restaurant really.  Like you have to

25   enter the hotel lobby, go up the hotel elevators and go through
```

Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1   the hallway to get to ADDiKT.  So it essentially functions as a
 2   hotel restaurant.  And with Marriott we had agreed with them to
 3   accept like Bonvoy stuff, like points, breakfast included with
 4   reservation, so those like forms of revenue.  People would pay
 5   like for their meals through their rooms.  The revenue goes to
 6   Marriott.  We also received like catering requests for the
 7   banquet orders because there were two big ballrooms.  Marriott
 8   hosted a lot of corporate events there and so we would get the
 9   catering request essentially to do all the food for that.  So
10   there would be an order and we could essentially place it for
11   them for that.  Room service as well.  Customers would charge
12   on their Marriott hotel room accounts and then we were supposed
13   to like reconcile that and get paid back from Marriott.  Oh,
14   also employee meals.  We provided the employee meals for the
15   whole building or for like all the staff of like the hotel part
16   of the building.  And so we were supposed to be reimbursed for
17   all of those, those services that we provided.  And, yeah,
18   Marriott was incredibly slow and didn't pay all of what was
19   owed.
20        Q    Can you state approximately when ADDiKT began
21   operating?
22        A    It was --
23        Q    And if you're reviewing a record as Mr. MacDonald --
24        A    I'm going to look.
25        Q    -- asked, just let us know what you've reviewed.
```

```
 1        A     It's here.  The termination is here so I can get

 2   references to the start and stop dates.  So it started March

 3   13th, 2023.

 4        Q     Did ADDiKT cease operation at any point in time?

 5        A     Yes.  February 23rd -- wait.  Yeah, February 23rd,

 6   2024 was the termination of this, yeah.

 7        Q     And can you state with clarity for both myself and

 8   Mr. MacDonald what document you're looking at.  Just reference

 9   it by a Bates label number.

10        A     Sorry.  The end date is February 22nd.  It's Alvarez

11   29.  The dates are on there.

12        Q     Okay.  Do you know the start and stop date that

13   Ms. Alvarez worked for ADDiKT?  And if you need to refresh your

14   recollection by looking at a document please state what

15   document you are referencing by Bates label number because

16   Plaintiff hasn't -- you know, we don't have any Bates labels

17   from her so we have to look at ours so that both myself and

18   Mr. MacDonald can follow along and so that so we are aware of

19   what is within your memory and what is from a document you are

20   needing to refresh your recollection.

21        A     Give me a second here.  I know the dates are in here.

22   I know them generally but not -- fired October 10th of 2023.

23   And that is on Bates Alvarez 14.  Did you ask for separation

24   date.

25        Q     Yes, ma'am, or last date worked.
```

```
 1        A    Hold on.  From February 2nd through the 12th -- I'm

 2   looking at -- also 18th.  And then -- I think her requested

 3   date, if I remember correctly on the form that was an exhibit

 4   prior to this during Mr. MacDonald's line of questioning I want

 5   to say it was February 12th was the form written down for the

 6   date on the GOAT Hospitality form.  But she had off.  She was

 7   on her requested leave during that time.

 8        Q    Okay.  So I am going to refer -- and for the record

 9   for Mr. MacDonald, I'm going to refer to Defendants' Bates

10   label document beginning Alvarez 00020 so Mr. MacDonald can

11   look at that before I share my screen.  So I'm going to go

12   ahead and share this document here.

13        Do you see what's on the screen here?  And I can make it

14   larger if you need?

15        A    Don't worry, I'll get super close like this.

16        Q    I can make it larger.

17        A    Okay.  Yes, pay it's a summary 2023-44-1.

18        Q    Yes.  So I'm going to direct your attention here to

19   gross pay.  Do you see where it says rate and can you read the

20   number next to it?

21        A    Twenty.  So I was right.  I said 18 to 22.  I hit the

22   nail on the head with 20 then.  Her rate of pay, $20.

23        Q    And does this, in fact, reflect the hourly rate?  And

24   let the record reflect I'm scrolling down to the bottom of 020.

25   Does the reflect the hourly rate that you are aware of as the
```

Deposition of Lisa Gonzalez                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
1    corporate representative for ADDiKT, WGOAT?
2         A    Yes, and that's exactly in line with the position and
3    what the pay would be.  I think I previously stated the range
4    for that position, and, yes, she's right in the middle of that.
5         Q    Okay.  And let the record reflect that I just
6    scrolled down to 0202022.  I'm going to go ahead and stop
7    sharing right there.  So one of the questions that I would like
8    to ask as to her start and stop, do you know if Eric Garcia had
9    any ability to recommend the hiring of any employee or to
10   instruct ADDiKT to hire anyone?
11        A    He had no ability to hire anyone.
12        Q    Did Mr. Garcia have the ability the fire anyone
13   independently?
14        A    No, he did not.
15        Q    Did Mr. Garcia have the ability to write anyone up or
16   do any disciplinary action independent of any client of GOAT or
17   ADDiKT's opinion?
18        A    No, it would have to be approved by the client.
19        Q    Okay.  And in the case of ADDiKT, did Mr. Garcia as
20   it relates to ADDiKT have any ability to override the decisions
21   of any manager at ADDiKT or instruct a manager at ADDiKT  TO DO
22   anything relating to disciplinary action of ADDiKT's employees?
23        A    No, he did not have that authority.
24        Q    Did Mr. Garcia create any schedules?
25        A    No, he did not.
```

Carol Alvarez v. Goat Hospitality Group LLC, et al.

1    Q    Did Mr. Garcia even have the power to access the

2   systems that created the schedules?

3    A    So  I know he would go -- he could go in to pull the

4   data, but I don't think his user settings like he could

5   manipulate any of the scheduling or anything like that, but I

6   do think he could go and get the data.

7    Q    Okay.  And what would be the purpose of that?

8    A    So that he could input it into the payroll so that

9   way like the ADP because they weren't integrated.

10   Q    As it relates to GOAT and ADDiKT when you are

11  speaking about Eric Garcia at GOAT and entering payroll I'd

12  like to focus on that.

13   A    Okay.

14   Q    So the money that was used to pay employees from ADP

15  for ADDiKT, what bank account did that come from?

16   A    WGOAT15.

17   Q    Did the money used to pay any of the employees at

18  WGOAT15 ADDiKT ever come from GOAT Hospitality?

19   A    No, not that I'm aware of.

20   Q    As it relates to the revenue streams from Marriott,

21  any money paid from Marriott, who received the money from

22  Marriott, as I think you referred to the word reconciled, to

23  reconcile those charges that were paid to rooms, through

24  Marriott Bonvoy points, room service, or from any of the

25  employee lunches and banquets that you testified to earlier,

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    what was the entity that received that revenue?

 2         A    WGOAT15.

 3         Q    Did GOAT receive any sort of commission from WGOAT15

 4    for any of the revenue that -- for any of the revenue that came

 5    in through WGOAT15?

 6         A    No, there was no commissions to GOAT.

 7         Q    Was there any revenue sharing of any kind between the

 8    two entities?

 9         A    WGOAT was a client so there would have been a charge

10    from GOAT to WGOAT as a client.  So that would have been the

11    revenue sharing or any sort of money that would have gone

12    between them is that, I mean, GOAT Hospitality was employing

13    these people who were providing services for WGOAT but they

14    were consulting and third-party independent services so there

15    would have been a charge for that.  Those things cost money.

16    These people have payroll too.

17         Q    Was there a charge for the services provided or was

18    there a revenue sharing arrangement?

19         A    It's a charge for the services provided.

20         Q    Okay.  As you sit here today can you state with

21    confidence that there was no revenue sharing between GOAT

22    Hospitality and WGOAT15?

23         A    That is correct, there was no revenue sharing between

24    the companies.

25         Q    And as we sit here today can you also state that
```

 1    there was no shared bank accounts between GOAT and WGOAT15?

 2        A    That is correct, there was no shared bank accounts

 3    between GOAT and WGOAT.

 4        Q    And I want to get back to GOAT.  Do you know how many

 5    employees GOAT had approximately?

 6        A    Five.  Seven maybe.

 7        Q    To your knowledge as a corporate representative for

 8    GOAT did GOAT ever have 15 or more employees?

 9        A    No.

10        Q    As you sit here as the corporate representative for

11    GOAT did GOAT ever have more than 50 employees within a 75 mile

12    radius as required under the Family Medical Leave Act?

13        A    No.

14        Q    Okay.  I'm going to pose the same questions for

15    WGOAT15.  Approximately how many employees did WGOAT15 have?

16        A    Maybe --

17        Q    And if you're reviewing a document simply state that

18    you're going to refresh your recollection.

19        A    I'm going to refresh and check and see if I have the

20    number.

21        Q    And then state what document you're referring to so

22    that Mr. MacDonald and I can know what you're looking at.

23        A    Okay.  I think at max even 15 is like what I want to

24    say.  I'm trying to see if I have a hard number on here

25    anywhere.

1    Q    Let me ask a different question and you can rephrase

2  that question if you would like to because I believe you

3  responded.  At any time did WGOAT15 LLC have 50 employees

4  within a 75-mile radius?

5    A    No.

6    Q    Okay.  Combined ADDiKT and GOAT together did they

7  ever have, between the two companies, 50 employees within a

8  75-mile radius?

9    A    No.

10    Q    Okay.  I want to focus now on the date that you

11  ceased operations for WGOAT15.

12    A    Okay.

13    Q    You gave a date earlier I believe it was either

14  February 22nd or 23rd of 2024.  Can you state the circumstances

15  as to why WGOAT15 ceased operations?

16    A    We were not receiving payment from Marriott and it

17  was very, very difficult to continue with operations and meet

18  obligations of payroll, vendors, basic, you know, invoices that

19  we needed to pay to stay open so -- and Marriott was incredibly

20  difficult to work with.  Anytime I would call them or get

21  somewhere with them I think maybe I'd get somebody and they

22  wouldn't pay because they would talk to a VP or something like

23  what a great, you know, title.  Like no one has decision-making

24  power there.  It's incredibly slow and the payments are even

25  slower.  So I just wasn't receiving the revenue and it was

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1   unsustainable.  Like I was having to take out MCA, merchant
 2   cash advances, and then those were snowballing because of the,
 3   I'm going to call them interest rates.  They don't call them
 4   interest rates.  The interest rates, like the pay back of that
 5   and then receiving no income it became completely unmanageable
 6   and so just dealing with Marriott was incredibly difficult and
 7   we ceased termination with them and the property.  It just
 8   wasn't viable.
 9        Q    As it relates to the revenue that was received you
10   did speak about Marriott.  Did any other revenue come in from
11   any other source besides Marriott?
12        A    So there would be patrons who'd come in and pay with
13   cash or they would pay with like their credit card and that
14   went to the POS system for WGOAT which went to the WGOAT bank
15   account and those went to pay the vendors and employees and
16   stuff like that, but it wasn't enough of those types of
17   customers because it is a hotel restaurant.  So you can imagine
18   you stay in a hotel when do you eat at the hotel restaurant.
19   Like you're going to put it on your room or, especially for
20   this particular class of hotels, it's a lot of business people
21   who travel a lot and either include the breakfast in their
22   rooms or they have like I mentioned Bonvoy.  They have these
23   like points or whatever to be able to pay for whatever
24   breakfast or an amount.  So there was a lot of that, a lot.
25   And, of course, then I was feeding all the employees every day.
```

 1    Banquets.  I was expected to cater hundreds of people for these

 2    banquets and then receive no revenue.  It was just, like I

 3    said, not viable.

 4          Q    And would you say the majority of the revenue came

 5    from people off the street or the majority of the revenue was

 6    coming from Marriott in the various ways you described?

 7          A    I would say the majority of the -- the overwhelming

 8    majority was coming through Marriott.  So when you're doing all

 9    that and receiving only a fraction of what you should in

10    revenues, and in hospitality you don't have a big margin to

11    begin with, yeah, it snowballed with not having any cash flow.

12    That will kill any business.

13          Q    And is that the reason that you closed ADDiKT?

14          A    Yes.

15          Q    When you closed ADDiKT do you know -- I believe you

16    testified earlier that Ms. Alvarez had stated that she was

17    scheduled to return to work on February 12th and then you

18    closed on either the 22nd or 23rd.  What is the approximate

19    period of time between when Ms. Alvarez could have returned

20    from work on her doctor's note and you closing?

21          A    There was about two weeks in between I would say,

22    max, between when she was supposed to return to work and it was

23    asked because we need to do the scheduling like do we put you

24    back on the schedule and when the business closed.  And while

25    the issue with Marriott had continued for quite some time.

Deposition of Lisa Gonzalez                                      Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    Like they would be sporadic with their payments and I was

 2    always hopeful they would live up to their agreement, that

 3    they're a large corporation and they would abide by their

 4    contract and the amounts that were supposed to pay.  And, you

 5    know, I'd get glimmers of hope, like I said, when a VP would

 6    call me or someone from -- a VP would come in person to me

 7    that, okay, they're going to abide by this, we're going to get

 8    back on track.  It never happened.  And so the closing came of

 9    the restaurant came rather quickly because this was kind of --

10    it had been going on for a while.  Like they'd give a payment

11    or not and then no more payments.  Like we were finally able to

12    come to an agreement with them because we also didn't want to,

13    I say we, WGOAT15, didn't want to be in breach of our agreement

14    and then have Marriott coming after us, a huge company, huge

15    pockets, to say you breached, you know, you're liable for all

16    of this.

17         Q    So when you closed what happened to the employees of

18    ADDiKT?

19         A    They were all let go.  There was no more business for

20    them to be employed by.  There was no more shifts.  There was

21    nothing.  No revenue.  No money.

22         Q    And WGOAT15 or ADDiKT has it employed any of those

23    employees since that closure date?

24         A    No.

25         Q    And have you personally employed any of these people
```

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

1    through any other successor or any other entity?

2         A    No.

3         Q    Do you have any other restaurants personally?

4         A    No.

5         Q    And what is your other business if you have any?

6         A    I have a law firm.  And, yeah, this restaurant left a

7    big scar.  I'm still bleeding.  So, no, no more.

8         Q    And as to GOAT, when WGOAT15 ceased operations what

9    happened to GOAT other than not providing services to ADDiKT?

10   Did anything happen to them because ADDiKT ceased operating?

11        A    GOAT Hospitality, I mean, it obviously had one less

12   client, like less to do, less needs.  And the other clients

13   have slowly closed and, you know, over the time.  They weren't

14   all immediate in February, but they have closed so right now it

15   has no clientele.

16        Q    But as to GOAT, the closure of ADDiKT did not cause

17   GOAT to close, did it?

18        A    No.  That's not why like it closed up.  I mean, it

19   had multiple clients because that's the way it functioned.  So

20   if you lost a client, yeah.  I mean, the same thing for the law

21   firm, you could have one really great client and if you lose it

22   hopefully you have other clients that would support it.  But,

23   yeah, so it didn't close -- GOAT didn't close immediately.

24        Q    Okay.

25        A    Because it wasn't fully dependent on WGOAT as a

 1   client.

 2       Q    Okay.  So as we sit here today what is the maximum

 3   amount of time that Ms. Alvarez could have worked for ADDiKT

 4   had she returned from maternity leave -- excuse me, strike

 5   that.  Had she returned from the leave that she had requested

 6   with that doctor's note you referenced earlier?

 7       A    Carol had two weeks at the company before the

 8   termination, the termination of the entire business.  Not her

 9   termination, but the operation ceasing to exist.

10       Q    Is it correct to say that neither GOAT nor WGOAT15

11   received any note from Ms. Alvarez to state that at the

12   conclusion of that leave from February 12th -- 7th until the

13   12th that she was actually medically cleared to work?

14       A    Can you repeat that.

15       Q    Yes.  Is it correct to say that at the time that

16   Ms. Alvarez was supposed to be off of leave she had requested

17   on her note February 7th until the 12th, so at the time that

18   she was intending to return is it correct to say that neither

19   GOAT nor WGOAT15 received any indication that any doctor had

20   cleared her to return to work?

21       A    I think the note -- hold on.  Can I refer to the

22   note?  I'll tell you what page.

23       Q    You can, but you need to advise us what you're

24   referring to.

25       A    Yeah.  Give me a second to find it.  So I'm referring

 1    to page Alvarez 60, and it says he/she may return to work

 2    February 12th, 2024.  Additional comments if needed.  And then

 3    there's nothing.  So from the company's perspective you would

 4    have been good to go, you know, on the 12th to come back and it

 5    doesn't have restriction on there or anything.  The company had

 6    no knowledge of anything like that.

 7         Q    I'm going to go ahead and share the screen right now.

 8    Let the record reflect I'm now showing what the witness has

 9    just spoken of which is Alvarez 60, that is the Bates label at

10    the bottom.  I'm now scrolling up.  As we come here I'm going

11    to refer to the sections that I am highlighting that say fecha.

12    I'm going to represent to you that that is the word for date in

13    Spanish.  Do you see the date of this work release form?

14         A    Yes.  It says February 7th and it also repeats it

15    down below.  This notice verifies that your employee Alvarez,

16    Carol, was seen at this facility on February 7th, 2024.  So the

17    date is on there twice.

18         Q    Okay.  And following his note did you receive, and

19    I'm going to stop sharing, did you receive any indication that

20    Ms. Alvarez was actually able to work after February 12th,

21    2024?

22         A    That's what the company understood from this letter.

23         Q    Okay.  Earlier you testified that Ms. Alvarez quit;

24    is that correct?

25         A    Yes.  Or I think what we documented, which is the

1    same difference as quit, is employee decided to end employment.

2         Q    Okay.  Did you understand that Ms. Alvarez quit in

3    writing?

4         A    I believe she texted.

5         Q    Okay.  And let the record reflect I'm now going to

6    refer the witness to Bates label number Alvarez 0063.  Although

7    you may have copies of the document I would like, and actually

8    0062, I would like to share the screen so that everyone is

9    looking at the same thing.  Okay?  So let me go ahead and share

10   that screen here.  Let the record reflect I'm showing what has

11   been previously marked in discovery as Alvarez 0062.

12        A    Uh-huh, I see it.

13        Q    Okay.  Do you speak Spanish?

14        A    No, I'm not fluent.

15        Q    Okay.  So I will read what it says and you can

16   confirm that what I'm saying appears to be what is on the

17   screen.  (Foreign language spoken.)

18   BY MS. FAENZA:

19        Q    Does that look correct or sound correct and

20   consistent with what you are currently seeing on the screen?

21        A    Yes.

22        Q    Okay.  And so do you know who sent this text message?

23        A    From my understanding this is Eric's text.  The green

24   here is Eric.

25        Q    Okay.  I'm going to just scroll up.  And I see the

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

1    document that we referred to is on the top of this screen.  Do

2    you see that there?

3         A    Yes.

4         Q    Okay.  And I will note that it says work release

5    form, Coral Gables Hospital, your employee Carol Alvarez was

6    seen at this facility on February 7th, 2024.  Okay.  I am now

7    going to scroll down and let me the record reflect I am now

8    pointing to, as I had stated earlier, what has been turned over

9    in discovery as Alvarez 0063.  And I'm going to reduce the size

10   just a little bit.  I see a date at the top, February 11th at

11   12:21 p.m.

12        A    Uh-huh.

13        Q    Is that the day before Ms. Alvarez was provided that

14   she was off until?

15        A    Yes.

16        Q    Okay.  Do you have an understanding -- have you seen

17   this text message before?

18        A    It's part of the response to the request for

19   production.

20        Q    Do you have an understanding without asking you to

21   translate what this text message says?

22        A    That she's quitting the job.

23        Q    Do you see the words (foreign language spoken).

24        A    Yes.

25        Q    Do you have an understanding --

```
 1        A    It's in the one, two, three, fourth, effective

 2   immediately.

 3        Q    Okay.  And so do you know who this text message was

 4   received by, like who received this?

 5        A    From my understanding this was from Abelardo.

 6        Q    I see some texts at the bottom.  Do you see that

 7   there?

 8        A    Yeah, I think that was Abelardo communicating that to

 9   Eric.

10        Q    It says:  FYI, I have never told her not to take a

11   break.  Idk what she is talking about neither about heavy

12   lifting.  I'm not replying?

13        A    Yeah, because she mentioned in there something about

14   that and obviously she says Eric.

15        Q    Okay.

16        A    Had said something and he was like that was never

17   communicated to him.

18        Q    Okay.  I'm going to go ahead and stop sharing right

19   there.  Did Mr. Alvarez attempt to return to work anytime after

20   this message on February 11th?

21        A    No, because she quit.

22        Q    Did Ms. Alvarez attempt to contact Eric Garcia any

23   time after February 11th to state that she wished to return or

24   to request any accommodation?

25        A    No.
```

1    Q    Do your understanding as the corporate representative

2    for ADDiKT Ms. Alvarez intended to cease her employment with

3    ADDiKT?

4    A    That is correct.

5    Q    Do you know why she responded in this fashion?

6    A    I don't know why she responded in that fashion.

7    Q    Okay.  Did she have any further discussion with

8    anyone regarding --

9    A    To my understanding these text messages were the last

10   communications with her.

11   Q    Okay.  And so as you sit here today do you have any

12   other communication to indicate that anyone caused the end of

13   Ms. Alvarez's employment with ADDiKT other than Ms. Alvarez?

14   A    That is correct, she was the only one deciding that

15   her employment was ended.  She was given many opportunities,

16   additional training, corrections, not even disciplinary actions

17   and multiple leaves, multiple times off.  All were accommodated

18   and even the accommodating her to say -- to follow up with her

19   to say that we wanted to continue to put her on the schedule

20   and she didn't want to.

21   Q    When did you follow up with her to tell her you

22   wanted to put her on the schedule and which entity did that?

23   Was that GOAT or was that WGOAT?  And if you're reviewing

24   documents please advise us what you're looking at.

25   A    I understand it to be Abelardo who followed up with

1    her because he did the scheduling.  GOAT didn't do the

2    scheduling so Eric I think didn't do that follow-up, I think

3    Abelardo did so he would do the scheduling because he did the

4    schedule for back of house.

5        Q    Okay.  So was there anybody else who could employ

6    her?  Did GOAT have any jobs for Ms. Alvarez that she could do?

7        A    No.  GOAT didn't have any line cooks on staff.  They

8    didn't run a restaurant.

9        Q    Did Ms. Alvarez to Eric Garcia or go and say that she

10   wanted to work for GOAT?

11       A    No, not that I'm aware of.

12       Q    Did Ms. Alvarez ever indicate to anybody that, in

13   fact, after that February 7th date she was cleared and able to

14   work for any entity?

15       A    From out understanding based on the doctor's note

16   that she was cleared to work after the 12th and without

17   restrictions because it wasn't listed on there and it wasn't

18   any sort of restrictions to her work were not communicated.

19       Q    Was there any indication to either GOAT or ADDiKT

20   that Ms. Alvarez was willing to work after her time off which

21   terminated on February 12th?

22       A    No, she didn't want to.  We are going to put her back

23   on the schedule.  She didn't want to be on the schedule.

24       Q    If Ms. Alvarez returned on the 12th is it correct to

25   say that the maximum money she could have earned would have

1    been two weeks pay?

2         A    Yes.

3         Q    Okay.  Earlier you spoke about an incident with a

4    smash burger that was given to you I think you had said not

5    cooked.  Is it correct to say it was uncooked, bleeding, and

6    cold to the touch?

7         A    Yes.

8         Q    Can you tell us how a smash burger should be

9    prepared?

10        A    So it's a piece of ground meat that you quite

11   literally smash into the griddle and you cook it all the way

12   through, almost like charring it.  So to get a undercooked

13   smash burger is like unheard of.  You just don't ever make it

14   that way.  It's not even like a matter of preference where

15   you'd say, oh, no I don't want it well done.  You can't make it

16   any other way.  That is how you cook it, there's only one way.

17   So you wouldn't even have ordered it differently.  And it's

18   ground beef.  You wouldn't have eaten this ground beef that way

19   and that was not the instruction to cook any of that ground

20   beef that way.

21        Q    And so did either GOAT or ADDiKT have any record of

22   any specific statements made towards Ms. Alvarez --

23        A    No.

24        Q    -- regarding gender or her pregnancy?

25        A    No.  They found -- Eric did an investigation, talked

```
 1    to everyone, talked to even other parties to see if there was

 2    any instances of this or if anybody else could potentially even

 3    say they overheard something, they overheard.  Nobody said --

 4    anybody else had anything to say about it, the other employees

 5    that were potentially questioned had good things to say.  So

 6    if --

 7         Q    As it relates to the records that you reviewed

 8    pertaining to Eric Garcia's investigation of Ms. Alvarez's

 9    complaint did that investigation reveal at any time that either

10    Ms. Alvarez or anyone else alleged that anyone working for

11    WGOAT or GOAT touched Ms. Alvarez?

12         A    No.

13         Q    Did Ms. Alvarez allege any sexual comments or

14    innuendos?

15         A    No.  The allegation was wanted her.  I think we

16    thoroughly --

17         Q    Did anyone corroborate that with Ms. Alvarez's

18    perception that Mr. Carvallo wanted her?

19         A    No.

20         Q    Did Ms. Alvarez provide any witnesses to which she

21    complained about?

22         A    No.

23         Q    Did the documentation you reviewed pertaining to

24    Mr. Garcia's investigation showed that Ms. Alvarez complained

25    about Richard Fuentes?
```

1     A     She complained I believe in the investigation solely

2   about Max.  Let me double check.

3     Q     If you are checking you need to advise us of what

4   you're checking and provide the Bates label so that we know.

5     A     Let me double check.  Yeah, so Alvarez 15, Eric puts

6   in his declaration that she did not complain about Richard and

7   didn't discuss him during his investigation.

8     Q     And so in referencing, I'm going to start with

9   Alvarez 14, 15, 16, 17, 18, and 19, which I believe is the

10  affidavit or declaration of Eric Garcia.  Did you have an

11  opportunity to review that in its entirety?

12    A     Yes, I reviewed it prior to today's deposition.

13    Q     Is there anything within that that you believe is

14  inaccurate or incorrect?

15    A     No.  That's probably why I've kept going back to it a

16  few times during my testimony is because I believe this from

17  everything else to be accurate as it matches all the other

18  documents and it kind of provides a more assisting timeline so

19  I've gone back to that and I don't have anything that

20  contradicts what Eric has put in here.

21    Q     As it relates to ADDiKT and GOAT is it correct that

22  Ms. Alvarez denied any specific comments from Mr. Carvallo

23  stating only that she personally felt he wanted her?

24    A     That's correct.

25    Q     Is it correct to say that Ms. Alvarez believed that

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 280 of 296

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

 1   because she had 15 years of experience that she required no

 2   supervision?

 3       A    That is correct.

 4       Q    Isn't it correct that Ms. Alvarez conceded that

 5   Mr. Carvallo had actually assigned another cook to review her

 6   work because he knew that she, quote, did not want him?  And

 7   I'm referring to Alvarez 14 numbered paragraph 25.

 8            MR. MACDONALD:  Objection.  Form.

 9       A    That is correct.

10   BY MS. FAENZA:

11       Q    Is it correct that Ms. Alvarez then complained about

12   that cook and his supervision as well?

13       A    Yes.

14       Q    And, again, is it correct that throughout the

15   investigation at least from Mr. Garcia's records that

16   Ms. Alvarez denied any sexual comments or innuendo?

17       A    Correct.

18            MR. MACDONALD:  Objection to form.

19   BY MS. FAENZA:

20       Q    And is my understanding that in the investigation of

21   Ms. Alvarez that her purpose of complaining was to no longer

22   have supervision for Mr. Carvallo and that her discussions were

23   based upon cooking techniques, styles, and feedback?

24       A    Yes, that is correct.

25       Q    Okay.  Is my understanding that the documents

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    reflect, and I would like you to verify this, that there were

 2    two specific comments or questions that Ms. Alvarez raised to

 3    Mr. Garcia's attention.  One, if she was married, and, two,

 4    offering to rent her a room responding to her request to

 5    multiple employees for help in finding a cheap room to rent; is

 6    that correct?

 7         A    That is correct.

 8         Q    Is it correct that Mr. Garcia spoke with an

 9    individual by the name of Reina Gutierrez?

10         A    Yes.

11         Q    And as it relates to Reina Gutierrez, although it

12    should be obvious, is that a female employee?

13         A    Yes, she is.

14         Q    Did Ms. Gutierrez confirm any inappropriate activity

15    on behalf of Mr. Carvallo?

16              MR. MACDONALD:  Object to form.

17         A    No, in fact, Reina spoke highly of Max when

18    interviewed by Eric to see what was going on.  So quite the

19    opposite.  She could have taken the opportunity to even, I

20    don't know, even complain about him even if it wasn't related

21    to

22    Ms. Alvarez, but that wasn't the case.  And Reina had no reason

23    to necessarily speak highly of Max in this because nothing

24    would have happened.  Eric was just doing an investigation.

25    She wasn't even part of it.  He just wanted to see what was
```

 1   going on in the kitchen, what's happening.

 2   BY MS. FAENZA:

 3       Q    Is it correct to say that according to the documents

 4   that you have received that Ms. Alvarez did not allege any

 5   continuing harassment or retaliation following this complaints

 6   and investigation that we have spoken of Mr. Garcia had

 7   conducted?

 8       A    Correct.  So this was in November and she still

 9   continued with her same hours, everything other than for

10   periods of leave, still put on the schedule, still given an

11   opportunity to come back, further training, and still continued

12   employment and even land employment after the birth of her

13   child and after her maternity leave.

14       Q    Is it correct to say that when you reviewed the

15   ADDiKT 15 -- the WGOAT15 ADDiKT documentation that Mr. Carvallo

16   brought to the attention of Eric Garcia that Ms. Alvarez had a

17   consistent late problem, lateness problem?  And I will refer to

18   Alvarez 16.

19       A    That was a long question, but, yes, she did have

20   issues with tardiness.

21       Q    I want to refer to number 64 and I'll read it.  When

22   confronted Ms. Alvarez would respond, quote, I'm here now,

23   aren't I.  ADDiKT declined to discipline her for this lateness

24   other than asking her to be timely.  Is that your understanding

25   that this correct?

Deposition of Lisa Gonzalez                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        A     Yeah, she again was verbally counseled on being on

 2   time and the importance of being there when scheduled.

 3        Q     Do you have any documentation to reflect that

 4   Ms. Alvarez requested a later start time or any type of

 5   accommodation to appear later at work because of some medical

 6   issue or pregnancy?

 7        A     No, I only have the two documented leaves that were

 8   accommodated.

 9        Q     After this investigation by Mr. Garcia you stated

10   that you reviewed the hours worked to determine whether

11   Ms. Alvarez's schedule had been reduced; is that correct?

12        A     Yes.

13        Q     Did you see any reduction in Ms. Alvarez's schedule

14   or hours in comparison to other line cooks other than the time

15   she took off?

16        A     No.

17        Q     Okay.  And is it your understanding that the

18   documentation from ADDiKT and GOAT reflect that Ms. Alvarez

19   simply declined to perform certain tasks associated with her

20   job?

21        A     I mean, she declined her job.

22        Q     Is it correct to say that Ms. Alvarez was able to eat

23   free during meal breaks in a small area in another part of the

24   building?

25        A     Yeah, during a break she could eat, of course.
```

```
1        Q    Do you know if Ms. Alvarez was clocking in and

2   clocking out during her breaks?

3        A    I don't believe she was that she wasn't clocking in

4   and clocking out so they were paid breaks.

5        Q    Do you know if ADDiKT at any time had a policy for

6   paid medical leave -- strike that, for paid maternity leave for

7   any employee in the approximate ten months of its existence?

8        A    WGOAT didn't provide any paid maternity leave.

9        Q    Did WGOAT provide any paid vacation or personal day

10  leave?

11       A    No, not for her position.

12       Q    For any position?

13       A    I do believe Abelardo had paid vacation because he

14  was salary so I believe he did.

15       Q    And for any line cook was Ms. Alvarez not having paid

16  time off the same as the other line cooks?

17       A    No, no.  No line cook -- that position didn't come

18  with paid time off.  It was an hourly thing.  Not many staff

19  had paid time off, that's why I said Abelardo did.  I believe

20  the front of the house manager, that position did which is also

21  a salaried position, but any of the other hourly positions

22  didn't have paid vacation.  Servers didn't have paid vacation.

23  Bussers didn't have paid vacation.  The other line cooks, food

24  prep did not have paid vacation.  The dishwasher.

25       Q    Were you surprised to learn that Ms. Alvarez was
```

1   expecting paid time off after having just started with ADDiKT?

2        A    I was.  It's just not -- not that we didn't offer it.

3   It's not common in the industry as well.  The positions from a

4   line cook probably from any restaurant is not going to get any

5   paid time off.  Any of the positions I just said, it's pretty

6   standard that you don't get paid time off so it was surprising

7   that that was the expectation.

8        Q    If ADDiKT had agreed to allow Ms. Alvarez 12 weeks of

9   Family Medical Leave Act presuming that that act applied to

10  ADDiKT what job was Ms. Alvarez  be able to return to?

11       A    She claimed she had all these problems so I'm not

12  sure.

13       Q    Well, at the end of those 12 weeks of the Family

14  Medical Leave Act was there a job or company for her to return

15  to?

16       A    Well, there wasn't.  It closed down.  There was

17  nothing to return to.

18       Q    Did -- and I will ask this.  You had spoken about

19  Ms. Alvarez's performance issues which you state were verbally

20  counseled; is that correct?

21       A    Correct.

22       Q    Do you see any recommendation from Maximillian

23  Carvallo to terminate Ms. Alvarez?

24       A    No.

25       Q    Do you see any documentation of any efforts of anyone

1    by the name of Richard Fuentes attempting to terminate

2    Ms. Alvarez?

3        A    He didn't have the -- he never did.  He never

4    attempted to, but he also didn't have the authority to as an

5    independent contractor and an employee of that subcontracted

6    service so he didn't have any authority to fire her.

7        Q    Did you see any documentation reflecting Abelardo

8    Vargas attempting to terminate Ms. Alvarez?

9        A    No, he was putting her back on the schedule.  That's

10   what was going to happen after the 12th to be put back on the

11   schedule.

12       Q    Did you have any documentation that reflects at any

13   point Eric Garcia attempted to take any efforts to terminate

14   Carol Alvarez?

15       A    I'm sorry, could you repeat that.

16       Q    Yes.  Did you locate any documentation in your review

17   on your diligent search in participating in this litigation to

18   reflect that Eric Garcia at any time took any efforts to

19   terminate Ms. Alvarez?

20       A    No, he never took any efforts to terminate her and he

21   didn't have the authority to terminate her.

22       Q    Any documentation to reflect that at any time Eric

23   Garcia recommended Ms. Alvarez be terminated?

24       A    No, he did not.

25       Q    Do you have anything within your records showing that

1    anyone at either GOAT or ADDiKT recommended Ms. Alvarez be

2    terminated?

3         A    No, no one did.

4         Q    And at the time that she resigned is it correct to

5    say that the intent was for Ms. Alvarez to return to work at

6    the conclusion of that leave of February 12th?

7         A    Yes, she was to return to work.

8         Q    Are you aware of any accommodation that Ms. Alvarez

9    requested that ADDiKT did not comply with?

10        A    I'm not aware of any request that was not complied

11   with.

12        Q    Have you ever seen that doctor's note that

13   Mr. MacDonald showed to you on the screen today?

14        A    No, I had testified to that earlier that I hadn't

15   that, the document, and I was looking at the dates and they

16   seemed strange compared to the other medical notes I had.

17        Q    As it relates to the operation within the kitchen if

18   Ms. Alvarez is not, quote, on the line as you testified to who

19   is there to prepare the food for the customers?

20        A    No one would be on that area of the line so you

21   wouldn't have anybody.  So you'd have a stall like in that

22   portion.

23        Q    And so if Ms. Alvarez does not show up for work at

24   all and does not give notice and you are not able to find

25   coverage who can prepare the food for the customers as they

Deposition of Lisa Gonzalez                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1    come in?
 2         A    So it would be very difficult.  Obviously, we'd try
 3    and get any other line cooks to come in.  In an absolute pinch
 4    the chef could step in and perform the line cook's duty, but
 5    then the chef's duties, no one is filling in for that.  There's
 6    no like back-up for that, for someone to come in and fill in
 7    those duties.  So it really throws everything off.
 8         Q    And is Reina Gutierrez able to perform those duties
 9    as a line cook?
10         A    She wasn't train to.  She had a different position.
11    She did food prep.  She prepped different meals.  She did
12    employee meals.  So if I took Reina, let's just say, to fill in
13    because Ms. Alvarez couldn't work or no showed, whatever it may
14    be, and I didn't have anybody else and I pulled Reina well now
15    there's nobody making employee meals.  So it was very difficult
16    if you just left.
17         Q    So if Ms. Alvarez did not show up for work, did not
18    provide notice, you could not get coverage or for any other
19    reason she was just absent from the line in the kitchen did
20    that critically affect the operation of ADDiKT?
21         A    Yeah, you couldn't get meals out.  So if you couldn't
22    get meals out, you're not making any revenue, you're not
23    satisfying any customer, what are you coming to the restaurant
24    for if I can't serve you a meal.
25         Q    To your knowledge following this investigation by
```

1    Eric Garcia are you aware if Ms. Alvarez ever complained about

2    any kind of anybody wanting her and/or sexual harassment any

3    time after that?

4         A    No.

5         Q    And when, if you know, approximately when did

6    Maximillian Carvallo cease working for ADDiKT?

7         A    January 9th.  Hold on and I'll tell you what

8    document.  I'm just want to confirm the date.  January 9th from

9    Alvarez 16.

10        Q    Okay.  Was Mr. Carvallo's separation from ADDiKT

11   because of any investigation regarding Ms. Alvarez conducted by

12   Eric Garcia?

13        A    No.

14        Q    And as it relates to Abelardo Vargas, do you have an

15   approximation of when he began working?

16        A    January 9th.

17        Q    And so as it relates to Abelardo Vargas are you aware

18   that Ms. Alvarez ever complained to anyone about Mr. Vargas

19   wanting her?

20        A    No.  I know I've heard that.  She did say that.  I

21   don't know which document I saw that in.  Hold on one second.

22   Hold on.  Someone came in and asked me a question.  Hold on.

23        Q    Okay.  As you sit here today are you aware of any

24   documentation to establish that Ms. Alvarez ever stated he was

25   emotionally distressed about anything at ADDiKT?

1    A    No, I don't have anything to that effect, the

2    document, anything like that.

3    Q    As you sit here today are you aware of any

4    documentation that would state that either GOAT or ADDiKT

5    ignored any of Carol Alvarez's complaints or issues that she

6    brought to the attention of either management or Eric Garcia?

7    A    No.  They were investigated.  They were taken

8    seriously.  When she made a complaint they were taken

9    seriously, fully investigated by Eric.  You know, there were a

10   lot of disciplinary actions.  She was given a lot of

11   opportunity to be able to train, to improve.  When she

12   requested something it was provided to her.  She requested time

13   off multiple times.  It was provided to her, and even a

14   follow-up from the company to ask her about when she's coming

15   back.

16   Q    Are there any statements or answers or anything that

17   you need to amend or change at this time that you find to be

18   inaccurate that you would like to take the opportunity to

19   address at this time?  I'm not suggesting you do.  I'm just

20   asking if there's anything to wrap this up.

21   A    No, I don't.  I thought a saw a typo when I was

22   reviewing.  I saw like a year and I was like, well, that

23   wouldn't even make sense, but I don't see it now.  If there is

24   I'll let you know.  Nothing substantively changed.  Like the

25   things I saw were a typo.  And it was in one of the

```
 1    interrogatories.  I'll look and find it again.  But I don't

 2    think -- it doesn't change anything substantively and it

 3    doesn't change any of my testimony today.

 4              MS. FAENZA:  Okay.  I think for now that's the

 5         questions that I have.

 6              MR. MACDONALD:  I just have a quick redirect.

 7                        REDIRECT EXAMINATION

 8    BY MR. MACDONALD:

 9         Q    Has GOAT Hospitality Group LLC filed taxes?

10              MS. FAENZA:  Objection.

11         A    I believe it filed an extension.

12    BY MR. MACDONALD:

13         Q    But have they ever filed taxes?

14         A    Ever filed, I believe so, yes.

15         Q    And they filed last year presumably?

16              MS. FAENZA:  Objection.

17         A    No.  I think last year was the extension.

18    BY MR. MACDONALD:

19         Q    Okay.  But as to the extension they're current on

20    their taxes; is all that correct?

21              MS. FAENZA:  Objection.  Instruct the witness not to

22         respond as to whether they're current on their taxes.  We

23         went through this issue before.  If you want to ask a

24         question about --

25    BY MR. MACDONALD:
```

1    Q    Okay.  Did they file for tax year 2024 taxes?

2    A    I can't say for certain.  I didn't file them.  That

3  would be the accountant.

4    Q    Who is the accountant?

5    A    Josh Kornick.

6    Q    And could you access those records if you wanted to?

7         MS. FAENZA:  Objection.

8    A    I don't have them.  I would have to go to another

9  person to get them.

10  BY MR. MACDONALD:

11    Q    Mr. Kornick?

12    A    Yes.

13    Q    Okay.  All right.  And did you search for those as

14  part of this litigation?

15    A    I did and I don't have them.

16    Q    You did search for them?

17    A    Yes.

18    Q    Okay.  Did you contact Mr. Kornick?

19    A    No, I didn't contact him.  I searched for them but I

20  didn't contact him.

21         MR. MACDONALD:  Okay.  All right.  No further

22       questions.

23         MS. FAENZA:  Okay.  I will state let the record

24       reflect it's 6:44 p.m.  We did receive documents and

25       responses to Plaintiff's discovery.  Just as a

Deposition of Lisa Gonzalez                                    Carol Alvarez v. Goat Hospitality Group LLC, et al.

```
 1        housekeeping matter I did ask that those be provided

 2        sooner.  At 5 p.m. we did provide a brief extension.  Her

 3        deposition is tomorrow morning so respectfully we will

 4        do what we need to do.  I will also state on the record

 5        that it was my understanding that Mr. MacDonald sent

 6        emailed communication on last Friday, which would have

 7        been the 16th stating that he was going to take a

 8        deposition of Eric Garcia at 4 p.m. following your

 9        deposition and Abelardo Vargas at 7 p.m.  It is my

10        understanding at this time although we did not agree to

11        those that there's been no service and that Mr. MacDonald

12        has not attempted to do those depositions today.  Is that

13        correct?

14              MR. MACDONALD:  Are you asking me?

15              MS. FAENZA:  Yeah.

16              MR. MACDONALD:  Well, obviously the depositions

17        haven't been conducted.  I don't understand the question.

18              MS. FAENZA:  I'm just asking if that is correct?

19              MR. MACDONALD:  That the depositions haven't occurred

20        yet?

21              MS. FAENZA:  That on Friday of last week, the 16th,

22        you stated you were going to take Eric Garcia's deposition

23        today following Ms. Gonzalez's beginning at 4 p.m. and

24        that you were going to take Mr. Abelardo Vargas's

25        deposition at 7 p.m. today, and I have requested multiple
```

Carol Alvarez v. Goat Hospitality Group LLC, et al.

 1      times specific service.  It is my understanding that you

 2      confirmed today you have not served either of them.  Is

 3      that correct?

 4              MR. MACDONALD:  No, I had not confirmed that.  We

 5      had discussed rescheduling the deposition to today and

 6      they obviously did not take place.

 7              MS. FAENZA:  I'm requesting to know if you had

 8      service?

 9              MR. MACDONALD:  I don't understand why this has

10      anything to do with this deposition.

11              MS. FAENZA:  Okay.  So i will just state on the

12      record I have no information stating that either person

13      has been served.

14              THE WITNESS:  You need to answer.  That should be

15      what the record reflects.  Do you have service or not?

16              MS. FAENZA:  It is what it is.  I just want to be

17      able to plan it.  It is 7:04.  Thank you for your time

18      Madame court reporter.  Mr. MacDonald, I don't have any

19      further follow-up questions so we will begin Ms. Alvarez's

20      testimony -- we can go off the record.  I don't need this

21      on the record.

22              (At 7:06 p.m., no further questions were propounded

23      to this witness.)

24

25

Case 1:24-cv-24135-RKA   Document 39-1   Entered on FLSD Docket 02/23/2026   Page 295 of 296

Deposition of Lisa Gonzalez
Carol Alvarez v. Goat Hospitality Group LLC, et al.

1

2

3                      CERTIFICATE OF OATH

4    STATE OF FLORIDA

5    COUNTY OF HILLSBOROUGH

6         I, the undersigned authority, certify that LISA GONZALEZ

7    remotely appeared before me and was duly sworn.

8         WITNESS my hand and official seal this 21st day of

9    January, 2026.

10

11

12    _____

13    MELISSA FERNANDEZ
      Notary Public - State of Florida
      Commission No.:  HH 278990
14    My Commission Expires:  6/21/2026

15

16

17

18

19

20

21

22

23

24

25

Deposition of Lisa Gonzalez                          Carol Alvarez v. Goat Hospitality Group LLC, et al.

1

2

3                    REPORTER'S DEPOSITION CERTIFICATE

4     STATE OF FLORIDA

5     COUNTY OF HILLSBOROUGH

6          I, MELISSA FERNANDEZ, Court Reporter, certify

7     that I was authorized to and did stenographically report

8     the foregoing deposition, and that the transcript is

9     a true record of the stenographic notes.

10         I further certify that I am not a relative,

11    employee, attorney, or counsel of any of the parties,

12    nor am I a relative or employee of any of the parties'

13    attorney or counsel connected with the action, nor am

14    I financially interested in the action.

15         Dated this 18th day of February, 2026.

16

17

18    _____

      MELISSA FERNANDEZ
19    Court Stenographer

20

21

22

23

24

25