ORIGINAL

1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:24-cv-24135-JEM


CAROL ALVAREZ,

    Plaintiff,

-vs-

GOAT HOSPITALITY GROUP LLC and
WGOAT15 LLC,
    Defendants.

_____/


Pathman Law, LLC

One Biscayne Tower - Suite 2400
2 South Biscayne Boulevard
Miami, Florida 33131


January 22, 2026
10:19 a.m. to 6:28 p.m.


DEPOSITION OF

CAROL ALVAREZ


Jennypher Aristilde, HH 605377

ORIGINAL

2

1                    APPEARANCES:

2    On Behalf of the Plaintiff:

3        MACDONALD LAW, PLLC

4        420 SW 7th Street, Suite 1118

5        Miami, Florida 33130
         (786) 500-9675
6        kyle@macdonaldemploymentlaw.com
         BY: KYLE T. MACDONALD, ESQUIRE
7
     On Behalf of the Defendants:
8
         PATHMAN LAW, LLC
9        One Biscayne Tower - Suite 2400
         2 South Biscayne Boulevard
10       Miami, Florida 33131
         (305) 379-2425
11       tfaenza@pathmanlaw.com
         BY: TARA E. FAENZA, ESQUIRE
12

13   Also present:

14       Sergio Brauer, INTERPRETER

15

16

17

18

19

20

21

22

23

24

25

ORIGINAL

3

1                    INDEX

2    TESTIMONY OF CAROL ALVAREZ                    PAGE

3    Direct Examination by Ms. Faenza              5

4

5              INDEX OF EXHIBITS

6
                   DEFENDANT'S EXHIBITS MARKED
7    NUMBER              DESCRIPTION              PAGE

8    Deemed Exhibit 1  ID of Ms. Alvarez            5

9    Exhibit 2         Composite Responses to      67
                       Interrogatories
10
     Exhibit 3         Composite DV Case Documents  71
11
     Exhibit 4         Amended Complaint            87
12
     Exhibit 5         Pay Summary                 137
13
     Exhibit 6         Composite Text Messages     173
14
     Exhibit 7         Composite Doctor's Notes    192
15
     Exhibit 8         DV Court Order Documents    198
16                     (Exhibit 1 was retained.)

17

18              CERTIFIED QUESTIONS

19   Page 32, Line 3
     Page 118, Line 12
20   Page 129, Line 24
     Page 131, line 5
21   Page 146, Line 19

22

23

24

25

ORIGINAL

4

1   THEREUPON:

2          THE REPORTER:  Good morning.  It is Thursday,

3   January 22nd.  The time -- January 22nd, 2026.  The

4   time is 10:19 a.m.  Before I swear in the deponent,

5   will all attorneys please state their name for the

6   record, starting with Plaintiff counsel?

7          MR. MACDONALD:  Kyle MacDonald on behalf of

8   the plaintiff, Carol Alvarez.

9          MS. FAENZA:  Good morning.  Tara Faenza on

10   behalf of the corporate defendants, GOAT Hospitality

11   Group, LLC, and WGOAT15, LLC.

12          THE REPORTER:  Thank you,

13          Mr. Sergio Brauer, please raise your right

14   hand.

15          (Oath is administered.)

16          THE REPORTER:  Thank you.  Please ask the

17   witness to raise her right hand.

18          (Oath is administered.)

19          THE REPORTER:  Thank you.  Counselor, you may

20   proceed.

21          MS. FAENZA:  Has Ms. Alvarez produced a valid

22   form of identification prior to being sworn in?

23          THE REPORTER:  Yes.

24          MS. FAENZA:  Okay.  May I see that?  May I

25   have that presented, please?

ORIGINAL

5

1          We'll ask that that be photocopied during the

2      break as Exhibit 1.

3          (Thereupon, Defendant's Exhibit 1 is deemed marked

4      for identification.)

5                    SERGIO BRAUER,

6       was duly sworn to truly and accurately

7     translate the testimony from English to Spanish and

8      Spanish to English,

9                    CAROL ALVAREZ,

10       having been first duly sworn, was examined and

11     testified as follows:

12                 DIRECT EXAMINATION

13   BY MS. FAENZA:

14     Q.   I can speak in Spanish, as I did before, but I

15   will not be doing so during this deposition.  We'll just

16   go ahead and hold that there, because this gentleman is

17   the interpreter.  His Spanish is much better than mine.

18   And so when we are on the record, I'm only allowed to

19   speak in English.  So, similarly, before we get into

20   some of the questions here, please note that when you

21   respond, even if you do know some English, but please

22   kindly respond in Spanish and allow the interpreter to

23   respond for you, please.

24     A.   Okay.

25     Q.   We cannot do depositions in Spanglish,

6

1   although I speak it better than Spanish, which means that

2   once a deposition begins in one language, it must

3   continue entirely in that language.  So it's not

4   intended to be rude.  I may even understand what you are

5   saying in Spanish, most likely I do, but it is a

6   requirement that this gentleman perform his

7   interpretation.

8          And so one thing I would like to acknowledge

9   is that Spanish is a language spoken in many countries,

10  with different dialects, and expressions that may differ

11  from country to country or even within the United States

12  with American-born Spanish speakers.  If at any period

13  in time you believe that the interpreter has not

14  captured the essence of what you stated in Spanish

15  correctly in English, I would ask that you please wait

16  until he's done and then advise: Sir Interpreter, I

17  believe you said X, Y, Z, and in fact I meant A, B, C.

18  That is to ensure that the record is clear and the

19  statements that you make are the ones that you intended

20  and in fact stated.  Do you understand that, Ms.

21  Alvarez?

22     A.   Yes.

23     Q.   Perfect.  Similarly, I may hear something from

24  you and that the interpreter says.  I generally will not

25  challenge an interpreter, but if I hear something

7

1    different, I may follow up.  I may address the interpreter

2    directly.  I may ask you to repeat your response so that

3    we can ensure that exactly what you say is captured on

4    the record.

5           Okay.  So with that, I'd like to go ahead and

6    begin by asking you to state for the record your full

7    name, including any middle names.

8    A.    Carol F. Alvarez.

9    Q.    What does the F stand for?

10   A.    Francisca.

11   Q.    Have you ever been known by any other name?

12   A.    No.

13   Q.    What is your date of birth, please?

14   A.    April 21, 1988.

15   Q.    And where were you born?

16   A.    Chile.

17   Q.    How long have you lived in the United States?

18   A.    Since 2017.

19   Q.    I'm going to try to give you a road map by

20   letting you know ahead of time the subject matter that

21   I'm going to ask you questions about to make it easier.

22   I am now going to switch gears and ask you about any

23   prior testimony that you may have given.

24   A.    Okay.

25   Q.    Have you given any testimony before as a

ORIGINAL

8

1    witness in a deposition, in a hearing, or in trial,

2    or for any purpose?

3         A.    No.

4         Q.    So based upon the fact that you have not

5    previously been deposed or testified, I would like to go

6    through just a couple of ground rules.  Is that fair?

7         A.    Okay.

8         Q.    The first sort of rule that I will provide to

9    you is becoming evident.

10         MS. FAENZA:  Let the record reflect that the

11         witness nodded her head and non-verbally indicated

12         yes before stating, "Okay."

13         I'll let you go and translate that.

14         Q.    And in deposition, you will notice that there

15    is a lovely court reporter at the end of the table who

16    his typing.  In addition, to her right, behind her pink

17    phone and by her pink water bottle, you will see a

18    recording device.  And there is a recording device

19    directly in front of you, slightly to your right.  These

20    recording devices are only for sound or audio.  Which

21    means, in order to capture your answers on the record, I

22    will need a verbal response that is a word.  Does that

23    make sense, Ms. Alvarez?

24         A.    Yes.

25         Q.    Okay.  And I must insist that, although verbal

ORIGINAL

9

1  responses can include expressions like, "um-hmm" -- I will

2  spell that for the court reporter M-M-H-M [sic] -- "uh-

3  huh" -- U-H-U-H [sic] -- or "huh-uh," once captured on a

4  record, it is impossible for me to know whether those

5  sounds, which are not words, actually mean yes, no,

6  maybe, not sure, kind of, or any other expression.

7  Therefore, when you make those statements, which is a

8  common thing for people to do, please note that you will

9  likely hear me state, "Is that a yes or is that a no?"

10  Is that fair, Ms. Alvarez?

11      A.   Yes.

12      Q.   And to be clear, I may say to you, "Is that a

13  yes or is that a no?"  However, you are always free to

14  use whatever words that you would like to use.  You are

15  not limited to yes or no.  You may respond, "yes, but,"

16  "no, but," "I'm not sure," "I believe so," however you

17  wish to speak.  I'm only using that expression to make

18  sure that we have a verbal response, which is an actual

19  word.  Is that fair?

20      A.   I understand.

21      Q.   Perfect.  Similarly, I think the interpreter

22  and I might somehow be related.

23           MS. FAENZA:  Let the record reflect that I am

24      moving my hands in front of my face.

25      Q.   The interpreter similarly moves his hands when

**ORIGINAL**

10

1   he speaks, which is common.  If you move your hands

2   while you're speaking, you'll hear something very odd

3   that doesn't happen in conversation, which is, I will

4   state, "let the record reflect," and then I will

5   describe your physical movements, because that would not

6   be captured by the court reporter.

7        The court reporter is not a screenplay

8   drafter.  She will not write down parenthetical,

9   "witness sighs and looks downward," "witness moves her

10   hands."  The court reporter will only be capturing the

11   actual words.  When I'm explaining this to you, it's so

12   that you do not take offense to these odd sort of

13   interactions where I'm stating, "let the record reflect"

14   or actually coming back and pushing you to say, "Is that

15   a yes or is that a no?"  Is that fair?

16      A.   I understand.

17      Q.   Perfect.  And these instructions are provided

18   literally to every deponent for every deposition that I

19   take.  It's not any reflection upon you.  It's to

20   establish the ground rules as we understand them.  Is

21   that fair?

22      A.   I understand.

23      Q.   Okay, perfect.  Before I begin with some of

24   the other rules, I ask the same question of everybody.

25   Please do not take offense.  Do you have any medical,

ORIGINAL

11

1    mental -- medical or mental condition, or are you under

2    the influence of any substances, whether legal or not --

3    I'm not asking what they are -- that would prevent you

4    from being able to understand and respond to the

5    questions being posed to you here today?

6        A.   No.

7        Q.   Okay.  So one of the first sort of rules that

8    I would like to explain is that a deposition is a legal

9    process by which I will pose questions to you and you

10   will respond.  It is not a conversation of us speaking

11   like somebody would over lunch or if I met you at the

12   grocery store.  So it is, to some extent, a bit of an

13   interrogation where I'm asking you the questions and

14   you're providing the responses.  Does that make sense?

15       A.   I understand.

16       Q.   Okay.  Which means if you ask me questions

17   about my clients -- I will use something outrageous that

18   would not make sense here -- what kind of dogs do the

19   owners of my clients have?  I would not be able to

20   respond, not because I don't want to, but because as you

21   notice, the court reporter only swore one person, and it

22   was yourself, and you are the only person who is here to

23   respond to questions.

24       A.   I understand.

25       Q.   Okay.  There is one exception to that, and

ORIGINAL

12

1    it's an important exception, which is, if I pose a

2    question to you and you don't understand what I'm asking

3    you, please tell me.  Please ask me to either state my

4    question differently or to explain it in a way that you

5    are able to respond.

6         A.   I understand.

7         Q.   Okay.  As it relates to that, if you respond

8    to a question, the presumption will be that you did in

9    fact understand the question and that the statement you

10   gave was in fact responsive.  Is that fair?

11        A.   I understand.

12        Q.   That said, occasionally people say things,

13   particularly when they're under stress, and leave out a

14   detail, maybe they misspeak, they say my child was five

15   and in fact your child was seven, you remember later.

16   I'm just using these examples, not as suggestions.  In

17   the event something like that happens that you remember,

18   oh, I need to change my answer, I would ask that you

19   simply finish answering the question that I've asked you

20   first, and then let me know, "I just realized" or "I

21   need to change my answer or add more information to the

22   prior question you asked me."  Is that fair?

23        A.   I understand.  Thank you.

24        Q.   Okay.  There is another odd thing about this

25   process, which is sitting next to you.  You are

ORIGINAL

13

1    represented by an attorney, Mr. MacDonald.  Mr. MacDonald,

2    throughout your testimony, may say the word,

3    "objection."  When Mr. MacDonald says that word, I would

4    ask that you please remain silent to allow Mr. MacDonald

5    to say whether or not he objects to the question before

6    you begin responding.  And the reason for that is

7    simple.  One, so that your attorney may make the record

8    for you.  Two, so that this lovely court reporter's

9    fingers don't fall off from exhaustion because we're all

10   talking over ourselves.

11       A.   I understand.

12       Q.   And similarly, it is unusual to have a

13   conversation where someone interjects and says,

14   "objection."  You would still answer the question, even

15   if your attorney says objection, unless he has

16   instructed you not to respond.  Does that make sense?

17       A.   I understand.

18       Q.   Most of the time, a witness will respond to

19   questions.  It is relatively unusual for you to be

20   instructed not to respond to a question.

21       A.   I understand.

22       Q.   And just to sort of set expectations as to the

23   questions that I'm asking, the meaning of privilege is

24   the communications between your attorney and yourself.

25   That is a sacred communication that I cannot ask you

ORIGINAL

14

1    questions about.  And I am, in fact, not seeking any

2    information from you which would require you to divulge

3    to me privileged information.  So if you hear a question

4    and some of the answer requires you to tell me what

5    you've spoken with your attorney about, you may safely

6    assume I am not asking for that information.

7        A.    I understand.

8        Q.    Okay.  Did you understand that the court

9    reporter, or the lady sitting at the end of the table,

10   issued an oath to you today?

11       A.    I do.

12       Q.    And what does that mean to you?

13       A.    That it's completely true what I'm going to

14   say.

15       Q.    And so, I will follow up with that to advise

16   you sort of how I view a truthful response.  If I ask

17   you a question, and you provide an answer which is

18   technically truthful but leaves out information which

19   would make that answer either misleading, substantially

20   incorrect, inaccurate, or flat-out false, I would not

21   consider that response to be truthful.  Does that make

22   sense?

23       A.    Yes.

24       Q.    And are you agreeing to respond here today not

25   solely with the words coming of your mouth being

ORIGINAL

15

1   truthful but, in fact, complete and not excluding any

2   information that you have in your knowledge?

3            MR. MACDONALD:  Objection.  Form.

4            Do you mind translating that to her?

5       A.   Yes.

6            MS. FAENZA:  Let the record reflect that the

7       deponent has nodded her head yes.

8       Q.   That is a prime example, what just happened

9   there.  Your attorney may, from time to time, state the

10  word "objection" or have other discussions with counsel.

11  Unless he has instructed you not to respond, I would ask

12  that you please do so.

13      A.   I understand.

14      Q.   Thank you.  As we sit here today, I may ask

15  you questions that you know the information but you

16  don't know it firsthand, meaning you didn't see it or

17  hear it yourself, but maybe someone else told you about

18  that information.  Supposing when I left my home this

19  morning it was not raining, and I did not actually see

20  any rain or get any water on me outside, and then I look

21  out the window and see that there are droplets on the

22  window --

23           MS. FAENZA:  Let the record reflect there are

24      droplets on the window to the left of me.

25      Q.   -- that the sky is gray and that the ground

ORIGINAL

16

1   beneath us is wet.  I may know that it rained, but I

2   would need to state how it is I saw that because I did

3   not actually see the rain.  I know it from other

4   information.  Does that make sense?

5        A.   I understand.

6        Q.   Similarly, if I was in a room that had no

7   windows, and instead my paralegal told me that it had

8   been raining, I would ask that my response be something

9   like, "It has been raining, and I know that because my

10  paralegal told me when she came in from the rain;"

11  thereby giving the basis for how you have that

12  knowledge.  Does that make sense?

13       A.   I agree.

14       Q.   Okay.  And this is not a normal way that

15  people talk, so please do not be offended if you make a

16  statement or give testimony and I follow up and ask you,

17  "Did you see that?" or "Did you hear that?" or "How do

18  you know that?"  It's not an intention to state that

19  there's disbelief as to your answer; it's an attempt to

20  find out the source of your knowledge.  Does that make

21  sense?

22       A.   I understand.

23       Q.   And as I stated before, if the basis of your

24  information is, "Well, my attorney told me," I am not

25  asking for that information.

ORIGINAL

17

1      A.    I understand.

2      Q.    Okay.  And so, in a deposition, it's my view

3   that respect and being comfortable and able to answer

4   the questions in a way that is as relaxed as possible is

5   critical; therefore, I just want to be clear, this is

6   not the Spanish Inquisition.  You're not in a criminal

7   court being thrown up on a stand.  You need to take a

8   break.  If you would like to get some additional water,

9   some coffee, if you need something to eat, or to use the

10  restroom, all I ask is that you finish the last

11  question, answering the last question that I posed, and

12  then let us know, and we will be happy to take as many

13  breaks as you need.

14     A.    Perfect, thank you.

15     Q.    Okay.  Generally speaking, I will state that

16  we will take a lunch break or a substantial time for you

17  to speak with your attorney, to eat, and to have a break

18  from this process.  I will simply advise you that, once

19  sworn in by this court reporter, should you discuss the

20  contents of this deposition with your attorney, that I

21  can ask about.

22     A.    I understand.

23     Q.    And the reason for stating that is not to tell

24  you what to discuss with your attorney, but to prevent

25  any arguments and to not have unnecessary delay in the

ORIGINAL

18

1    deposition.  It is not uncommon, even with my own

2    clients or a deponent during the break, to call their

3    attorney and ask, "How am I doing?  What should I say?"

4    That's natural, but if you do that and you engage in a

5    discussion, that permits me the opportunity, and I

6    generally will ask, did you discuss the contents or your

7    responses to this deposition with your attorney?  So I

8    just want to give that ahead of time to make this

9    process smoother and easier for everyone.

10        A.   Thank you.

11             MR. MACDONALD:  Objection to form.

12        Q.   Okay.  Is that fair?

13        A.   I understand completely, and I agree.

14        Q.   Okay, perfect.  Are there any questions that

15   you have for me regarding anything before we begin the

16   substance of this deposition?

17        A.   No.

18        Q.   Ms. Alvarez, do you know why you're here?

19        A.   Yes.

20        Q.   And why are you here?

21        A.   I'm suing the company that I used to work for

22   because the damages to my person.  And that's why we're

23   here.

24        Q.   Okay.  Do you understand that you're here for

25   a deposition?

ORIGINAL

19

1     A.    Yes.

2     Q.    Madam, how did you prepare for the deposition

3  today?  Without discussing any conversations that you

4  had with your attorney.

5     A.    I am only going to state what happened, and

6  I'm going to tell the truth.

7          MS. FAENZA:  Move to strike portion as

8      nonresponsive.

9     Q.    The question was, how did you prepare to be

10  here to answer the questions?  And I will expound a

11  little bit if it's not clear.  Did you look over

12  documents?  Did you speak to anyone who is not your

13  attorney?  Did you look anything up on the internet?

14  Did you call anyone?  Did you look over medical records?

15  Text messages?  Documents that were provided by the

16  defendants?  What specifically did you do to prepare for

17  this deposition, excluding any information which would

18  fall under an attorney-client privilege?

19     A.    I have the medical records from my pregnancy,

20  that I was diagnosed with postpartum depression because

21  of the situation that was going on at the job.  That

22  brought complications to my pregnancy.  That's the way

23  that I prepared myself.  I only have the medical

24  documents from the doctor.

25          MS. FAENZA:  Let the record reflect the

ORIGINAL

20

1       defendant is turning to her attorney and questioning

2       her attorney.  I would instruct the witness not to

3       seek any coaching or advisement on how to answer

4       from her attorney during responses.

5       A.   I wasn't asking him for help.

6       Q.   I'll let the record speak for itself.

7            MS. FAENZA:  I'm going to move to strike the

8       portions that are nonresponsive.

9       Q.   And I'll explain what that means.  It means

10   that you're not responding to the question.  In part,

11   you are adding information that you would like to state.

12   I will not interrupt you, I will not argue with you, but

13   you may hear me make that statement, "Move to strike

14   portions that are nonresponsive."

15           The question was not the content of anything.

16   The question was: How did you prepare?  So rather than

17   go over this, I don't care to argue with you.  What I'm

18   going to ask you is sort of question by question, just

19   to make sure that I have an understanding what

20   specifically you did to prepare for the deposition.

21           So I'm going to go ahead and begin and ask

22   you, other than your attorney, who did you speak with

23   about this deposition?

24   A.   Just with my attorney.

25   Q.   Did you speak with Fernando Eviel Guevara

ORIGINAL

21

1   Perez?

2          THE INTERPRETER:  Fernando?

3          MS. FAENZA:  Eviel.

4          THE INTERPRETER:  Eviel?

5          MS. FAENZA:  Um-hmm.  E-V-I-E-L.  Guevara,

6      G-U-E-V-A-R-A, and Perez.

7          THE WITNESS:  He is my fiance.

8          MS. FAENZA:  Move to strike portion as

9      nonresponsive.

10  BY MS. FAENZA:

11     Q.   The question was, did you speak to him about

12  this deposition today?

13     A.   Yes.

14     Q.   What did you discuss with Mr. Guevara Perez?

15     A.   That I had to travel from Texas to Miami,

16  Miami to Texas.

17     Q.   Have you discussed this case or the

18  allegations that you've made in this case with Mr.

19  Guevara Perez?

20     A.   Very little.

21     Q.   What have you discussed?

22     A.   The moment that the lawsuit was placed.  And

23  that, waiting for the time to go by.

24     Q.   Okay.  Did you discuss this deposition with

25  Carmen Gloria Quineo (phonetic), your mother?

ORIGINAL

22

 1      A.   Quineo.

 2      Q.   Quineo, okay.

 3      A.   At the time that I placed the lawsuit, I was

 4   living with my mother.

 5      Q.   And the question was --

 6           MS. FAENZA:  And I'll move to strike portion

 7      as nonresponsive.

 8      Q.   Did you discuss this deposition with your

 9   mother Ms. Quineo?

10      A.   No.

11      Q.   Okay.  Madam, I'm going to ask you a series of

12   background questions.  We'll get into any documents that

13   you reviewed later on in this deposition.  I see that

14   you've listed your current address on your Responses to

15   Defendant GOAT Hospitality Group LLC's First Set of

16   Interrogatories as 6550 Hillcroft Street, Apartment --

17           THE INTERPRETER:  6550?

18           MS. FAENZA:  Hillcroft Street.

19           THE INTERPRETER:  Hillcroft Street.

20           MS. FAENZA:  Apartment 235.  Houston, Texas

21      77081.

22           THE WITNESS:  Yes.

23   BY MS. FAENZA:

24      Q.   How long have you lived at that address?

25      A.   Six, seven months.

ORIGINAL

23

1    Q.    Okay.   What is your social security number?

2         MR. MACDONALD:  I'm going to object to having

3    it on the record.  I'm happy to give it to you after

4    the fact, but --

5         MS. FAENZA:  We will not -- we can take it off

6    the record, but we will have the social security

7    number.  It's discoverable.

8         MR. MACDONALD:  Right.  So I just don't want

9    it in the transcript.

10        MS. FAENZA:  Right.  So she pops off the

11   record --

12        MR. MACDONALD:  Okay.

13        MS. FAENZA:  -- and we agree that the social

14   security number will not be on the record.

15        THE REPORTER:  One moment.

16        Back on the record, 11:00 a.m.

17        MS. FAENZA:  Let the record reflect, the

18   deponent's driver's license, and we will similarly

19   place my question as to the license number off the

20   record.

21   BY MS. FAENZA:

22   Q.    So I'm now going to read to you, Ms. Alvarez,

23   the driver's license number that I have on the driver's

24   license you -- read in the number --

25        (Off the record.)

ORIGINAL

24

1          THE REPORTER:  Back on the record.

2    BY MS. FAENZA:

3      Q.   -- to verify that that is in fact your

4    driver's license number.  And, of course, I don't expect

5    you to have your driver's --

6          (Off the record.)

7          (On the record.)

8    BY MS. FAENZA:

9      Q.   -- for you to review and just make sure that I

10   have it correct.

11         MS. FAENZA:  I believe the deponent responded.

12         THE INTERPRETER:  "Perfect."

13         MS. FAENZA:  Okay.

14   BY MS. FAENZA:

15     Q.   So is your driver's license number --

16         THE REPORTER:  One moment.

17         (Off the record.)

18         THE REPORTER:  Back on the record.

19     A.   Yes.

20     Q.   Madam, as you sit here today, are you legally

21   married?

22     A.   No.

23     Q.   Were you ever married?

24     A.   Yes.

25     Q.   From what period to what period?

ORIGINAL

25

1      A.   Is that important?

2           MS. FAENZA:  Move to strike portion as

3      nonresponsive.

4      Q.   I'll pose the question again.  From what

5      period were you married?

6      A.   I don't remember.

7      Q.   You don't remember when you were married?

8      A.   Many years ago.

9      Q.   More than ten?

10          MR. MACDONALD:  Objection.  Form.

11     Q.   More than ten years ago?

12          MR. MACDONALD:  Same objection.

13          MS. FAENZA:  The witness needs to respond.

14     A.   2017.

15     Q.   Okay.  So nine years ago.  Is that the year of

16     a divorce?

17     A.   Yes.

18     Q.   Okay.  What is the name of your former spouse?

19     A.   Frank King Vera.

20     Q.   Please spell the last name of Mr. Vera.

21     A.   King is spelled K-I-N-G.

22     Q.   And what was the name after, Vera?

23     A.   Vera is spelled V as in Victor, E-R-A.

24     Q.   Okay.  When were you married to Mr. King Vera?

25     A.   May

ORIGINAL

26

1     Q.   Of what year?

2     A.   I don't remember.

3     Q.   Do you know if you were married for more than

4 one year?

5          MR. MACDONALD:  Objection.  Form.

6     Q.   You must respond, Madam.  There's been on

7 instruction from your counsel to refrain from

8 responding.

9          MR. MACDONALD:  You can answer.

10        MS. FAENZA:  And let the record reflect the

11    deponent is looking towards her counsel for

12    direction, and the counsel said something that I did

13    not hear.  Could you repeat what you said?

14    (Crosstalk)

15        MR. MACDONALD:  I said, "You can answer."

16        MS. FAENZA:  Okay.

17 BY MS. FAENZA:

18    Q.   Ms. Alvarez, can you answer?

19    A.   I need you to ask me the question again,

20 please.

21    Q.   Were you married more than one year?

22    A.   No.

23    Q.   Were you married in the United States?

24    A.   Yes.

25    Q.   Okay.  Where were you married?

ORIGINAL

27

1       A.    Florida.

2       Q.    What city?

3       A.    Broward.

4       Q.    That's the county.  If you wouldn't mind

5    telling me what city.

6       A.    I don't remember.  I think that belongs to

7    Hollywood.

8       Q.    Have you been married any other time?

9       A.    No.

10      Q.    Okay.  Do you currently have children?

11      A.    Yes.

12      Q.    How many?

13      A.    Four.

14      Q.    Without providing their first names, for

15   anyone under the age of 18, would you please provide

16   their ages?

17      A.    All four of them are underage.

18      Q.    Okay.  So we'll start with the oldest child.

19   How old is the oldest child?

20      A.    The oldest is female, is 19 years old.

21      Q.    You agree that 19 years old is over the age of

22   18?

23      A.    Not in Chile.  And she lives in Chile.

24      Q.    Okay.  During the period that you lived in the

25   United States, did your eldest adult child reside with

ORIGINAL

28

1    you?

2         A.    No.

3         Q.    When you came to the United States, where was

4    your daughter?

5         A.    In Chile.

6         Q.    How old was your daughter at the time that you

7    left Chile and came to the United States?

8         A.    I think she had seven, eight, to ten years

9    old.

10        Q.    Were you legally still her parent with

11   parental responsibilities at the time you came to the

12   United States and left her in Chile?

13             MR. MACDONALD:  Objection.  Form.

14        A.    I left a legal power for her father to be in

15   charge of her.

16        Q.    Have you relinquished parental rights of your

17   daughter?

18        A.    No.

19             MR. MACDONALD:  Objection.  Form.

20        Q.    Are you responsible to pay anything, or were

21   you responsible during the pendency that you lived in

22   the United States and left Chile, to provide any

23   financial support to your daughter?

24        A.    Yes.

25        Q.    How much did you have to pay per month?

ORIGINAL

29

```
 1      A.   We have reached an agreement with the father

 2  that I'm to send a certain amount of time every certain

 3  amount of periods because I had already left a house in

 4  Chile.  That house is rented in Chile, and they get

 5  funds from that, and his father has a good financial

 6  situation in Chile.

 7          MS. FAENZA:  Move to strike portions

 8      nonresponsive.

 9      Q.   Do you have any other children who are in

10  Chile?

11      A.   Yes.

12      Q.   How many?

13      A.   One more.

14      Q.   And how old is that child?

15      A.   Eleven.

16      Q.   How old was that child when you came to the

17  United States?

18      A.   Three, four years old.

19      Q.   Is that the same father as your eldest child?

20      A.   No.

21      Q.   Did you -- and I'm just going to ask basic,

22  same questions as to what responsibilities you had for

23  that child when you came to the United States.  So, did

24  you relinquish your parental rights?

25      A.   I have a question.  What does all these
```

ORIGINAL

30

1   questions I got about my past have anything to do with

2   relate and show to what we're here for?

3          MS. FAENZA:  Move to strike portions

4      nonresponsive.

5      Q.   I may seem cold.  I'm here to ask questions.

6   I'm not here to answer questions, unfortunately.  If

7   there's a question about what I'm asking you, as to

8   whether or not you understand it, I'm happy to clarify.

9   If it feels invasive, unfortunately, this is the way a

10  deposition goes, and I am entitled to explore and ask

11  certain questions.  I will try to do so as respectfully

12  as I can, but I would ask that you please respond to the

13  question.

14         So the question was: Did you relinquish your

15  parental rights of your second child that remains in

16  Chile?

17     A.   No.

18         THE INTERPRETER:  The answer is no.

19     Q.   I would ask that you allow the translator to

20  complete the response first, only because Madam Court

21  Reporter has to capture everything down.

22         Did you have financial responsibility for the

23  second child in Chile?

24     A.   Yes, that child is studying.

25         MS. FAENZA:  Move to strike portions

ORIGINAL

31

1    nonresponsive.

2        Q.   Do you have to send money back to either a

3    father or grandparents or other person who is caring for

4    the child in Chile?

5            MR. MACDONALD:  Objection.  Form.

6        A.   Yes.  Sometimes, yes.  When they request it.

7    And it's very rare, like I said before because, like I

8    said before, the father is in a very well financial

9    situation.

10       Q.   As it relates to the second child, I don't

11   believe I've asked any questions about this father or

12   heard any testimony.  Am I incorrect in understanding

13   that you stated that this child had a different father

14   than the first child that you spoke about with the

15   rented home?

16           THE INTERPRETER:  I'm sorry, I lost track of

17       that one.

18           MS. FAENZA:  What was the last thing you said?

19           THE INTERPRETER:  With relationship to this

20       second child, I don't know if I've asked anything in

21       relationship to the father.

22           MS. FAENZA:  It is my understanding that this

23       is a different father than the father who had the

24       rented home.

25           MR. MACDONALD:  Objection.  Form.

ORIGINAL

32

1          THE WITNESS:  Yes.

2     BY MS. FAENZA:

3          Q.   Okay.  So is there a second rented home or

4     some other form of financial support provided to this

5     person?

6               MR. MACDONALD:  Objection.  Form.

7          A.   I'm going to be as clear and as frank with the

8     lady attorney.  I'm here in regards to the lawsuit that

9     I placed against the hotel, not to question what kind of

10    parent I am.

11         Q.   Okay.

12              MS. FAENZA:  I'm actually not going to move to

13         strike portions that are not responsive to the

14         question.  I'm going to certify the question, and I

15         will move on.

16         Q.   I will continue to pose the questions.  Should

17    you choose to refuse to respond and decide whatever you

18    think is relevant, it's going to be quite a long

19    deposition.

20              MS. FAENZA:  What was the last thing you said?

21              THE INTERPRETER:  "I'm just going to certify

22         the question."

23              MS. FAENZA:  And I will continue to ask the

24         questions.

25         A.   I understand.

ORIGINAL

33

1      Q.   As it relates to these two children in

2   Chile, do you see them regularly in person?

3           MR. MACDONALD:  Objection.  Form.

4      A.   No.

5      Q.   How many times have you seen your children

6   since 2017, in person?  And to be clear, I'm only

7   referring to the children that we've spoken about so far

8   that reside in Chile.

9           MR. MACDONALD:  Objection.  Form.

10      A.   I have seen him.

11      Q.   How many times?

12      A.   On two occasions.

13      Q.   In the United States, or in Chile, or in

14   another place?

15      A.   Another country.

16           MR. MACDONALD:  Slow down.  Let him finish the

17      translation.

18           THE WITNESS:  I'm sorry, I'm sorry.

19   BY MS. FAENZA:

20      Q.   And I also want to be clear, because it's not

21   my intent to offend anybody, Madam, you've asked for

22   $1.5 million in emotional distress damages.  When a

23   person asks for emotional distress damages, I am

24   entitled to ask questions about your mental state, about

25   other conditions which could cause emotional distress.

**ORIGINAL**

34

1    I am not questioning, nor will I be passing any judgment

2    upon anyone as a parent.  The questions are pertaining

3    to that you have claimed emotional distress damages, and

4    you are now testifying to being without your children

5    for some period of time separated.  Again, not a

6    judgment, but I am able to ask these questions.

7         MR. MACDONALD:  Objection.  Form.

8    Q.   Do you understand that?

9    A.   I do understand.

10   Q.   Okay.  As it relates to just the two children

11   we spoke of, do you speak to these children regularly?

12        Yes?  And how often?

13   A.   Yes.  Once or twice per day.

14   Q.   Have you seen your eldest child since you left

15   Chile in 2017?

16   A.   Yes.

17   Q.   And when did you see her?  What year?

18   A.   I think 2022.  I don't remember if it was '21

19   or '22.

20   Q.   Other than this instance, have you seen your

21   eldest daughter in person any other time?

22        MR. MACDONALD:  Objection.  Form.

23   A.   No.

24   Q.   It sounds weird to ask the question this way,

25   but I'm just going to solely focus on the two children

ORIGINAL

35

1    that we've spoken about that are in Chile.  Do you miss

2    them?

3              MR. MACDONALD:  Objection.  Form.  That's

4         harassing.  You can answer.

5              MS. FAENZA:  Move to strike.  There will be no

6         speaking objections, sir.

7    BY MS. FAENZA:

8         Q.   Do you miss your children that are in Chile?

9         A.   What mother would not miss her children?

10        Q.   Is that a yes?

11             MR. MACDONALD:  Objection.  Form.

12        A.   Of course I need them, yes.

13        Q.   Does it cause you emotional distress to be

14   without your children, in another country, from 2017

15   until now 2026, where you've only seen your children a

16   handful of times, if that?

17        A.   Of course not.

18        Q.   Of course not?

19             MR. MACDONALD:  Objection.  Form.

20        A.   No.

21        Q.   So you have no emotional distress of being

22   separated from your children since 2017?

23             MR. MACDONALD:  Objection.  Form.

24        A.   No.

25        Q.   So when you left a toddler, at age three or

ORIGINAL

36

1    four, in Chile, there was no emotional distress at all?

2            MR. MACDONALD:  Objection.  Form.  Asked and

3        answered.

4        Q.   You may respond.

5        A.   No, because they are well.

6        Q.   Okay.  So you mentioned that you have four

7    children.  Can you state the age of your next child?

8        A.   Five years old.

9        Q.   Does that child have the same father as either

10   of the other two children?

11       A.   No.

12       Q.   And is the father of that child Mr. King Vera?

13       A.   No.

14       Q.   Were you married to the father of that child?

15       A.   No.

16       Q.   And who does that child reside with?

17       A.   With me.

18       Q.   Do you receive financial support from the

19   father of that child?

20           MR. MACDONALD:  Objection.  Form.

21       A.   I don't need it.

22       Q.   Okay.

23           MS. FAENZA:  Move to strike portions

24       nonresponsive.

25       Q.   Do you receive money from the father of the

ORIGINAL

37

1    child?

2        A.    No.

3        Q.    Have you established paternity through a court

4    for that child?

5            MR. MACDONALD:  Objection.  Form.

6        A.    The father has recognized paternity.

7            MS. FAENZA:  Move to strike portions

8    nonresponsive.

9        Q.    So I understand what you're saying is that the

10   father has acknowledged, which is fine, and I can accept

11   that; however, the question is whether that paternity

12   was established by a court, or you may, if you prefer to

13   say, that the gentleman simply accepted paternity and is

14   agreeing that he's the father of the child, but I'm just

15   asking if it was through a court or how that was done.

16           MR. MACDONALD:  Objection.  Form.  Go ahead.

17       A.    You're asking if I receive child support for

18   the child?  Is that what you're asking me?

19       Q.    No.  What I have asked is just how -- I will

20   simplify the question.  Has paternity been established

21   because of a court case?  Has the person accepted his

22   parental responsibilities and agreed that he's the

23   father?  Or is there some other some other determination

24   or lack of clarification as to paternity?

25       A.    The father has been recognized and appears on

ORIGINAL

38

1    the birth certificate.  He does not have contact with my

2    daughter.  I don't know if that answers your question.

3        Q.  So it's correct to say that -- I think your

4    testimony is, and please correct me if it's incorrect,

5    that there was no case necessary, that the father

6    accepted that he was the father of the child and placed

7    his name on the birth certificate, and there's no case,

8    no legal process pertaining to that child?

9        A.  Yes, that is correct.

10       Q.  Okay.  And does anyone else provide you any

11   assistance, whether it be from government benefits, a

12   grandparent, a relative, a friend?  Does anyone provide

13   financial assistance with your third child?

14            MR. MACDONALD:  Objection.  Form.

15       A.  I don't receive government help.  And my

16   emotional partner is the one that supports us as the

17   head of the family.

18       Q.  I did not understand that response.  Could you

19   please repeat it?

20       A.  I also don't understand your question.

21       Q.  Well, the question is whether or not you

22   receive money from anyone for the support of this child.

23            MR. MACDONALD:  Objection.  Form.

24       A.  Not from the father, I don't receive any

25   money.  But my emotional partner is the one that helps

ORIGINAL

39

1   me with the child's expenses.  We are a family.  Did I

2   answer your question?

3       Q.   Yes.  I didn't understand the term "emotional

4   partner."  And Madam, are you --

5       A.   He is my fiance.

6       Q.   Is that the individual Fernando Eviel --

7            (Crosstalk)

8            MR. MACDONALD:  Slow down and wait for him --

9       the question and --

10           THE WITNESS:  I'm sorry, I'm sorry.

11  BY MS. FAENZA:

12      Q.   It's normal.  And in fact, sometimes I hop in

13  there with my own Spanish --

14           (Crosstalk)

15      Q.   I will remind you, this is intense.  It's not

16  intended to offend.  The emotional stress of going

17  through a deposition in and of itself may require you to

18  take a break.  So if you need it, just ask [sic] the

19  last question, take a breather, pop to the bathroom, get

20  something to drink, whatever you need.  Okay?

21      A.   Well, yes, the thing is that I'm also a little

22  bit cold.  I didn't -- I thought we were in Miami, so I

23  wasn't very much prepared.

24      Q.   I will tell you that I warned the attorney

25  that it is freezing in this office, hence the coffee.

ORIGINAL

40

1   We do also have tea and other things.  What is that, a

2   blanket?  If you would like a scarf, it looks like --

3        A.   (Spanish - not translated).

4        Q.   And, of course, if you need a break, that is

5   also an opportunity.  I will state -- we can pop off the

6   record.

7             (Off the record.)

8             THE REPORTER:  Back on the record at 11:38

9   a.m.

10  BY MS. FAENZA:

11       Q.   Okay.  So I just want to move on and sort of

12  wrap up.  And once again, what I will say is that the

13  discussion point as it relates to your family situation

14  is to determine -- as you've placed your emotional

15  condition at issue in this case, unfortunately, although

16  it is sensitive, and I'm trying to be respectful and not

17  really asking the children's names, just simply their

18  ages, I'm not trying to inquire too much, but I do need

19  to have an understanding as to whether or not there are

20  potentially other causes of emotional distress in your

21  life.  It's just part of my job.  It has nothing to do

22  with any judgment pertaining to anyone as a parent.

23       A.   Yes, I'm not taking it personally.  The thing

24  is, I'm a very private person, so whenever these types

25  of questions are being posed, it kind of affects me a

ORIGINAL

41

1   little.

2        Q.   I understand, and I will be as delicate as I

3   can.  I myself am a volunteer guardian ad litem, so

4   trust, when I say that in handling cases with utmost

5   confidentiality, I have seen quite a few things.  So I

6   don't have judgment.  Nothing shocks me, and if it did,

7   I would not express it.

8             So, as to your youngest child, what is the age

9   of your youngest child?

10       A.   One year and eight.

11       Q.   Eight months?

12       A.   Eight months.

13       Q.   Okay.  And again, I'm just asking with

14  sensitivity, is the father of this child the same as the

15  father of your third child?

16       A.   No.  It's Fernando Guevara.

17       Q.   I believe you testified you were married only

18  one time.  Is it correct to say that you have not been

19  married to Mr. Guevara?

20       A.   Not yet.

21       Q.   Okay.  And earlier we discussed your current

22  address in Houston, Texas.  Aside from your two children

23  and Mr. Guevara, does anyone else live with you?

24       A.   No, just us.

25       Q.   So Mr. Guevara, yourself, and then the two

ORIGINAL

42

1   children who reside in the United States?

2      A.   Yes.

3      Q.   Okay.  All right.  You mentioned in your

4   interrogatory responses that you speak to your mother,

5   and you have had some discussions with your mother at

6   some point.  Are you also in contact with your father?

7      A.   He is right now in Chile.  I cannot talk very

8   much with him right now because he has terminal cancer.

9      Q.   Does he live permanently in Chile?

10     A.   Yes.  He has never left the country.

11     Q.   Does your mother live in the United States or

12  Chile?

13     A.   She lives in the United States.

14     Q.   And for how long -- and again, I mean this

15  with respect and sensitivity.  I am very sorry to hear

16  that your dad has a serious medical condition.  How long

17  has he suffered with this medical condition?

18     A.   I am also very sorry to know of his sickness.

19  We received the news a month ago.

20     Q.   I am going to go through some of the questions

21  that we may have asked in your interrogatories, just

22  to -- I may clarify.  I may have other questions.  I see

23  that there was a question regarding any lawsuits that

24  you may have been a party or witness to since you

25  reached the age of 18.  I'm just going to kind of go

ORIGINAL

43

1   back a little bit.  You mentioned that you were born in

2   Chile and you now reside in the United States.  Just so

3   we don't waste time going through a bunch of history we

4   don't need to, did you reside in any other country

5   besides Chile and the United States?

6            THE INTERPRETER:  And the question is, at the

7       end?

8            MS. FAENZA:  Did you reside in any other

9       county?

10   A.   No.

11   Q.   Okay.  May I ask the reason for immigrating to

12   the United States in 2017?

13   A.   Because I have a degree on international

14   gastronomy, and my mother has been living here for over

15   30 years.  She wanted me to come to the United States so

16   we could be closer.

17   Q.   Did you grow up in Chile without your mother

18   living in the same country?  For any period of time?

19   A.   A short amount of time.

20   Q.   And so, based upon your date of birth, you

21   would be 37, 38 years old; is that correct?

22   A.   Yes.

23   Q.   So I'm a little bit confused, because you had

24   stated your mother had lived in the United States for

25   more than 30 years, which would make you seven or eight

ORIGINAL

44

1    when she began living in the United States; is that

2    correct?

3          MR. MACDONALD:  Objection.  Form.

4      A.   I don't remember the exact date because it's

5    been many years.  But I'm not sure, maybe from eight

6    years old or 12 years old.  I'm not very sure.

7      Q.   And did you live with your father then or

8    another relative?

9      A.   My sisters, my father, and my grandfather.

10     Q.   Okay.  So now I'm going to kind of switch

11   gears a little bit.  I'm just going to talk about

12   educational background.  I do ask everyone this.

13   There's no implication that I don't, you know, think you

14   have one.  It's the same question I ask everyone.  What

15   is the highest level of education that you have

16   obtained?

17     A.   University.

18     Q.   Did you graduate?

19     A.   Yes.

20     Q.   And what degree did you obtain?

21     A.   I studied international gastronomy.

22     Q.   So thank you for that.  The answer to the

23   question is what degree did you obtain?  And I will give

24   you an example.  You could get an associate's degree.

25   You could get a bachelor's degree, a master's degree.

**ORIGINAL**

45

1  You could get a PhD.  You could get any one of a number

2  of different degrees.  So the question is, what was the

3  degree that you obtained?

4      A.    Education in Chile is very different from here

5  in the United States.  I did the basic, the middle, and

6  university.

7      Q.    How many years of university did you do?

8      A.    Four.

9      Q.    Okay.  What is the name of the university?

10     A.    There was two of them.  I think one is not

11  anymore functioning.  It's INCAP, I-N-C-A-P, and the

12  other one is Culinary.

13     Q.    Was the name of the school Culinary?

14     A.    Yes.

15     Q.    Simply that?

16     A.    That's what I remember.  Many years ago.

17     Q.    When did you graduate?

18     A.    I don't remember.

19     Q.    Before you moved to the United States?

20     A.    Yes, many years before.  You finish middle

21  school at 17 years old.

22     Q.    Okay.  When you say INACAP, I-N-A-C-A-P, is

23  that the Universidad Tecnologica de Chile?

24     A.    I think, yes, it's still the same.

25     Q.    Okay.  And what location did you study in?

ORIGINAL

46

1      A.    Valparaiso.

2      Q.    Can you spell that for me, please?

3      A.    Valparaiso is spelled V as in Victor,

4   A-L-P-A-R-A-I-S-O.

5      Q.    And did you study gastronomy at this

6   institution?

7      A.    Yes.

8      Q.    Okay.  Other than this university, the two

9   that you've mentioned, any other education or

10  certifications?

11     A.    I validated my education at the institution

12  that's called Mariano Moreno Instituto Culinario, but I

13  was not able to finish it because of the pandemic.  It's

14  located in Coral Gables.

15     Q.    Is that the Mariano Moreno Culinary Institute,

16  2135 Coral Way?

17     A.    Yes, it is in Coral Gables.

18     Q.    Okay.  Is that the name of the institution,

19  though, the Mariano Moreno?

20     A.    Yes.

21     Q.    Okay.  And what year did you begin your

22  studies there?

23     A.    I don't remember.  I know it was before the

24  pandemic.

25     Q.    Approximately how many years did you study

ORIGINAL

47

1   there?

2       A.   I was not able to attend because that was the

3   beginning of the pandemic.

4       Q.   Did you attend any courses?

5       A.   I just signed up for it, and then that's when

6   the pandemic started.

7       Q.   Okay.  So as we sit here today, you did not

8   complete any coursework at this institute; is that

9   correct?

10      A.   I just signed up, and that's when the pandemic

11  started.

12          MS. FAENZA:  Move to strike portions

13      nonresponsive.

14      Q.   I'm only asking if you did any studying there.

15  That's it.

16          MR. MACDONALD:  Objection.  Form.

17      A.   No.

18      Q.   Okay.  Other than this institute and the one

19  that you mentioned, any other educational institutions

20  that you studied at?

21          MR. MACDONALD:  Objection.  Form.

22      A.   I did take another course here, yeah, in

23  Florida.  I think that's to care for elderly people.  I

24  think it's HHA.

25      Q.   By HHA, are you referring to a home health

ORIGINAL

48

1   aide?

2       A.   That's correct.

3       Q.   Okay.  Did you complete that course?

4       A.   Yes.

5       Q.   Do you have a license?

6       A.   Yes.

7       Q.   Okay.  Which will then move us into another

8   section.  I'm now going to ask you about any

9   professional licenses you may have.  I'm taking some

10  time so you can relax and hear what I'm saying because

11  it doesn't always make sense.  It could be a lawyer,

12  like the attorney sitting next to you or myself.  It

13  could be a translator, maybe certified.  It could be a

14  court reporter.  It could be a notary public.  It could

15  be a, what we call a commercial driver's license for a

16  truck driver.  It could be a real estate agent.  So when

17  I'm referring to professional licenses, other than the

18  home health aide license that you have, do you have any

19  others?

20      A.   No, not any other one besides my food handling

21  license in Texas and Florida.

22      Q.   Okay.  So as we sit here today, you have a

23  home health aide license in Florida and a food handling

24  license in Texas and Florida; is that correct?

25      A.   Yes.  The Texas one is active.  The Florida

ORIGINAL

49

1    one, it is not because I moved to Texas.

2         Q.    Okay.  I ask everyone the same question.

3    There's no offense intended towards you.  At any point

4    in time for any of these licenses, have you had any

5    suspensions, disciplines, cancellations which were

6    involuntary, or any allegations of misconduct for any of

7    those licenses?

8         A.    No.

9         Q.    And when you came to the United States -- I'm

10   not going to be asking any questions pertaining to the

11   legality of how you came, because that's not the

12   question that I have.  It's more your ability to work

13   lawfully.  So if you were working, I can ask you that.

14   I will not be asking for any periods of time that you

15   worked before you started working for my clients,

16   whether it was legal or not, because I am not interested

17   in any of that information.  But I am going to ask as to

18   your sort of work experience before coming to Addikt.

19   Is that fair?  Does that make sense?

20        A.    I need you to be more clear about that.

21        Q.    Okay.  So I am going to ask about your past

22   work experience.  I will not be asking about whether or

23   not you were working lawfully or not, because --

24        (Crosstalk)

25        Q.    -- except after the period of time that you

ORIGINAL

50

1   began working for my client.  It's not uncommon for

2   people to enter the United States and begin working

3   immediately, even if they don't have the, you know, the

4   work permit.  So I'm not asking about that.  Simply if

5   you were working.  So when you entered the United

6   States, did you begin -- how quickly did you begin

7   working?

8        A.   About two months after I came.

9        Q.   Okay.  And where did you work?

10        A.   At a restaurant at the condominium that I used

11   to live at the time.

12        Q.   Okay.  What is the name of that restaurant?

13        A.   Blue.

14        Q.   And where is that located?

15        A.   It's in Ocean Drive in Hallandale Beach.

16        Q.   Okay.  How long did you work there?

17        A.   I am not sure if it was eight months or a

18   year.  I don't remember.

19        Q.   Okay.  What was your title there?

20        A.   More specific, please?

21        Q.   What was your job?

22        A.   I used to help on the cook line.

23        Q.   Is it correct to say you were not employed as

24   a line cook or a chef?

25             THE INTERPRETER:  That you are not?

ORIGINAL

51

```
1            MS. FAENZA:  Not.

2            THE INTERPRETER:  Okay.

3   BY MS. FAENZA:

4       Q.   You were not a line cook or a chef?

5            MR. MACDONALD:  Objection.  Form.

6       A.   No.

7       Q.   Okay.  And why did you leave that job?

8       A.   Because I received my residency, and I looked

9   for a better opportunity.

10      Q.   And what do you mean by your residency?

11      A.   Permanent resident.  US permanent resident.

12      Q.   Okay.  What was your rate of pay?

13      A.   I think $13.

14      Q.   Is that a rate per hour?

15      A.   Yes.

16      Q.   Did you work more than 40 hours?

17      A.   No.

18      Q.   Was it a full-time or part-time job?

19      A.   I didn't want to work full-time because I

20  didn't want to take the risk to work so much without

21  being legal in this country.

22      Q.   Okay.

23      A.   I just wanted to become familiar with the

24  kitchens in America, kitchen culture in America.

25      Q.   And where did you work after that?
```

ORIGINAL

52

```
 1      A.   I went to Gulfstream Park.

 2      Q.   And for how long did you work there?

 3      A.   Three years.

 4      Q.   What was your role there?

 5      A.   First I was a line cook.  Then I was promoted.

 6  Sous-chef.

 7      Q.   Is there a restaurant inside of Gulfstream

 8  Park?

 9      A.   Many.

10      Q.   Okay.  Which restaurant or restaurants did you

11  work at?

12      A.   Within the group, there was about seven

13  restaurants.  I serviced two of them.

14      Q.   Okay.  And what was your rate of pay?

15      A.   Twenty-one per hour.

16      Q.   And why did you leave that job?

17      A.   From the Ten Palms -- that was the name of one

18  of the restaurants -- I was moved as a sous-chef to

19  Frankey's Sport Bar.  But that one closed because of the

20  pandemic.  It's a racing track.

21      Q.   Were you laid off because the restaurant

22  closed or did you decide to leave?

23      A.   They closed because there were a lot of people

24  infected with COVID.

25      Q.   So the question is -- as an attorney, I work
```

ORIGINAL

53

1   with a lot of restaurants, and some restaurants did

2   operate during the pandemic.  So the reason you stopped

3   working there, were you told by the company, we do not

4   need you anymore because we are closing?  Or did you

5   decide, I am not going to work here because of the

6   pandemic?

7              MR. MACDONALD:  Objection.  Form.  Go ahead.

8        A.   No, they closed.

9        Q.   So did they terminate your employment because

10  they closed?

11             MR. MACDONALD:  Objection.  Form.

12       A.   Mine and many other people.

13       Q.   Okay.  Do you know what years that was?

14       A.   Pandemic was 2021, I think.

15       Q.   And what year did you start working for

16  Gulfstream?

17       A.   2019.

18       Q.   Is there a period in time that you did not

19  work between when you came from Chile until starting at

20  -- you had testified earlier that you began working

21  about two months after you came to the US.  So you were

22  at Blue for about eight months to a year.  That would

23  put you at somewhere in 2018.  Were you unemployed

24  between Blue and Gulfstream for any period of time?

25       A.   I don't understand.

ORIGINAL

54

1      Q.   Did you go directly from Blue to Gulfstream or

2   were you unemployed, not working, between Blue and

3   Gulfstream?

4      A.   Directly.

5      Q.   Okay.  All right.  So when Gulfstream closed,

6   were you working afterwards or did you have a period

7   that you were not working?

8           MR. MACDONALD:  Objection.  Form.

9      A.   It was closed for about six months.  We were

10  not able to leave our homes.

11     Q.   Right.  So the question is whether you were

12  doing some other job or whether you were not employed

13  during that period.  I do understand there were a lot of

14  people not leaving their homes or not working.  I'm just

15  trying to figure out if you were one of them.  So for

16  example, I worked the entire time.  Certain people did

17  work.  It just depended on what you did and depended on

18  the opportunities.  Were you specifically -- during the

19  period of the pandemic, were you working or were you not

20  working during that time?

21          MR. MACDONALD:  Objection.  Form.

22     A.   I was not able to work.

23     Q.   Okay.  And when you say not able, was there --

24  were you sick?  Was there a physical reason or was it

25  just you weren't able to find work during that time?

ORIGINAL

55

1          MR. MACDONALD:  Objection.  Form.

2     A.   I got sick with COVID.

3     Q.   And for how long?

4     A.   I don't remember.

5     Q.   Were you hospitalized for that?

6     A.   No.  I had to be careful because at that time

7 I was pregnant.

8     Q.   Okay.  After Gulfstream, where did you work?

9     A.   I went to Texas.

10     Q.   Okay.  So, after Gulfstream, the question is:

11 Where did you work?  Meaning, who was your employer?

12     A.   Let's see, the pandemic, I got pregnant, I

13 went to Texas.  I think there was a period I didn't

14 work.

15     Q.   For how long?

16     A.   I think for a year.  I don't remember.

17     Q.   Were you able to work during that pregnancy?

18     A.   No.

19          MR. MACDONALD:  Objection.  Form.

20     Q.   For how long during that pregnancy were you

21 unable to work?

22          MR. MACDONALD:  Objection.  Form.

23     A.   I did not work during my pregnancy.

24          MS. FAENZA:  Move to strike portions

25     nonresponsive.

ORIGINAL

56

1    Q.  Let me clarify the question.  Some people,

2  when they are pregnant, are not able to work at all.  So

3  as an example, I knew a woman who was perfectly healthy.

4  She became pregnant, and she needed bed rest for the

5  entire pregnancy.  She could not work.  Other people --

6  I know someone else who's a personal trainer, and she

7  literally was teaching a spin class one week before

8  giving birth.  It's very different per woman.  So I am

9  simply asking, for this period of time where you were

10  not working while pregnant, was it because you could not

11  work physically, or is there some other reason you were

12  not working?

13       MR. MACDONALD:  Objection.  Form.

14    A.  I'm happy for your trainer that could do the

15  spin class a week before giving birth.  This was a

16  personal option for me.  We had a good financial

17  situation, and I choose to stay home.

18    Q.  Okay.  Why did you move to Texas?

19    A.  Because of my emotional partner's job.

20    Q.  And how far into your pregnancy were you at

21  the time that you moved to Texas?

22    A.  I had my child in Florida, and after she was

23  born -- after that child was born, we left for Texas.

24  Because the pandemic was still going on.

25    Q.  Okay.  So, what part of Texas did you live in?

ORIGINAL

57

1      A.    Houston.

2      Q.    Okay.  After moving to Texas, did you work at

3  all during that period of time in Texas?

4            MR. MACDONALD:  Objection.  Form.

5      Q.    Professionally.  I'm understanding that having

6  a child is a lot of work.

7      A.    A lot of work.

8      Q.    So did you work at another job while you were

9  in Texas at any point?

10     A.    I was dedicated to the home.

11     Q.    But the question is, some people work from

12  home.  There's many things a person can do.  It's not

13  questioning you.  It's just, were you working for

14  another company during the period of time you were in

15  Texas?  If not, then I can just move on to when you left

16  Texas.

17           MR. MACDONALD:  Objection form.

18     A.    No.

19           MS. FAENZA:  Okay.  Let the record reflect the

20           deponent is shaking her head, was shaking her head

21           no.

22     Q.    Did you have any other form of sort of self-

23  employment, working for Uber, working for Lyft, doing

24  the chef work privately for individuals, or were you

25  solely dedicated to caring for your family?

ORIGINAL

58

1      A.   I was dedicated to --

2           MS. FAENZA:  You want to have it repeated?

3           THE INTERPRETER:  No, no, no.  I just -- the

4      term is escaping my mind right now.

5      A.   I was a homemaker, and usually I would, if the

6  neighbors asked me to cook, bake a cake for them, or

7  help with a party or things like that, I would do that.

8  I want to state that gastronomy is my passion, and I

9  don't see myself as not cooking or doing something with

10 it.

11          MS. FAENZA:  So, point of clarification.  I

12     can state on the record that I heard in Spanish her

13     say, after she was doing the parties, I believe she

14     said that (speaking Spanish).  Which I believe she

15     said, "but not a business."  Can I ask the

16     translator, did you hear her say that?  Because I'm

17     not sure that I heard --

18     A.   Yes, that is correct.  I didn't do it for

19 money.  I do it because I like to do it.

20     Q.   Understood, okay.  And so, did you leave Texas

21 after this?

22     A.   We returned to Florida because my emotional

23 partner was offered a good job in Miami.

24     Q.   Where is your partner working in Miami?

25     A.   He is a truck driver.

ORIGINAL

59

1        Q.   Does he work for himself or does he work for a

2   company?

3        A.   On his own, and then he worked for a while for

4   a company.

5        Q.   Okay.  And so when did you return to Florida?

6        A.   2023.

7        Q.   What month approximately?

8        A.   I don't know if it was around April, June,

9   around that time.

10        Q.   Okay.  And did you have a job lined up in

11   Florida when you returned?

12        A.   No.

13        Q.   Okay.  When did you next begin working?

14        A.   I worked at a restaurant that's still

15   operating.  It's called Mofongo Puerto Rican Cuisine.

16        Q.   Where was that located?

17        A.   On 8th Street.

18        Q.   What was your job?

19        A.   Food preparation.

20        Q.   For how long did you work there?

21        A.   I don't remember the exact amount of time, but

22   it was not for a long time.  And I moved because that's

23   when I applied to W.

24        Q.   What was your rate of pay at Mofongos?

25        A.   I think $14 per hour because it was food

ORIGINAL

60

1    preparation.

2        Q.    Did you voluntarily resign?

3        A.    Yes, because I was accepted to work at W.

4        Q.    I am going to just focus on background

5    questions for now, and then we'll talk about your

6    experiences and the allegations in the lawsuit.  So if

7    you hear me skip over that, that's why.  Is that fair?

8        A.    I understand.

9        Q.    So one of the questions posed to you in your

10   interrogatories is whether or not there were any other

11   lawsuits that you had, I think I had asked for the

12   period of time from when you were 18 on.  And you stated

13   from the year 2019 until now that you did not have any

14   other lawsuits that you were a party to.  Is that

15   correct?

16            MR. MACDONALD:  Objection.  Form.

17       A.    No.

18       Q.    Okay.  Are you familiar with an individual by

19   the name of Reydel Yaro (phonetic) Gonzalez?

20       A.    Yes.

21       Q.    And who is this individual?

22       A.    He is the father of my five-year-old child.

23       Q.    Are you familiar with child support case No.

24   2001768437?

25            THE INTERPRETER:  2001?

ORIGINAL

61

1            MS. FAENZA:  768437.

2            THE INTERPRETER:  That's a -- what type of

3      case is it?  I'm sorry.

4            MS. FAENZA:  Child support.

5            MR. MACDONALD:  Objection.  Form.

6            THE WITNESS:  I think so, because I was forced

7      to put that case, but I don't know what has happened

8      with it.

9  BY MS. FAENZA:

10     Q.   What does that mean, I was forced to put that

11  case?

12     A.   Because I applied for Medicare for Grace.  And

13  they told me that if I wanted to get the Medicare, I had

14  to put the child support case.

15     Q.   And who is they?

16     A.   When you request the Medicare, they send it to

17  you.  I don't really know how that works.

18     Q.   Do you know who they is that told you that you

19  needed to file a child support case?

20     A.   When I applied for the Medicare, they gave me

21  this thing in relation to food stamps.  And they

22  transferred the case to child support.

23     Q.   Did you receive food stamps?

24     A.   For a while, yes.

25     Q.   What period?

ORIGINAL

62

```
 1      A.    I don't remember very well about that.

 2      Q.    Do you know the address 1501 SW 37th Avenue,

 3   Apartment --

 4            THE INTERPRETER:  Wait, wait.  15- --

 5            MS. FAENZA:  -- 01 SW 37th Avenue, Apartment

 6      708.  Miami, Florida 33145.

 7      A.    Yes.

 8      Q.    What is that address?

 9      A.    That's my mother's address.

10      Q.    Do you know why, in your child support case

11   that I just referenced, it lists your address as 1501 SW

12   37th Avenue, Apartment 708?

13            MR. MACDONALD:  Objection.  Form.

14      A.    I don't understand.

15      Q.    Do you know why, on your child support case,

16   it indicates the address that I just gave you as your

17   address?

18            MR. MACDONALD:  Objection.  Form.  I'm just

19      going to object because she doesn't have the

20      document or whatever you're referring to.

21            MS. FAENZA:  No speaking objections.

22            MR. MACDONALD:  I wasn't, I was just trying to

23      note it for the record.

24            MS. FAENZA:  Okay.  And no coaching the

25      witness.
```

63

1          So I'm just asking -- same question.  You can

2     repeat it, sir.

3          MR. MACDONALD:  Same objection.

4     A.   I used to live there.

5     Q.   Okay.  Are you aware that the court case is

6  listed as having a date of August 28th, 2025?

7          MR. MACDONALD:  Same objection.

8     A.   I don't remember.

9     Q.   Were you living at that address in Miami in

10  August of 2025?

11    A.   I don't remember.

12    Q.   Do you remember when you moved back to Texas?

13         MR. MACDONALD:  Objection.  Form.

14    A.   That was after the pandemic.

15    Q.   Well, you currently reside in Texas; is that

16  correct?

17    A.   Yes.

18    Q.   When did you move back this time?

19         MR. MACDONALD:  Objection.  Form.

20    A.   I don't understand.  What is the question?

21    Q.   Well, right now you reside in Texas.  You just

22  testified that you had returned from Texas and began

23  working in Mofongos and then Addikt.  At what point did

24  you return to Texas where you currently live?

25         THE INTERPRETER:  When did she return to

ORIGINAL

64

1    Texas?

2         MS. FAENZA:  Correct, after being in Florida.

3    A.   Okay.  Now I understand.  I left Florida in

4    April.

5    Q.   Of what year?

6    A.   2025.

7    Q.   Okay.  And why?

8    A.   Work-related reasons regarding my partner, my

9    emotional partner.

10   Q.   Okay.  Do you have an attorney representing

11   you in this child support case against Reydel Yaro

12   Gonzalez?

13   A.   I really don't know what's going on with that

14   case because I don't get anything from him.

15   Q.   I understand.

16        MS. FAENZA:  Move to strike portions

17        nonresponsive.

18   Q.   But the reason I'm asking the question is

19   because, if you have an attorney representing you, I

20   would have to let that attorney know, and I wouldn't be

21   able to ask you questions about a case that you're

22   represented with another attorney.

23   A.   At the moment that they forced me to put the

24   child support case, I did have a female attorney that

25   was looking after the case.  But I don't know what has

ORIGINAL

65

1   happened with that case.

2       Q.   Okay.  Do you currently have an attorney?

3       A.   I repeat, at that time I had an attorney.  I

4   don't know if that case is closed or not.

5       Q.   But do you have an attorney now for anything

6   pertaining to child support?

7            MR. MACDONALD:  Objection.  Form.

8       A.   I repeat, at the time I had an attorney.  I

9   don't know if that case is still open or not.  If that

10  case is still open, I do have an attorney.

11      Q.   Okay.  In the year 2021, do you recall having

12  a domestic violence case against Reydel Yaro Gonzalez?

13  Case No. -- I'll go slow -- 2021-021011-FC-04.

14      A.   Yes.

15      Q.   Okay.  So, that case was filed in 2021; is

16  that correct?

17      A.   I'm not sure.  I don't remember.

18      Q.   Is there a reason why you did not provide this

19  case number when answering the legal cases that you had

20  had open in your interrogatories?

21           MR. MACDONALD:  Objection.  Form.

22      A.   I don't know if it has anything to do with one

23  with the other.  I don't know if we're looking at pears

24  and apples at the same time.

25      Q.   Okay.

ORIGINAL

66

1        MS. FAENZA:  Move to strike portions

2        nonresponsive.

3        Q.   So, I am looking at Plaintiff's Responses to

4    Defendant GOAT Hospitality Group LLC's First Set of

5    Interrogatories to Plaintiff.

6        MS. FAENZA:  I will, Counsel, show you a copy

7        of the document.  This is just what you had served

8        to me last night.

9        Q.   I'm going to flip to the back page.  And I

10   will also pull the Response to Interrogatories to the

11   other defendant WGOAT15 LLC.

12       MS. FAENZA:  In fact, I will walk over and

13       show counselor a copy of this as well before having

14       it passed to his client.  Let the record reflect,

15       I'm going to stand up and walk over to Mr. MacDonald

16       and just show him the two verification forms.  And

17       Madam, pardon me for the closeness.

18       Q.   I'm just going to place this in front of you.

19   You may feel free to flip through those documents.  Do

20   you recognize those documents?

21       MS. FAENZA:  Let the record reflect, the

22       witness has looked at the title page of both

23       documents now.

24       A.   I do recognize them.

25       Q.   And is that your signature and your

ORIGINAL

67

1    verification to the answers within there?

2        A.   Yes.

3        Q.   And do you verify, in fact, under penalty of

4    perjury, that those are true and accurate responses to

5    the questions within there?

6            MR. MACDONALD:  Objection.  Form.

7        A.   Yes.

8        Q.   Okay.  I'm just going to go ahead and take

9    this.

10           MS. FAENZA:  Madam Court Reporter, I will do a

11           Composite Exhibit 2 for this, which I'll provide to

12           you during the break.  A courtesy copy to be printed

13           for you, I'm more than happy to have my team do that

14           for you.

15           MR. MACDONALD:  Okay.

16           (Thereupon, Defendant's Composite Exhibit 2 is

17           marked for identification.)

18           THE WITNESS:  May I ask a question?

19           MS. FAENZA:  To whom?  We can take a break,

20           and during a break, you're more than welcome to ask

21           your attorney questions.  I mean this with all

22           sincerity, relaxed witnesses are better witnesses.

23           Despite how it may appear, I would like to see you

24           perform well.  I'd like to see how you present.

25           Generally that's part of the deposition process.

ORIGINAL

68

1    I'm not here to make you feel uncomfortable or to

2    create additional stress that's unnecessary.  I

3    would like simply just to finish this question here.

4    And then if you would like --

5         MR. MACDONALD:  Yeah, then we can --

6         (Crosstalk)

7         THE WITNESS:  I think you're attacking me -- I

8    feel like you're attacking me on a very personal

9    situation that I do not want to be bringing it to

10   the open.

11        MS. FAENZA:  Move to strike --

12        THE WITNESS:  And I withdraw what I just said.

13        MS. FAENZA:  Okay.  I would move to strike

14   portions nonresponsive.

15        I will explain something to you.  I will 100

16   percent assure you, during a break, I'm more than

17   happy to make you a cup of tea with some steamed

18   milk.  I have nothing personal against you.  Nothing

19   I say is personal.  When I walk out of here, I'll

20   probably shake hands with Mr. MacDonald and wish you

21   the best of luck.

22        I have nothing negative.  Some of the

23   questions are based upon my job, to try to discover

24   information.  It is uncomfortable, which is why I

25   say that frequent breaks are necessary.  I wouldn't

**ORIGINAL**

69

 1          like questions being asked of me either, but

 2          unfortunately, this is part of what I do.

 3               You can feel free to take a breath.  You can

 4          feel free to collect yourself.  If you'd like my

 5          team to get you a pad of paper that you can write

 6          down and collect yourself, feel free to do that, and

 7          we'll have someone help you.  Okay?

 8               I just want to be clear, unfortunately, when

 9          you deal with emotional distress damages, I have to

10          explore where those came from, and that can be

11          uncomfortable.  So I apologize for the process, but

12          it is indeed the process and not specific to you.

13               THE WITNESS:  Thank you for your kindness.  I

14          do need a break.

15               THE INTERPRETER:  Oh, "I don't need a break."

16               MS. FAENZA:  We'll have one at lunch but not

17          right now.  Okay.

18               So, I would like the record to reflect, and of

19          course I will show counsel before I hand it to the

20          witness -- sir, if you want courtesy copies, please

21          let me know.

22     BY MS. FAENZA:

23          Q.  I am now going to be handing to you a printout

24     of Filing No. 136634417, case of Carol Alvarez,

25     Petitioner vs. Reydel Yaro Gonzalez.

**ORIGINAL**

70

1          MS. FAENZA:  Yes, sir, I will hand you this

2     document so that you don't have to memorize that.

3     Q.   That is, in fact -- it appears to be three

4     pages front and back.  I will also attach a document

5     called Notice of Related Cases, and there's a filing

6     number that appears at the top ending in 4417.  I will

7     also hand to you a document that appears to have come in

8     October of 2021.  It is an Order Denying Petition for

9     Temporary Injunction.  And then finally, a Memo of

10    Disposition for that case, which is Case No. 2021-

11    021011-FC-04.  Before I hand this to you, I want to

12    confirm this is in fact your case that you did have

13    against Mr. Yaro Gonzalez; is that correct?

14         MR. MACDONALD:  Objection.  Form.  I just

15    don't want her to confirm without looking at it.

16         MS. FAENZA:  She's unable -- I would like the

17    witness to state whether or not she had a domestic

18    violence case against Mr. Yaro Gonzalez.

19         THE WITNESS:  He kidnapped my daughter.  I

20    called the police.  And he beat me.

21         MS. FAENZA:  Okay.  Move to strike portions

22    nonresponsive.

23    BY MS. FAENZA:

24    Q.   As it relates to -- I'm not judging you for

25    having a case.  I genuinely don't have that.  Did you in

ORIGINAL

71

1  fact have a domestic violence case filed on October 15th,

2  2021, on or around that date, against Reydel Yaro

3  Gonzalez in the Circuit Court for the Eleventh Judicial

4  Circuit in and for Miami-Dade County, Florida?

5          MR. MACDONALD:  Objection.  Form.

6      A.   Yes, I do have one.  I don't remember the

7  date.

8      Q.   Okay.  So let me just go ahead and show you.

9      A.   Oh, thank you.

10     Q.    I will show your attorney first.

11         MS. FAENZA:  And then, would you mind passing

12     it to her when you're done?

13     Q.   Just let me know.

14         MS. FAENZA:  I would ask that the witness go

15     ahead and review the documents.

16     A.    When he tried to forcibly go into the

17  apartment.

18     Q.   And so that is the case?  That is your case?

19     A.   Yes, because of the address.

20     Q.   Okay.  And if I could just have the documents

21  back, please.

22         MS. FAENZA:  And I'll attach these as Exhibit

23     3.  And I'll provide that as a composite.

24         (Thereupon, Defendant's Composite Exhibit 3 is

25     marked for identification.)

ORIGINAL

72

1    BY MS. FAENZA:

2        Q.   So, one of the things that I would like to ask

3    is that, earlier we asked if there had been paternity

4    established through any paternity case.  Do you recall

5    that question?

6            MR. MACDONALD:  Objection.  Form.

7        A.   Yes.

8        Q.   Okay.  So in the document titled Notice of

9    Related Cases, which I just showed to you, it states,

10   and I will show your signature on it: the following

11   cases are related cases.  Related case number one,

12   Reydel Yaro Gonzalez, Petitioner, Respondent Carol

13   Alvarez, Case No. 210013342.  Under type of proceeding,

14   it says paternity is checked.

15           MS. FAENZA:  And let the record reflect, I'm

16       just going to hand this document directly to Mr.

17       MacDonald for review and pass on to his client.

18       A.   May I answer?

19       Q.   Yes, ma'am, you may feel free.

20           MR. MACDONALD:  She's just showing you the

21       document.

22       A.   I want to clarify something.

23       Q.   Feel free.

24       A.   When we put the case for child support, he

25   said that she was not his daughter so that he would not

73

1    have to pay child support.

2        Q.    Okay.

3        A.    So the guy, when he wants to hurt you, they do

4    anything they can, so this doesn't surprise me.

5        Q.    Okay.  I'm just going to refer to the

6    document.  Do you see that there's a signature at the

7    bottom of the document, ma'am?  Is that your signature?

8        A.    Yes.

9        Q.    Okay.  So did you, in fact, have a paternity

10   case with Mr. Yaro Gonzalez?

11           MR. MACDONALD:  Objection.  Form.

12       A.    Apparently, yes.

13       Q.    Okay.  And I'm going to go ahead and grab the

14   documents.  In reviewing the publicly-available

15   documents, it indicates that Reydel Yaro Gonzalez had an

16   employer by the name of Gulfstream Park and Racing

17   Casino.  Is that correct?

18           MR. MACDONALD:  Objection.  Form.

19       A.    Yes.

20       Q.    Okay.  Did you work at the same place as Mr.

21   Yaro Gonzalez?

22       A.    No.

23       Q.    Okay.  How does Gulfstream Park and Racing

24   Casino differ from the Gulfstream that you had talked

25   about?

ORIGINAL

74

1       A.   Because he used to work with the horses.

2  And I worked in the kitchen.

3       Q.   How did you meet Mr. Yaro Gonzalez?

4       A.   Through a friend.  Apparently, he didn't turn

5  out to be a very good friend.

6       Q.   Understood.  Did you meet him before or after

7  you worked at Gulfstream Park?

8            MR. MACDONALD:  Objection.  Form.

9       A.   I don't remember.

10      Q.   Did you meet him at work?

11           MR. MACDONALD:  Objection.  Form.

12      A.   No.

13      Q.   Was your friend that introduced you also

14  working for Gulfstream Park and Racing?

15           MR. MACDONALD:  Objection.  Form.

16      A.   Yes.

17      Q.   Okay.  But is this the same employer, even

18  though you were working in the kitchen and he was

19  working for horses, or is this a different location?

20      A.   No.

21           (Crosstalk)

22           MR. MACDONALD:  Wait until he finishes the

23      question, okay?

24      Q.   Okay.  And I think that the witness did

25  respond, although --

ORIGINAL

75

```
1       A.   No.

2       Q.   Okay.  How is Gulfstream, let me state the

3   name, Park Racing and Casino different than the

4   Gulfstream you worked at?

5            MR. MACDONALD:  Objection.  Form.

6       A.   Because he was the owner of a horse there, who

7   raced there, and I would work at the kitchen.

8       Q.   But is it the same employer, meaning the same

9   company, even though you're not working with him

10  directly?

11           MR. MACDONALD:  Objection.  Form.

12      A.   No.

13      Q.   Okay.  Well, what was the name of your

14  employer at that time?

15           MR. MACDONALD:  Objection.  Form.

16      A.   My employer?

17      Q.   Yes, at the time.  He has his listed as

18  Gulfstream Park Racing and Casino.  So I'm just trying

19  to understand what the name of yours was, if that's a

20  different company.

21           MR. MACDONALD:  Objection.  Form.

22      A.   Clearly, because he would just pay for his

23  membership to be able to race with them.

24      Q.   The question is, what's the difference in the

25  name of the employer?  That's all.  I'm just trying to
```

76

1    understand.

2              MR. MACDONALD:  Objection.  Form.

3        A.   I have no idea in regards to that.  The only

4    thing I know is I was working there.

5        Q.   Okay.  And the address that you worked at, was

6    that 901 South Federal Highway, Hallandale Beach,

7    Florida?

8        A.   For work?

9        Q.   Yes, for you.

10       A.   I think so, yes.

11       Q.   Okay.  Did you attend a hearing for your

12   petition for domestic violence?

13             MR. MACDONALD:  Objection.  Form.

14       A.   I didn't go to court.  That's why I'm a little

15   confused about that.

16       Q.   Okay.  Did you request a hearing for your

17   petition for injunction, for protection?

18             MR. MACDONALD:  Objection.  Form.

19       A.   Of course.  After he tried to kidnap my

20   daughter, I asked for protection.

21       Q.   Okay.

22             MS. FAENZA:  Move to strike portions

23         nonresponsive.

24       Q.   But the question is whether you requested a

25   hearing in court.  That's a little bit different than

ORIGINAL

1    just filing a case.  Whether you asked the Court to

2    allow you to be heard so you could speak to the judge.

3           MR. MACDONALD:  Objection.  Form.

4    A.   I don't know if they requested, I requested.

5    Q.   Do you recall there being any hearing on that

6    request for protection from the Court?

7           MR. MACDONALD:  Objection.  Form.

8    A.   Like I said before, I have not been in court.

9    Q.   Okay.

10          MS. FAENZA:  Let the record reflect, I'm now

11          showing --

12   A.   Not physically.

13          MS. FAENZA:  -- opposing counsel a document

14          here and he may hand it to the witness when you're

15          done.

16   Q.   Do you see that document there, Madam?

17   A.   Yes.

18   Q.   Do you see where your name appears on the

19   document?  Top left.

20   A.   Yes.

21   Q.   Do you see that there's a box there that says

22   "present" and it is checked?

23   A.   Yes.

24   Q.   Do you see under, or on the right side, the

25   name Reydel Yaro Gonzalez, there is also a box there

ORIGINAL

78

1    that says "absent," and that is checked?

2        A.    Yes.

3        Q.    Okay.  It appears the documents in the Court

4    suggest that you were present before the Court for a

5    hearing.  Does the document refresh your recollection?

6            MR. MACDONALD:  Objection.  Form.

7        A.    I don't remember that.  I don't know so much

8    about these proceedings.

9        Q.    Did you appear via Zoom?

10           MR. MACDONALD:  Objection.  Form.

11       A.    I think so.

12       Q.    Did you give testimony to that judge?

13           MR. MACDONALD:  Objection.  Form.  Asked and

14           answered.

15       A.    Yes.  I think so.

16       Q.    I will just take that document back.  Thank

17   you.  At the bottom of this document, which is signed by

18   Judge Spencer J. Multack, it says "Pet," which I believe

19   is an abbreviation for petition, "dismissed, will file

20   in Broward, Pat case in Broward open."  And I believe

21   Pat stands for paternity, and that is spelled P-A-T.

22           I also see that on October 15th, 2021, for

23   Circuit Court Judge Eleane Sosa-Bruzon, there was an

24   order denying the petition for temporary injunction.

25   And next to the sentence: There is no appearance of an

ORIGINAL

79

1    immediate and present danger of domestic violence as

2    required pursuant to 741.30 Florida Statutes, and a

3    hearing will be set on the petition for injunction for

4    protection.

5         MS. FAENZA:  You can hold onto it.

6    Q.   Beneath that is another checkbox that says: If

7    in danger, call 911.  Do you have any recollection of

8    this case or that order at all?

9         MR. MACDONALD:  Objection.  Form.  The witness

10        isn't an attorney --

11        MS. FAENZA:  No speaking record -- objections.

12        MR. MACDONALD:  You're asking about the text

13        of an order from a court.  She doesn't understand

14        it.

15        MS. FAENZA:  No speaking objection and no

16        coaching the witness.

17   BY MS. FAENZA:

18   Q.   Does the showing you of these documents and

19   the reading of this refresh your recollection as to the

20   existence of this case and the result?

21   A.   I repeat again, I don't remember.

22   Q.   Okay.  And there was a Broward County

23   paternity case that had been filed.  Do you acknowledge

24   that case, on the document that you completed and

25   signed, for the notice of related cases?

ORIGINAL

80

1              MR. MACDONALD:  Objection.  Form.

2        A.   Yes, of course.  He was stating that he was

3   not the father so he didn't have to pay child support.

4        Q.   What was the result of that case in Broward?

5              MR. MACDONALD:  Objection.  Form.  Calls for a

6        legal conclusion.

7        A.   At the end, he said that he was the father.

8        Q.   Okay.  And the determination of him being

9   determined the father came from a court case; is that

10  correct?

11             MR. MACDONALD:  Objection.  Form.  Calls for a

12        legal conclusion.

13       A.   I don't remember.  I imagine so.

14       Q.   And as it relates to that case, did you give

15  any testimony in court in the Broward paternity case?

16             MR. MACDONALD:  Objection.  Form.

17       A.   If it's there, yes.

18       Q.   Do you have a recollection?

19             MR. MACDONALD:  Objection.  Form.  Asked and

20        answered.

21       A.   No.

22       Q.   Okay.  And as it relates to the incidents --

23             MS. FAENZA:  And I can take that document

24        back.

25             THE INTERPRETER:  Yes.

ORIGINAL

81

1   BY MS. FAENZA:

2       Q.    -- the incidents that you had described and as

3   it relates -- as it relates to the violence, and I am

4   very sorry to hear that anyone has suffered that, but

5   the question is, was there a criminal case opened

6   against Reydel Yaro Gonzalez for the acts of violence

7   that you spoke about?

8           MR. MACDONALD:  Objection.  Form.

9       A.   Yes, because he had previous charges of

10  domestic violence against another woman.

11      Q.   Okay.  And were the charges of domestic

12  violence for violence against yourself, your child, or

13  yourself and your child?

14          MR. MACDONALD:  Objection.  Form.

15      A.   Both.

16      Q.   Okay.  Did you give any testimony or statement

17  under oath in the criminal case you just referenced

18  against Mr. Yaro Gonzalez?

19          MR. MACDONALD:  Objection.  Form.

20      A.   Yes, I gave testimony.  Yes, I was afraid he

21  was going to hurt me because he had already tried it

22  against another woman.

23      Q.   Do you have any restraining order against Mr.

24  Yaro Gonzalez at this time?

25          MR. MACDONALD:  Objection.  Form.  Calls for a

ORIGINAL

82

1       legal conclusion.

2       A.   No.  And I don't know -- I don't know anything

3    about him.

4       Q.   Okay.  I'm not suggesting any answer.  Some

5    people know, some people do obtain it, so I'm just

6    asking the question.  Do you know whether or not Mr.

7    Yaro Gonzalez was convicted in that criminal case that

8    you spoke about in Broward?

9       A.   I don't know.

10           MR. MACDONALD:  Objection.  Form.

11      A.   I don't remember.

12      Q.   As we sit here today, are you still afraid of

13   Mr. Yaro Gonzalez?

14           MR. MACDONALD:  Objection.  Form.

15      A.   Yes.

16      Q.   The situation you described where Mr. Yaro

17   Gonzalez -- I'm not going to repeat it because I'm not

18   attempting to create unnecessary emotional distress --

19   but the situation that you described of violence, was

20   that the first or only time that Mr. Yaro Gonzalez

21   expressed those violent tendencies towards either

22   yourself or your daughter?

23           MR. MACDONALD:  Objection.  Form.

24      A.   No.

25      Q.   How many times did you call the police on Mr.

ORIGINAL

83

1    Yaro Gonzalez during the pendency of the time you knew

2    him, for violence?

3            THE INTERPRETER:  How many times have you had

4        to?

5            MS. FAENZA:  Call the police.

6            MR. MACDONALD:  Objection.  Form.  Harassing.

7            MS. FAENZA:  No speaking objections.

8            MR. MACDONALD:  It's not a speaking objection.

9        It's one word.

10            MS. FAENZA:  Sir.

11   BY MS. FAENZA:

12       Q.   How many times did you call the police

13   regarding violence for this person?

14       A.   I don't remember more than one time.

15       Q.   Okay.  For how long did you -- and again, I'm

16   very sorry to hear anyone is a victim of violence, but

17   for how long did this violent relationship carry on for,

18   meaning the violence?  Even if you broke up with him and

19   continued to be violent toward you, I'm just talking

20   about how long was the violence for?

21            MR. MACDONALD:  Objection.  Form.

22       A.   In spite that we were not together anymore, he

23   would find out the opportunities to be present and

24   bother.

25       Q.   Okay.  So the period of time of the, I will

ORIGINAL

84

1    just use the word abuse, how long did it go on for?

2    So, was it right away when you started the relationship

3    with him?  All the way through a year after you knew

4    him?  What is the time frame we're talking about?

5              MR. MACDONALD:  Objection.  Form.

6        A.   A little after we met.

7        Q.   And how long were you with him?

8        A.   I don't remember.

9        Q.   More than a year?

10             MR. MACDONALD:  Objection.  Form.  Asked and

11        answered.

12        A.   I don't remember.

13             MR. MACDONALD:  Same objection.

14        A.   Yes.

15        Q.   More than six months?

16             MR. MACDONALD:  Same objection.

17        A.   This is so long ago, I don't remember.  I

18   cannot remember these things always.

19        Q.   You don't remember the period of time that you

20   dealt with this domestic violence situation with Mr.

21   Yaro Gonzalez?

22             MR. MACDONALD:  Objection.  Form.  Asked and

23        answered.

24        A.   This is something I don't want to remember.

25        Q.   Do you remember?

**ORIGINAL**

```
 1    A.   No.

 2         MR. MACDONALD:  Objection.  Form.  Asked and

 3    answered.  Harassing at this point.

 4         MS. FAENZA:  You can cease your speaking

 5    objection, sir.

 6  BY MS. FAENZA:

 7    Q.   And as it relates to the situation, did it

 8  cause you emotional distress?

 9    A.   Of course not.

10    Q.   Of course not?

11    A.   Of course not.

12    Q.   Well, then why did you file an injunction for

13  protection if you weren't bothered, if it didn't cause

14  you any emotional distress?

15         MR. MACDONALD:  Objection.  Calls for a legal

16    conclusion.  Go ahead.

17         MS. FAENZA:  No speaking objection, sir.

18    A.   Because at that time he became aggressive.

19  And what are you supposed to do?  Let someone attack

20  you?  You have to put something to restrain him.

21    Q.   And being afraid of this person did not cause

22  you any emotional distress?

23         MR. MACDONALD:  Objection.  Form.

24    A.   No.

25    Q.   Okay.  So earlier you said -- I'm going to
```

ORIGINAL

86

1   switch gears a little bit here.  Earlier you stated

2   that you put a case against the W, or something to that

3   effect.  Do you recall that?

4        A.   The W Hotel?

5        Q.   Yes.

6        A.   The one that hired me who was GOAT.

7        Q.   Do you know that you are not suing the W

8   Hotel?

9             MR. MACDONALD:  Objection.  Form.

10       A.   I sue who hired me.

11            MS. FAENZA:  Move to strike portions

12       nonresponsive.

13       Q.   The question is whether you know that you are

14   not suing the W Hotel.

15            MR. MACDONALD:  Objection.  Form.

16       A.   Yes, I know that.

17       Q.   Okay.  And so you do not believe that you have

18   sued either the W Hotel or Marriott or Starwood

19   Corporation; is that correct?

20            MR. MACDONALD:  Objection.  Form.

21       A.   I repeat, I'm suing whoever hired me.

22       Q.   Okay.

23            MS. FAENZA:  Move to strike portions

24       nonresponsive.

25            If you could repeat the question again.

ORIGINAL

87

1          MR. MACDONALD:  Objection.  Form.

2     A.   Yes.

3          (Thereupon, Defendant's Exhibit 4 is marked

4     for identification.)

5     Q.   Okay.  So, I am not going to talk about the

6     allegations in the Complaint right now, meaning the meat

7     of your case.  We will talk about that later.  I just

8     want to move on with just talking about where you worked

9     after you stopped working for Addikt Restaurant.  Okay?

10    A.   Yes.

11    Q.   So, do you know the last day that you worked

12    for Addikt?

13         THE INTERPRETER:  Addikt?

14         MS. FAENZA:  Addikt.  Addikt.

15         MR. MACDONALD:  Objection.  Form.

16         MS. FAENZA:  A-D-D-I-K-T.

17    BY MS. FAENZA:

18    Q.   Do you know the last day you worked for

19    Addikt?

20         MR. MACDONALD:  Objection.  Form.

21    A.   Not the exact date.  I think it was February,

22    the month.  I'm not sure.

23    Q.   Okay.  And what year?

24         MR. MACDONALD:  Objection.  Form.

25    A.   '24.

ORIGINAL

88

1     Q.    2024?

2     A.    Seems.  I don't remember the exact date.

3     Q.    Okay.  So after you left Addikt, what was the

4  next job you had?

5     A.    I moved to Texas.

6     Q.    When did you move to Texas?

7           MR. MACDONALD:  Objection.  Form.

8     A.    I answered that already.

9     Q.    Okay.  So, your response is that you already

10  responded to when you moved to Texas, which I think

11  you're correct; you did say April to July of 2025.  Is

12  it correct to say that from February 2024 until April or

13  July of 2025, you did not work?

14           MR. MACDONALD:  Objection.  Form.

15     A.    I'm very bad with dates.

16     Q.    Well, the question has to do with where you

17  worked after you left Addikt, before moving to Texas.

18     A.    I was a year without working because of the

19  postpartum stress that was causing me, and I was not

20  able to return to cooking, which is what I like to do.

21  And it caused me trauma not to be able to do what I like

22  to do.

23     Q.    Are you familiar with a company called United

24  States Service Industries, Inc.?

25           THE INTERPRETER:  United States?

ORIGINAL

89

1          MS. FAENZA:  Service Industries, Inc.

2     A.   Well, you know that companies put their name

3   and then they go some other way.  I think I worked with

4   them.

5     Q.   Okay.  When did you work there?

6     A.   I don't remember the exact date.

7     Q.   What year, approximately?

8          MR. MACDONALD:  Objection.  Form.

9     A.   2025.

10    Q.   Okay.  And what was that job?

11    A.   Secretary.

12    Q.   Okay.

13    A.   I repeat, I was not able to work in the

14  kitchen anymore because of what they did to me.  I was

15  afraid to be denigrated again.  They mistreated me.  To

16  go again through that process.

17         MS. FAENZA:  Move to strike portions

18    nonresponsive.

19    Q.   You stated you worked as a secretary.  What is

20  the name of that employer, as you know it?

21         MR. MACDONALD:  Objection.  Form.

22    A.   I used to call him Boss, but I think his name

23  was Jason or something like that.

24    Q.   What's the name of the company you worked for?

25         MR. MACDONALD:  Objection.  Form.

ORIGINAL

90

1     A.   That I don't remember.  It should be in my tax

2     returns.

3     Q.   How long did you work there as a secretary?

4          MR. MACDONALD:  Objection.  Form.

5     A.   A few months only because then I returned to

6     Texas.  I think March.  I don't remember well.

7     Q.   March of 2025?

8     A.   It seems like.  I don't remember it well.

9     Q.   And what did you do as the secretary?

10    A.   What secretaries do, paperwork.

11    Q.   I'm asking what you did as a secretary.

12    A.   I would receive documents, I worked on the

13    computer, what secretaries do.

14    Q.   Okay.  What was the type of business?

15    A.   It was like cars, real estate.

16         THE INTERPRETER:  I'm sorry, interpreter would

17    like to clarify a term that the witness used.  It

18    could be referring to real estate or could be

19    referring to furniture.

20    A.   They would provide remodeling services for

21    homes and things like that.

22    Q.   Okay.  What language did you do that in?

23    A.   Spanish.

24    Q.   Did you use English?

25    A.   No.

ORIGINAL

91

1      Q.    Did you work there more than six months?

2      A.    Apparently, yes.

3      Q.    So you worked there from March 2025

4  approximately until at least September of 2025?

5            MR. MACDONALD:  Objection.  Form.

6      A.    Yes, because then I went to Texas.  Because

7  the rental contract in Texas was 6th of April, so I'm

8  guiding myself because of that.

9            MR. MACDONALD:  Whenever we reach a good

10          stopping point, could we take a break?

11          MS. FAENZA:  What time is it?  Yes, always,

12          but I just want to see what time it is.  Oh, it's

13          1:24.  Why don't we just go ahead and take a lunch?

14          MR. MACDONALD:  Okay.

15          MS. FAENZA:  I didn't realize it was already

16          1:00.

17          THE REPORTER:  We are off the record at 1:24

18          p.m.

19          (A recess was taken.)

20          THE REPORTER:  Back on the record at 2:38 p.m.

21          MS. FAENZA:  Thank you so much.  I hope that

22          everyone had a positive break and we're all ready to

23          get started.  Any questions before we begin, Ms.

24          Alvarez?

25          THE WITNESS:  No, everything is well.  Thank

ORIGINAL

92

1      you.

2  BY MS. FAENZA:

3      Q.   Perfect.   Okay.   So before the break, I had

4  just started to get into sort of asking you about just

5  your employment after you left Addikt.   So I just want

6  to chat with you about the places that you worked, and

7  then I will come back and ask you a little bit about

8  what you did to try to find work.   Does that make sense?

9      A.   Okay.

10      Q.   Okay.   So when you were talking about some

11  information that I had reviewed from public records, but

12  right now I'm just going to refer to your Responses to

13  Interrogatories, which is a document that you had signed

14  that I showed you earlier, just kind of going through

15  some of the responses you had provided.   Okay.   And so,

16  we had requested, for the last five years until now, all

17  positions, job titles, employers that you had had, and

18  anything that you may have worked during Addikt.   And

19  so, I just kind of want to go through the response and

20  then see if there's anything else that you need to add.

21           MR. MACDONALD:   Objection.   Form.

22      Q.   Fair enough?

23      A.   Yes.

24      Q.   Perfect.   So I am asking you about the name of

25  an employer that you provided me called Build'em LLC /

ORIGINAL

93

1    Yvon Construction Services, and Yvon spelled Y-V-O-N,

2    Inc., and then it states related entities.

3        A.   Yes.

4        Q.   Okay.  So here in the response, it states that

5    you began on or around September or October of 2024

6    until February of 2025; is that correct?

7        A.   I don't remember.

8        Q.   Okay.  And so, rather than go through every

9    question, if you signed these interrogatories that we

10   identified earlier, should I assume that the information

11   contained within these interrogatories is correct?

12            MR. MACDONALD:  Objection.  Form.

13       A.   Yes.

14       Q.   Okay.  And without including any information

15   that you have discussed with your attorney, did you in

16   fact prepare the documents that we showed to you

17   earlier, these Responses to First Set of

18   Interrogatories?

19            MR. MACDONALD:  Well, I'm going to object.

20       Maybe I'm misunderstanding.  Are you asking her

21       whether those are her responses?  Just because I

22       don't want her to reveal anything privileged.

23            MS. FAENZA:  Without revealing anything

24       privileged, I'm asking her, did she prepare these

25       documents?

**ORIGINAL**

94

1          MR. MACDONALD:  Well, prepare is just what

2     I'm getting --

3          MS. FAENZA:  No speaking objections, Mr.

4     MacDonald.

5          MR. MACDONALD:  Yeah, but it's --

6          (Crosstalk)

7          MR. MACDONALD:  Well, then I'm going to

8     instruct her not to answer.

9          MS. FAENZA:  You are not the deponent.  I will

10    provide -- let the record reflect, I am providing

11    what has been previously marked as Exhibit 2.

12 BY MS. FAENZA:

13    Q.   So let me first make sure that I address your

14 attorney's concern.  When I ask you this question,

15 please note, I don't want to hear anything about

16 anything your attorney did, said to you, nothing.  The

17 question is whether or not you assisted in preparing

18 these documents here that you have signed.

19    A.   Ask the question again and be more clear,

20 please.

21    Q.   What part of it don't you understand?

22    A.   The question itself.

23    Q.   Okay.  So the document that's in front of you,

24 which is one of the Responses to Interrogatories, do you

25 see that document there?

1     A.   Yes.

2     Q.   Okay.  Earlier in the deposition, I had shown

3  you a signature on the second-to-last page, and I had

4  asked if it was yours, and you had confirmed that it

5  was.  And so, what's happening is I'm asking questions

6  from information within there, and I'm not sure whether

7  the testimony you're giving now is correct, or whether

8  the testimony that's contained in those documents is

9  correct.

10          MR. MACDONALD:  Objection.  Form.

11     Argumentative.

12     Q.   So the question is whether or not you assisted

13  in the preparation and the completion of the document

14  that is in front of you.

15     A.   Yes.

16     Q.   Okay.  And so, so I don't go through each and

17  every answer, is everything contained within that

18  document, I should assume, correct?

19          MR. MACDONALD:  Objection.  Form.  Asked and

20     answered.

21     A.   Yes.

22     Q.   Okay.  So just the same questions to the

23  document to your left, that way when I'm going through

24  and asking the questions, I know what I can rely on.

25          MR. MACDONALD:  Objection.  Form.

ORIGINAL

96

1       Q.   Should I assume the document is correct on

2   your left?

3            MR. MACDONALD:  Same objection.

4       A.   It's the same one, right?

5       Q.   It should be different.  One should be for

6   GOAT Hospitality and one should be for WGOAT15.

7       A.   Yes.

8       Q.   So to make things easier, rather than read to

9   you and then you don't have the document in front of

10  you, I'll go ahead and have you just look at the same

11  page and that will make it easier.  So I'm just going to

12  refer to Plaintiff's Responses to Defendant WGOAT15

13  LLC's First Set of Interrogatories to Plaintiff, and I'm

14  referring to page 4, Question 5.  All I'm asking about

15  at this point in time are all the jobs that you have

16  held, and I'm starting from the present and working my

17  way backwards.  Is that fair?

18      A.   Yes.

19      Q.   Okay.

20           MS. FAENZA:  Let the record reflect that the

21           witness is reading, which is perfectly fine.

22      Q.   I'd like to start, Madam, asking you about

23  your most recent job.  Are you currently employed?

24      A.   Yes.

25      Q.   Okay.  It says here in your interrogatories

ORIGINAL

97

1   that you began working on October 5th, 2025; is that

2   correct?

3       A.   Yes.

4       Q.   Okay.  And so, are you continuing to be

5   employed by the same agency, Exclusive Events Agency?

6       A.   Yes.

7       Q.   Is that a full-time job?

8       A.   Yes.

9       Q.   About approximately how many hours do you work

10  there?

11      A.   It's relative, depending on the amount of work

12  that's at the hotel.

13      Q.   Approximately.  Is it more than 40 hours?  Is

14  it less than 35?

15          MR. MACDONALD:  Objection.  Form.

16      A.   It's an employment agency that provides

17  services for hotels, banquets.  And they call you when

18  they need you.  So that is relative.  Sometimes I do

19  forty hours.  Sometimes I do sixty.  It depends on the

20  season and what is needed.

21      Q.   Okay.  How did you get this job?

22      A.   It's an employment agency that I knew from

23  before.  It's a national employment agency.

24      Q.   And so, when did you first work for Exclusive?

25          MR. MACDONALD:  Objection.  Form.

ORIGINAL

98

1      A.    When I started to work in Texas.

2      Q.    When did you first work for them?

3            MR. MACDONALD:  Objection.  Form.

4      A.    October 5.

5      Q.    Is this the first time that you have worked

6   for Exclusive Events Agency was October 5th, '25?

7            THE INTERPRETER:  Is it the only time is the

8      question?

9            MS. FAENZA:  The first time.

10     A.    Yes.

11     Q.    How did you become aware of Exclusive for this

12  particular position?

13           MR. MACDONALD:  Objection.  Form.

14     A.    Because the hotel that I was working

15  previously used to use that company.

16     Q.    And which hotel was that?

17     A.    W.

18     Q.    Do you believe you were working for the W

19     Hotel at some point?

20           MR. MACDONALD:  Objection.  Form.

21     A.    No.

22     Q.    Okay.  Did you ever work for the W Hotel?

23           MR. MACDONALD:  Objection.  Form.

24     A.    I worked for GOAT.

25           MS. FAENZA:  Move to strike portions

ORIGINAL

99

1       nonresponsive.

2       Q.    The question is, at any point in time, did you

3   work for the W Hotel?

4             MR. MACDONALD:  Objection.  Form.

5       A.    As far as I know, GOAT was providing services

6   for W.  Other than that, I don't know.

7       Q.    Okay.  So, I think that there's a

8   misunderstanding as to the question.  I don't know the

9   entirety of your background.  So I'm trying to find out

10  if you ever worked for the W Hotel specifically.  I

11  understand that this lawsuit involves a restaurant that

12  was located at the W Hotel.  Let's put that aside.

13  Aside from that, did you ever work for the W Hotel?

14            MR. MACDONALD:  Objection.  Form.  Asked and

15        answered.

16      A.    No.

17      Q.    Okay.  And that's fine if you refer to the W

18  and you're referring to the location, but it's confusing

19  for me because I don't know where you work and

20  everywhere.  So, as --

21            MS. FAENZA:  Go ahead.

22      A.    Yeah, but that's why the question is also

23  confusing for me.

24      Q.    Understood.  So as it relates to Exclusive,

25  how did you contact them?  By email?  By telephone?  Was

ORIGINAL

1   there a job posting somewhere?

2           MR. MACDONALD:  Objection.  Form.

3       A.   I knew that this company operates in the whole

4   country, the whole nationwide.  I looked if they were

5   operating in my area.  And yes, they were in Houston.

6   And I went there personally.

7       Q.   You went where personally?

8       A.   To the offices of Exclusive.  In Houston.

9       Q.   Did you fill out a job application?

10      A.   I don't know if you can call that an

11  application.  I put in my information.  The information

12  for my taxes.  They asked me if I had experience with

13  working in the kitchen.  I said yes.

14      Q.   And when did you visit their office for the

15  purpose of obtaining work from Exclusive?

16      A.   I don't remember the date exactly.

17      Q.   Do you remember the month?

18          MR. MACDONALD:  Objection.  Form.

19      A.   That was in October.

20      Q.   Are you a 1099 or a W-2 employee?

21          MR. MACDONALD:  Objection.  Form.

22      A.   Now it's a W-2.

23      Q.   Okay.  I see also in your response in your

24  interrogatories that you state an employer called

25  Build'em, B-U-I-L-D apostrophe E-M, LLC/Yvon, Y-V-O-N,

ORIGINAL

101

1    Construction Services, Inc.  And then it says related

2    entities.  Do you have an idea who this is?

3         A.    What is the name of it?

4         Q.    Madam, you can find it on page 4.

5         A.    Yes, I know it.

6         Q.    Okay.  Perfect.  And was that the person that

7    you spoke of earlier that she worked for as a secretary?

8         A.    Yes.

9         Q.    Okay.  How did you get that job?

10        A.    A friend.

11        Q.    And what friend is that?

12        A.    A friend.

13        Q.    Right.  What's the name of the friend?

14        A.    His name is Sterling (phonetic).

15        Q.    His last name, please?

16        A.    I don't know.

17        Q.    And how do you know Sterling?

18        A.    It's a friend of a friend.

19        Q.    And who's the friend that he's a friend of?

20             MR. MACDONALD:  Objection.  Form.

21        A.    It's a group of friends that know each other

22    and that they pass me the information that was needed.

23             MS. FAENZA:  Move to strike portions

24        nonresponsive.

25        Q.    Are you unable to provide -- it's okay if you

ORIGINAL

102

1    don't know.  Are you unable to tell me the name of the

2    person who introduced you to Sterling?

3        A.   I just know the name but not the last name.

4        Q.   And how do you know this person?

5        A.   Through a friend that was a friend of a

6    neighbor.

7        Q.   Where?  In Houston or in Miami?

8        A.   Miami.

9        Q.   So, what did this person tell you?  Sterling.

10   Regarding this position.

11       A.   That they needed a person who could handle

12   documents in an office.

13       Q.   Okay.  Did you go for an interview?

14       A.   I went there, and the same day I started

15   working.

16       Q.   Okay.  Did you have an interview?

17       A.   A very short one because I was recommended by

18   this person.

19       Q.   By what person?

20       A.   Sterling.

21       Q.   Sterling recommended you for your work; is

22   that correct?

23            MR. MACDONALD:  Objection.  Form.

24       A.   Yes.

25       Q.   And have you worked with Sterling before?

**ORIGINAL**

103

1       A.    No.

2       Q.    Have you ever worked as a secretary before?

3       A.    In Chile.

4       Q.    Okay.  When was that?

5       A.    Many years before.  I don't remember the exact

6    date.

7       Q.    Okay.  And for how many years did you work as

8    a secretary?

9       A.    For a year and a half I studied business

10   administration.  For practical training, they gave me

11   the job.

12      Q.    Who is they?

13      A.    From the school that I was obtaining my --

14   because in Chile it's known as four and a half, the

15   education system.  I don't know what it's equivalent

16   here.  It's like middle school.  Well, it's like high

17   school.

18      Q.    I see.

19      A.    Something like that.

20      Q.    Okay.  So, were you looking for a job?

21      A.    Now, are we referring to secretarial work in

22   Chile or in the United States?  I'm confused.

23      Q.    I'm referring to the job in front of you on

24   page 4, the Build'em LLC / Yvon Construction Services.

25   At the time you took that job, had you been looking for

ORIGINAL

104

1    a job?

2        A.   Yes.

3        Q.   And how were you looking?  What was the manner

4    that you were looking for a job?

5        A.   Employment sites for hotels on the internet.

6    And through friends.

7        Q.   Okay.  What employment sites did you use?

8        A.   Job.com.  Applying directly with the hotels.

9        Q.   Did you provide copies of those job

10   applications and emails demonstrating your search for

11   work?

12           THE INTERPRETER:  Job application, and the

13       other one?

14           MS. FAENZA:  Establishing your search for --

15           THE INTERPRETER:  Yeah, but the two things,

16       job applications and?

17           MS. FAENZA:  Emails.

18           MR. MACDONALD:  Objection.  Form.  Misleading.

19           THE WITNESS:  I didn't understand.

20   BY MS. FAENZA:

21       Q.   Did you provide copies of the emails that you

22   sent when you were looking for work?

23           MR. MACDONALD:  Objection.  Form.

24       A.   I used to keep them on an email account that I

25   had before that I lost.

ORIGINAL

105

1      Q.   What email account was that?

2      A.   carolpancha@hotmail.com.

3      Q.   Are all of the emails and applications that

4  you sent using these job sites using that email?

5      A.   Most of them.

6      Q.   And you did not keep that email?

7           MR. MACDONALD:  Objection.  Form.

8      A.   They stole my phone.  I lost the codes.  I had

9  to change phones.  It was a big problem.

10     Q.   Did you attempt to access or contact Hotmail

11  to get access to that email?

12          MR. MACDONALD:  Objection.  Form.

13     A.   Yes.

14     Q.   And what happened?

15     A.   I don't remember the security code.  To the

16  number that was registered, they would send me the codes

17  to try to recover it.  I was not able to recover

18  anything.  I just decided to get a new email.

19     Q.   Did you use a new email to continue to apply

20  for jobs?

21     A.   I don't remember.

22     Q.   What is the email you currently use now?

23     A.   Okay.  It's alvarezcarol1@icloud.com.

24     Q.   For how long have you used that email address?

25     A.   I think I've had that for six, seven months.

ORIGINAL

106

1    I don't remember well.

2        Q.   So as we sit here today, are you unable to

3    provide any emails demonstrating that you applied to

4    jobs with the carolpancha@hotmail.com email address?

5            MR. MACDONALD:  Objection.  Form.

6        A.   I don't have access to that account, and I am

7    very sad that I lost that email address because I had it

8    for a very long time, since before in Chile.

9            MS. FAENZA:  Move to strike portions

10       nonresponsive.

11       Q.   What was the approximate date that you lost

12   access to that email address?

13           MR. MACDONALD:  Objection.  Form.

14       A.   I don't remember exactly.

15       Q.   What year?

16           MR. MACDONALD:  Objection.  Form.  Asked and

17       answered.

18       A.   I don't remember exactly.

19       Q.   You don't remember if it was 2025?  Or 2024?

20           MR. MACDONALD:  Objection.  Form.

21       A.   I don't remember.  I'm not going to guess.

22       Q.   Did you complete a police report for the theft

23   of your cell phone?

24       A.   No.

25       Q.   Why not?

ORIGINAL

107

1      A.   Why would I have to do that?

2      Q.   My question is why you did not do it.  I'm not

3  here to answer questions, Madam.  I can only ask you

4  questions.

5      A.   I didn't do it because it was an old phone and

6  I decided to get a newer one.

7      Q.   Is there any record, any documentation

8  establishing the fact of your cell phone or the loss of

9  the access to the carolpancha@hotmail.com account?

10     A.   When I try to access that old account,

11 carolpancha, it says that please verify the account.

12         MS. FAENZA:  Move to strike portions

13     nonresponsive.

14     Q.   So really, just the question I'm asking is,

15 are there any documents?  That's why I asked if you had

16 a police report or something that shows me that you no

17 longer have access to carolpancha@hotmail.com.

18     A.   No.

19     Q.   As it relates to your job applications that

20 you completed on these job sites, I think you said

21 job.com and you said on the hotel websites.  Any other

22 job-seeking site besides job.com?

23         MR. MACDONALD:  Objection.  Form.

24     A.   I searched Google.  I put I'm looking for

25 kitchen work.  I put up my information.  Some webpages

ORIGINAL

108

1    came up.  Some of them were fraudulent.

2          MS. FAENZA:  Move to strike portions that are

3      nonresponsive.

4      Q.   What is the website for Google's job searching

5    site?

6          MR. MACDONALD:  Objection.  Form.

7      A.   You Google kitchen work near me, and the pages

8    pop up.

9      Q.   Did you use any other job site besides job.com

10   and Google?

11     A.   I applied directly with the hotels.

12         MS. FAENZA:  Move to strike portions

13     nonresponsive.

14     Q.   So we'll get to the hotels that you applied

15   directly to.  Right now I'm just asking if there's

16   anything else.  So we can move on if there's no other

17   website that you used to search for jobs.

18         MR. MACDONALD:  Objection.  Form.

19     Q.   And just for example, there are some job

20   searching sites like Indeed, Career Builder, LinkedIn.

21   There are some very specific to hospitality.  So I'm

22   really just trying to wrap up only the job searching

23   sites first so that we can move on to your direct

24   applications.

25     A.   Yes, Career is one of them.

ORIGINAL

109

1       Q.   Okay.  What is the username that you had for

2   job.com?

3       A.   Carol Pancha.  My old email.

4       Q.   Did you attempt to access your profile on

5   job.com to identify the jobs that you applied to?

6       A.   I don't remember.

7       Q.   So in preparation for this deposition and

8   responses to your Request for Production, did you make

9   any attempt to either go to job.com, Career Builder,

10  Google to locate any applications or emails pertaining

11  to any job search you had?

12          MR. MACDONALD:  Objection.  Form.  Misleading.

13      A.   Carol Pancha, the email that I used to use, I

14  have no access to it.

15          MS. FAENZA:  Move to strike portions

16      nonresponsive.

17      Q.   The question, Ms. Alvarez, has to do not with

18  carolpancha@hotmail.com.  I'm talking about the website

19  job.com or Career Builder, where you log in with a

20  username and password.  Did you attempt to log in to any

21  employment site that you used in order to produce any

22  evidence that you searched for work after leaving

23  Addikt?

24          MR. MACDONALD:  Objection.  Form.

25      A.   Yes.

ORIGINAL

110

1     Q.   And what did you do?

2     A.   I tried to recover my account Carol Pancha.

3  Because I thought with a new phone, it's going to be the

4  same when I put it in the application, but I could not

5  access it.

6          MS. FAENZA:  Move to strike portions

7      nonresponsive.

8     Q.   I specifically said I am not asking -- and I

9  don't mean this to be confrontational.  I want to be

10  clear.  I'm not asking about efforts to access

11  carolpancha@hotmail.com.  How you attempted to access

12  your account on job.com.

13    A.   I don't understand what you're asking because

14  I already answered.

15    Q.   I'm asking about job.com.  I'm not asking

16  about carolpancha@hotmail.com.  Job.com.

17         MR. MACDONALD:  Objection.  Form.  Asked and

18     answered.

19    A.   My username was Carol Pancha.

20    Q.   I'm not asking about access to the Hotmail

21  account.  I'm asking about any attempts to obtain any

22  documents on the website job.com.  Did you make any

23  attempts to try to recover anything or obtain any

24  documents from job.com?

25    A.   I cannot answer something that I don't

ORIGINAL

111

1   understand.

2       Q.   Did you log into an account on job.com?

3            MR. MACDONALD:  Objection.  Form.  Asked and

4       answered.

5       A.   Before the phone was stolen, yes.

6       Q.   What does job.com have to do with your Hotmail

7   email address?

8       A.   I don't know.  I'm asking the same thing.

9       Q.   Did you attempt to log into job.com?

10           MR. MACDONALD:  Objection.  Form.  Asked and

11      answered.

12      Q.   To provide documents for this lawsuit?

13      A.   I could not go in because I lost my email.  I

14  lost my email.

15      Q.   Are you saying that you tried to get into

16  job.com and you were denied access to that account

17  because you don't have access to the carolpancha@hotmail

18  account?

19           MR. MACDONALD:  Objection.

20      A.   Yes.

21      Q.   When did you attempt to access your job.com

22  account?

23           MR. MACDONALD:  Objection.  Form.  Asked and

24      answered.

25      A.   I don't have that exact date.  I don't have

ORIGINAL

112

1    that.

2        Q.   Did you attempt to access that account after

3    you were served with discovery requests and required to

4    produce documents pertaining to mitigation?

5            MR. MACDONALD:  Objection.  Form.  Asked and

6        answered.

7        Q.   That would have been in the last month.

8            MR. MACDONALD:  Same objection.

9        A.   Can you ask the question again?

10       Q.   Did you attempt to log into job.com in the

11   last month?

12           MR. MACDONALD:  Same objection.

13       A.   No, because I was already working.

14       Q.   Okay.  Did you attempt to access an account on

15   careerbuilder.com in the last month?

16           MR. MACDONALD:  Objection.  Form.

17       A.   We come back to the same point.  I tried to go

18   in but I cannot.

19       Q.   Was that in the last month?

20           MR. MACDONALD:  Objection.  Form.

21       A.   I don't remember.

22       Q.   Did you search any computers to attempt to

23   locate any copies of any applications for jobs since you

24   left Addikt?

25           MR. MACDONALD:  Objection.  Form.

ORIGINAL

113

1        A.   I want you to be more clear.  I don't

2    understand the question.

3        Q.   What portion don't you understand?

4        A.   What you're asking.

5        Q.   What part of the question do you not

6    understand?  I'll have the court reporter repeat it

7    again.  Let the court reporter repeat it again.

8        A.   The whole question.

9        Q.   We'll have the court reporter repeat it.

10            (The record was read back.)

11            THE REPORTER:  Is that?

12            MS. FAENZA:  Yes, after.  It should say after

13       the --

14            (Crosstalk)

15            MR. MACDONALD:  Objection.  Form.

16            (The record was read back.)

17            MS. FAENZA:  Yes.  That is correct.

18            THE WITNESS:  I just used my cell phone to

19       apply because I don't have a computer.

20   BY MS. FAENZA:

21       Q.   Did you back up that cell phone to any cloud

22   or storage device?

23            MR. MACDONALD:  Objection.  Form.

24       A.   I'm not good with technology.  I'm not good

25   with the modern phone.  When I went to the store, the

ORIGINAL

114

1    young lady transferred everything, but the account

2    could not be accessed.

3        Q.   What account are you referring to?

4             MR. MACDONALD:  Objection.  Form.

5        A.   My email account.

6        Q.   And when you were applying to jobs after you

7    left Addikt, did you make any copies and preserve copies

8    of those job applications?

9             MR. MACDONALD:  Objection.  Form.

10       A.   No.

11       Q.   Why not?

12            MR. MACDONALD:  Objection.  Form.

13       A.   Because I thought that was going to be kept in

14   the emails.

15       Q.   I understand that you filed a charge of

16   discrimination before the EEOC on April 16th, 2024.  Do

17   you have a recollection of that?

18       A.   The discrimination suit, that is the one that

19   I did.

20       Q.   Right.  I'm asking if you recall that there

21   was a charge of discrimination filed before the EEOC on

22   that date, which is, I believe I just read it, April

23   16th, 2024.

24       A.   I don't know what to answer.

25       Q.   You don't know if you had an EEOC charge of

ORIGINAL

115

1    discrimination in April of 2024?

2              MR. MACDONALD:  Objection.  Form.

3         A.   The only thing I can say, and I'm going to

4    repeat it, I was discriminated because of my pregnancy.

5    Not only one, by one person at work, but by various

6    people at work.  And that is the lawsuit that I placed

7    to get a solution for the emotional damage that they

8    caused on me.

9              MS. FAENZA:  Move to strike portions

10        nonresponsive.

11        Q.   I will give you one more time to answer the

12   question or I will certify it.  I asked you if you filed

13   an EEOC charge of discrimination on or about April 16th,

14   2024.

15             MS. FAENZA:  It may be helpful to use the term

16        "charge of discrimination," just in English --

17             THE INTERPRETER:  Okay.  In English, okay.

18        Yes.

19             MS. FAENZA:  -- because that's a specific

20        term.

21             THE INTERPRETER:  Okay, yeah.

22   BY MS. FAENZA:

23        Q.   I'm just trying to establish if in fact you

24   recall that you filed a charge of discrimination on that

25   date.  That is it.

ORIGINAL

116

1          MR. MACDONALD:  Objection.  Form.  Asked and
2      answered.
3      A.   Yes.  I don't remember the date.
4      Q.   Okay.  After the date you filed your EEOC
5  charge of discrimination, did you attempt to maintain
6  copies or to preserve evidence of your attempts to find
7  work?
8          MR. MACDONALD:  Objection.  Form.  Calls for a
9      legal conclusion.
10     A.   I repeat again, those records are on my email.
11     Q.   Did you make any other attempts to keep copies
12 of those records knowing that you were pursuing legal
13 action against GOAT Hospitality Group LLC and WGOAT15
14 LLC?
15         MR. MACDONALD:  Objection.  Asked and answered
16     multiple times.
17     A.   Yes.  I exhausted all the efforts to try to
18 recover that account.
19     Q.   I'm not asking about the efforts to recover
20 the account.  I'm just asking if you did anything else
21 besides -- you may not look at your attorney, Ms.
22 Alvarez, for guidance, respectfully.  Unfortunately, you
23 just need to answer it.  I'm not trying to pick on you,
24 I just want to know.  You said the emails --
25         MS. FAENZA:  Please do not speak over me, Mr.

ORIGINAL

117

```
1        MacDonald.  Do not coach your witness.

2             MR. MACDONALD:  Coach the witness?

3             MS. FAENZA:  Do not coach the witness,

4        interrupt me, or otherwise participate this way.

5        I'm trying to clarify for the witness.  Stop with

6        your um-hmm, smiling, laughing.  It's not

7        appropriate.

8             MR. MACDONALD:  I can't smile?

9             MS. FAENZA:  It's not appropriate.  Let the

10       record reflect that the attorney --

11            MR. MACDONALD:  Smiling's not appropriate?

12            MS. FAENZA:  -- is not only speaking over me

13       but also laughing.

14            MR. MACDONALD:  Smiling is not appropriate,

15       got it.

16            MS. FAENZA:  Let the record reflect that

17       opposing counsel will not stop talking and laughing.

18  BY MS. FAENZA:

19       Q.   So the question really --

20            MR. MACDONALD:  That is a lie.

21            (Crosstalk)

22            MS. FAENZA:  Once again, opposing counsel

23       continues to interrupt me.

24            MR. MACDONALD:  Stop narrating the deposition.

25            MS. FAENZA:  Once again, opposing counsel
```

118

1      continues to interrupt me.  If you need a break, Mr.

2      MacDonald, we can take one after this question.  We

3      are moving on.

4  BY MS. FAENZA:

5      Q.   When it comes down to -- Ms. Alvarez, I have

6  an understanding that you no longer have access to that

7  one email with Hotmail.  I understand that.  I

8  understand you have stated that you tried to get access

9  to it.  That is not the question.  And it is okay if

10 your answer is, yes, "I did X, Y, Z," "No, I did not,"

11 "I can't remember," whatever it is.

12      Did you attempt to keep copies of any of the

13 emails or job applications, since you left Addikt, in

14 another form?  Meaning print them out in paper, or save

15 them to a PDF and keep them on a computer, or save it as

16 a photograph on your cell phone, send it to someone

17 else, forward it to another email address.  Did you make

18 any other attempt?

19      What I'm looking for is, are there documents

20 somewhere that you have in your possession?  That's why

21 I'm asking.  Did you make attempts, other than the

22 Hotmail account, to keep copies of your applications for

23 other jobs?

24      MR. MACDONALD:  Objection.  Asked and answered

25      multiple times.

ORIGINAL

119

1      A.   With all due respect, Madam Attorney, I

2   respect your job.  I already answered.

3      Q.   Okay.  We'll certify the question.

4           MS. FAENZA:  We'll certify the question.

5      Q.   And I will come back to it and see if you want

6   to answer whether you kept it somewhere else other than

7   your Hotmail account, Ms. Alvarez, because now you're

8   not answering the question.

9      A.   No, I don't have any of that.  It was only on

10  the email.

11     Q.   As we sit here today, do you have any

12  documents, text messages, emails, or job applications

13  that you can show you were looking for another job after

14  you left Addikt?

15          MR. MACDONALD:  Objection.  Asked and

16      answered.

17     A.   Yes, on the email that I lost.

18     Q.   But can you give it to us to look at, Ms.

19  Alvarez?

20          MR. MACDONALD:  Objection.  Form.

21      Argumentative.

22     A.   No.

23     Q.   And so, I'm trying to discover what evidence

24  would be presented in trial.  That's all I'm trying to

25  find out.  Are you planning on showing up at trial with

120

1    a bunch of emails and job applications that you have not

2    turned over to your attorney so that we can review?

3            MR. MACDONALD:  Objection.  Form.

4        A.   No, it's not that I don't want to show them.

5    It's that I don't have access to that account.

6        Q.   The question is not asking if you don't want

7    to.  I just want to make sure that there are not

8    documents.  And you may not receive advice from your

9    attorney, Madam.  Are there documents that exist that

10   you do have access to that you have not turned over?

11           MR. MACDONALD:  Objection.  Form.

12       Q.   Okay.  You mentioned that you applied directly

13   to hotel website.  Is that correct?  Or hotels, excuse

14   me.

15       A.   I applied on their pages.

16       Q.   What pages?

17       A.   Marriott.  Houstonian.  I don't remember where

18   did I apply exactly, but there was many of them.

19       Q.   Did you keep any of the applications that you

20   completed on these hotel websites?  Do you have any

21   documents showing that you applied to any of these

22   hotels since you left Addikt?

23       A.   That's online and that's on the email.

24       Q.   Did you contact any of those hotels to obtain

25   a copy of your application at any of those hotels?

ORIGINAL

121

1          MR. MACDONALD:  Objection.  Form.

2     A.   Can you do that?

3     Q.   The question is, did you contact any of the

4  hotels to get a copy of your application that you made

5  at any of those hotels?

6     A.   No, because I didn't know you are able to do

7  so.

8     Q.   But you did not, is the answer?

9          MR. MACDONALD:  Objection.  Form.

10    A.   I didn't know it could be done.  If I would

11 have known that there was a possibility, I would have

12 done it.

13    Q.   And at the time you completed your

14 application, you didn't separately make a copy for

15 yourself to show that you had applied for a job?

16         MR. MACDONALD:  Objection.  Form.

17    A.   No, I don't have a printer at home.

18    Q.   Well, electronically, did you save a copy?

19    A.   No.

20    Q.   So, really, this isn't a criticism.  I'm just

21 trying to figure out, are there some documents somewhere

22 that I don't know about, that I have not received?  So

23 in the total of when you looked for your jobs after

24 leaving Addikt, do you have any documents to show your

25 job search?  That you have in your possession.

ORIGINAL

122

1          MR. MACDONALD:  Objection.  Form.

2     A.   Unfortunately, no.

3     Q.   Okay.  And for how long did you begin looking

4  for work?

5          MR. MACDONALD:  Objection.  Form.

6     Q.   After you left Addikt.

7     A.   After that, after I left there, I had my baby

8  and I took some time because -- I took some time off

9  because of the postpartum depression that I suffered.

10         MS. FAENZA:  Move to strike portions

11    nonresponsive.

12    Q.   I'm just asking when you started looking.  We

13 will go back and talk about those things.  I'm just

14 trying to get a date when you started looking for new

15 jobs.

16    A.   I don't remember.

17    Q.   Did you start looking within the year of 2024?

18         MR. MACDONALD:  Objection.  Form.  Asked and

19    answered.

20    A.   No.  I don't remember.

21    Q.   Do you have any recollection at all if you

22 made any attempt to look for any work within the year of

23 2024?

24         MR. MACDONALD:  Objection.  Form.

25    A.   I don't remember.

ORIGINAL

123

1        Q.   Do you have any documents to establish

2    any job search within the year of 2024?

3            MR. MACDONALD:  Objection.  Form.

4        A.   I don't remember.

5        Q.   Do you have any documents is the question.

6            MR. MACDONALD:  Objection.  Form.  Asked and

7        answered.

8        A.   I don't have a document because I don't

9    remember.  I don't remember if I have it or not.

10       Q.   Did you do a diligent search to locate any

11   documents pertaining to your job search?

12           MR. MACDONALD:  Objection.  Form.  She's

13       answered this multiple times.

14       A.   Yeah, I tried many times, but because in that

15   email I not only had those job-related documents, but I

16   had also personal, important personal things that I

17   needed to recuperate.

18       Q.   So as it relates to the year 2024, is it

19   correct to say you have no documents to show any job

20   search efforts after leaving Addikt?

21           MR. MACDONALD:  Objection.  Form.

22       Q.   In your possession.

23       A.   No.  In my possession, I don't have anything.

24       Q.   Okay.  And so, do you recall the date that

25   your child was born?  In 2024?

ORIGINAL

124

1       A.    April 12th.

2       Q.    From the period of time of February 12th until

3   April 12th, 2024, did your doctor clear you to work?

4            MR. MACDONALD:  Objection.  Form.

5       A.    Can you repeat again, please?

6            MS. FAENZA:  Would the court reporter repeat

7       it?

8            (The record was read back.)

9       A.    I have the document, and the doctor recommend,

10  gave me the okay to go back to work light duty.

11      Q.    All the way until April 12th, 2024?

12           MR. MACDONALD:  Objection.  Form.

13      A.    I didn't continue working after that date.

14      Q.    Were you able to work all the way up until the

15  date you gave birth?

16           MR. MACDONALD:  Objection.  Form.

17      A.    You're asking me if the day that I gave birth

18  I went back to work?

19      Q.    I'm asking if you were able to work.  As I

20  said earlier, some people -- every person is different.

21  There are some women who cannot work immediately when

22  they're pregnant.  There are some women who can work all

23  the way until the day they give birth.  I don't know.

24  So I'm asking if you were able to work.

25           MR. MACDONALD:  Objection.  Form.  Misleading.

ORIGINAL

125

1      A.    No.   I had a C-section.

2      Q.    And, so, for how long before the C-section

3   were you unable to work?

4            MR. MACDONALD:  Objection.  Form.  Misleading.

5      A.    I worked until seventh month of pregnancy.

6      Q.    That's not the question.  Just let me clarify.

7   At what point were you unable to work before you gave

8   birth?  When were you no longer able to work?

9            MR. MACDONALD:  Objection.  Form.  Misleading.

10     A.    When the stress and mistreatment that I was

11  receiving at work became intolerable.  That was in

12  February.

13     Q.    Were you able physically to work the rest of

14  the month of February?

15           MR. MACDONALD:  Objection.  Form.

16     A.    No.

17     Q.    Why not?

18           MR. MACDONALD:  Objection.  Form.

19     A.    Because of the emotion distress they caused on

20  me, and because the fear that they gave me of losing my

21  pregnancy.

22     Q.    So after you quit Addikt, were you unable to

23  work because of this stress that you're speaking of?

24           MR. MACDONALD:  Objection.  Form.  Misleading.

25     A.    I could not continue working because they

ORIGINAL

126

1    caused abortion symptoms or pregnancy loss symptoms in me.

2          MS. FAENZA:  Move to strike portions

3     nonresponsive.

4     Q.   The question is, after you quit, were you

5    unable to work?

6          MR. MACDONALD:  Objection.  Form.

7     A.   No.

8     Q.   You were not able to work?

9          MR. MACDONALD:  Objection.  Form.  Asked and

10    answered.

11    A.   Because of the risk of losing the pregnancy.

12          THE INTERPRETER:  Excuse me.  "Because of the

13    fear of the risk of losing the pregnancy."

14    Q.   How old were you in 2024 at the time you were

15   pregnant?

16    A.   Twenty-seven.  My birthday is on the 21st of

17   April.

18    Q.   So how old were you when you were pregnant?

19    A.   Thirty-five.

20    Q.   You're aware that over the age of 35 is

21   considered a geriatric and high-risk pregnancy?

22          MR. MACDONALD:  Objection.  Form.

23    A.   If knew that?

24    Q.   I asked the question.

25    A.   I didn't understand.

ORIGINAL

127

1       Q.   What don't you understand?

2       A.   Your question.

3       Q.   We can have the court reporter repeat it back.

4  Respectfully, I'm not going to sit here like a child or

5  a parrot and repeat the same question again and again.

6  We'll have the court reporter repeat it --

7            (Crosstalk)

8            MR. MACDONALD:  You're asking her to give

9  medical testimony.

10           MS. FAENZA:  No speaking objections, Mr.

11  MacDonald.

12           MR. MACDONALD:  You're making comments on

13  record.

14           MS. FAENZA:  No speaking objections.  You are

15  not making --

16           MR. MACDONALD:  Hold on.

17           MS. FAENZA:  -- comments on the record.

18           MR. MACDONALD:  Hold on.  I'm entitled to

19  respond --

20           MS. FAENZA:  No --

21           MR. MACDONALD:  -- to your comment.

22           MS. FAENZA:  -- you're not.  No one is posing

23  a question to you.

24           MR. MACDONALD:  Okay.  Just like you did.

25           MS. FAENZA:  No one is posing a question to

ORIGINAL

128

1        you.  Stop arguing.

2             MR. MACDONALD:  No one's arguing.

3             MS. FAENZA:  Mr. MacDonald, why don't you just

4        limit your comments to appropriate objections?

5             (The record was read back.)

6             MS. FAENZA:  High-risk pregnancy.

7             THE REPORTER:  Yes, sorry.

8             MR. MACDONALD:  Objection.  Form.

9             THE WITNESS:  I did not know that.

10   BY MS. FAENZA:

11        Q.   Okay.

12        A.   I am not a doctor.

13        Q.   Okay.

14             MS. FAENZA:  Let the record reflect that, in

15        fact, the witness simply repeated what her counsel

16        had said next to her.

17        Q.   I'm going to move on and provide a copy to

18   opposing counsel --

19             MR. MACDONALD:  Hold on.  I'm going to --

20             (Crosstalk)

21        Q.   -- the Amended Complaint --

22             MR. MACDONALD:  The objections are --

23        Q.   -- for jury trial.

24             MR. MACDONALD:  The objections are not being

25        translated, so it's almost certain that she was not

ORIGINAL

129

1       even aware of what I just said.

2       A.   Do you have one in Spanish for me?

3       Q.   I do not.  And, Madam, what I have handed to

4   your attorney and to the translator is something called

5   an Amended Complaint in Demand for Jury Trial.  I will

6   ask that your attorney hand it to you.  Do you see that

7   in front of you, ma'am?

8       A.   I see the document.

9       Q.   I heard her say "but."

10      A.   But it's in English.

11      Q.   That is correct.  And I'm not being impolite

12  to provide it to you in English.  It's because this is

13  the document that was filed with the Court, and those

14  documents are filed in English.

15          And let the record reflect that I have

16  provided a copy to the interpreter because I am aware

17  that you are not able to read English to the level to be

18  able to respond in a deposition.  And so the interpreter

19  will interpret anything that I read from this document

20  for you, Madam.

21      A.   Thank you.

22      Q.   Okay.  Do you recognize this document?

23      A.   That is the lawsuit.

24      Q.   Did you assist -- without discussing anything

25  privileged, did you assist in preparing this document in

ORIGINAL

130

1   any way?

2          MR. MACDONALD:  I'm going to object and

3       instruct her not to answer on work product and

4       attorney-client privilege.

5          MS. FAENZA:  I will certify the question.

6   BY MS. FAENZA:

7       Q.   As it relates to this Amended Complaint in

8   Demand for Jury Trial, does this reflect the accurate

9   facts associated with your lawsuit, Ms. Alvarez?

10          MR. MACDONALD:  Objection.  Form.

11      A.   What do you want me to answer?

12      Q.   Whether the document in front of you is the

13  accurate representation of the allegations in your

14  lawsuit.

15      A.   When I put the lawsuit, I brought my

16  evidences.

17      Q.   The question is pertaining to the document in

18  front of you, whether that is an accurate description of

19  the allegations in this lawsuit.  And you're saying that

20  they're correct?

21          MR. MACDONALD:  Objection.  Form.

22      A.   If I would have it in Spanish, I would know

23  what to answer, but it's in English.  I don't

24  understand.  I cannot give you a good answer.

25      Q.   So as it relates to the lawsuit that you filed

ORIGINAL

131

1  in amended form on March 28th, 2025, this Amended

2  Complaint and Demand for a Jury Trial, has this been

3  provided to you translated into Spanish?

4         MR. MACDONALD:  Objection.

5     Q.   Or separately, have you attempted to have this

6  document translated yourself?

7         MR. MACDONALD:  Objection.  Form.  I'm going

8      to instruct her not to answer on the --

9         MS. FAENZA:  Mr. --

10        MR. MACDONALD:  Hold on -- that that would

11     reveal a communication between herself and myself.

12        MS. FAENZA:  Well, we don't need the substance

13     of the communication.  The portion of the question

14     that asks "or through somebody else" has nothing to

15     do with privilege.  I'll certify the question if

16     you're going to instruct her not to answer or --

17        MR. MACDONALD:  If you want to rephrase the

18     question to the second part, that would be fine.

19        MS. FAENZA:  I don't need to.  I do not need

20     to.  So we're going to certify the question.  We're

21     going to go ahead and move on.

22        THE WITNESS:  Perfect.

23  BY MS. FAENZA:

24     Q.   Okay.  I see in your Complaint, on page 4,

25  paragraph 26, you state that you began working by the

ORIGINAL

132

1    defendants as a line cook in September 2023.  Do you see

2    that, Ms. Alvarez?

3        A.   Yes.

4        Q.   Do you have any documents establishing that

5    you began working for the defendants in September 2023?

6            MR. MACDONALD:  Objection.  Form.

7        A.   That documentation is with Human Resources.

8        Q.   Is it your position you started in September

9    2023?  It says in or around.  Do you have a distinct

10   recollection of when you started?

11           MR. MACDONALD:  Objection.  Form.

12       A.   That's what I remember.

13       Q.   Okay.  You have turned over your paycheck

14   showing that you were not beginning to be paid until

15   October 11th of 2023.  What happened between September

16   and October 11th, 2023?  Were you not working?  Did you

17   view yourself as hired but you hadn't begun working?

18   I'm just trying to understand where the date of

19   September is coming from.

20           MR. MACDONALD:  Objection.  Form.  Misleading.

21       A.   I am confused.  I'm confused in regards to the

22   dates.

23       Q.   Is it possible that you started working in

24   October of 2023 and not September?

25       A.   I don't remember.

ORIGINAL

133

1      Q.   So as you sit here today, whether you

2   started in September 2023 or October 2023, you can't

3   say, and therefore, No. 26, you don't know if that's

4   accurate?

5           MR. MACDONALD:  Objection.  Form.

6      Mischaracterizes the testimony.

7      Q.   You may not look to your attorney.

8           MS. FAENZA:  Let the record reflect the

9      deponent looking at her attorney.

10     A.   It says here around September.

11     Q.   Right.  So I've asked if you have any evidence

12  to show that you were working there in September because

13  the defendants only have records of you working since

14  October.  So if you're sure that it was September, then

15  the question comes down to, well, where are the

16  documents, and why don't we have any documents as far as

17  you being on schedule, as far as there being any checks

18  issued to you.  If you don't know exactly when you

19  started, that's one thing.  But if you're insisting that

20  this is September 2023, that's a different thing.  I'm

21  just trying to figure out how firm that is.

22          MR. MACDONALD:  Objection.  Form.  Asked and

23     answered.

24     A.   So they pay biweekly day there.  They pay

25  biweekly.  So that payment date of October 11th, it's a

ORIGINAL

134

1    biweekly payment, the payment for two, for biweekly.

2         Q.   So, I will advise you that the check actually

3    indicates that the work period began on October 10th,

4    2023, not that you were paid on that date.

5              MR. MACDONALD:  Objection.  Form.

6         A.   Maybe it's just confusion since I don't know

7    English.  That's indicated in the check, maybe that was

8    a confusion in there.

9         Q.   Okay.  Who did you work for, for the period of

10   time that you were at the W Hotel?  You have said GOAT.

11   You have sometimes said the W.  Who was your employer?

12             MR. MACDONALD:  Objection.  Form.

13             Mischaracterizes testimony.  Asks for a legal

14             conclusion.

15        A.   My check said GOAT.

16             MS. FAENZA:  Move to strike portions

17             nonresponsive.

18        Q.   Who was your employer?  Not what your check

19   said.  Who was your employer?

20             MR. MACDONALD:  Same objection.

21        A.   GOAT.

22        Q.   Only GOAT?

23             MR. MACDONALD:  Same objection.  Asking for a

24             legal conclusion.

25             MS. FAENZA:  Sir, I can ask the questions.

ORIGINAL

135

1   BY MS. FAENZA:

2        Q.   Only GOAT?

3             MR. MACDONALD:  Same objection.

4        A.   I don't know that.  I don't understand that.

5   I would receive my check, and my check would read GOAT.

6        Q.   Is that the only entity you worked for?

7             MR. MACDONALD:  Objection.

8        A.   My check said GOAT.  That's what I'm basing

9   myself on.

10       Q.   Okay.

11            MS. FAENZA:  So let the record reflect, I'm

12       now providing the witness what has been previously

13       marked as Bates label Alvarez 020 all the way

14       through to 0028.  I will just show Mr. MacDonald.

15       And if you could just pass it to your client,

16       please.

17       Q.   Have you seen these documents before, Ms.

18   Alvarez?

19       A.   It's very blurry.  I don't have my eyeglasses.

20       Q.   Do you recognize the documents?

21       A.   I know it says GOAT.  It's very blurry.  I

22   imagine this is payment for the hours.

23       Q.   I just asked if you recognize the document,

24   that's it.

25            MR. MACDONALD:  Objection.  Form.

ORIGINAL

136

1      A.   I recognize the name of the company that I

2   was working for.

3      Q.   Did you receive any documents at the end of

4   the year of either 2023 or 2024 for the payment of

5   taxes?  And I'll take those documents back.  From either

6   GOAT or WGOAT15 LLC.

7      A.   I think so because I did file for taxes.

8      Q.   Is there a reason why you have not turned over

9   those documents to us?  I didn't see them in the

10   documents that were provided to me.

11         MR. MACDONALD:  Objection.  Form.

12      A.   (No translation given.)

13      Q.   Would you be able to locate them and provide

14   them to your attorney and then have those turned over to

15   me?

16         MR. MACDONALD:  Objection.  Form.  She doesn't

17      have to commit to production.

18         MS. FAENZA:  No, sir, you cannot.

19         MR. MACDONALD:  That's not proper.

20         MS. FAENZA:  I'm asking a question.  You may

21      not do that.

22         MR. MACDONALD:  That's not a proper question.

23         MS. FAENZA:  Stop.

24   BY MS. FAENZA:

25      Q.   Will you be able to locate those documents to

provide to your attorney, then to provide to your office?

MR. MACDONALD: Same objection.

A. They would pay for an application, 7shifts. That was handled by them. And after I stopped working for them, they blocked my account.

Q. So the question is whether you would be able to locate the tax documents that you received from your employers in 2023 and 2024 to provide to your attorney so that I may have them.

MS. FAENZA: I am going to provide to the court reporter -- I believe we're at 5; is that correct?

THE REPORTER: Correct.

MS. FAENZA: Exhibit No. 5.

(Thereupon, Defendant's Exhibit 5 is marked for identification.)

MS. FAENZA: Let the record reflect, the documents that have been provided as Exhibit No. 5 indicate the name on the check as WGOAT15, LLC.

THE INTERPRETER: WGOAT?

MS. FAENZA: 15, LLC.

THE REPORTER: Counsel, I'm sorry to interrupt. That would be Exhibit 4 that he has in front of him.

MS. FAENZA: Can you please hand it to her?

ORIGINAL

138

1          Well, he may need it.  If you want to put the

2      sticker on it, that's fine.  He may need it as we go

3      through.

4    BY MS. FAENZA:

5      Q.   You claimed that GOAT Hospitality Group shared

6    authority and control over the terms and conditions of

7    your employment, including hiring, firing, and work

8    assignments.

9          MS. FAENZA:  And so for the record, I'm

10      referring to page 2.  And that would be paragraph 7,

11      Mr. Interpreter.

12          THE INTERPRETER:  What page, I'm sorry?

13          MS. FAENZA:  Two.

14          THE INTERPRETER:  Yeah.

15          MS. FAENZA:  And it's 7.

16          MR. MACDONALD:  Objection.  Form.  Calls for a

17      legal conclusion.

18    BY MS. FAENZA:

19      Q.   Did you see anyone at GOAT Hospitality engage

20    in hiring, firing, or providing work assignments for

21    anyone in the Addikt location?

22          MR. MACDONALD:  Same objection.

23      A.   Maybe I saw them, but I don't know who these

24    people were.  I don't know who these persons were.

25      Q.   You don't know who is responsible for work

ORIGINAL

139

1   assignments at GOAT?

2          MR. MACDONALD:  Objection.  Form.

3      A.   I know that that goes through Human Resources

4   and then through the Chef.

5      Q.   So your work assignment went through Human

6   Resources?

7          MR. MACDONALD:  Objection.  Form.

8      A.   I know when I started, I was sent to Human

9   Resources to give them my information for payment.

10     Q.   Well, I'm asking about work assignment.  So in

11  the kitchen, who was involved in assigning you work?

12         MR. MACDONALD:  Objection.  Form.

13     A.   The chef.

14     Q.   Did Eric Garcia go into the kitchen and assign

15  you work?

16     A.   Yes, he is from Human Resources.

17     Q.   What did Eric Garcia tell you to do in the

18  kitchen?

19     A.   He told me to move some frozen boxes.  Very

20  heavy.  More than 50 pounds.

21     Q.   What was Eric Garcia, a Human Resources

22  representative, doing working in the kitchen for a

23  different company, Ms. Alvarez?

24         MR. MACDONALD:  Objection.  Form.  Calls for

25         speculation.

ORIGINAL

140

1    A.   I don't know.  I don't have that information.

2    Q.   Well, did Eric Garcia work in the kitchen?

3         MR. MACDONALD:  Objection.  Form.

4    A.   He had his office at Human Resources.

5    Q.   The question is whether Eric Garcia worked in

6  the kitchen at Addikt.

7         MR. MACDONALD:  Same objection.

8    A.   His office was on the 49th floor, if I'm not

9  wrong.

10    Q.   The question is whether he worked in the

11  kitchen.

12         MR. MACDONALD:  Objection.  Form.

13    A.   He did not belong to kitchen; he belonged to

14  Human Resources.

15    Q.   Did Mr. Garcia create your schedules?

16    A.   I don't handle that information.

17    Q.   Did you ever see Mr. Garcia create your

18  schedule?

19    A.   Like I said, I don't handle that information.

20    Q.   So as we sit here today, you have no evidence

21  and no testimony that you can provide that you ever saw

22  Mr. Garcia creating schedules for you?

23         MR. MACDONALD:  Same objection.

24  Mischaracterizes testimony.  You can answer.

25    Q.   You may not look at your counsel for advice on

141

1    answering.

2              MR. MACDONALD:  She wasn't looking at me for

3    advice.

4              MS. FAENZA:  Do not -- let the record reflect

5    the deponent turned to look at her attorney.

6              MR. MACDONALD:  She's allowed to look at me.

7              MS. FAENZA:  Sir, not for advice on how to

8    respond to questions.

9              MR. MACDONALD:  And she did not do that.

10             MS. FAENZA:  Stop.  I want the court reporter

11   to please repeat back the question so that the

12   translator may translate.

13             THE REPORTER:  One moment, please.

14             MS. FAENZA:  Yes, ma'am.

15             (The record was read back.)

16              MS. FAENZA:  That is correct.

17             THE WITNESS:  One time Maximilian, the chef,

18   he told me that they could not get many hours

19   because they were being cut by Human Resources.

20             THE INTERPRETER:  Excuse me, the interpreter

21   would like to correct.  The chef's name is not

22   Maximilian, it's Maximiliano.

23             MS. FAENZA:  Move to strike portions

24   nonresponsive.

25   BY MS. FAENZA:

ORIGINAL

142

1    Q.   As it relates to Eric Garcia, did he hire you?

2    A.   He belongs to Human Resources.

3    Q.   The question is whether --

4         MS. FAENZA:  And I will move to strike

5    portions nonresponsive.

6    Q.   Did Eric Garcia hire you?

7         MR. MACDONALD:  Objection.  Form.

8    A.   Hiring is done by Human Resources.  He works

9    in Human Resources.  I don't know who is going to do

10   that.

11   Q.   The question is whether Eric Garcia hired you.

12        MS. FAENZA:  And I will move to strike

13   portions nonresponsive.

14   Q.   In this case, were you hired by Eric Garcia?

15        MR. MACDONALD:  Objection.  Form.  Badgering.

16   A.   When I went to the interview, I was seen by

17   Maximiliano, the chef.  And he told me to go to Floor 49

18   to finalize the hiring.  So I do not know who hired me.

19   That is something handled by the office.

20   Q.   And you interviewed with Max; is that correct?

21   A.   The chef Maximiliano, yes.

22   Q.   And Maximiliano then sent you to Human

23   Resources to finalize the hiring; is that correct?

24   A.   To finalize the hiring?

25   Q.   Yes.

ORIGINAL

143

1      A.    No, he was fired before that.

2      Q.    He was fired before you were hired?

3      A.    No, they fired him while I was working.  They

4  fired him first.

5      Q.    The question is, when you were hired, who you

6  interviewed with.  And you stated that you had

7  interviewed with Max.  So I'm asking you, when you

8  finished your interview with Max, did he send you to

9  Human Resources to finalize, maybe the translation of

10  the word finalize, that hiring?

11         MS. FAENZA:  You can say complete.

12     A.    Yes, so that I could start working.

13     Q.    And did Max tell you that you had the job

14  before you went to Human Resources?

15         MR. MACDONALD:  Objection.  Form.

16     A.    He said to me, it's your job.  It's going to

17  be finalized in Human Resources.  Go out there.

18     Q.    After you started to work for Addikt -- and is

19  it correct to say you were hired as a line cook, Ms.

20  Alvarez?

21     A.    Line cook.

22     Q.    When did you begin to have any problems

23  working at Addikt?

24     A.    I started about three weeks after that, after

25  the beginning, when Chef Maximiliano start doing sexual

ORIGINAL

144

1   advances towards me.

2       Q.   What were those sexual advances?  Touching.

3   Touch the chicken like you massage your Cuban boyfriend.

4   If you put makeup on your face, you can also put makeup

5   on your ass.  Making allusions that the salmon should be

6   roasted on both sides.  And he said to me, the way you

7   do the makeup on your face, you should do the same on

8   your ass.

9       Q.   How many times did he make these comments?

10      A.   In various occasions he did these

11  insinuations, I tried not to answer.  But he wouldn't

12  stop.

13      Q.   Did anyone else see or hear these comments?

14      A.   No.

15      Q.   How big is the kitchen, Ms. Alvarez, at

16  Addikt?  How big is the kitchen?

17      A.   It's fairly big.  It has two sections.

18      Q.   And who was in the kitchen with you when Mr.

19  Caraballo (phonetic) made these comments?

20      A.   I was on the morning shift and we were alone.

21  And he came to me.

22      Q.   At any time, did anyone else hear these

23  comments?

24          MR. MACDONALD:  Objection.  Form.  Calls for

25          speculation.

ORIGINAL

145

1      Q.   That you're aware of?

2      A.   He would look for the right times when no one

3   was listening.  But the workmates were already aware of

4   what was going on, so they would tell me, just take it

5   easy; don't do anything.

6      Q.   What workmates are those?

7           MR. MACDONALD:  She's upset.  Would you mind

8       taking a moment?

9           MS. FAENZA:  Sure.  We'll hold that question.

10          THE WITNESS:  I need water, please.

11          THE REPORTER:  Off the record at 4:23 p.m.

12          (A recess was taken.)

13          THE REPORTER:  Back on the record at 4:26 p.m.

14   BY MS. FAENZA:

15      Q.   And who were the co-workers that were telling

16   you to remain calm?

17      A.   Ramses (phonetic).  That's the way they call

18   him in the kitchen.

19      Q.   What is his last name?

20      A.   I don't know.  I don't remember.

21      Q.   Anyone else?

22      A.   He's the one who heard, like heard it, and

23   he's the one who told me to take it easy.

24      Q.   He's the one that heard what?

25      A.   The insinuations that were made by

146

1  Maximiliano, the chef.

2      Q.   So I don't see that there was a person by the

3  name of Ramses listed as a person with knowledge.  Is

4  this a list that you're able to bring?  Have you been in

5  contact with this person to testify in this case?

6          MR. MACDONALD:  Objection.  Form.

7      A.   I don't have contact with him.  I lost my

8  contacts on my old phone.

9      Q.   Why didn't you identify this individual as a

10  witness in either your initial disclosures or in any

11  discovery documents?

12          MR. MACDONALD:  Objection.  Form.

13      A.   I did tell that to the chef when I talked to

14  the chef.

15      Q.   Tell what to the chef?

16      A.   To stop those insinuations, to respect me,

17  because I respected him.  I was feeling uncomfortable.

18      Q.   So let me just clarify.  I think what I'm

19  asking is a little bit different.  I'm asking, in this

20  lawsuit, why has Ramses not been identified before as a

21  witness?

22          MR. MACDONALD:  Objection.  Form.  And I'm

23      going to instruct her not to answer based on work

24      product and attorney-client privilege.

25          MS. FAENZA:  I'm going to certify the

ORIGINAL

147

1      question.

2           MR. MACDONALD:  Okay.  It's clearly a method

3      of trial preparation as to what witnesses are called

4      or not called, and she'd have to reveal

5      communications, even if that was a decision that was

6      made.

7           MS. FAENZA:  I'm not responding to improper

8      objections, sir.  I will certify the question.

9  BY MS. FAENZA:

10     Q.   Did you tell anyone -- and actually, strike

11 that.  Did you complain to anyone about this alleged

12 behavior?

13     A.   Yes, of course, with Eric in Human Resources.

14     Q.   When did you do that?

15     A.   I don't remember the exact date.  I put that

16 on my statement.  This was a long time ago.  And for me,

17 this means that I have to recall all of these things

18 that affect me very much.

19          MS. FAENZA:  Move to strike portions

20     nonresponsive.

21     Q.   I have in my records that it was on or about

22 November 6th, 2023 that you verbally gave a complaint to

23 Eric Garcia.  Does that sound correct?

24     A.   I don't remember the exact date, but he sent

25 me a text message in which he made an appointment for me

ORIGINAL

148

1    to come to his office to talk about this situation.

2        Q.   And did you?

3        A.   Of course.

4        Q.   Okay.  And so, were you aware that Mr. Garcia

5    was taking notes and writing as he was conducting his

6    investigation with you?

7        A.   Yes, and there was another person present

8    also.

9        Q.   Who was the other person?

10       A.   It was another young lady from Human

11   Resources.  I don't remember her name.

12       Q.   Are you aware, Ms. Alvarez, that there was no

13   other person working in Human Resources?

14       A.   What?

15       Q.   There was no other person working in Human

16   Resources.  Is it possible it was just another person in

17   the office, or are you certain that this was a Human

18   Resources professional?

19       A.   When I went into the office, she was sitting

20   there.  I don't know who she was, but I have seen her at

21   the Human Resources offices before.

22       Q.   Okay.  But the Human Resources offices, are

23   you referring in totality to the GOAT office on the 49th

24   floor?

25       A.   Yes, that was specifically designated as the

ORIGINAL

149

1   place for Human Resources.

2       Q.   Okay.  Were you aware that there were other

3   things happening there like accounting, consulting,

4   advertising, other kinds of work done at that location?

5       A.   I'm not aware of that.

6       Q.   Okay.  So the notes that Mr. Garcia kept at

7   the same time that he was meeting with you states that

8   you had complained that Maximiliano was constantly

9   checking your work, and only checked your work and does

10  not give feedback to any other line cooks because

11  they've been working there longer.  Is that what you

12  told Mr. Garcia?

13          MR. MACDONALD:  Objection.  Lack of

14      foundation.

15      A.   I don't know what Eric put on that paper.  He

16  had the paper.

17      Q.   I'm asking if you told him that you were

18  complaining that Max was checking your work too closely.

19          MR. MACDONALD:  Same objection.

20      A.   What I complained to Eric that the represaries

21  [sic] from Maximiliano became much more stronger after I

22  revealed that I was pregnant.  So his purpose would have

23  been to hostigate [sic] me and to cause me to go away.

24          MS. FAENZA:  Mr. Interpreter, I don't know

25      what that word hostigate means --

ORIGINAL

150

1          (Crosstalk)

2          THE INTERPRETER:  Harass me.

3     A.   Harass me so that I would quit and go away.

4     Q.   Is it your position that when you had this

5     meeting with Eric, that you were actually complaining

6     about pregnancy discrimination at that time?

7          MR. MACDONALD:  Objection.  Form.  Calls for a

8          legal conclusion.

9     A.   What I complained to Eric about Maximiliano

10    was that he was harassing me sexually.  Maximiliano and

11    the other chef that was in charge, Richard Fuentes, I

12    told them that I was pregnant.  They told me, don't let

13    Human Resources know about it.  I told them I already

14    informed Human Resources because of the harassment that

15    I was suffering from Maximiliano.  So Maximiliano was

16    constantly changing my schedules, giving me less hours.

17    For example, I would ask for a free day, he would have

18    me work that day, and he was constantly harassing me.

19         MS. FAENZA:  Move to strike portions

20         nonresponsive.

21    Q.   I am only asking about what you discussed with

22    Eric on that first meeting --

23         (Crosstalk)

24         MR. MACDONALD:  Objection.  Form.

25    Q.   And I am going to continue on this line, and

ORIGINAL

151

1    then everything you want to talk about, 100 percent we

2    will discuss.  But in order to stay focused. I am just

3    talking about this one meeting on November 6th.  Do you

4    understand that this is what I'm asking about, just that

5    meeting with Eric on November 6th?

6        A.   In that meeting, I informed Eric of the

7    constant harassment that I was suffering from

8    Maximiliano, the chef.  I told him that he had told me

9    that I needed to massage the chicken the way that I

10   massage my Cuban boyfriend.  If I would have to sear the

11   salmon, he would say to me that I needed to put makeup

12   on my ass the same way that I would put makeup on my

13   face.  He was constantly harassing me.  I told Eric that

14   he was constantly harassing me.

15       Even him telling me to help him get his legal

16   residency status because he didn't used to have a

17   resident status, a legal resident status.  I told Eric

18   that he was doing sexual advances towards me.  And since

19   my answer, and since I was rejecting his advances, he

20   started to denigrate me more harshly.  And to

21   discriminate against me because of my pregnancy.

22       Q.   So, is it correct that you were separated from

23   your current fiance at the time that you were beginning

24   work at this time?

25            MR. MACDONALD:  Objection.  Form.

ORIGINAL

152

1       A.   No, not separated.  Maximiliano the chef

2  asked me if I was married, if I was single.  He asked me

3  some questions in regards to my love life.

4       Q.   Did you come to Miami to have a start over

5  because you were separated from your fiance at the time,

6  which would have been in October of 2023?

7            MR. MACDONALD:  Objection.  Lack of

8       foundation.

9       A.   We came back.  We were together, and we had an

10  argument like any other marriage does.

11       Q.   Were you living with your boyfriend at the

12  time that you started work for Addikt?

13            MR. MACDONALD:  Objection.  Form.

14       A.   Yes, ours was an argument.

15            MS. FAENZA:  Move to strike portions

16       nonresponsive.

17       Q.   Were you living with your fiance at the time

18  you started working for Addikt in 2023?

19       A.   We moved from Texas to Miami, and we had an

20  argument.

21       Q.   The question is whether you were living

22  together.

23            MS. FAENZA:  Again, I will move to strike

24       portions nonresponsive.

25       A.   And I answered yes.

ORIGINAL

153

1      Q.   At any period of time since you were with

2  your current fiance, did you live separately?

3           MR. MACDONALD:  Objection.  Form.

4      A.   He's a truck driver.  He spends a lot of time

5  on the road.

6      Q.   At any point in time, were you separated and

7  not living together since the beginning of your

8  relationship with your fiance?

9           MR. MACDONALD:  Objection.  Form.

10     A.   No.  The separations have been due to his

11 work.  When we argued, we separated, but it was because

12 of his work.

13     Q.   Is it correct that you were looking for a

14 cheap room to rent at the time that you started working

15 at Addikt?

16     A.   I wanted to move where I was living with my

17 mother.

18     Q.   Would you also be living with your fiance at

19 your mother's, at your mother's place?

20          MR. MACDONALD:  Objection.  Form.

21     A.   Yes, when we came back from Texas, we came to

22 my mother's home.

23     Q.   The question was whether you were looking for

24 a low-cost room to rent.

25     A.   I was looking for an apartment for us to move

ORIGINAL

154

1    to.

2       Q.   Did Maximiliano offer to rent you a room in

3    his residence?

4       A.   He said that, yes, he could rent me a room,

5    that he lived alone with his son.  His son worked a lot,

6    but that there was an available bedroom.  And I said no,

7    I'm looking for an apartment.

8       Q.   Is it correct that Maximiliano did not

9    physically touch you at any time?

10      A.   No, he didn't touch me.  Only when he was

11   fired, he came to me.  He hugged me tightly.  He

12   squeezed my shoulders, and he gave me a kiss on the

13   cheek.

14      Q.   Did you tell Eric Garcia that you don't

15   believe you need supervision because you have been

16   working for over 15 years, and you did not want

17   Maximiliano to be supervising you and telling you what

18   to do?

19      A.   I don't remember having said that.  I only

20   said to him that I had many years of experience in the

21   kitchen.  That I'm not perfect; that every place is

22   different.  And I'm a fast learner.

23      Q.   Do you know a person by the name of Reina

24   Salvatora Gutierrez?

25            THE INTERPRETER:  What is it?

ORIGINAL

155

1          MS. FAENZA:  Reina.  R-E-I-N-A.

2     A.    Reina, queen.

3     Q.    Who is Reina?

4     A.    It's a workmate.

5     Q.    Were you aware that Eric Garcia had

6     interviewed Reina in response to your complaints?

7     A.    I'm not aware of that.

8     Q.    Would it surprise you to learn that Reina,

9     when interviewed by Eric, did not observe any of the

10    allegations that you were speaking about?

11         MR. MACDONALD:  Objection.  Form.  Lack of

12         foundation.

13    A.    May I answer?

14    Q.    Yes.

15    A.    Reina was working on the order area of the

16    kitchen, not the area I was working in.

17    Q.    Well, the question was whether you were

18    surprised that she did not support any of your

19    allegations directed towards Max.

20         MR. MACDONALD:  Same objection.

21    A.    Well, the thing is, she was working in another

22    area of the kitchen that was separated by a wall.  We

23    didn't see each other, so she was not in the same area.

24    She worked in the area where they do, where they prepare

25    the food for the employees.

ORIGINAL

156

1    Q.   You've given some testimony in answering

2    questions about the things that you had spoken to Eric

3    about in this November 6th meeting.  Is there anything

4    else that you have not discussed as far as your

5    complaint to Mr. Garcia in that meeting alone?

6         MR. MACDONALD:  Objection.  Contention

7    request.

8    A.   I don't know.  I don't remember.

9    Q.   You don't remember the meeting or you don't

10   remember if there was anything else that you complained

11   about to Eric?

12   A.   I remember what I thought.  I remember I

13   complained about the things that Maximiliano was doing

14   to me.  And that Eric said to me, just take it easy, I'm

15   going to talk to him.  And not to do anything else.  To

16   take it easy; that he was going to solve it.

17   Q.   So do you remember having a hamburger sent

18   back, it's called a smash burger, sent back to the

19   kitchen on the date of November 7th, 2023?  Do you have

20   a recollection of this?

21   A.   I cannot answer to that.  There's many food

22   that used to be returned.

23   Q.   So on -- there's many food that used to be

24   returned?

25   A.   Many times the customers would not be okay

ORIGINAL

157

1   with the terms of the way the meat was cooked.

2   There's a lot of people working in the kitchen.  We knew

3   all the different works, at least I was familiar with

4   the area.

5       Q.   Is that normal for you to have food be sent

6   back to the kitchen for issues with how the meat is

7   cooked?

8           MR. MACDONALD:  Objection.  Form.

9       A.   It depends on the client and on that client's

10  taste.

11      Q.   So I'll represent to you that on the date of

12  November 7th, 2023, the owner of WGOAT15, which was

13  called Addikt at the time, came into the restaurant and

14  ordered a smash burger.

15          MS. FAENZA:  Go ahead, and I'll finish after

16      you.

17          THE INTERPRETER:  Okay.

18      Q.   And the owner, her name is Lisa Gonzalez, was

19  with Eric Garcia.

20          THE INTERPRETER:  She was with?

21          MS. FAENZA:  Addikt.  She was the owner of

22      Addikt.

23          THE INTERPRETER:  No, no --

24          MS. FAENZA:  She was with Eric Garcia.

25  BY MS. FAENZA:

158

1       Q.   Both Ms. Gonzalez and Mr. Garcia have given

2   testimony under oath.

3            THE INTERPRETER:  Lisa.  Lisa Gonzalez?

4            MS. FAENZA:  Yes.

5            THE INTERPRETER:  Lisa Gonzalez.

6            MS. FAENZA:  And Eric Garcia have given

7       testimony under oath.

8            THE INTERPRETER:  Okay.

9   BY MS. FAENZA:

10      Q.   Regarding the burger prepared by you on that

11  day.  And on that day, the burger that you prepared

12  appeared at the table raw in the center, bloody, cold to

13  the touch, and not meeting health standards.  And the

14  owner had to send it back to the kitchen for safety

15  reasons.  Were you aware of this incident?

16           MR. MACDONALD:  Objection.  Lack of

17      foundation.

18      A.   I don't remember that incident.  I don't

19  remember that incident.  Like I said before, it was

20  various people working.  There was two people, me and

21  another person, working on the grill, so it could have

22  been that other person.

23      Q.   The records reflect that the testimony of both

24  persons was that you were the person that had prepared

25  that hamburger, and that you were angry when you

ORIGINAL

159

1    received the feedback, saying you had prepared it

2    correctly.

3         MR. MACDONALD:  Objection.  Lack of

4         foundation.

5         A.   I don't think that's correct because I'm a

6    very patient person and I don't get upset.

7         Q.   Is it correct that you had been verbally

8    counseled on being late?

9         A.   That is a lie.  I am always a very punctual

10   person.  I'm always on time.  Yes, they called my

11   attention to the fact that I was coming in too early,

12   and that I had to punch at the correct time.  I had to

13   punch in at the correct time.

14        Q.   Were you punching in before your shift

15   started?

16        A.   Two or three minutes.

17        Q.   How many hours were reduced after you made

18   this complaint and after Maximiliano Caraballo and

19   Richard Fuentes became aware of your pregnancy?

20        A.   A lot.  A regular shift was eight hours, and

21   he would have me go for four hours.

22        Q.   So I can represent to you that WGOAT15

23   obtained the hours that were worked by you, another

24   individual whose last name is Junior, first initial A,

25   and another individual whose last name is Acosta, and

ORIGINAL

160

1   first initial W.  Do you recognize those names,

2   A. Junior and W. Acosta?

3       A.   I think Acosta was the young man that was

4   working the grill with me.  We didn't usually call each

5   other by the last name.

6       Q.   Well, do you recognize who W. Acosta is?  I

7   believe that's Wilmer.

8       A.   Yeah, the Venezuelan guy.

9       Q.   And those are two line cooks, correct?

10      A.   Yes.  He would work the grill, and sometimes

11  the fryer, and sometimes the cooking surface.

12      Q.   Would it surprise you to know that, in looking

13  at the hours assigned to Wilmer Acosta and A. Junior,

14  that the hours did not substantially change, and your

15  hours were similar to the other line cooks, and in some

16  months more than the other line cooks?

17          MR. MACDONALD:  Objection.  Lack of

18      foundation.

19      A.   I worked there for many months, and I was

20  paying attention to my business, not to their business.

21      Q.   Were you aware that the hours had been cut for

22  everybody?

23      A.   Like I said, I was only worrying about my

24  business.

25      Q.   So you don't know whether or not the entire

ORIGINAL

161

1    company reduced hours, as you testified earlier, for

2    everybody?

3            MR. MACDONALD:  Objection.  Form.

4        A.   Like I said, I was worried about my schedule.

5    I was not aware of the schedule of the rest of the

6    people.

7        Q.   And you're not able to testify as to whether

8    the other line cooks were given more hours than you?

9            MR. MACDONALD:  Same objection.

10       A.   Yes, I can testify that they were getting more

11   hours, because when I saw that they were giving me four

12   hours, I asked why I'm only getting four hours.

13       Q.   And who did you ask?

14       A.   To Maximiliano, the chef.

15       Q.   And what did Max say?

16       A.   That that was the only thing that he could

17   give me.

18       Q.   How much money did you lose as a result of the

19   reduction in your hours, according to you?

20           MR. MACDONALD:  Objection.  Form.

21       A.   A lot of money because I'm paid $20 an hour,

22   and it was forty hours per week.

23       Q.   So you lost forty hours a week, Ms. Alvarez?

24           MR. MACDONALD:  Objection.  Form.

25       A.   I didn't say that.

ORIGINAL

162

1      Q.   I'm asking how much money -- I'm looking for a

2   number.  How much money did you lose as a result of

3   having your hours reduced?

4           MR. MACDONALD:  Objection.  Form.

5      A.   I would say 16 hours per week, 20 hours per

6   week.  And when I asked Maximiliano why was that, that's

7   when he told me that's what's available.

8      Q.   Is your testimony that you were working just

9   16 to 20 hours a week?

10          MR. MACDONALD:  Objection.  Form.

11     A.   Like I said before, that was relative.  He did

12  reduce my hours after he became aware that I was

13  pregnant.

14     Q.   So in the month of November, you worked 152.91

15  hours.  And in the month of December, the amount of

16  hours that you worked increased to 178.21 hours.  Are

17  you aware of this?

18          MR. MACDONALD:  Objection.  Lack of

19          foundation.

20     A.   I don't remember, but if it was December, it

21  might have been due to the holidays.

22     Q.   Are you aware that you actually worked more

23  hours than Mr. Acosta in the month of December?

24          MR. MACDONALD:  Same objection.

25     A.   I don't have that information.

ORIGINAL

163

1      Q.   In the month of January, I can represent

2  you the records reflect you worked 158.84 hours, and you

3  took off the week of January 10th through 15th.  And you

4  still worked more hours than the gentleman named Mr.

5  Junior at 149.94 hours.

6      A.   Like I said before, all that was done through

7  the application 7shifts.  And after I was not working

8  there anymore, they blocked me out of that, so I could

9  not tell that.

10     Q.   Are you surprised to see that the records do

11 not reflect that your hours were reduced substantially

12 after this complaint to Mr. Garcia?  And that, in fact,

13 you worked more hours in certain months than other line

14 cooks, even when you took time off?

15         MR. MACDONALD:  Objection.  Lack of

16     foundation.

17     A.   That is the time that Chef Tito came on board,

18 and he would give me double shifts so that I could do

19 the work of three people for him.

20         MS. FAENZA:  Move to strike the portions

21     nonresponsive.

22     Q.   Your Complaint reads --

23         MS. FAENZA:  And, sir, if you wish to read

24     along, it's page 4, paragraph 29.

25     Q.   -- that you had persistent fatigue, frequent

ORIGINAL

1  nausea, episodes of lightheadedness, difficulty standing,

2  inability to perform heavy lifting, among others.  When

3  did you begin experiencing these symptoms?

4       A.   That started when Chef Tito assigned me to do

5  the shift so that I would have to do the work of three

6  people, to harass me and have me quit.  I had to

7  constantly be running around trying to do the work of

8  three people at the same time.

9       MS. FAENZA:  Move to strike portions

10      nonresponsive.

11      Q.   During the period of time that you worked for

12  Max, did you experience the symptoms that are described

13  in your complaint?

14      A.   Not as strong as with Chef Tito.  With Max, it

15  was more of a verbal harassment.

16      Q.   After you met with Eric, what happened with

17  Max?  Did he speak to you about your complaint?  Did he

18  mention your complaint in any way?

19      A.   He was upset with me.  His aggressivity

20  towards me was stronger.  And Chef Richard said to me

21  that next time I should go talk directly to him.  And I

22  didn't have to go to Human Resources to complain.

23      Q.   Directly to who?

24      A.   Human Resources.

25      Q.   So Chef Richard -- and I'm not agreeing that

ORIGINAL

165

1    Richard was a chef -- allegedly told you that you should

2    talk directly to Human Resources, not Human Resources?

3    I'm not understanding who Mr. Richard is telling you --

4            (Crosstalk)

5            MR. MACDONALD:  Objection.  Form.

6        A.   Richard said to me that I didn't have to go to

7    Human Resources to complain.  I did not have to go.

8        Q.   Instead who would you talk to?

9        A.   That I had to either solve it with him or with

10   they.

11       Q.   With who?

12       A.   With Chef Richard.

13       Q.   Is your position that Richard was a chef at

14   Addikt?

15           MR. MACDONALD:  Objection.  Form.

16       A.   It is my understanding he had a higher

17   position than Maximiliano.

18       Q.   After this discussion, did -- with Eric

19   Garcia, was there any further comments from Maximiliano

20   Caraballo of a sexual nature?

21       A.   No.

22       Q.   Did it stop after you spoke to Eric Garcia?

23       A.   Yes.  Because then he got fired.

24           THE INTERPRETER:  Excuse me, excuse me, excuse

25       me.

ORIGINAL

166

1      A.    Because then they fired him.

2      Q.    Do you know why they fired Maximiliano

3   Caraballo?

4      A.    I don't know why directly.  But there were

5   comments that he was not doing his job right.  And he

6   said that it had been a complaint from Lisa, the owner,

7   because he was spending more of the resources of the

8   restaurant than what he was bringing in.

9      Q.    And who told you this information?

10      A.    Maximiliano when he said goodbye to me.

11      Q.    Okay.  Do you speak to Maximiliano Caraballo

12   today?

13          THE INTERPRETER:  Do you?

14          MS. FAENZA:  Speak to him today.

15      A.    No.  I saw him for the last time that time

16   that he said goodbye to me.  I never see him again.

17      Q.    Any further contact with him at all?

18      A.    None.

19      Q.    And what about Richard?

20      A.    No.

21      Q.    Okay.  Any other issues between Maximiliano

22   Caraballo and this person Richard that you have not

23   discussed?

24          MR. MACDONALD:  Objection.  Contention

25          request.

ORIGINAL

167

1    A.   I already said about the treatment that he

2  was giving me and after the relation that I was

3  pregnant.  After that, Maximiliano was fired, then

4  Richard was fired.  And that's when Tito arrived.

5    Q.   When did you tell anyone at work that you were

6  pregnant?

7    A.   I became aware one night, and the next day I

8  told the chef.

9    Q.   What day was that?

10   A.   I don't remember.

11   Q.   Was it before or after you complained to Eric

12  Garcia?

13   A.   I told it to the chefs before I talked to

14  Eric.

15   Q.   Did you tell Eric you were pregnant in that

16  meeting?

17   A.   Yes.  And I told him I was afraid because of

18  the mistreatment I was suffering from Maximiliano.

19   Q.   Afraid of what?

20   A.   Of the represars [sic] --

21        THE INTERPRETER:  Is that a word?

22        MS. FAENZA:  No.

23        THE INTERPRETER:  Of the -- I have it on the

24    tip of my tongue.  Reprisals.

25        MS. FAENZA:  Reprisals?  Okay.

168

1          THE INTERPRETER:  Yes.

2   BY MS. FAENZA:

3      Q.   All right.  So you told Eric when

4   specifically, if you recall?

5      A.   I went up to the office to talk to Eric.  He

6   was not there.  And they talked to him.  They gave me

7   the telephone number where I can talk to him.  I talked

8   to him, and through a text message he says, meet me at

9   the office, we need to talk about this.

10     Q.   Okay.  And is that the date that you told him

11  that you were pregnant?

12     A.   Yes.

13     Q.   Do you have any text messages or anything in

14  writing showing that you told Mr. Garcia that you were

15  pregnant?  I'm not implying that you do, just trying to

16  find out if there's a document.

17          MR. MACDONALD:  Objection.  Form.

18     A.   I have a screen picture of that message that I

19  sent.

20     Q.   And what did it say?

21     A.   He said he was thankful that I trusted to talk

22  about these things with him, and that he would give me

23  an appointment to meet him at the office to talk about

24  it.

25     Q.   What was there to talk about in announcing

ORIGINAL

169

1    that you were pregnant?  Were you asking for time off?

2    I'm just trying to determine what you were there to

3    speak about.

4        A.   No, it was just to inform them that I was

5    pregnant, because the protocols of the kitchen work is

6    that you have to let people know that you are pregnant.

7        Q.   What protocols?

8        A.   There are kitchen protocols that say that if

9    you are feeling bad, you have to let people know.  If

10   you cut yourself, you have to let people know.  And if

11   you are pregnant, you have to let them know.

12       Q.   So it's your position that the handbook for

13   the company required you to advise them that you were

14   pregnant?

15            MR. MACDONALD:  Objection.  Form.

16       A.   I reported it because I followed the line of

17   command.

18       Q.   Did you ask for any time off at the time that

19   you reported it to Eric?

20       A.   No.

21       Q.   Did you ask for any accommodation when you

22   reported it to Eric?

23       A.   No.  I told him being pregnant is not a

24   sickness.

25       Q.   When is the first time that you asked for any

ORIGINAL

170

1   form of accommodation from either Eric or the chef

2   that you worked with?

3           MR. MACDONALD:  Objection.  Form.

4   A.   I never asked for any type of --

5           THE INTERPRETER:  What's the word we just

6   used?

7           MS. FAENZA:  Have her repeat it.

8           (The record is read back.)

9           MS. FAENZA:  No, that's a different word.

10           You should ask the witness to repeat the word.

11           THE INTERPRETER:  What was the question?

12           THE REPORTER:  Oh, the question?  Okay.  One

13   moment.

14           (The record was read back.)

15           THE WITNESS:  I didn't ask for any

16   accommodation.

17   BY MS. FAENZA:

18   Q.   Did you ever ask for any accommodation?

19           MR. MACDONALD:  Objection.  Form.  Calls for a

20   legal conclusion.

21   A.   No, only chef Richard at that time and Eric

22   told me to let them know in advance when I had a medical

23   appointment.  But I always stated and restated that

24   being pregnant is not a sickness.

25   Q.   And did you ask for the days of January 10th

171

1   until January 15th, 2024 to not work?

2       A.   Yes, I did ask for time after I went to the

3   hospital.

4       Q.   And did you provide a doctor's note when you

5   requested that time off?

6       A.   Of course.  I gave it to Eric.

7       Q.   Okay.  And were you told that 45 minutes

8   before you start is not enough time for there to be

9   notice to give that you're going to be out of work?

10      A.   Yes.  Chef Tito said that 45 minutes was not

11  enough time for me to advise him that I was having

12  contractions.  To that I said to him, I cannot control

13  my contractions to know when I'm going to get them.

14          MS. FAENZA:  Let the record reflect that I'm

15      now providing to the translator Plaintiff's Exhibit

16      CA0006, which is the text message that I believe Ms.

17      Alvarez has been referring to.  At this point in

18      time, I would ask that the translator show the

19      document to Ms. Alvarez.

20          THE WITNESS:  May I go to the bathroom?

21          MS. FAENZA:  Of course.  I don't want any

22      issues with --

23          (Crosstalk)

24          THE REPORTER:  Off the record at 5:26 p.m.

25          (A recess was taken.)

ORIGINAL

172

1            THE REPORTER:  Back on the record at 5:31 p.m.

2            MS. FAENZA:  Let the record reflect that the

3       interpreter has provided the text message to Ms.

4       Alvarez.

5  BY MS. FAENZA:

6       Q.   Ms. Alvarez, please review that and let us

7  know if that is the correct and accurate version of the

8  text messages that was provided to my office by your

9  attorney.

10      A.   Yes, and here it appears that I did send the

11 copy of the doctor's note to the human resources.

12      Q.   At the top of that document it says Tito; is

13 that correct?

14      A.   Yes.  We call him Chef Tito because that's the

15 way he introduced himself to us, but later on we come to

16 realize his name was Alberto.

17      Q.   Do you mean Abelardo (phonetic)?

18      A.   Yes, yes, I'm sorry.  Yes, Abelardo.

19      Q.   Abelardo Vargas?

20      A.   Yes.

21           MS. FAENZA:  And so I would ask the

22      interpreter to please translate the documents that

23      are -- the words that appear on there, just to

24      ensure that the text that Ms. Alvarez has stated is

25      correct is translated for the record.

ORIGINAL

1          THE INTERPRETER:  Okay.  So it says here,
2     Friday, yesterday, call, 14 seconds.  Today, to GOAT
3     Hospitality Group, (inaudible).  "Good afternoon,
4     group.  I am on the urgent care because of my
5     pregnancy.  I am experiencing pain.  I don't think
6     I'm going to be able to do my shift today."
7          Then it says, "I need a letter from the doctor
8     tomorrow.  You advised us 45 minutes before you come
9     in to your shift.  Human resources is aware of the
10    situation.  I hope you're feeling good.  What is
11    correct is two hours before your shift."  Then Tito,
12    Chef Hotel W, "What's correct is two hours before
13    your shift."
14         "With all due respect, Chef, I do not control
15    my pain or that for pain to appear two hours before
16    my shift.  I am still in the emergency room.  I am
17    coming out with documentation for you, a copy of the
18    documentation from -- to Eric on human resources.
19    Good afternoon."
20         MS. FAENZA:  Okay.  We'll make that, I
21    believe, is that Exhibit 7, Madam?
22         THE REPORTER:  No, that's Exhibit 6.
23         MS. FAENZA:  Six?  Okay.
24         (Thereupon, Defendant's Exhibit 6 is marked
25    for identification.)

ORIGINAL

174

1          MS. FAENZA:  And I will provide a copy of that

2      document, which is the doc- -- let the record

3      reflect, I'm showing opposing counsel -- this

4      document is in Spanish -- and his client, the

5      doctor's note from December 10th, which is two

6      pages.

7  BY MS. FAENZA:

8      Q.   Ms. Alvarez, once you've had a chance to

9  review it, let me know.  Once we confirm that that is

10  something you're aware of, I can ask some questions and

11  have the translator ensure that the information is

12  correctly translated.

13     A.   Yes, this was when I was in the emergency

14  room.

15     Q.   Is that the documents -- are those the

16  documents that you provided to Abelardo Vargas?

17     A.   I gave them to him in Human Resources.

18     Q.   Okay.  If you could please pass those to the

19  translator.

20          MS. FAENZA:  Mr. Translator, I would ask that

21      you please read on the documents what they say.

22      It's pretty short.

23          THE INTERPRETER:  Okay.  "Patient visit

24      information.  Today received care due to

25      pharyngitis" (phonetic) "acute, 23 weeks gestation,

ORIGINAL

175

1          patient instructions received with this package on

2          01/10/24 at 11:15, second trimester changes,

3          pharyngitis report pending.  Follow-up, Carol F.

4          Alvarez has been referred to the following clinic

5          specialists for follow-up.  One unknown PCP date.

6          Prescriptions, azithromycin, 500 mg, orally daily, 3

7          tablets, 500 mg tablets, refills zero.  Other

8          documents delivered, precautions, home medication

9          list."

10              THE WITNESS:  I have to say something.

11              MS. FAENZA:  That is the document from where I

12         had the flu, not from that.  Well, I turned in all

13         the medical documents anyways.  There is the

14         document where it appears that I cannot do heavy

15         lifting.

16    BY MS. FAENZA:

17         Q.   I'm asking about this document, Madam.

18         A.   But that document is not from the date that

19    you are referring to in that text.

20         Q.   Okay.  The document and the text message, did

21    you provide that documentation to Eric?

22         A.   I gave Eric all the documentation from when I

23    went to the hospital.  At all times I was very

24    transparent.

25              MS. FAENZA:  Move to strike portions

ORIGINAL

176

1     nonresponsive.

2     Q.   The question just has to do with whether or

3   not you provided that document right there to Eric

4   Garcia and requested the time off from January 10th

5   until the 15th.

6     A.   I did not ask for free time.  The medical

7   prescription states it.  I want to make it clear that I

8   never request time off.  Only that the doctor were

9   telling me to take the time off because of all the

10   stressful situation I was living through.  I never took

11   one day off that was not prescribed by the doctor.

12        MS. FAENZA:  Move to strike portions

13     nonresponsive.

14     Q.   I was only asking if that was a document

15   provided requesting the time off from January 10th to

16   the 15th.

17     A.   If the dates are there, yes.

18     Q.   And were you given the time off from January

19   10th until the 15th?

20     A.   In the medical document, they gave me the

21   dates that appear there.

22     Q.   Okay.  So when you presented that document

23   where the doctor said you should not work until the

24   15th, Addikt did allow you to be off the schedule and

25   did not require you to work during that time; is that

 1   correct?

 2            MR. MACDONALD:  Objection.  Form.

 3       A.   I gave it to Eric, and he said he was going to

 4   have it in mind when he would make the schedule.

 5       Q.   Eric told you he was making the schedule?

 6       A.   He answered to me that -- I don't know who is

 7   making the schedule, who was making the schedule.  I

 8   don't know if it was a communication between him and the

 9   chef or what was going on.

10       Q.   Just simply whether or not you were required

11   to work January 10th to the 15th.  Did they give you the

12   time off for the doctor's note?

13            MR. MACDONALD:  Objection.  Form.

14       A.   It seems so.  I don't remember.  I would be

15   lying if I say otherwise.

16       Q.   Is it your position that at any time, or at

17   least at this time when you asked for January 10th to

18   15th, that they did not give you the time off?

19            MR. MACDONALD:  Objection.  Form.

20       A.   My position is that I brought the document,

21   and that when I needed the rest, they gave it to me.

22       Q.   Okay.  So, I understand that there was another

23   doctor's note that you provided to either Eric or Tito,

24   which was a doctor's note.  And I will provide it to you

25   now.  Let me see.  I have a couple different copies of

ORIGINAL

178

1    it.  That's why.  It appears to be from Coral Gables

2    Hospital.  It's going to be Plaintiff CA016, 18, and 20.

3    I will hand it to --

4          (Crosstalk)

5      Q.   Do you recognize those documents?

6      A.   Yes.

7      Q.   Did you provide those documents to Eric Garcia

8    or Tito?

9      A.   Yes.

10     Q.   Who did you provide them to?

11     A.   Eric.

12     Q.   Okay.  And when did you provide them to Eric?

13     A.   And to Tito also, but it was after I came back

14   to work.

15         MS. FAENZA:  I know it's late.  I have a point

16     to the interpreter.  I believe she said, "I don't

17     remember the date."

18         THE INTERPRETER:  Yes, yes.

19         MS. FAENZA:  She did say that.  I didn't hear

20     you translate it.  I'm sorry.  I want to make sure

21     everything she says is on the record, that's all.

22         THE INTERPRETER:  Okay.

23         (The record was read back.)

24   BY MS. FAENZA:

25     Q.   Do you remember the date that you provided

ORIGINAL

179

1   that to Eric Garcia?

2       A.   It appears here that it's February 7th, 2024.

3   And I went there the next day because they didn't give

4   me a rest day.

5       Q.   Who did not give you a rest day?

6       A.   I didn't say that.  I said, I went the next

7   day to work Because they didn't give me a day of rest.

8   I don't have a restriction not to work.  I went to work.

9           MS. FAENZA:  Move to strike portions

10      nonresponsive.

11      Q.   The question was only when did you provide

12  that note to --

13          (Crosstalk)

14          MR. MACDONALD:  Objection.  Form.

15      A.   The day after I went to work.

16      Q.   What was that date?

17          MR. MACDONALD:  Objection.  Form.

18      A.   If it says here the 7th, on the 8th I went to

19  work.

20      Q.   And did you present this document to someone

21  on February the 8th?

22          MR. MACDONALD:  Same objection.

23      A.   I gave it to Tito, and I gave it to Eric.

24      Q.   And what happened?

25      A.   Nothing.  They looked at it and that's it.

ORIGINAL

180

1      Q.   And did you work on February the 8th?

2      A.   I don't remember the date, but if here, if I

3   was not given the time off, I did went to work.

4      Q.   Did you ask for the time off and provide that

5   doctor's note to either Eric or Tito?

6           MR. MACDONALD:  Objection.  Form.  Asked and

7       answered.

8      A.   I don't understand.  I worked that day.

9      Q.   What day?

10     A.   That's on the 7th.  I went to the hospital at

11  8:00 at night.

12     Q.   After work?

13     A.   Yes.

14     Q.   Okay.  And after you went to the hospital, did

15  you go to work the next day?

16          MR. MACDONALD:  Objection.  Form.

17     A.   Yes.

18     Q.   Did you provide the note on that day?

19          MR. MACDONALD:  Objection.  Form.  Asked and

20      answered.

21     A.   The next day when I went to work, I presented

22  that note.

23     Q.   And did you have to work that day, or did you

24  ask Eric or Tito for the day off, as it's described in

25  the note?

ORIGINAL

1          MR. MACDONALD:  Objection.  Form.  Asked and

2     answered.

3     A.   I don't remember if I worked or not, but I'm

4     looking at the date.  That must have been after work.

5     Q.   What must have been after work?

6          MR. MACDONALD:  Objection.  Form.  Asked and

7     answered.

8     A.   Having gone to the hospital because I was

9     feeling bad.

10    Q.   I'm not really understanding the order.  I

11    want to just take it easy and go step by step.  So I

12    understand you testified that you worked on February

13    7th.  And then I understand after work, you went to the

14    doctor.  And that is the doctor's note.  Am I correct on

15    that so far?

16    A.   Because I was feeling bad.

17    Q.   Understood.  Did you take a photograph of

18    these and send a text to Mr. Vargas and Mr. Garcia

19    before the 8th?

20         MR. MACDONALD:  Objection.  Form.  Asked and

21    answered.

22    A.   I appear on the 12th of January with this

23    document.

24    Q.   On the 12th of January?

25    A.   It says here.  It says February.

ORIGINAL

182

1    Q.   Did you work from February 7th until the 12th?

2    A.   I was given rest from the 7th to the 12th.

3         MS. FAENZA:  Move to strike portions

4    nonresponsive.

5    Q.   I'm only asking when you worked.  Did you work

6    during that week?

7         MR. MACDONALD:  Objection.  Form.  Asked and

8    answered.

9    A.   I went there on the 7th.  I went to the

10   hospital.  Because I was feeling bad with headaches.

11   Feeling very bad.  And they gave me free from the 7th to

12   the 12th.

13   Q.   Who is they?  I don't understand.  I'm just

14   trying to figure out if you worked during that time or

15   whether you were given the time to rest per that

16   doctor's order.

17   A.   I did not went to work because here it says

18   there that I was given free days.

19   Q.   Okay.  And were you allowed to take that time

20   off from work by Addikt?

21        MR. MACDONALD:  Objection.  Form.

22   A.   The doctor gave them to me.

23   Q.   I'm asking you whether Addikt allowed you to

24   be off from work from February 7th until the 12th.

25        MR. MACDONALD:  Objection.  Form.

ORIGINAL

183

1      A.    Exactly.

2      Q.    Is that correct --

3            (Crosstalk)

4            MR. MACDONALD:  Objection.  Form.

5      A.    I took the days that the doctor gave me.

6      Q.    And have you provided all of your medical

7    records that you have from the time that you worked at

8    Addikt until the present?

9            MR. MACDONALD:  Objection.  Form.

10     A.    Yes.

11     Q.    So did you provide the records of when you

12   gave birth?

13           MR. MACDONALD:  Objection.  Form.

14     A.    I don't remember.  I think I did.  I'm not

15   sure.  There's many documents.

16     Q.    Did you have a doctor specific for your

17   pregnancy?

18     A.    Yes, of course.

19     Q.    What's the name of that doctor?

20     A.    I don't remember.

21     Q.    At which hospital?

22     A.    Jackson.

23           MS. FAENZA:  Let the record reflect, I'm now

24     showing counsel what is previously marked as

25     Plaintiff CA37.

ORIGINAL

184

1     Q.   Do you recognize this document?

2     A.   Yes.

3     Q.   What is it?

4     A.   That was given to me at the Jackson Hospital.

5  The doctor that was taking care of my pregnancy.

6     Q.   Did you ever provide that document to Eric

7  Garcia or Tito Vargas?

8     A.   Yes.

9     Q.   When?

10    A.   I don't remember the date of it.

11    Q.   Well, how did you provide it to them?

12    A.   I gave them the original.

13    Q.   Why did you text message all of the other

14  doctor notes and this one you handed to them in person?

15    A.   I think I sent it to them.  I'm not sure.

16    Q.   Do you have evidence of any text messages that

17  show that you sent that note from -- what's the date

18  listed on there, Ms. Alvarez?

19    A.   I cannot tell very good.  It's from 06 of '24.

20  I cannot see it very well.

21    Q.   Do you know the date that you saw the doctor,

22  Ms. -- it's fine.  Do you know the date that you saw the

23  doctor at Jackson?

24    A.   It was on various occasions.  I don't remember

25  all the appointments.

ORIGINAL

1      Q.    I'm talking about that note right there.

2      A.    Here it says 6.

3      Q.    Of what month?

4      A.    It's not clear.

5      Q.    Your documentation shows that you went to the

6   doctor on February 7th, and we just talked about that.

7   Do you remember that?

8      A.    Here it says 2/5/24.

9      Q.    Did you go to the doctor the day before at

10  Jackson, and then go to the doctor at Coral Gables the

11  next day?

12          MR. MACDONALD:   Objection.   Form.

13     A.    By chance I had my control date on that day.

14     Q.    What is a control date?

15     A.    When you are pregnant they do a follow-up

16  every month.

17          MS. FAENZA:   I'm going to hand to the

18          plaintiff what has been previously marked as

19          Plaintiff's Exhibit 1 through 11.   I'll hand it to

20          opposing counsel.

21     Q.    I'm going to represent to you that your

22  attorney provided these.   You can just briefly look at

23  them and verify that those are accurate.

24     A.    That's what I said previously.

25     Q.    Do you see anywhere in these documents when

ORIGINAL

186

1  you sent that note dated -- one part of it says

2  May 6th; the other part of it says February 6th, 2024.

3  Could you tell me if you see it within these documents?

4      A.   Thursday, November 6.  And the other is --

5      Q.   I'm solely asking you if you see the text

6  message where you sent that note that we just looked at

7  dated from Jackson Hospital to anyone at either GOAT or

8  WGOAT.

9      A.   I don't know.  Probably.  There was a lot of

10  them.

11     Q.   Have you provided all text messages between

12  either Eric Garc a, Tito, Max, Richard Fuentes, or

13  anyone else at GOAT and WGOAT15 or Addikt?

14         MR. MACDONALD:  Objection.  Form.

15     A.   Yes.

16     Q.   Okay.

17     A.   And this one in general from Wednesday,

18  January 10.  Tito was not yet on his position; Richard

19  was.  And Richard gave me the telephone number of Tito,

20  the chef, to let him know that I have been given rest

21  days.

22         MS. FAENZA:  So, let the record reflect there

23         is no question pending.

24     Q.   I want to make sure we get through this

25  quickly so your attorney has time.  I was just asking

ORIGINAL

187

1    about that one doctor's note.  So, as we sit here today,

2    I would like to draw your attention to a specific page,

3    which would be at the bottom, 0009.  The second-to-last

4    page, third-to-last page.  The top of it reads "558 Eric

5    Recurso Humano."

6         A.   Yeah, he sent it to me.

7         Q.   Okay.

8         A.   And I didn't answer anything.

9         Q.   Okay.  And so, is this the correct text

10   message, Ms. Alvarez?

11        A.   He sent me this message.

12        Q.   Is that the correct and accurate version of

13   the text message?

14        A.   Yes.

15        Q.   Would you please hand it to the interpreter so

16   that he can read the message on top?

17             MS. FAENZA:  Beginning with the text, "Hola,

18        Carol."

19             THE INTERPRETER:  "Hello, Carol.  I sent you

20        the documents from FMLA that were not approved

21        because, since you came to work, you have only

22        worked 627 hours in total, and you have not

23        completed a year of work."

24   BY MS. FAENZA:

25        Q.   Do you have a recollection of that message?

ORIGINAL

188

1      A.   Yes, Eric sent me this back after I sent the

2   message to Eric.  That I was not going to go back to

3   work.

4      Q.   What do you mean go back to work?

5      A.   I sent a message to Tito, the chef.  Of his

6   constant harassment towards me.  You should have all

7   this.  The message that I sent to Tito.  The next day,

8   Eric sent this to me.  I don't know if it was the next

9   day or a few days after.

10     Q.   Did you ask Eric Garc a for Family Medical

11  Leave Act time off?

12          MR. MACDONALD:  Objection.  Form.

13     A.   What do you mean if I asked him for medical

14  leave?

15     Q.   Did you ask Eric for medical leave pertaining

16  to your pregnancy?

17     A.   Never.  I never asked for free days of my own.

18  It was all through medical notes.

19     Q.   Did you intend to work after you had the baby

20  or were you intending to take time off and seek medical

21  leave?  Excuse me, maternity leave.

22          MR. MACDONALD:  Objection.  Form.

23     A.   My son was born prematurely.

24     Q.   Were you planning on working after the birth

25  of your son?

ORIGINAL

189

1      A.   Clearly, yes, to take the maternity leave,

2  as it is legal.

3      Q.   And how much maternity leave were you seeking?

4           MR. MACDONALD:   Objection.   Form.

5      A.   It is three months you are given for maternity

6  leave.

7      Q.   Who gives you three months for maternity

8  leave?

9      A.   Isn't it that, the way it is?

10      Q.   I'm asking, who provides twelve weeks of

11  maternity leave?

12      A.   It's always common knowledge that you are

13  given three months of maternity leave after you give

14  birth.  Optional.  Because you can go back to work the

15  next day if that's what you want.  It depends on the

16  person.

17      Q.   Was it your belief that Addikt was required to

18  give you twelve weeks of work off for maternity leave?

19      A.   No.  I don't know how maternity leave works

20  here.  I'm not aware of that.

21      Q.   Did you expect to receive paid time off during

22  your pregnancy leave?

23      A.   I don't expect them to pay me anything.  I

24  want justice to be done for the emotional damage that

25  they did to me.

190

1          MS. FAENZA:  Move to strike portions

2     nonresponsive.

3     Q.   When did you send the text message

4     communicating that you were resigning?

5     A.   I don't remember the exact date, but it was in

6     February.  Here it is.  It was in February.  Because it

7     was days after Eric sent me this document.

8     Q.   What document?

9     A.   This one.

10    Q.   So you determined to resign after you were

11    told that you were not eligible for FMLA leave?

12         MR. MACDONALD:  Objection.  Form.

13    A.   No.  I resigned, and then Eric sent me this

14    days later.

15    Q.   What's the date of that text message?

16    A.   The date doesn't appear there.

17    Q.   Do you have it on your phone?

18    A.   It is, unfortunately, on the phone that was

19    stolen.

20         MR. MACDONALD:  Objection.  Form.

21    Q.   As you sit here today, you don't know the date

22    that you received that text from Eric?

23    A.   I don't remember.  I know it was in February,

24    but I don't remember the exact date.  I would be lying

25    if I tell you the wrong date.

ORIGINAL

191

1          MR. MACDONALD:  She has to go soon.  She has

2      to go to the airport.  She has a flight.

3          MS. FAENZA:  Okay.

4  BY MS. FAENZA:

5      Q.   Well, I'm just going to address page -- it

6  says page 5.  If you could look at page 5, it begins,

7  "Buen dia."

8      A.   Page 5 it says, after I send the message, it

9  says, "Human Resources is going to be contacting you."

10 And that's when Eric sent me the document and the

11 formularies that -- I don't know.

12         MS. FAENZA:  Let the record reflect, there was

13     no question pending.  I'm going to move to strike.

14     It wasn't responsive because there was no question.

15     Q.   I'm solely asking you about the text that

16 says, "Buen dia."  Do you see that?  It says, "Oy," and

17 then "buen dia."  Do you see that?  It appears in green.

18     A.   I see it.

19     Q.   Okay.  Is that your text message to Mr.

20 Vargas?

21     A.   I sent it to him.

22     Q.   Okay.  And is that a true and accurate copy of

23 it?

24     A.   Yes.

25     Q.   Could you please hand it to the translator so

ORIGINAL

192

1    that he may translate that?

2         MS. FAENZA:  And for the record, Madam Court

3    Reporter, the medical documents will be Composite

4    Exhibit 6.  And the text messages will be Composite

5    Exhibit 7.  Is that right?

6         THE REPORTER:  Okay.  I'll switch it.

7         MS. FAENZA:  Perfect.  Or we can keep it the

8    way you had it.  We can do 7 for doctor's -- all the

9    doctor's notes will just be one.

10        THE REPORTER:  Okay.

11        (Thereupon, Defendant's Exhibit 7 is marked

12   for identification.)

13        THE INTERPRETER:  The green part, right?

14        MS. FAENZA:  Yes, sir.

15        THE INTERPRETER:  "Good day.  I'm contacting

16   you to inform you that I will be resigning of my

17   position with immediately.  It is not an easy

18   decision, but I feel I have no choice but to resign

19   due to the health of my pregnancy.  I told you and

20   Eric that I cannot lift heavy things because of my

21   pregnancy, and you told me I must do so despite my

22   serious medical concerns.  I also told you that I

23   need to be able to take breaks during my shifts, and

24   you have denied me.  I'm afraid that if I continue

25   with this treatment, I will be endangering my health

ORIGINAL

193

1        or that of my baby, and I must resign."

2   BY MS. FAENZA:

3        Q.   And, Ms. Alvarez, you, in fact, quit your job;

4   is that correct?

5        A.   Yes.

6        Q.   Okay.  I have reviewed your medical records.

7   I want to ask you a quick question regarding the medical

8   care that you received, in generalities.  Did you see

9   any psychiatrist for the treatment of any emotional

10  distress?

11       A.   The obstetrician that was taking care of my

12  pregnancy, she referred me because of the possibility

13  that I was having posttraumatic --

14            MS. FAENZA:  Posttraumatic stress disorder?

15            THE INTERPRETER:  No, no, no, no, no.

16            MS. FAENZA:  Postpartum --

17            (Crosstalk)

18            THE INTERPRETER:  Huh?

19            MS. FAENZA:  Posttraumatic stress disorder or

20       postpartum depression?

21            THE INTERPRETER:  Postpartum depression.

22  BY MS. FAENZA:

23       Q.   Did you, in fact, see a psychiatrist?

24       A.   No.

25       Q.   Did you see a psychologist?

ORIGINAL

194

1      A.   They referred me to someone in Jackson.   They

2  brought me to a sitting room.   They asked me questions.

3  The specialist was taking notes.   That person told me I

4  was living through a stress after giving birth because

5  of everything that I have lived through at work.

6      Q.   That your postpartum depression was caused by

7  your work?

8      A.   She let me know that that was it.

9      Q.   Did you provide any diagnosis or documentation

10 reflecting that treatment on that day?

11     A.   There was a document that she left registered.

12 And they asked me if I wanted to take any type of

13 medicine, and I said no.

14     Q.   Okay.   Did you provide that document of this

15 diagnosis to your attorney to provide to us?   I did not

16 see it in the documentation for the medical records.

17     A.   It was not given to me.   The specialist kept

18 that document.   Because I didn't want to take medicine.

19     Q.   So you just testified that you declined to

20 take any medication for the treatment of this condition.

21 Did you receive any therapy from a therapist?

22     A.   I didn't want to take medicine because the

23 doctors tell me that it's going to make me sleepy, and I

24 said I cannot afford to do that because I have two young

25 children that I have to care for.

ORIGINAL

195

1     Q.   The question was whether or not you went to

2  therapy since you declined the medicine.

3     A.   I didn't want to follow it.

4     Q.   Did you do any treatment for this postpartum

5  depression?

6     A.   No.

7     Q.   Supervised by a doctor?

8     A.   I didn't want to do the follow-up because I

9  was afraid of the medication.

10    Q.   Did you seek a second opinion?

11    A.   No.

12    Q.   As you sit here today, do you have someone who

13 will testify as to your emotional distress who is a

14 physician?

15         MR. MACDONALD:  Objection.  Form.

16    A.   I don't remember the name of the doctor that

17 saw me.

18    Q.   So as we sit here today, is it correct that

19 you cannot identify either a witness who told you this

20 information or any documents to establish any diagnosis

21 of postpartum depression?

22         MR. MACDONALD:  Objection.  Form.

23    A.   I said it was at Jackson.

24    Q.   Did you obtain those medical records?

25    A.   No.

ORIGINAL

196

1    Q.   Did you provide them?

2    A.   No.

3    Q.   Why not?

4    A.   She didn't want to give them to me.

5    Q.   Who is she?

6    A.   The specialist that saw me.

7    Q.   So your testimony that the specialist that saw

8  you declined to provide you your own medical records?

9    A.   She took notes.  She kept those notes.

10        MS. FAENZA:  Move to strike portions

11    nonresponsive.

12    Q.   When did you request those medical records?

13    A.   She didn't give them to me.  I didn't ask for

14  them, but she didn't give them to me.

15    Q.   So you did not ask for those medical records?

16        MR. MACDONALD:  Objection.  Form.

17    A.   She didn't give them to me.

18    Q.   The question is whether you asked for them.

19    A.   No, I didn't.

20    Q.   Okay.  Did you see any medical professional

21  following the notes, after the visits that you had and

22  the notes that you provided us since you left Addikt?

23        MR. MACDONALD:  Objection.  Form.

24    A.   No.

25    Q.   You haven't seen a doctor at all since you

ORIGINAL

197

1   left Addikt?

2         MR. MACDONALD:  Objection.  Form.

3     A.   Just therapy, yoga, walk.

4     Q.   I'm asking about a doctor.  I don't see in the

5   records that you've provided the records pertaining to

6   your cesarean section child birth.  Did you go to the

7   doctor for your cesarean?

8     A.   When I gave birth, they gave me the document.

9     Q.   Did you turn those documents over?

10    A.   No.

11    Q.   And following the C-section, did you return to

12  the doctor for any follow-up visits to check up on your

13  condition after having a cesarean?

14    A.   Yes, they give you a follow-up about a month

15  after the birth.

16    Q.   Did you provide those records?

17    A.   I think I have them at home.

18    Q.   Did you provide them to -- I don't see them in

19  my documents.  Did you provide them to your attorney to

20  provide to us?  I'm not asking for privileged

21  communication.  Whether or not these have been given to

22  us is what I'm asking.

23    A.   I did not turn in that information.  I don't

24  remember.

25    Q.   Okay.

**ORIGINAL**

198

1          MR. MACDONALD:  She has to go.

2          MS. FAENZA:  Okay.

3          MR. MACDONALD:  She's going to miss her flight

4     if she doesn't leave.  It's 6:20.

5          MS. FAENZA:  Okay.  One more question.

6          MR. MACDONALD:  Okay.

7     BY MS. FAENZA:

8          Q.  So the medical records are one, the text

9     messages are another.  I'm just going to show a

10    document --

11         MS. FAENZA:  Let the record reflect, I'm

12         showing to Plaintiff's counsel DVCE 2100736.

13         Q.  Do you have any recollection of this document,

14    Madam?

15         A.  I don't know what it says but it's clearly my

16    name and the father of my son.

17         Q.  Could you look through the documents and just

18    put your eyes on each page?

19         A.  Um-hmm.

20         Q.  Okay.  I'm going to go ahead and take those

21    back.

22         MS. FAENZA:  I will make this Exhibit 8.

23         (Thereupon, Defendant's Exhibit 8 is marked

24         for identification.)

25    BY MS. FAENZA:

**ORIGINAL**

199

1        Q.   So I will represent to you that this is an

2    order in the case of Carol Francisca Alvarez and Reydel

3    Yaro Gonzalez, DVCE 21007346.  Attached is a Domestic

4    Violence Division of DCF, which is the Department of

5    Children and Families.  Attached to that is a document

6    that is filed by Carol Francisca Alvarez, titled An

7    Amended Injunction for Protection Against Domestic

8    Violence.  Beginning on subsection 4, there is a

9    description of alleged domestic violence, which

10   continues on several pages that starts in May 2020, and

11   details for multiple pages abuse at the hands of Reydel

12   Yaro Gonzalez, continuing through the month of October

13   2021.  When I asked you earlier, Ms. Alvarez, if you

14   recall the time frame -- and I understand it's a

15   sensitive subject -- is that correct, that the abuse by

16   Mr. Yaro Gonzalez began in October 2020 and continued --

17   excuse me, May 2020, and continued for more than a year

18   throughout the month of October of 2021?

19             MR. MACDONALD:  Objection.  Form.

20        A.   Like I said before, I don't remember the

21   dates.  It's many things.

22        Q.   Okay.  But is the time frame, does that sound

23   correct to you?

24             MR. MACDONALD:  Objection.  Form.  Asked and

25        answered.

ORIGINAL

200

1     A.    If it's in the paper.   I don't know.   I'm

2  confused.

3     Q.    Okay.   Well, I will attach this as Exhibit 8.

4  And I will state that the last page, which is signed by

5  you, Ms. Alvarez, on November 15th, 2021, states, "I

6  understand that by filing this petition, I'm asking the

7  Court to hold a hearing; that both Respondent and I will

8  be notified of the hearing and that I must appear."

9  Then I'll go to the end.   "Under penalties of perjury, I

10  declare that I have read this document, and the facts

11  stated in it are true."   And I'll just provide that.

12     A.    Okay.

13          MS. FAENZA:   I think that's it.

14          MR. MACDONALD:   Okay.   I don't have any

15     questions for the witness.

16          MS. FAENZA:   I know you've got to get to the

17     airport.

18          THE REPORTER:   Counselor, when we go through

19     the exhibits, do you want to do it on the record or

20     do you want to do it off the record?   Just to make

21     sure everything is in order.

22          MS. FAENZA:   Are you traveling with her?   I

23     can do it right now.

24          MR. MACDONALD:   It's okay.   I mean, I don't

25     mind if it's off the record.   I don't think you're

ORIGINAL

201

1          going to sneak anything in.

2               (Crosstalk)

3               MS. FAENZA:  Do you want to have your client

4          take a photo of the driver's license?

5               MR. MACDONALD:  Yeah, I can do that, too.

6               MS. FAENZA:  Okay.  That will be 1.  And so

7          that then -- 2 is just going to be the Interrogatory

8          Responses.  Three is going to be the Miami-Dade DV

9          case.  Four is going to be the Amended Complaint.

10         Five is going to be the texts.

11              THE REPORTER:  The summary payment.

12              MS. FAENZA:  Correct.  Six is going to be the

13         text messages.  Six is the text messages.  Seven is

14         the doctor's notes.  Do you have them?

15              THE REPORTER:  I think we do.

16              MS. FAENZA:  I need the doctor's notes.  Do

17         you have anything still?  No.

18              THE INTERPRETER:  No, no, no.

19              MS. FAENZA:  Perfect.  So that's going to be

20         7.

21              (Crosstalk)

22              MS. FAENZA:  This is 7, and this is 8.  And

23         we're done.  That's the texts.  I think you have

24         that already.

25              (Crosstalk)

ORIGINAL

202

1          THE REPORTER:  This one's 8.  I've got it.

2          MS. FAENZA:  Correct.

3          THE REPORTER:  Thank you so much.

4          MS. FAENZA:  I'll help clean this.  I'm sorry

5     that was so intense.

6          (Thereupon, the deposition was concluded at 6:28

7     p.m.)

8          (Reading and signing of the transcript was waived.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ORIGINAL

203

1                      CERTIFICATE OF OATH

2      STATE OF FLORIDA

3      COUNTY OF MIAMI-DADE

4

5           I, Jennypher Aristilde, Court Reporter, Notary

6      Public, State of Florida, certify that Carol Alvarez and

7      Sergio Brauer, Interpreter, appeared personally before

8      me on the 22nd day of January 2026, and were duly sworn.

9           Signed this 20th day of February 2026.

10

11

12      _____

13      Jennypher Aristilde, Court Reporter

14      Notary Public, State of Florida

15      Commission No.: HH 605377

16      Commission Expires: 02/14/29

17

18

19

20

21

22

23

24

25

ORIGINAL

204

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA

3    COUNTY OF MIAMI-DADE

4

5         I, Jennypher Aristilde, Court Reporter, certify

6    that I was authorized to and did report the Deposition

7    of Carol Alvarez; that a review of the transcript was

8    waived; and that the transcript is a true and correct

9    record of my notes.

10        I further certify that I am not a relative,

11   employee, attorney, or counsel of any of the parties,

12   nor am I a relative or employee of any of the parties'

13   attorneys or counsel connected with the action, nor am I

14   financially interested in the action.

15        Dated this 20th day of February 2026.

16

17

18   _____

19   Jennypher Aristilde, Court Reporter

20

21

22

23

24

25

**A**

**A-D-D-I-K-T**
  87:16
**A-L-P-A-R-A-...**
  46:4
**a.m** 1:16 4:4
  23:16 40:9
**abbreviation**
  78:19
**Abelardo** 172:17
  172:18,19
  174:16
**ability** 49:12
**able** 11:4,19 12:5
  17:3 34:6 46:13
  47:2 54:10,22
  54:23,25 55:17
  56:2 64:21
  75:23 88:20,21
  89:13 105:17
  121:6 124:14
  124:19,24
  125:8,13 126:8
  129:17,18
  136:13,25
  137:6 146:4
  161:7 173:6
  192:23
**abortion** 126:1
**absent** 78:1
**abuse** 84:1
  199:11,15
**accept** 37:10
**accepted** 37:13
  37:21 38:6 60:3
**access** 105:10,11
  106:6,12 107:9
  107:10,17
  109:4,14 110:5
  110:10,11,20
  111:16,17,21
  112:2,14 118:6
  118:8 120:5,10
**accessed** 114:2
**accommodation**

169:21 170:1
  170:16,18
**account** 104:24
  105:1 106:6
  107:9,10,11
  110:2,12,21
  111:2,16,18,22
  112:2,14 114:1
  114:3,5 116:18
  116:20 118:22
  119:7 120:5
  137:5
**accounting** 149:3
**accurate** 67:4
  130:8,13,18
  133:4 172:7
  185:23 187:12
  191:22
**accurately** 5:6
**acknowledge** 6:8
  79:23
**acknowledged**
  37:10
**Acosta** 159:25
  160:2,3,6,13
  162:23
**Act** 188:11
**action** 116:13
  204:13,14
**active** 48:25
**acts** 81:6
**actual** 9:18 10:11
**acute** 174:25
**ad** 41:3
**add** 12:21 92:20
**Addikt** 49:18
  63:23 87:9,12
  87:13,14,14,19
  88:3,17 92:5,18
  109:23 112:24
  114:7 118:13
  119:14 120:22
  121:24 122:6
  123:20 125:22
  138:21 140:6

143:18,23
  144:16 152:12
  152:18 153:15
  157:13,21,22
  165:14 176:24
  182:20,23
  183:8 186:13
  189:17 196:22
  197:1
**adding** 20:11
**addition** 8:16
**additional** 17:8
  68:2
**address** 7:1 22:14
  22:24 41:22
  62:2,8,9,11,16
  62:17 63:9
  71:19 76:5
  94:13 105:24
  106:4,7,12
  111:7 118:17
  191:5
**administered**
  4:15,18
**administration**
  103:10
**adult** 27:25
**advance** 170:22
**advances** 144:1,2
  151:18,19
**advertising** 149:4
**advice** 120:8
  140:25 141:3,7
**advise** 6:16 14:15
  17:18 134:2
  169:13 171:11
**advised** 173:8
**advisement** 20:3
**affect** 147:18
**afford** 194:24
**afraid** 81:20
  82:12 85:21
  89:15 167:17
  167:19 192:24
  195:9

**afternoon** 173:3
  173:19
**age** 27:15,21
  35:25 36:7 41:8
  42:25 126:20
**agency** 97:5,5,16
  97:22,23 98:6
**agent** 48:16
**ages** 27:16 40:18
**aggressive** 85:18
**aggressivity**
  164:19
**ago** 25:8,11,15
  42:19 45:16
  84:17 147:16
**agree** 16:13
  18:13 23:13
  27:21
**agreed** 37:22
**agreeing** 14:24
  37:14 164:25
**agreement** 29:1
**ahead** 5:16 7:5
  7:20 18:8 20:21
  37:16 53:7 67:8
  71:8,15 73:13
  85:16 91:13
  96:10 99:21
  131:21 157:15
  198:20
**aide** 48:1,18,23
**airport** 191:2
  200:17
**Alberto** 172:16
**allegations** 21:18
  49:6 60:6 87:6
  130:13,19
  155:10,19
**alleged** 147:11
  199:9
**allegedly** 165:1
**allow** 5:22 13:4
  30:19 77:2
  176:24
**allowed** 5:18

141:6 182:19
  182:23
**allusions** 144:5
**Alvarez** 1:5,19
  3:2,8 4:8,21 5:9
  6:21 7:8 8:23
  9:10 18:18
  23:22 26:18
  69:24 72:13
  91:24 109:17
  116:22 118:5
  119:7,19 130:9
  132:2 135:13
  135:18 139:23
  143:20 144:15
  148:12 161:23
  171:17,19
  172:4,6,24
  174:8 175:4
  184:18 187:10
  193:3 199:2,6
  199:13 200:5
  203:6 204:7
**alvarezcaroll...**
  105:23
**amended** 3:11
  128:21 129:5
  130:7 131:1,1
  199:7 201:9
**America** 51:24
  51:24
**American-born**
  6:12
**amount** 29:2,3
  43:19 59:21
  97:11 162:15
**angry** 158:25
**announcing**
  168:25
**answer** 12:18,21
  13:14 14:4,17
  14:19 16:19
  17:3 19:10 20:3
  26:9,15,18 30:6
  30:18 35:4 39:2

44:22 72:18
82:4 94:8 95:17
107:3 110:25
114:24 115:11
116:23 118:10
119:6 121:8
130:3,11,23,24
131:8,16
140:24 144:11
146:23 151:19
155:13 156:21
187:8
**answered** 36:3
78:14 80:20
84:11,23 85:3
88:8 95:20
99:15 106:17
110:14,18
111:4,11,24
112:6 116:2,15
118:24 119:2
119:16 122:19
123:7,13
126:10 133:23
152:25 177:6
180:7,20 181:2
181:7,21 182:8
199:25
**answering** 12:19
17:11 65:19
119:8 141:1
156:1
**answers** 8:21
38:2 67:1
**anybody** 33:21
**anymore** 45:11
53:4 83:22
89:14 163:8
**anyways** 175:13
**apartment** 22:16
22:20 62:3,5,12
71:17 153:25
154:7
**apologize** 69:11
**apostrophe**

100:25
**Apparently**
73:12 74:4 91:2
**appear** 67:23
78:9 172:23
173:15 176:21
181:22 190:16
200:8
**appearance**
78:25
**APPEARANC...**
2:1
**appeared** 158:12
203:7
**appears** 37:25
70:3,6,7 77:18
78:3 172:10
175:14 178:1
179:2 191:17
**apples** 65:24
**application** 100:9
100:11 104:12
110:4 120:25
121:4,14 137:3
163:7
**applications**
104:10,16
105:3 107:19
108:24 109:10
112:23 114:8
118:13,22
119:12 120:1
120:19
**applied** 59:23
61:12,20 106:3
108:11,14
109:5 120:12
120:15,21
121:15
**apply** 105:19
113:19 120:18
**applying** 104:8
114:6
**appointment**
147:25 168:23

170:23
**appointments**
184:25
**appropriate**
117:7,9,11,14
128:4
**approved** 187:20
**approximate**
106:11
**approximately**
46:25 59:7 89:7
91:4 97:9,13
**April** 7:14 59:8
64:4 88:11,12
91:7 114:16,22
115:1,13 124:1
124:3,11
126:17
**area** 100:5
155:15,16,22
155:23,24
157:4
**argue** 20:12,17
**argued** 153:11
**arguing** 128:1,2
**argument** 152:10
152:14,20
**Argumentative**
95:11 119:21
**arguments** 17:25
**Aristilde** 1:25
203:5,13 204:5
204:19
**arrived** 167:4
**aside** 41:22 99:12
99:13
**asked** 12:19,22
31:11,20 33:21
36:2 37:19
42:21 58:6
60:11 69:1 72:3
76:20 77:1
78:13 80:19
84:10,22 85:2
95:4,19 99:14

100:12 106:16
107:15 110:17
111:3,10,23
112:5 115:12
116:1,15
118:24 119:15
122:18 123:6
126:9,24
133:11,22
135:23 152:2,2
161:12 162:6
169:25 170:4
177:17 180:6
180:19 181:1,6
181:20 182:7
188:13,17
194:2,12
196:18 199:13
199:24
**asking** 7:6 11:3
11:13 12:2
13:23 14:6
16:25 20:5 30:7
37:15,17,18
40:17 41:13
47:14 49:10,14
49:22 50:4 56:9
63:1 64:18
79:12 82:6
90:11 92:4,24
93:20,24 95:5
95:24 96:14,22
107:14 108:15
110:8,10,13,15
110:15,20,21
111:8 113:4
114:20 116:19
116:20 118:21
120:6 122:12
124:17,19,24
127:8 134:23
136:20 139:10
143:7 146:19
146:19 149:17
150:21 151:4

162:1 169:1
175:17 176:14
182:5,23 186:5
186:25 189:10
191:15 197:4
197:20,22
200:6
**asks** 33:23
131:14 134:13
**ass** 144:5,8
151:12
**assign** 139:14
**assigned** 160:13
164:4
**assigning** 139:11
**assignment** 139:5
139:10
**assignments**
138:8,20 139:1
**assist** 129:24,25
**assistance** 38:11
38:13
**assisted** 94:17
95:12
**associate's** 44:24
**associated** 130:9
**assume** 14:6
93:10 95:18
96:1
**assure** 68:16
**attach** 70:4 71:22
200:3
**Attached** 199:3,5
**attack** 85:19
**attacking** 68:7,8
**attempt** 16:19
105:10 109:4,9
109:20 111:9
111:21 112:2
112:10,14,22
116:5 118:12
118:18 122:22
**attempted**
110:11 131:5
**attempting** 82:18

**attempts** 110:21
110:23 116:6
116:11 118:21
**attend** 47:2,4
76:11
**attention** 159:11
160:20 187:2
**attorney** 13:1,7
13:15,24 14:5
15:9 16:24
17:17,20,24
18:3,7 19:4,13
20:1,2,4,22,24
32:8 39:24
48:12 52:25
64:10,19,20,22
64:24 65:2,3,5
65:8,10 67:21
71:10 79:10
93:15 94:16
116:21 117:10
119:1 120:2,9
129:4,6 133:7,9
136:14 137:1,8
141:5 172:9
185:22 186:25
194:15 197:19
204:11
**attorney's** 94:14
**attorney-client**
19:18 130:4
146:24
**attorneys** 4:5
204:13
**audio** 8:20
**August** 63:6,10
**authority** 138:6
**authorized** 204:6
**available** 154:6
162:7
**Avenue** 62:2,5,12
**aware** 63:5 98:11
126:20 129:1
129:16 145:1,3
148:4,12 149:2

149:5 155:5,7
158:15 159:19
160:21 161:5
162:12,17,22
167:7 173:9
174:10 189:20
**azithromycin**
175:6

**B**

**B** 6:17
**B-U-I-L-D**
100:25
**baby** 122:7
188:19 193:1
**bachelor's** 44:25
**back** 10:14 23:16
24:1,18 31:2
40:8 43:1 63:12
63:18 66:9 70:4
71:21 78:16
80:24 91:20
92:7 112:17
113:10,16,21
119:5 122:13
124:8,10,18
127:3 128:5
136:5 141:11
141:15 145:13
152:9 153:21
156:18,18
157:6 158:14
170:8,14 172:1
178:13,23
188:1,2,4
189:14 198:21
**background**
22:12 44:12
60:4 99:9
**backwards** 96:17
**bad** 88:15 169:9
181:9,16
182:10,11
**Badgering**
142:15

**bake** 58:6
**banquets** 97:17
**Bar** 52:19
**based** 8:4 43:20
68:23 146:23
**basic** 29:21 45:5
**basing** 135:8
**basis** 16:11,23
**Bates** 135:13
**bathroom** 39:19
171:20
**Beach** 50:15 76:6
**beat** 70:20
**becoming** 8:9
**bed** 56:4
**bedroom** 154:6
**began** 44:1 50:1
53:20 63:22
93:5 97:1
131:25 132:5
134:3 199:16
**beginning** 47:3
132:14 143:25
151:23 153:7
187:17 199:8
**begins** 6:2 191:6
**begun** 132:17
**behalf** 2:2,7 4:7
4:10
**behavior** 147:12
**belief** 189:17
**believe** 6:13,17
9:16 24:11
31:11 41:17
58:13,14 78:18
78:20 86:17
98:18 114:22
137:11 154:15
160:7 171:16
173:21 178:16
**belong** 140:13
**belonged** 140:13
**belongs** 27:6
142:2
**beneath** 16:1

79:6
**benefits** 38:11
**best** 68:21
**better** 5:17 6:1
51:9 67:22
**big** 105:9 144:15
144:16,17
**birth** 7:13 38:1,7
43:20 56:8,15
124:15,17,23
125:8 183:12
188:24 189:14
194:4 197:6,8
197:15
**birthday** 126:16
**Biscayne** 1:13,13
2:9,9
**bit** 11:12 19:11
39:22 43:1,23
44:11 76:25
86:1 92:7
146:19
**biweekly** 133:24
133:25 134:1,1
**blanket** 40:2
**blocked** 137:5
163:8
**bloody** 158:12
**Blue** 50:13 53:22
53:24 54:1,2
**blurry** 135:19,21
**board** 163:17
**born** 7:15 43:1
56:23,23
123:25 188:23
**Boss** 89:22
**bother** 83:24
**bothered** 85:13
**bottle** 8:17
**bottom** 73:7
78:17 187:3
**Boulevard** 1:13
2:9
**box** 77:21,25
**boxes** 139:19

**boyfriend** 144:3
151:10 152:11
**Brauer** 2:14 4:13
5:5 203:7
**break** 5:2 17:8,16
17:17 18:2
39:18 40:4
67:12,19,20
68:16 69:14,15
91:10,22 92:3
118:1
**breaks** 17:13
68:25 192:23
**breath** 69:3
**breather** 39:19
**briefly** 185:22
**bring** 146:4
**bringing** 68:9
166:8
**broke** 83:18
**brought** 19:22
130:15 177:20
194:2
**Broward** 27:3
78:20,20 79:22
80:4,15 82:8
**buen** 191:7,16,17
**Build'em** 92:25
100:25 103:24
**Builder** 108:20
109:9,19
**bunch** 43:3 120:1
**burger** 156:18
157:14 158:10
158:11
**business** 58:15
90:14 103:9
160:20,20,24

**C**

**C** 6:17
**C-section** 125:1,2
197:11
**CA0006** 171:16
**CA016** 178:2

**CA37** 183:25
**cake** 58:6
**call** 18:2 19:14
  48:15 79:7
  82:25 83:5,12
  89:22 97:17
  100:10 145:17
  160:4 172:14
  173:2
**called** 46:12
  59:15 70:5,20
  88:23 92:25
  100:24 129:4
  147:3,4 156:18
  157:13 159:10
**Calls** 80:5,11
  81:25 85:15
  116:8 138:16
  139:24 144:24
  150:7 170:19
**calm** 145:16
**cancellations**
  49:5
**cancer** 42:8
**capture** 8:21
  30:21
**captured** 6:14
  7:3 9:3 10:6
**capturing** 10:10
**Caraballo** 144:19
  159:18 165:20
  166:3,11,22
**care** 20:17 47:23
  173:4 174:24
  184:5 193:8,11
  194:25
**Career** 108:20,25
  109:9,19
**careerbuilder.c...**
  112:15
**careful** 55:6
**caring** 31:3 57:25
**Carmen** 21:25
**Carol** 1:5,19 3:2
  4:8 5:9 7:8

69:24 72:12
  109:3,13 110:2
  110:19 175:3
  187:18,19
  199:2,6 203:6
  204:7
**carolpancha**
  107:11
**carolpancha@...**
  111:17
**carolpancha@...**
  105:2 106:4
  107:9,17
  109:18 110:11
  110:16
**carry** 83:17
**cars** 90:15
**case** 1:3 3:10
  21:17,18 37:21
  38:5,7 40:15
  60:23 61:3,7,11
  61:14,19,22
  62:10,15 63:5
  64:11,14,21,24
  64:25 65:1,4,9
  65:10,12,13,15
  65:19 69:24
  70:10,10,12,18
  70:25 71:1,18
  71:18 72:4,11
  72:13,24 73:10
  77:1 78:20 79:8
  79:20,23,24
  80:4,9,14,15
  81:5,17 82:7
  86:2 87:7
  142:14 146:5
  199:2 201:9
**cases** 41:4 65:19
  70:5 72:9,11,11
  79:25
**Casino** 73:17,24
  75:3,18
**cause** 33:25
  35:13 85:8,13

85:21 149:23
**caused** 88:21
  115:8 125:19
  126:1 194:6
**causes** 40:20
**causing** 88:19
**cease** 85:4
**cell** 106:23 107:8
  113:18,21
  118:16
**center** 158:12
**certain** 29:2,2
  30:11 54:16
  128:25 148:17
  163:13
**certificate** 38:1,7
  203:1 204:1
**certifications**
  46:10
**certified** 3:18
  48:13
**certify** 32:14,21
  115:12 119:3,4
  130:5 131:15
  131:20 146:25
  147:8 203:6
  204:5,10
**cesarean** 197:6,7
  197:13
**challenge** 6:25
**chance** 174:8
  185:13
**change** 12:18,21
  105:9 160:14
**changes** 175:2
**changing** 150:16
**charge** 28:15
  114:15,21,25
  115:13,16,24
  116:5 150:11
**charges** 81:9,11
**chat** 92:6
**cheap** 153:14
**check** 134:2,7,15
  134:18 135:5,5

135:8 137:19
  197:12
**checkbox** 79:6
**checked** 72:14
  77:22 78:1
  149:9
**checking** 149:9
  149:18
**checks** 133:17
**cheek** 154:13
**chef** 50:24 51:4
  57:24 139:4,13
  141:17 142:17
  142:21 143:25
  146:1,13,14,15
  150:11 151:8
  152:1 161:14
  163:17 164:4
  164:14,20,25
  165:1,12,13
  167:8 170:1,21
  171:10 172:14
  173:12,14
  177:9 186:20
  188:5
**chef's** 141:21
**chefs** 167:13
**chicken** 144:3
  151:9
**child** 12:14,15
  27:18,19,25
  29:14,16,19,23
  30:15,23,24
  31:4,10,13,14
  31:20 34:14
  36:7,9,12,14,16
  36:19 37:1,4,14
  37:17,18 38:6,8
  38:13,22 41:8,9
  41:14,15 56:22
  56:23 57:6
  60:22,23 61:4
  61:14,19,22
  62:10,15 64:11
  64:24 65:6

72:24 73:1 80:3
  81:12,13
  123:25 127:4
  197:6
**child's** 39:1
**children** 27:10
  29:9 33:1,5,7
  34:4,10,11,25
  35:8,9,14,15,22
  36:7,10 41:22
  42:1 194:25
  199:5
**children's** 40:17
**Chile** 7:16 27:23
  27:23 28:5,7,12
  28:22 29:4,4,6
  29:10 30:16,23
  31:4 33:2,8,13
  34:15 35:1,8
  36:1 42:7,9,12
  43:2,5,17 45:4
  45:23 53:19
  103:3,14,22
  106:8
**choice** 192:18
**choose** 32:17
  56:17
**Circuit** 71:3,4
  78:23
**city** 27:2,5
**claimed** 34:3
  138:5
**clarification**
  37:24 58:11
**clarify** 30:8 42:22
  56:1 72:22
  90:17 117:5
  125:6 146:18
**class** 56:7,15
**clean** 202:4
**clear** 6:18 9:12
  17:5 19:11 32:7
  33:6,20 49:20
  69:8 94:19
  110:10 113:1

124:3 176:7
185:4
**clearly** 75:22
147:2 189:1
198:15
**client** 50:1 66:14
72:17 135:15
157:9 174:4
201:3
**client's** 157:9
**clients** 11:17,19
18:2 49:15
**clinic** 175:4
**closed** 52:19,22
52:23 53:8,10
54:5,9 65:4
**closely** 149:18
**closeness** 66:17
**closer** 43:16
**closing** 53:4
**cloud** 113:21
**co-workers**
145:15
**coach** 117:1,2,3
**coaching** 20:3
62:24 79:16
**code** 105:15
**codes** 105:8,16
**coffee** 17:9 39:25
**cold** 30:5 39:22
158:12
**collect** 69:4,6
**come** 43:15 70:7
92:7 112:17
119:5 148:1
152:4 172:15
173:8
**comes** 118:5
133:15
**comfortable** 17:3
**coming** 10:14
14:25 49:18
132:19 159:11
173:17
**command** 169:17

**comment** 127:21
**comments** 127:12
127:17 128:4
144:9,13,19,23
165:19 166:5
**commercial**
48:15
**Commission**
203:15,16
**commit** 136:17
**common** 9:8 10:1
189:12
**communicating**
190:4
**communication**
13:25 131:11
131:13 177:8
197:21
**communications**
13:24 147:5
**companies** 89:2
**company** 18:21
53:3 57:14 59:2
59:4 75:9,20
88:23 89:24
98:15 100:3
136:1 139:23
161:1 169:13
**complain** 147:11
164:22 165:7
**complained**
149:8,20 150:9
156:10,13
167:11
**complaining**
149:18 150:5
**complaint** 3:11
87:6 128:21
129:5 130:7
131:2,24
147:22 156:5
159:18 163:12
163:22 164:13
164:17,18
166:6 201:9

**complaints** 155:6
**complete** 15:1
30:20 47:8 48:3
106:22 143:11
**completed** 79:24
107:20 120:20
121:13 187:23
**completely** 14:13
18:13
**completion** 95:13
**complications**
19:22
**composite** 3:9,10
3:13,14 67:11
67:16 71:23,24
192:3,4
**computer** 90:13
113:19 118:15
**computers**
112:22
**concern** 94:14
**concerns** 192:22
**concluded** 202:6
**conclusion** 80:6
80:12 82:1
85:16 116:9
134:14,24
138:17 150:8
170:20
**condition** 11:1
40:15 42:16,17
194:20 197:13
**conditions** 33:25
138:6
**condominium**
50:10
**conducting** 148:5
**confidentiality**
41:5
**confirm** 70:12,15
174:9
**confirmed** 95:4
**confrontational**
110:9
**confused** 43:23

76:15 103:22
132:21,21
200:2
**confusing** 99:18
99:23
**confusion** 134:6
134:8
**connected** 204:13
**consider** 14:21
**considered**
126:21
**constant** 151:7
188:6
**constantly** 149:8
150:16,18
151:13,14
164:7
**Construction**
93:1 101:1
103:24
**consulting** 149:3
**contact** 38:1 42:6
99:25 105:10
120:24 121:3
146:5,7 166:17
**contacting** 191:9
192:15
**contacts** 146:8
**contained** 93:11
95:8,17
**content** 20:15
**Contention** 156:6
166:24
**contents** 17:20
18:6
**continue** 6:3
32:16,23
105:19 124:13
125:25 150:25
192:24
**continued** 83:19
199:16,17
**continues** 117:23
118:1 199:10
**continuing** 97:4

199:12
**contract** 91:7
**contractions**
171:12,13
**control** 138:6
171:12 173:14
185:13,14
**conversation**
10:3 11:10
13:13
**conversations**
19:3
**convicted** 82:7
**cook** 50:22,24
51:4 52:5 58:6
132:1 143:19
143:21
**cooked** 157:1,7
**cooking** 58:9
88:20 160:11
**cooks** 149:10
160:9,15,16
161:8 163:14
**copies** 69:20
104:9,21
112:23 114:7,7
116:6,11
118:12,22
177:25
**copy** 66:6,13
67:12 120:25
121:4,14,18
128:17 129:16
172:11 173:17
174:1 191:22
**Coral** 46:14,16
46:17 178:1
185:10
**corporate** 4:10
**Corporation**
86:19
**correct** 24:10
38:3,4,9 41:18
43:21 44:2 47:9
48:2,24 50:23

58:18 60:15
63:16 64:2
65:16 70:13
73:17 80:10
86:19 88:11,12
93:6,11 95:7,9
95:18 96:1 97:2
102:22 113:17
120:13 123:19
129:11 130:20
137:12,13
141:16,21
142:20,23
143:19 147:23
151:22 153:13
154:8 159:5,7
159:12,13
160:9 172:7,13
172:25 173:11
173:12 177:1
181:14 183:2
187:9,12 193:4
195:18 199:15
199:23 201:12
202:2 204:8
**correctly** 6:15
159:2 174:12
**counsel** 4:6 15:10
26:7,11,12 66:6
69:19 77:13
117:17,22,25
128:15,18
137:22 140:25
174:3 183:24
185:20 198:12
204:11,13
**counseled** 159:8
**counselor** 4:19
66:13 200:18
**countries** 6:9
**country** 6:11,11
33:15 35:14
42:10 43:4,18
51:21 100:4
**county** 27:4 43:9

71:4 79:22
203:3 204:3
**couple** 8:6 177:25
**course** 24:4 35:12
35:17,18 40:4
47:22 48:3
69:19 76:19
80:2 85:9,10,11
147:13 148:3
171:6,21
183:18
**courses** 47:4
**coursework** 47:8
**court** 1:1 3:15
8:15 9:2 10:6,7
10:10 11:21
13:8 14:8 17:7
17:19 30:20
37:3,12,15,21
48:14 63:5
67:10 71:3
76:14,25 77:1,6
77:8 78:3,4,23
79:13 80:9,15
113:6,7,9 124:6
127:3,6 129:13
137:11 141:10
192:2 200:7
203:5,13 204:5
204:19
**courtesy** 67:12
69:20
**COVID** 52:24
55:2
**create** 68:2 82:18
140:15,17
**creating** 140:22
**criminal** 17:6
81:5,17 82:7
**critical** 17:5
**criticism** 121:20
**Crosstalk** 26:14
39:7,14 49:24
68:6 74:21 94:6
113:14 117:21

127:7 128:20
150:1,23 165:4
171:23 178:4
179:13 183:3
193:17 201:2
201:21,25
**Cuban** 144:3
151:10
**Cuisine** 59:15
**Culinario** 46:12
**Culinary** 45:12
45:13 46:15
**culture** 51:24
**cup** 68:17
**current** 22:14
41:21 151:23
153:2
**currently** 27:10
63:15,24 65:2
96:23 105:22
**customers** 156:25
**cut** 141:19
160:21 169:10

────────────
**D**
**dad** 42:16
**daily** 175:6
**damage** 115:7
189:24
**damages** 18:22
33:22,23 34:3
69:9
**danger** 79:1,7
**date** 7:13 43:20
44:4 63:6 71:2
71:7 87:21 88:2
89:6 100:16
103:6 106:11
111:25 114:22
115:25 116:3,4
122:14 123:24
124:13,15
132:18 133:25
134:4 147:15
147:24 156:19

157:11 168:10
175:5,18
178:17,25
179:16 180:2
181:4 184:10
184:17,21,22
185:13,14
190:5,15,16,21
190:24,25
**dated** 186:1,7
204:15
**dates** 88:15
132:22 176:17
176:21 199:21
**daughter** 28:4,6
28:17,23 34:21
38:2 70:19
72:25 76:20
82:22
**day** 34:13 87:11
87:18 102:14
124:17,23
133:24 150:17
150:18 158:11
158:11 167:7,9
176:11 179:3,4
179:5,7,7,15
180:8,9,15,18
180:21,23,24
185:9,11,13
188:7,9 189:15
192:15 194:10
203:8,9 204:15
**days** 170:25
182:18 183:5
186:21 188:9
188:17 190:7
190:14
**DCF** 199:4
**de** 45:23
**deal** 69:9
**dealt** 84:20
**December** 162:15
162:20,23
174:5

**decide** 32:17
52:22 53:5
**decided** 105:18
107:6
**decision** 147:5
192:18
**declare** 200:10
**declined** 194:19
195:2 196:8
**dedicated** 57:10
57:25 58:1
**deemed** 3:8 5:3
**defendant** 20:1
22:15 66:4,11
96:12
**Defendant's** 3:6
5:3 67:16 71:24
87:3 137:15
173:24 192:11
198:23
**defendants** 1:9
2:7 4:10 19:16
132:1,5 133:13
**degree** 43:13
44:20,23,24,25
44:25 45:3
**degrees** 45:2
**delay** 17:25
**delicate** 41:2
**delivered** 175:8
**Demand** 129:5
130:8 131:2
**demonstrating**
104:10 106:3
**denied** 111:16
192:24
**denigrate** 151:20
**denigrated** 89:15
**denying** 70:8
78:24
**Department**
199:4
**depended** 54:17
54:17
**depending** 97:11

depends 97:19
157:9 189:15
deponent 4:4
10:18 15:7 18:2
24:11 26:11
57:20 94:9
133:9 141:5
deponent's 23:18
deposed 8:5
deposition 1:18
5:15 6:2 8:1,14
10:18 11:8 17:2
17:20 18:1,7,16
18:25 19:2,17
20:20,23 21:12
21:24 22:8,13
30:10 32:19
39:17 67:25
95:2 109:7
117:24 129:18
202:6 204:6
depositions 5:25
depression 19:20
122:9 193:20
193:21 194:6
195:5,21
describe 10:5
described 81:2
82:16,19
164:12 180:24
description 3:7
130:18 199:9
designated
148:25
despite 67:23
192:21
detail 12:14
details 199:11
determination
37:23 80:8
determine 40:14
169:2
determined 80:9
190:10
device 8:18,18

113:22
devices 8:20
dia 191:7,16,17
diagnosed 19:20
diagnosis 194:9
194:15 195:20
dialects 6:10
differ 6:10 73:24
difference 75:24
different 6:10 7:1
31:13,23 45:2,4
56:8 74:19 75:3
75:20 76:25
96:5 124:20
133:20 139:23
146:19 154:22
157:3 170:9
177:25
differently 12:4
difficulty 164:1
diligent 123:10
direct 3:3 5:12
108:23
directed 155:19
direction 26:12
directly 7:2 8:19
54:1,4 72:16
75:10 104:8
108:11,15
120:12 164:21
164:23 165:2
166:4
disbelief 16:19
disciplines 49:5
disclosures
146:10
discover 68:23
119:23
discoverable 23:7
discovery 112:3
146:11
discriminate
151:21
discriminated
115:4

discrimination
114:16,18,21
115:1,13,16,24
116:5 150:6
discuss 17:19,24
18:6 21:14,24
22:8 151:2
discussed 21:17
21:21 41:21
93:15 150:21
156:4 166:23
discussing 19:3
129:24
discussion 18:5
40:13 165:18
discussions 15:10
42:5
dismissed 78:19
disorder 193:14
193:19
Disposition 70:10
distinct 132:9
distress 33:22,23
33:25 34:3
35:13,21 36:1
40:20 69:9
82:18 85:8,14
85:22 125:19
193:10 195:13
DISTRICT 1:1,1
Division 1:2
199:4
divorce 25:16
divulge 14:2
doc- 174:2
doctor 19:24
124:3,9 128:12
173:7 176:8,11
176:23 181:14
182:22 183:5
183:16,19
184:5,14,21,23
185:6,9,10
195:7,16
196:25 197:4,7

197:12
doctor's 3:14
171:4 172:11
174:5 177:12
177:23,24
180:5 181:14
182:16 187:1
192:8,9 201:14
201:16
doctors 194:23
document 62:20
66:7 70:2,4,7
72:8,16,21 73:6
73:7 77:13,16
77:19 78:5,16
78:17 79:24
80:23 92:13
94:23,25 95:13
95:18,23 96:1,9
123:8 124:9
129:8,13,19,22
129:25 130:12
130:17 131:6
135:23 168:16
171:19 172:12
174:2,4 175:11
175:14,17,18
175:20 176:3
176:14,20,22
177:20 179:20
181:23 184:1,6
190:7,8 191:10
194:11,14,18
197:8 198:10
198:13 199:5
200:10
documentation
107:7 132:7
173:17,18
175:21,22
185:5 194:9,16
documents 3:10
3:15 19:12,15
19:24 22:12
66:19,20,23

71:15,20 73:14
73:15 78:3
79:18 90:12
93:16,25 94:18
95:8 102:12
107:15 110:22
110:24 111:12
112:4 118:19
119:12 120:8,9
120:21 121:21
121:24 123:1,5
123:11,15,19
129:14 132:4
133:16,16
135:17,20
136:3,5,9,10,25
137:7,18
146:11 172:22
174:15,16,21
175:8,13 178:5
178:7 183:15
185:25 186:3
187:20 192:3
195:20 197:9
197:19 198:17
dogs 11:18
doing 5:15 18:3
54:12 57:23
58:9,13 139:22
143:25 151:18
156:13 166:5
domestic 65:12
70:17 71:1
76:12 79:1
81:10,11 84:20
199:3,7,9
double 163:18
downward 10:9
drafter 10:8
draw 187:2
drink 39:20
Drive 50:15
driver 48:16
58:25 153:4
driver's 23:18,23

23:23 24:4,5,15
48:15 201:4
**droplets** 15:21,24
**due** 119:1 153:10
162:21 173:14
174:24 192:19
**duly** 5:6,10 203:8
**duty** 124:10
**DV** 3:10,15 201:8
**DVCE** 198:12
199:3

———————
**E**
**E** 2:11
**E-M** 100:25
**E-R-A** 25:23
**E-V-I-E-L** 21:5
**earlier** 41:21
53:20 72:3
85:25 86:1
92:14 93:10,17
95:2 101:7
124:20 161:1
199:13
**early** 159:11
**easier** 7:21 18:9
96:8,11
**easy** 145:5,23
156:14,16
181:11 192:17
**eat** 17:9,17
**education** 44:15
45:4 46:9,11
103:15
**educational**
44:12 47:19
**EEOC** 114:16,21
114:25 115:13
116:4
**effect** 86:3
**efforts** 110:10
116:7,19
123:20
**eight** 28:8 41:10
41:11,12 43:25

44:5 50:17
53:22 159:20
**either** 12:3 14:19
31:2 36:9 69:1
82:21 86:18
109:9 136:4,5
146:10 165:9
170:1 177:23
180:5 186:7,12
195:19
**elderly** 47:23
**eldest** 27:25
29:19 34:14,21
**Eleane** 78:23
**electronically**
121:18
**Eleven** 29:15
**Eleventh** 71:3
**eligible** 190:11
**email** 99:25
104:24 105:1,4
105:6,11,18,19
105:22,24
106:4,7,12
109:3,13 111:7
111:13,14
114:5 116:10
118:7,17
119:10,17
120:23 123:15
**emails** 104:10,17
104:21 105:3
106:3 109:10
114:14 116:24
118:13 119:12
120:1
**emergency**
173:16 174:13
**emotion** 125:19
**emotional** 33:22
33:23,25 34:3
35:13,21 36:1
38:16,25 39:3
39:16 40:14,20
56:19 58:22

64:9 69:9 82:18
85:8,14,22
115:7 189:24
193:9 195:13
**employed** 50:23
54:12 96:23
97:5
**employee** 100:20
204:11,12
**employees**
155:25
**employer** 55:11
73:16 74:17
75:8,14,16,25
89:20 92:25
100:24 134:11
134:18,19
**employers** 92:17
137:8
**employment** 53:9
57:23 92:5
97:16,22,23
104:5,7 109:21
138:7
**endangering**
192:25
**engage** 18:4
138:19
**English** 5:7,8,19
5:21 6:15 90:24
115:16,17
129:10,12,14
129:17 130:23
134:7
**ensure** 6:18 7:3
172:24 174:11
**enter** 50:2
**entered** 50:5
**entire** 54:16 56:5
160:25
**entirely** 6:3
**entirety** 99:9
**entities** 93:2
101:2
**entitled** 30:10

33:24 127:18
**entity** 135:6
**episodes** 164:1
**equivalent**
103:15
**Eric** 139:14,17,21
140:2,5 142:1,6
142:11,14
147:13,23
149:15,20
150:5,9,22
151:5,6,13,17
154:14 155:5,9
156:2,11,14
157:19,24
158:6 164:16
165:18,22
167:11,14,15
168:3,5 169:19
169:22 170:1
170:21 171:6
173:18 175:21
175:22 176:3
177:3,5,23
178:7,11,12
179:1,23 180:5
180:24 184:6
186:12 187:4
188:1,2,8,10,15
190:7,13,22
191:10 192:20
**escaping** 58:4
**ESQUIRE** 2:6,11
**essence** 6:14
**establish** 10:20
115:23 123:1
195:20
**established** 37:3
37:12,20 72:4
**establishing**
104:14 107:8
132:4
**estate** 48:16
90:15,18
**event** 12:17

**Events** 97:5 98:6
**everybody** 10:24
160:22 161:2
**evidence** 109:22
116:6 119:23
133:11 140:20
184:16
**evidences** 130:16
**evident** 8:9
**Eviel** 20:25 21:3
21:4 39:6
**exact** 44:4 59:21
87:21 88:2 89:6
103:5 111:25
147:15,24
190:5,24
**exactly** 7:3
100:16 106:14
106:18 120:18
133:18 183:1
**Examination** 3:3
5:12
**examined** 5:10
**example** 15:8
44:24 54:16
56:3 108:19
150:17
**examples** 12:16
**exception** 11:25
12:1
**excluding** 15:1
19:17
**Exclusive** 97:5,24
98:6,11 99:24
100:8,15
**excuse** 120:13
126:12 141:20
165:24,24,24
188:21 199:17
**exhausted** 116:17
**exhaustion** 13:9
**Exhibit** 3:8,9,10
3:11,12,13,14
3:15,16 5:2,3
67:11,16 71:22

71:24 87:3
94:11 137:14
137:15,18,23
171:15 173:21
173:22,24
185:19 192:4,5
192:11 198:22
198:23 200:3
**exhibits** 3:5,6
200:19
**exist** 120:9
**existence** 79:20
**expect** 24:4
189:21,23
**expectations**
13:22
**expenses** 39:1
**experience** 49:18
49:22 100:12
154:20 164:12
**experiences** 60:6
**experiencing**
164:3 173:5
**Expires** 203:16
**explain** 11:8 12:4
20:9 68:15
**explaining** 10:11
**explore** 30:10
69:10
**expound** 19:10
**express** 41:7
**expressed** 82:21
**expression** 9:6,17
**expressions** 6:10
9:1
**extent** 11:12
**eyeglasses** 135:19
**eyes** 198:18

**F**

**F** 7:8,9 175:3
**face** 9:24 144:4,7
151:13
**fact** 6:17,20 8:4
12:9,10,15 14:1

15:1 23:4 24:3
39:12 66:12
67:3 70:3,12
71:1 73:9 93:16
107:8 115:23
128:15 159:11
163:12 193:3
193:23
**facts** 130:9
200:10
**Faenza** 2:11 3:3
4:9,9,21,24
5:13 8:10 9:23
15:6,23 19:7,25
20:7 21:3,5,8
21:10 22:6,18
22:20,23 23:5
23:10,13,17,21
24:2,8,11,13,14
25:2,13 26:10
26:16,17 29:7
30:3,25 31:18
31:22 32:2,12
32:20,23 33:19
35:5,7 36:23
37:7 39:11
40:10 43:8
47:12 51:1,3
55:24 57:19
58:2,11 61:1,4
61:9 62:5,21,24
64:2,16 66:1,6
66:12,21 67:10
67:19 68:11,13
69:16,22 70:1
70:16,21,23
71:11,14,22
72:1,15 76:22
77:10,13 79:5
79:11,15,17
80:23 81:1 83:5
83:7,10,11 85:4
85:6,17 86:11
86:23 87:14,16
87:17 89:1,17

91:11,15,21
92:2 93:23 94:3
94:9,12 96:20
98:9,25 99:21
101:23 104:14
104:17,20
106:9 107:12
108:2,12
109:15 110:6
113:12,17,20
115:9,15,19,22
116:25 117:3,9
117:12,16,18
117:22,25
118:4 119:4
122:10 124:6
126:2 127:10
127:14,17,20
127:22,25
128:3,6,10,14
130:5,6 131:9
131:12,19,23
133:8 134:16
134:25 135:1
135:11 136:18
136:20,23,24
137:10,14,17
137:21,25
138:4,9,13,15
138:18 141:4,7
141:10,14,16
141:23,25
142:4,12
143:11 145:9
145:14 146:25
147:7,9,19
149:24 150:19
152:15,23
155:1 157:15
157:21,24,25
158:4,6,9
163:20,23
164:9 166:14
167:22,25
168:2 170:7,9

170:17 171:14
171:21 172:2,5
172:21 173:20
173:23 174:1,7
174:20 175:11
175:16,25
176:12 178:15
178:19,24
179:9 182:3
183:23 185:17
186:22 187:17
187:24 190:1
191:3,4,12
192:2,7,14
193:2,14,16,19
193:22 196:10
198:2,5,7,11,22
198:25 200:13
200:16,22
201:3,6,12,16
201:19,22
202:2,4
**fair** 8:6 9:10,19
10:15,21 12:10
12:22 18:12
49:19 60:7
92:22 96:17
**fairly** 144:17
**fall** 13:9 19:18
**false** 14:20
**familiar** 51:23
60:18,23 88:23
157:3
**Families** 199:5
**family** 38:17 39:1
40:13 57:25
188:10
**far** 33:7 56:20
99:5 133:16,17
156:4 181:15
**fast** 154:22
**father** 28:14 29:1
29:5,19 31:3,8
31:11,13,21,23
31:23 36:9,12

36:14,19,25
37:6,10,14,23
37:25 38:5,6,24
41:14,15 42:6
44:7,9 60:22
80:3,7,9 198:16
**fatigue** 163:25
**fear** 125:20
126:13
**February** 87:21
88:12 93:6
124:2 125:12
125:14 179:2
179:21 180:1
181:12,25
182:1,24 185:6
186:2 190:6,6
190:23 203:9
204:15
**Federal** 76:6
**feedback** 149:10
159:1
**feel** 66:19 68:1,8
69:3,4,6 72:19
72:23 192:18
**feeling** 146:17
169:9 173:10
181:9,16
182:10,11
**feels** 30:9
**female** 27:20
64:24
**Fernando** 20:25
21:2 39:6 41:16
**fiance** 21:7 39:5
151:23 152:5
152:17 153:2,8
153:18
**figure** 54:15
121:21 133:21
182:14
**file** 61:19 78:19
85:12 136:7
**filed** 65:15 71:1
79:23 114:15

114:21 115:12
115:24 116:4
129:13,14
130:25 199:6
**filing** 69:24 70:5
77:1 200:6
**fill** 100:9
**finalize** 142:18,23
142:24 143:9
143:10
**finalized** 143:17
**finally** 70:9
**financial** 28:23
29:5 30:22 31:8
32:4 36:18
38:13 56:16
**financially**
204:14
**find** 16:20 54:25
83:23 92:8 99:9
101:4 116:6
119:25 168:16
**fine** 37:10 96:21
99:17 131:18
138:2 184:22
**fingers** 13:9
**finish** 12:19
17:10 33:16
45:20 46:13
68:3 157:15
**finished** 143:8
**finishes** 74:22
**fired** 143:1,2,3,4
154:11 165:23
166:1,2 167:3,4
**firing** 138:7,20
**firm** 133:21
**first** 5:10 8:8 11:7
12:20 22:15
27:14 30:20
31:14 52:5 66:4
71:10 82:20
93:17 94:13
96:13 97:24
98:2,5,9 108:23

143:4 150:22
159:24 160:1
169:25
**firsthand** 15:16
**five** 12:14 36:8
92:16 201:10
**five-year-old**
60:22
**flat-out** 14:20
**flight** 191:2 198:3
**flip** 66:9,19
**floor** 140:8
142:17 148:24
**Florida** 1:1,14
2:5,10 27:1
47:23 48:21,23
48:24,25 56:22
58:22 59:5,11
62:6 64:2,3
71:4 76:7 79:2
203:2,6,14
204:2
**flu** 175:12
**FMLA** 187:20
190:11
**focus** 34:25 60:4
**focused** 151:2
**follow** 7:1 14:15
16:16 195:3
**follow-up** 175:3,5
185:15 195:8
197:12,14
**followed** 169:16
**following** 72:10
175:4 196:21
197:11
**follows** 5:11
**food** 48:20,23
59:19,25 61:21
61:23 155:25
156:21,23
157:5
**forced** 61:6,10
64:23
**forcibly** 71:16

**form** 4:22 15:3
18:11 25:10
26:5 28:13,19
31:5,25 32:4,6
33:3,9 34:7,22
35:3,11,19,23
36:2,20 37:5,16
38:14,23 44:3
47:16,21 51:5
53:7,11 54:8,21
55:1,19,22
56:13 57:4,17
57:22 60:16
61:5 62:13,18
63:13,19 65:7
65:21 67:6
70:14 71:5 72:6
73:11,18 74:8
74:11,15 75:5
75:11,15,21
76:2,13,18 77:3
77:7 78:6,10,13
79:9 80:1,5,11
80:16,19 81:8
81:14,19,25
82:10,14,23
83:6,21 84:5,10
84:22 85:2,23
86:9,15,20 87:1
87:15,20,24
88:7,14 89:8,21
89:25 90:4 91:5
92:21 93:12
95:10,19,25
97:15,25 98:3
98:13,20,23
99:4,14 100:2
100:18,21
101:20 102:23
104:18,23
105:7,12 106:5
106:13,16,20
107:23 108:6
108:18 109:12
109:24 110:17

111:3,10,23
112:5,16,20,25
113:15,23
114:4,9,12
115:2 116:1,8
118:14 119:20
120:3,11 121:1
121:9,16 122:1
122:5,18,24
123:3,6,12,21
124:4,12,16,25
125:4,9,15,18
125:24 126:6,9
126:22 128:8
130:10,21
131:1,7 132:6
132:11,20
133:5,22 134:5
134:12 135:25
136:11,16
138:16 139:2,7
139:12,24
140:3,12 142:7
142:15 143:15
144:24 146:6
146:12,22
150:7,24
151:25 152:13
153:3,9,20
155:11 157:8
161:3,20,24
162:4,10 165:5
165:15 168:17
169:15 170:1,3
170:19 177:2
177:13,19
179:14,17
180:6,16,19
181:1,6,20
182:7,21,25
183:4,9,13
185:12 186:14
188:12,22
189:4 190:12
190:20 195:15

195:22 196:16
196:23 197:2
199:19,24
**former** 25:18
**forms** 66:16
**formularies**
191:11
**forty** 97:19
161:22,23
**forward** 118:17
**foundation**
149:14 152:8
155:12 158:17
159:4 160:18
162:19 163:16
**four** 27:13,17
29:18 36:1,6
45:8 103:14
159:21 161:11
161:12 201:9
**frame** 84:4
199:14,22
**Francisca** 7:10
199:2,6
**frank** 25:19 32:7
**Frankey's** 52:19
**fraudulent** 108:1
**free** 9:13 66:19
69:3,4,6 72:19
72:23 150:17
176:6 182:11
182:18 188:17
**freezing** 39:25
**frequent** 68:25
163:25
**Friday** 173:2
**friend** 38:12 74:4
74:5,13 101:10
101:11,12,13
101:18,18,19
101:19 102:5,5
**friends** 101:21
104:6
**front** 8:19 9:24
66:18 70:4

94:23 95:14
96:9 103:23
129:7 130:12
130:18 137:24
**frozen** 139:19
**fryer** 160:11
**Fuentes** 150:11
159:19 186:12
**full** 7:6
**full-time** 51:18
51:19 97:7
**functioning**
45:11
**funds** 29:5
**furniture** 90:19
**further** 165:19
166:17 204:10

**G**

**G-U-E-V-A-R-A**
21:6
**Gables** 46:14,17
178:1 185:10
**Garc** 186:12
188:10
**Garcia** 139:14,17
139:21 140:2,5
140:15,17,22
142:1,6,11,14
147:23 148:4
149:6,12
154:14 155:5
156:5 157:19
157:24 158:1,6
163:12 165:19
165:22 167:12
168:14 176:4
178:7 179:1
181:18 184:7
**gastronomy**
43:14 44:21
46:5 58:8
**gears** 7:22 44:11
86:1
**general** 186:17

**generalities**
193:8
**generally** 6:24
17:15 18:6
67:25
**gentleman** 5:16
6:6 37:13 163:4
**genuinely** 70:25
**geriatric** 126:21
**gestation** 174:25
**getting** 94:2
161:10,12
**give** 7:19 16:16
18:8 23:3 44:23
78:12 80:14
81:16 115:11
119:18 124:23
127:8 130:24
139:9 149:10
161:17 163:18
168:22 171:9
177:11,18
179:3,5,7
189:13,18
196:4,13,14,17
197:14
**given** 7:23,25
136:12 156:1
158:1,6 161:8
176:18 180:3
182:2,15,18
184:4 186:20
189:5,13
194:17 197:21
**gives** 189:7
**giving** 16:11 56:8
56:15 95:7
150:16 161:11
167:2 194:4
**Gloria** 21:25
**go** 5:16 7:5 8:5
8:13 20:17,21
21:23 37:16
42:20,25 53:7
54:1 65:13 67:8

71:8,14,16
73:13 76:14
84:1 85:16 89:3
89:16 91:13
92:19 93:8
95:16 96:10
99:21 102:13
109:9 111:13
112:17 122:13
124:10 131:21
138:2 139:14
142:17 143:17
149:23 150:3
157:15 159:21
164:21,22
165:6,7 171:20
180:15 181:11
185:9,10 188:2
188:4 189:14
191:1,2 197:6
198:1,20 200:9
200:18
**GOAT** 1:8 4:10
22:15 66:4 86:6
96:6 98:24 99:5
116:13 134:10
134:15,21,22
135:2,5,8,21
136:6 138:5,19
139:1 148:23
173:2 186:7,13
**goes** 30:10 139:3
**going** 7:19,21,22
14:13 19:5,6,21
20:7,18,21
22:11 23:2,22
29:21 32:7,12
32:14,18,21
34:25 39:16
42:20,25 43:3
44:10,11 48:8
49:10,17,21
53:5 56:24 60:4
62:19 64:13
66:9,15,18 67:8

69:23 72:16
73:5,13 81:21
82:17 85:25
87:5 92:12,14
93:19 94:7
95:23 96:11
106:21 110:3
114:13 115:3
127:4 128:17
128:19 130:2
131:7,16,20,21
137:10 142:9
143:16 145:4
146:23,25
150:25 156:15
156:16 171:9
171:13 173:6
177:3,9 178:2
185:17,21
188:2 191:5,9
191:13 194:23
198:3,9,20
201:1,7,8,9,10
201:12,19
**Gonzalez** 60:19
64:12 65:12
69:25 70:13,18
71:3 72:12
73:10,15,21
74:3 77:25 81:6
81:18,24 82:7
82:13,17,20
83:1 84:21
157:18 158:1,3
158:5 199:3,12
199:16
**good** 4:2,9 29:5
56:16 58:23
74:5 91:9
113:24,24
130:24 173:3
173:10,19
184:19 192:15
**goodbye** 166:10
166:16

**Google** 107:24
108:7,10
109:10
**Google's** 108:4
**government**
38:11,15
**grab** 73:13
**Grace** 61:12
**graduate** 44:18
45:17
**grandfather** 44:9
**grandparent**
38:12
**grandparents**
31:3
**gray** 15:25
**green** 191:17
192:13
**grill** 158:21 160:4
160:10
**grocery** 11:12
**ground** 8:6 10:20
15:25
**group** 1:8 4:11
22:15 52:12
66:4 101:21
116:13 138:5
173:3,4
**grow** 43:17
**guardian** 41:3
**guess** 106:21
**Guevara** 20:25
21:5,14,19
41:16,19,23,25
**guidance** 116:22
**guiding** 91:8
**Gulfstream** 52:1
52:7 53:16,24
54:1,3,5 55:8
55:10 73:16,23
73:24 74:7,14
75:2,4,18
**Gutierrez** 154:24
**guy** 73:3 160:8

**H**

**half** 103:9,14
**Hallandale** 50:15
  76:6
**hamburger**
  156:17 158:25
**hand** 4:14,17
  69:19 70:1,7,11
  72:16 77:14
  129:6 137:25
  178:3 185:17
  185:19 187:15
  191:25
**handbook** 169:12
**handed** 129:3
  184:14
**handful** 35:16
**handing** 69:23
**handle** 102:11
  140:16,19
**handled** 137:4
  142:19
**handling** 41:4
  48:20,23
**hands** 9:24,25
  10:1,10 68:20
  199:11
**happen** 10:3
**happened** 15:8
  19:5 61:7 65:1
  105:14 132:15
  164:16 179:24
**happening** 95:5
  149:3
**happens** 12:17
**happy** 17:12 23:3
  30:8 56:14
  67:13 68:17
**harass** 150:2,3
  164:6
**harassing** 35:4
  83:6 85:3
  150:10,18
  151:13,14
**harassment**

150:14 151:7
  164:15 188:6
**harshly** 151:20
**head** 8:11 15:7
  38:17 57:20,20
**headaches**
  182:10
**health** 47:25
  48:18,23
  158:13 192:19
  192:25
**healthy** 56:3
**hear** 6:23,25 9:9
  10:2 14:3 15:17
  16:17 20:13
  26:13 42:15
  48:10 58:16
  60:7 81:4 83:16
  94:15 144:13
  144:22 178:19
**heard** 31:12
  58:12,17 77:2
  129:9 145:22
  145:22,24
**hearing** 8:1 76:11
  76:16,25 77:5
  78:5 79:3 200:7
  200:8
**heavy** 139:20
  164:2 175:14
  192:20
**held** 96:16
**Hello** 187:19
**help** 20:5 38:15
  50:22 58:7 69:7
  151:15 202:4
**helpful** 115:15
**helps** 38:25
**HH** 1:25 203:15
**HHA** 47:24,25
**high** 103:16
**high-risk** 126:21
  128:6
**higher** 165:16
**highest** 44:15

**Highway** 76:6
**Hillcroft** 22:16
  22:18,19
**hire** 142:1,6
**hired** 86:6,10,21
  132:17 142:11
  142:14,18
  143:2,5,19
**hiring** 138:7,20
  142:8,18,23,24
  143:10
**history** 43:3
**Hola** 187:17
**hold** 5:16 79:5
  127:16,18
  128:19 131:10
  145:9 200:7
**holidays** 162:21
**Hollywood** 27:7
**home** 15:18
  31:15,24 32:3
  47:25 48:18,23
  56:17 57:10,12
  121:17 153:22
  175:8 197:17
**homemaker** 58:5
**homes** 54:10,14
  90:21
**hop** 39:12
**hope** 91:21
  173:10
**horse** 75:6
**horses** 74:1,19
**hospital** 171:3
  175:23 178:2
  180:10,14
  181:8 182:10
  183:21 184:4
  186:7
**hospitality** 1:8
  4:10 22:15 66:4
  96:6 108:21
  116:13 138:5
  138:19 173:3
**hospitalized** 55:5

**hostigate** 149:23
  149:25
**hotel** 32:9 86:4,8
  86:14,18 97:12
  98:14,16,19,22
  99:3,10,12,13
  107:21 120:13
  120:20 134:10
  173:12
**hotels** 97:17
  104:5,8 108:11
  108:14 120:13
  120:22,24,25
  121:4,5
**Hotmail** 105:10
  110:20 111:6
  118:7,22 119:7
**hour** 51:14 52:15
  59:25 161:21
**hours** 51:16 97:9
  97:13,19
  135:22 141:18
  150:16 159:17
  159:20,21,23
  160:13,14,15
  160:21 161:1,8
  161:11,12,12
  161:19,22,23
  162:3,5,5,9,12
  162:15,16,16
  162:23 163:2,4
  163:5,11,13
  173:11,12,15
  187:22
**house** 29:3,4
**Houston** 22:20
  41:22 57:1
  100:5,8 102:7
**Houstonian**
  120:17
**hugged** 154:11
**huh** 9:3 193:18
**huh-uh** 9:3
**human** 132:7
  139:3,5,8,16,21

140:4,14
  141:19 142:2,8
  142:9,22 143:9
  143:14,17
  147:13 148:10
  148:13,15,17
  148:21,22
  149:1 150:13
  150:14 164:22
  164:24 165:2,2
  165:7 172:11
  173:9,18
  174:17 191:9
**Humano** 187:5
**hurt** 73:3 81:21

**I**

**I-N-A-C-A-P**
  45:22
**I-N-C-A-P** 45:11
**ID** 3:8
**idea** 76:3 101:2
**identification**
  4:22 5:4 67:17
  71:25 87:4
  137:16 173:25
  192:12 198:24
**identified** 93:10
  146:20
**identify** 109:5
  146:9 195:19
**imagine** 80:13
  135:22
**immediate** 79:1
**immediately** 50:3
  124:21 192:17
**immigrating**
  43:11
**implication** 44:13
**implying** 168:15
**impolite** 129:11
**important** 12:1
  25:1 123:16
**impossible** 9:4
**improper** 147:7

inability 164:2
INACAP 45:22
inaccurate 14:20
inaudible 173:3
INCAP 45:11
incident 158:15
158:18,19
incidents 80:22
81:2
include 9:1
including 7:7
93:14 138:7
incorrect 14:20
31:12 38:4
increased 162:16
INDEX 3:1,5
indicate 137:19
indicated 8:11
134:7
indicates 62:16
73:15 134:3
individual 39:6
60:18,21 146:9
159:24,25
individuals 57:24
Industries 88:24
89:1
infected 52:24
influence 11:2
inform 169:4
192:16
information
12:21 14:2,3,6
14:18 15:2,15
15:18 16:4,24
16:25 19:17
20:11 49:17
68:24 92:11
93:10,14 95:6
100:11,11
101:22 107:25
139:9 140:1,16
140:19 162:25
166:9 174:11
174:24 195:20

197:23
informed 150:14
151:6
initial 146:10
159:24 160:1
injunction 70:9
76:17 78:24
79:3 85:12
199:7
inquire 40:18
Inquisition 17:6
inside 52:7
insinuations
144:11 145:25
146:16
insist 8:25
insisting 133:19
instance 34:20
institute 46:15
47:8,18
institution 46:6
46:11,18
institutions 47:19
Instituto 46:12
instruct 20:2
94:8 130:3
131:8,16
146:23
instructed 13:16
13:20 15:11
instruction 26:7
instructions
10:17 175:1
intend 188:19
intended 6:4,19
39:16 49:3
intending 188:20
intense 39:15
202:5
intent 33:21
intention 16:18
interactions
10:13
interested 49:16
204:14

interjects 13:13
international
43:13 44:21
internet 19:13
104:5
interpret 129:19
interpretation
6:7
interpreter 2:14
5:17,22 6:13,16
6:24,25 7:1
9:21,25 21:2,4
22:17,19 24:12
30:18 31:16,19
32:21 43:6
50:25 51:2 58:3
60:25 61:2 62:4
63:25 69:15
80:25 83:3
87:13 88:25
90:16,16 98:7
104:12,15
115:17,21
126:12 129:16
129:18 137:20
138:11,12,14
141:20,20
149:24 150:2
154:25 157:17
157:20,23
158:3,5,8
165:24 166:13
167:21,23
168:1 170:5,11
172:3,22 173:1
174:23 178:16
178:18,22
187:15,19
192:13,15
193:15,18,21
201:18 203:7
interrogation
11:13
interrogatories
3:9 22:16 42:21

60:10 65:20
66:5,10 92:13
93:9,11,18
94:24 96:13,25
100:24
interrogatory
42:4 201:7
interrupt 20:12
117:4,23 118:1
137:23
interview 102:13
102:16 142:16
143:8
interviewed
142:20 143:6,7
155:6,9
intolerable
125:11
introduced 74:13
102:2 172:15
invasive 30:9
investigation
148:6
involuntary 49:6
involved 139:11
involves 99:11
issue 40:15
issued 14:10
133:18
issues 157:6
166:21 171:22

—————
J
—————
J 78:18
Jackson 183:22
184:4,23
185:10 186:7
194:1 195:23
January 1:16 4:3
4:3 163:1,3
170:25 171:1
176:4,15,18
177:11,17
181:22,24
186:18 203:8

Jason 89:23
Jennypher 1:25
203:5,13 204:5
204:19
job 19:21 40:21
50:21 51:7,18
52:16 54:12
56:19 57:8
58:23 59:10,18
68:23 88:4
89:10 92:17
96:23 97:7,21
100:1,9 101:9
103:11,20,23
103:25 104:1,4
104:9,12,16
105:4 107:19
107:20 108:4,9
108:19,22
109:11 114:8
118:13 119:2
119:12,13
120:1 121:15
121:25 123:2
123:11,19
143:13,16
166:5 193:3
job-related
123:15
job-seeking
107:22
job.com 104:8
107:21,22
108:9 109:2,5,9
109:19 110:12
110:15,16,22
110:24 111:2,6
111:9,16,21
112:10
jobs 96:15 105:20
106:4 108:17
109:5 112:23
114:6 118:23
121:23 122:15
judge 77:2 78:12

78:18,23
**judging** 70:24
**judgment** 34:1,6
40:22 41:6
**Judicial** 71:3
**July** 88:11,13
**June** 59:8
**Junior** 159:24
160:2,13 163:5
**jury** 128:23
129:5 130:8
131:2
**justice** 189:24

**K**

**K-I-N-G** 25:21
**keep** 104:24
105:6 116:11
118:12,15,22
120:19 192:7
**kept** 114:13
119:6 149:6
194:17 196:9
**kidnap** 76:19
**kidnapped** 70:19
**kind** 9:6 11:18
32:9 40:25
42:25 44:10
92:14,19
**kindly** 5:22
**kindness** 69:13
**kinds** 149:4
**King** 25:19,21,24
36:12
**kiss** 154:12
**kitchen** 51:24
74:2,18 75:7
89:14 100:13
107:25 108:7
139:11,14,18
139:22 140:2,6
140:11,13
144:15,16,18
145:18 154:21
155:16,22

156:19 157:2,6
158:14 169:5,8
**kitchens** 51:24
**knew** 56:3 83:1
84:3 97:22
100:3 126:23
157:2
**know** 5:21 7:20
9:4 12:20 15:15
15:16 16:1,3,9
16:18 17:12
18:18 26:3
31:20 38:2
42:18 44:13
46:23 50:3
53:13 56:6 59:8
61:7,17,18 62:2
62:10,15 64:13
64:20,25 65:4,9
65:22,23 69:21
71:13 76:4 77:4
78:7 82:2,2,5,6
82:9 86:7,13,16
87:11,18 89:2
89:20 95:24
99:5,6,8,19
100:10 101:5
101:16,17,21
102:1,3,4
103:15 111:8
114:24,25
116:24 121:6
121:10,22
124:23 128:9
130:22 133:3
133:18 134:6
135:4,21
138:23,24,25
139:3,8 140:1
142:9,18
145:20 148:20
149:15,24
150:13 154:23
156:8 160:12
160:25 166:2,4

169:6,9,10,11
170:22 171:13
172:7 174:9
177:6,8 178:15
184:21,22
186:9,20 188:8
189:19 190:21
190:23 191:11
194:8 198:15
200:1,16
**knowing** 116:12
**knowledge** 15:2
16:12,20 146:3
189:12
**known** 7:11
103:14 121:11
**Kyle** 2:6 4:7
**kyle@macdon...**
2:6

**L**

**label** 135:13
**lack** 37:24 149:13
152:7 155:11
158:16 159:3
160:17 162:18
163:15
**lady** 14:9 32:8
114:1 148:10
**laid** 52:21
**language** 6:2,3,9
90:22
**late** 159:8 178:15
**laughing** 117:6
117:13,17
**Law** 1:12 2:3,8
**lawfully** 49:13,23
**lawsuit** 21:22
22:3 32:8 60:6
99:11 111:12
115:6 129:23
130:9,14,15,19
130:25 146:20
**lawsuits** 42:23
60:11,14

**lawyer** 48:11
**learn** 155:8
**learner** 154:22
**leave** 12:13 51:7
52:16,22 54:10
58:20 188:11
188:14,15,21
188:21 189:1,3
189:6,8,11,13
189:18,19,22
190:11 198:4
**leaves** 14:18
**leaving** 54:14
109:22 121:24
123:20
**left** 15:18,24 28:7
28:12,14,22
29:3 34:14
35:25 42:10
56:23 57:15
64:3 77:19 88:3
88:17 92:5
95:23 96:2
112:24 114:7
118:13 119:14
120:22 122:6,7
194:11 196:22
197:1
**legal** 11:2,8 28:14
38:8 49:16
51:21 65:19
80:6,12 82:1
85:15 116:9,12
134:13,24
138:17 150:8
151:15,17
170:20 189:2
**legality** 49:11
**legally** 24:20
28:10
**Let's** 55:12 99:12
**letter** 173:7
**letting** 7:20
**level** 44:15
129:17

**lawyer** — cont.
**license** 23:18,19
23:23,24 24:4
24:15 48:5,15
48:18,21,23,24
201:4
**licenses** 48:9,17
49:4,7
**lie** 117:20 159:9
**life** 40:21 152:3
**lift** 192:20
**lifting** 164:2
175:15
**light** 124:10
**lightheadedness**
164:1
**limit** 128:4
**limited** 9:15
**line** 3:19,19,20,20
3:21 50:22,24
51:4 52:5 132:1
143:19,21
149:10 150:25
160:9,15,16
161:8 163:13
169:16
**lined** 59:10
**LinkedIn** 108:20
**Lisa** 157:18
158:3,3,5 166:6
**list** 146:4 175:9
**listed** 22:14 63:6
75:17 146:3
184:18
**listening** 145:3
**lists** 62:11
**litem** 41:3
**literally** 10:18
56:7
**little** 19:11 21:20
39:21 41:1 43:1
43:23 44:11
76:14,25 84:6
86:1 92:7
146:19
**live** 41:23 42:9,11

44:7 50:11
56:25 63:4,24
153:2
**lived** 7:17 22:24
27:24 28:21
43:24 154:5
194:5
**lives** 27:23 42:13
**living** 22:4 43:14
43:18 44:1 63:9
152:11,17,21
153:7,16,18
176:10 194:4
**LLC** 1:8,8,12 2:8
4:11,11 66:11
92:25 103:24
116:13,14
136:6 137:19
137:21
**LLC's** 22:15 66:4
96:13
**LLC/Yvon**
100:25
**locate** 109:10
112:23 123:10
136:13,25
137:7
**located** 46:14
50:14 59:16
99:12
**location** 45:25
74:19 99:18
138:21 149:4
**log** 109:19,20
111:2,9 112:10
**long** 7:17 22:24
32:18 42:14,16
50:16 52:2 55:3
55:15,20 59:20
59:22 83:15,17
83:20 84:1,7,17
90:3 105:24
106:8 122:3
125:2 147:16
**longer** 107:17

118:6 125:8
149:11
**look** 15:20 19:11
19:13,14 96:10
116:21 119:18
122:22 133:7
140:25 141:5,6
145:2 185:22
191:6 198:17
**looked** 51:8
66:22 100:4
121:23 179:25
186:6
**looking** 26:11
64:25 65:23
66:3 70:15
103:20,25
104:3,4,22
107:24 118:19
119:13 122:3
122:12,14,17
133:9 141:2
153:13,23,25
154:7 160:12
162:1 181:4
**looks** 10:9 40:2
**lose** 161:18 162:2
**losing** 125:20
126:11,13
**loss** 107:8 126:1
**lost** 31:16 104:25
105:8 106:7,11
111:13,14
119:17 146:7
161:23
**lot** 52:23 53:1
54:13 57:6,7
153:4 154:5
157:2 159:20
161:21 186:9
**love** 152:3
**lovely** 8:15 13:8
**low-cost** 153:24
**luck** 68:21
**lunch** 11:11

17:16 69:16
91:13
**Lyft** 57:23
**lying** 177:15
190:24

---

**M**

**M-M-H-M** 9:2
**ma'am** 72:19
73:7 129:7
141:14
**MacDonald** 2:3,6
4:7,7 13:1,1,3,4
15:3 18:11 23:2
23:8,12 25:10
25:12 26:5,9,15
28:13,19 31:5
31:25 32:6 33:3
33:9,16 34:7,22
35:3,11,19,23
36:2,20 37:5,16
38:14,23 39:8
44:3 47:16,21
51:5 53:7,11
54:8,21 55:1,19
55:22 56:13
57:4,17 60:16
61:5 62:13,18
62:22 63:3,7,13
63:19 65:7,21
66:15 67:6,15
68:5,20 70:14
71:5 72:6,17,20
73:11,18 74:8
74:11,15,22
75:5,11,15,21
76:2,13,18 77:3
77:7 78:6,10,13
79:9,12 80:1,5
80:11,16,19
81:8,14,19,25
82:10,14,23
83:6,8,21 84:5
84:10,13,16,22
85:2,15,23 86:9

86:15,20 87:1
87:15,20,24
88:7,14 89:8,21
89:25 90:4 91:5
91:9,14 92:21
93:12,19 94:1,4
94:5,7 95:10,19
95:25 96:3
97:15,25 98:3
98:13,20,23
99:4,14 100:2
100:18,21
101:20 102:23
104:18,23
105:7,12 106:5
106:13,16,20
107:23 108:6
108:18 109:12
109:24 110:17
111:3,10,19,23
112:5,8,12,16
112:20,25
113:15,23
114:4,9,12
115:2 116:1,8
116:15 117:1,2
117:8,11,14,20
117:24 118:2
118:24 119:15
119:20 120:3
120:11 121:1,9
121:16 122:1,5
122:18,24
123:3,6,12,21
124:4,12,16,25
125:4,9,15,18
125:24 126:6,9
126:22 127:8
127:11,12,16
127:18,21,24
128:2,3,8,19,22
128:24 130:2
130:10,21
131:4,7,10,17
132:6,11,20

133:5,22 134:5
134:12,20,23
135:3,7,14,25
136:11,16,19
136:22 137:2
138:16,22
139:2,7,12,24
140:3,7,12,23
141:2,6,9 142:7
142:15 143:15
144:24 145:7
146:6,12,22
147:2 149:13
149:19 150:7
150:24 151:25
152:7,13 153:3
153:9,20
155:11,20
156:6 157:8
158:16 159:3
160:17 161:3,9
161:20,24
162:4,10,18,24
163:15 165:5
165:15 166:24
168:17 169:15
170:3,19 177:2
177:13,19
179:14,17,22
180:6,16,19
181:1,6,20
182:7,21,25
183:4,9,13
185:12 186:14
188:12,22
189:4 190:12
190:20 191:1
195:15,22
196:16,23
197:2 198:1,3,6
199:19,24
200:14,24
201:5
**Madam** 19:2
22:11 24:20

26:6 30:20
33:21 39:4
66:17 67:10
77:16 96:22
101:4 107:3
119:1 120:9
129:3,20
173:21 175:17
192:2 198:14
**maintain** 116:5
**makeup** 144:4,4
144:7 151:11
151:12
**making** 127:12
127:15 144:5
177:5,7,7
**man** 160:3
**manner** 104:3
**map** 7:19
**March** 90:6,7
91:3 131:1
**Mariano** 46:12
46:15,19
**marked** 3:6 5:3
67:17 71:25
87:3 94:11
135:13 137:15
173:24 183:24
185:18 192:11
198:23
**marriage** 152:10
**married** 24:21,23
25:5,7,24 26:3
26:21,23,25
27:8 36:14
41:17,19 152:2
**Marriott** 86:18
120:17
**massage** 144:3
151:9,10
**master's** 44:25
**maternity** 188:21
189:1,3,5,7,11
189:13,18,19
**matter** 7:20

**Max** 142:20
143:7,8,13
149:18 155:19
161:15 164:12
164:14,17
186:12
**Maximilian**
141:17,22
**Maximiliano**
141:22 142:17
142:21,22
143:25 146:1
149:8,21 150:9
150:10,15,15
151:8 152:1
154:2,8,17
156:13 159:18
161:14 162:6
165:17,19
166:2,10,11,21
167:3,18
**mean** 9:5 14:12
42:14 51:10
61:10 67:21
110:9 172:17
188:4,13
200:24
**meaning** 13:23
15:16 55:11
75:8 83:18 87:6
118:14
**means** 6:1 8:21
11:16 20:9,9
147:17 149:25
**meant** 6:17
**meat** 87:6 157:1
157:6
**medical** 10:25
11:1 19:14,19
19:23 42:16,17
127:9 170:22
175:13 176:6
176:20 183:6
188:10,13,15
188:18,20

192:3,22 193:6
193:7 194:16
195:24 196:8
196:12,15,20
198:8
**Medicare** 61:12
61:13,16,20
**medication** 175:8
194:20 195:9
**medicine** 194:13
194:18,22
195:2
**meet** 74:3,6,10
168:8,23
**meeting** 149:7
150:5,22 151:3
151:5,6 156:3,5
156:9 158:13
167:16
**membership**
75:23
**Memo** 70:9
**memorize** 70:2
**mental** 11:1,1
33:24
**mention** 164:18
**mentioned** 36:6
42:3 43:1 46:9
47:19 120:12
**message** 147:25
168:8,18
171:16 172:3
175:20 184:13
186:6 187:10
187:11,13,16
187:25 188:2,5
188:7 190:3,15
191:8,19
**messages** 3:13
19:15 119:12
168:13 172:8
184:16 186:11
192:4 198:9
201:13,13
**met** 11:11 84:6

164:16
**method** 147:2
**mg** 175:6,7
**Miami** 1:2,14 2:5
2:10 21:15,16
39:22 58:23,24
62:6 63:9 102:7
102:8 152:4,19
**Miami-Dade**
71:4 201:8
203:3 204:3
**middle** 7:7 45:5
45:20 103:16
**milk** 68:18
**million** 33:22
**mind** 15:4 27:4
58:4 71:11
145:7 177:4
200:25
**mine** 5:17 53:12
**minutes** 159:16
171:7,10 173:8
**Mischaracterizes**
133:6 134:13
140:24
**misconduct** 49:6
**misleading** 14:19
104:18 109:12
124:25 125:4,9
125:24 132:20
**misspeak** 12:14
**mistreated** 89:15
**mistreatment**
125:10 167:18
**misunderstand...**
93:20 99:8
**mitigation** 112:4
**modern** 113:25
**Mofongo** 59:15
**Mofongos** 59:24
63:23
**moment** 21:22
23:15 24:16
64:23 141:13
145:8 170:13

**money** 31:2
36:25 38:22,25
58:19 161:18
161:21 162:1,2
**month** 28:25
42:19 59:7
87:22 100:17
112:7,11,15,19
125:5,14
162:14,15,23
163:1 185:3,16
197:14 199:12
199:18
**months** 22:25
41:11,12 50:8
50:17 53:21,22
54:9 84:15 90:5
91:1 105:25
160:16,19
163:13 189:5,7
189:13
**Moreno** 46:12,15
46:19
**morning** 4:2,9
15:19 144:20
**mother** 21:25
22:4,9 35:9
42:4,5,11 43:14
43:17,24
153:17
**mother's** 62:9
153:19,19,22
**mouth** 14:25
**move** 10:1 19:7
20:7,13 21:8
22:6 25:2 29:7
30:3,25 32:12
32:15 35:5
36:23 37:7
40:11 47:12
48:7 55:24
56:18 57:15
63:18 64:16
66:1 68:11,13
70:21 76:22

86:11,23 87:8
88:6 89:17
98:25 101:23
106:9 107:12
108:2,12,16,23
109:15 110:6
115:9 122:10
126:2 128:17
131:21 134:16
139:19 141:23
142:4,12
147:19 150:19
152:15,23
153:16,25
163:20 164:9
175:25 176:12
179:9 182:3
190:1 191:13
196:10
**moved** 45:19
49:1 52:18
56:21 59:22
63:12 88:5,10
152:19
**movements** 10:5
**moves** 9:25 10:9
**moving** 9:24 57:2
88:17 118:3
**Multack** 78:18
**multiple** 116:16
118:25 123:13
199:11

**N**

**name** 4:5 7:7,11
25:18,20,22
38:7 45:9,13
46:18 50:12
52:17 60:19
73:16 75:3,13
75:19,25 77:18
77:25 89:2,20
89:22,24 92:24
101:3,13,14,15
102:1,3,3 136:1

137:19 141:21
145:19 146:3
148:11 154:23
157:18 159:24
159:25 160:5
172:16 183:19
195:16 198:16
**named** 163:4
**names** 7:7 27:14
40:17 160:1
**narrating** 117:24
**national** 97:23
**nationwide** 100:4
**natural** 18:4
**nature** 165:20
**nausea** 164:1
**near** 108:7
**necessary** 38:5
68:25
**need** 8:22 12:18
12:21 16:2 17:7
17:9,13 26:19
35:12 36:21
39:18,20 40:4
40:18 43:4
49:20 53:4
69:14,15 92:20
97:18 116:23
118:1 131:12
131:19,19
138:1,2 145:10
154:15 168:9
173:7 192:23
201:16
**needed** 56:4
61:19 97:20
101:22 102:11
123:17 151:9
151:11 177:21
**needs** 25:13
**negative** 68:22
**neighbor** 102:6
**neighbors** 58:6
**never** 42:10
166:16 170:4

176:8,10
188:17,17
**new** 105:18,19
110:3 122:14
**newer** 107:6
**news** 42:19
**night** 66:8 167:7
180:11
**nine** 25:15
**nodded** 8:11 15:7
**non-verbally**
8:11
**nonresponsive**
19:8 20:8,14
21:9 22:7 25:3
29:8 30:4 31:1
36:24 37:8
47:13 55:25
64:17 66:2
68:14 70:22
76:23 86:12,24
89:18 99:1
101:24 106:10
107:13 108:3
108:13 109:16
110:7 115:10
122:11 126:3
134:17 141:24
142:5,13
147:20 150:20
152:16,24
163:21 164:10
176:1,13
179:10 182:4
190:2 196:11
**normal** 16:14
39:12 157:5
**notary** 48:14
203:5,14
**note** 5:20 9:8
62:23 94:15
171:4 172:11
174:5 177:12
177:23,24
179:12 180:5

180:18,22,25
181:14 184:17
185:1 186:1,6
187:1
**notes** 3:14 148:5
149:6 184:14
188:18 192:9
194:3 196:9,9
196:21,22
201:14,16
204:9
**notice** 8:14 11:21
70:5 72:8 79:25
171:9
**notified** 200:8
**November**
147:22 151:3,5
156:3,19
157:12 162:14
186:4 200:5
**number** 3:7 23:1
23:7,14,19,23
23:24 24:4,15
45:1 65:19 70:6
72:11 105:16
162:2 168:7
186:19

———————

**O**

**oath** 4:15,18
14:10 81:17
158:2,7 203:1
**object** 23:2 62:19
93:19 130:2
**objection** 13:3,14
13:15 15:3,10
18:11 25:10,12
26:5 28:13,19
31:5,25 32:6
33:3,9 34:7,22
35:3,11,19,23
36:2,20 37:5,16
38:14,23 44:3
47:16,21 51:5
53:7,11 54:8,21

55:1,19,22
56:13 57:4,17
60:16 61:5
62:13,18 63:3,7
63:13,19 65:7
65:21 67:6
70:14 71:5 72:6
73:11,18 74:8
74:11,15 75:5
75:11,15,21
76:2,13,18 77:3
77:7 78:6,10,13
79:9,15 80:1,5
80:11,16,19
81:8,14,19,25
82:10,14,23
83:6,8,21 84:5
84:10,13,16,22
85:2,5,15,17,23
86:9,15,20 87:1
87:15,20,24
88:7,14 89:8,21
89:25 90:4 91:5
92:21 93:12
95:10,19,25
96:3 97:15,25
98:3,13,20,23
99:4,14 100:2
100:18,21
101:20 102:23
104:18,23
105:7,12 106:5
106:13,16,20
107:23 108:6
108:18 109:12
109:24 110:17
111:3,10,19,23
112:5,8,12,16
112:20,25
113:15,23
114:4,9,12
115:2 116:1,8
116:15 118:24
119:15,20
120:3,11 121:1

121:9,16 122:1
122:5,18,24
123:3,6,12,21
124:4,12,16,25
125:4,9,15,18
125:24 126:6,9
126:22 128:8
130:10,21
131:4,7 132:6
132:11,20
133:5,22 134:5
134:12,20,23
135:3,7,25
136:11,16
137:2 138:16
138:22 139:2,7
139:12,24
140:3,7,12,23
142:7,15
143:15 144:24
146:6,12,22
149:13,19
150:7,24
151:25 152:7
152:13 153:3,9
153:20 155:11
155:20 156:6
157:8 158:16
159:3 160:17
161:3,9,20,24
162:4,10,18,24
163:15 165:5
165:15 166:24
168:17 169:15
170:3,19 177:2
177:13,19
179:14,17,22
180:6,16,19
181:1,6,20
182:7,21,25
183:4,9,13
185:12 186:14
188:12,22
189:4 190:12
190:20 195:15

195:22 196:16
196:23 197:2
199:19,24
**objections** 35:6
62:21 79:11
83:7 94:3
127:10,14
128:4,22,24
147:8
**objects** 13:5
**observe** 155:9
**obstetrician**
193:11
**obtain** 44:20,23
82:5 110:21,23
120:24 195:24
**obtained** 44:16
45:3 159:23
**obtaining** 100:15
103:13
**occasionally**
12:12
**occasions** 33:12
144:10 184:24
**Ocean** 50:15
**October** 70:8
71:1 78:22 93:5
97:1 98:4,6
100:19 132:15
132:16,24
133:2,14,25
134:3 152:6
199:12,16,18
**odd** 10:2,12
12:24
**offend** 33:21
39:16
**offended** 16:15
**offense** 10:12,25
49:3
**offer** 154:2
**offered** 58:23
**office** 39:25
100:14 102:12
137:1 140:4,8

142:19 148:1
148:17,19,23
168:5,9,23
172:8
**offices** 100:8
148:21,22
**oh** 12:18 69:15
71:9 91:12
170:12
**okay** 4:24 5:24
7:5,24 8:7,12
8:25 10:23 11:7
11:16,25 12:7
12:24 14:8
16:14 17:2,15
18:12,14,24
21:24 22:2,11
23:1,12 24:13
25:15,18,24
26:16,25 27:10
27:18,24 32:3
32:11 34:10
36:6,22 38:10
39:20 40:11
41:13,21 42:3
43:11 44:10
45:9,22,25 46:8
46:18,21 47:7
47:18 48:3,7,22
49:2,21 50:9,12
50:16,19 51:2,7
51:12,22 52:10
52:14 53:13
54:5,23 55:8,10
56:18,25 57:2
57:19 58:20
59:5,10,13
60:18 62:24
63:5 64:3,7,10
65:2,11,15,25
67:8,15 68:13
69:7,17 70:21
71:8,20 72:8
73:2,5,9,13,20
73:23 74:17,23

74:24 75:2,13
76:5,11,16,21
77:9 78:3 79:22
80:8,22 81:11
81:16 82:4
83:15,25 85:25
86:17,22 87:5,9
87:23 88:3,9
89:5,10,12
90:14,22 91:14
92:3,9,10,15
93:4,8,14 94:23
95:2,16,22
96:19,25 97:4
97:21 98:22
99:7,17 100:23
101:6,9,25
102:13,16
103:4,7,20
104:7 105:23
109:1 112:14
115:17,17,21
116:4 118:9
119:3 120:12
122:3 123:24
124:10 127:24
128:11,13
129:22 131:24
132:13 134:9
135:10 147:2
148:4,22 149:2
149:6 156:25
157:17 158:8
166:11,21
167:25 168:10
170:12 171:7
173:1,20,23
174:18,23
175:20 176:22
177:22 178:12
178:22 180:14
182:19 186:16
187:7,9 191:3
191:19,22
192:6,10 193:6

194:14 196:20
197:25 198:2,5
198:6,20
199:22 200:3
200:12,14,24
201:6
**old** 27:19,20,21
28:6,9 29:14,16
29:18 36:8
43:21 44:6,6
45:21 107:5,10
109:3 126:14
126:18 146:8
**oldest** 27:18,19
27:20
**once** 6:2 9:3
17:18 34:13
40:12 117:22
117:25 174:8,9
**one's** 128:2 202:1
**ones** 6:19
**online** 120:23
**open** 65:9,10,20
68:10 78:20
**opened** 81:5
**operate** 53:2
**operates** 100:3
**operating** 59:15
100:5
**opinion** 195:10
**opportunities**
54:18 83:23
**opportunity** 18:5
40:5 51:9
**opposing** 77:13
117:17,22,25
128:18 174:3
185:20
**option** 56:16
**Optional** 189:14
**orally** 175:6
**order** 3:15 8:21
70:8 78:24 79:8
79:13 81:23
109:21 151:2

155:15 181:10
182:16 199:2
200:21
**ordered** 157:14
**original** 184:12
**outrageous** 11:17
**outside** 15:20
**owner** 75:6
157:12,18,21
158:14 166:6
**owners** 11:19
**Oy** 191:16

**P**

**P-A-T** 78:21
**p.m** 1:16 91:18
91:20 145:11
145:13 171:24
172:1 202:7
**package** 175:1
**pad** 69:5
**page** 3:2,7,19,19
3:20,20,21 66:9
66:22 95:3
96:11,14 101:4
103:24 131:24
138:10,12
163:24 187:2,4
187:4 191:5,6,6
191:8 198:18
200:4
**pages** 70:4 108:7
120:15,16
174:6 199:10
199:11
**paid** 132:14
134:4 161:21
189:21
**pain** 173:5,15,15
**Palms** 52:17
**Pancha** 109:3,13
110:2,19
**pandemic** 46:13
46:24 47:3,6,10
52:20 53:2,6,14

54:19 55:12
56:24 63:14
**paper** 69:5
118:14 149:15
149:16 200:1
**paperwork** 90:10
**paragraph**
131:25 138:10
163:24
**paralegal** 16:7,10
**pardon** 66:17
**parent** 28:10
32:10 34:2
40:22
**parental** 28:11
28:16 29:24
30:15 37:22
**parenthetical**
10:8
**Park** 52:1,8
73:16,23 74:7
74:14 75:3,18
**parrot** 127:5
**part** 20:10 40:21
56:25 67:25
69:2 94:21
113:5 131:18
186:1,2 192:13
**part-time** 51:18
**participate** 117:4
**particular** 98:12
**particularly**
12:13
**parties** 58:13
204:11
**parties'** 204:12
**partner** 38:16,25
39:4 58:23,24
64:8,9
**partner's** 56:19
**party** 42:24 58:7
60:14
**pass** 72:17
101:22 135:15
174:18

**passed** 66:14
**passing** 34:1
71:11
**passion** 58:8
**password** 109:20
**Pat** 78:20,21
**paternity** 37:3,6
37:11,13,20,24
72:3,4,14 73:9
78:21 79:23
80:15
**Pathman** 1:12
2:8
**patient** 159:6
174:23 175:1
**pay** 3:12 28:20
28:25 51:12
52:14 59:24
73:1 75:22 80:3
133:24,24
137:3 189:23
**paycheck** 132:13
**paying** 160:20
**payment** 133:25
134:1,1 135:22
136:4 139:9
201:11
**PCP** 175:5
**PDF** 118:15
**pears** 65:23
**penalties** 200:9
**penalty** 67:3
**pendency** 28:21
83:1
**pending** 175:3
186:23 191:13
**people** 9:8 12:12
16:15 47:23
50:2 52:23
53:12 54:14,16
56:1,5 57:11
82:5,5 115:6
124:20 138:24
157:2 158:20
158:20 161:6

163:19 164:6,8
169:6,9,10
**percent** 68:16
151:1
**Perez** 21:1,6,14
21:19
**perfect** 6:23 9:21
10:17,23 17:14
18:14 24:12
92:3,24 101:6
131:22 154:21
192:7 201:19
**perfectly** 56:3
96:21
**perform** 6:6
67:24 164:2
**period** 6:12 24:25
24:25 25:5
27:24 34:5
43:18 49:25
53:18,24 54:6
54:13,19 55:13
56:9 57:3,14
60:12 61:25
83:25 84:19
124:2 134:3,9
153:1 164:11
**periods** 29:3
49:14
**perjury** 67:4
200:9
**permanent** 51:11
51:11
**permanently**
42:9
**permit** 50:4
**permits** 18:5
**persistent** 163:25
**person** 11:21,22
18:22 31:3 32:5
33:2,6,23 34:21
37:21 40:24
57:12 83:13
85:21 101:6
102:2,4,9,11,18

102:19 115:5
124:20 146:2,3
146:5 148:7,9
148:13,15,16
154:23 158:21
158:22,24
159:6,10
166:22 184:14
189:16 194:3
**personal** 56:6,16
68:8,18,19
123:16,16
**personally** 40:23
100:6,7 203:7
**persons** 138:24
158:24
**pertaining** 34:2
38:8 40:22
49:10 65:6
109:10 112:4
123:11 130:17
188:15 197:5
**Pet** 78:18
**petition** 70:8
76:12,17 78:19
78:24 79:3
200:6
**Petitioner** 69:25
72:12
**pharyngitis**
174:25 175:3
**PhD** 45:1
**phone** 8:17 105:8
106:23 107:5,8
110:3 111:5
113:18,21,25
118:16 146:8
190:17,18
**phones** 105:9
**phonetic** 21:25
60:19 101:14
144:19 145:17
172:17 174:25
**photo** 201:4
**photocopied** 5:1

photograph
118:16 181:17
physical 10:5
54:24
physically 56:11
77:12 125:13
154:9
physician 195:14
pick 116:23
picture 168:18
pink 8:16,17
place 23:19 33:14
66:18 73:20
149:1 153:19
154:21
placed 21:22 22:3
32:9 38:6 40:14
115:6
places 92:6
plaintiff 1:6 2:2
4:6,8 66:5
96:13 178:2
183:25 185:18
Plaintiff's 66:3
96:12 171:15
185:19 198:12
planning 119:25
188:24
please 4:5,13,16
4:25 5:20,21,23
6:15 7:13 9:8
10:25 12:3,3
16:15 25:20
26:20 27:15
30:12 38:4,19
46:2 50:20
69:20 71:21
94:15,20
101:15 107:11
116:25 124:5
135:16 137:25
141:11,13
145:10 172:6
172:22 174:18

174:21 187:15
191:25
PLLC 2:3
point 40:13 42:6
49:3 57:9 58:11
63:23 85:3
91:10 96:15
98:19 99:2
112:17 125:7
153:6 171:17
178:15
police 70:20
82:25 83:5,12
106:22 107:16
pop 39:19 40:5
108:8
pops 23:10
portion 19:7 21:8
22:6 25:2 113:3
131:13
portions 20:8,14
29:7 30:3,25
32:13 36:23
37:7 47:12
55:24 64:16
66:1 68:14
70:21 76:22
86:11,23 89:17
98:25 101:23
106:9 107:12
108:2,12
109:15 110:6
115:9 122:10
126:2 134:16
141:23 142:5
142:13 147:19
150:19 152:15
152:24 163:20
164:9 175:25
176:12 179:9
182:3 190:1
196:10
pose 11:9 12:1
25:4 32:16
posed 11:5 17:11

40:25 60:9
posing 127:22,25
position 98:12
102:10 132:8
150:4 165:13
165:17 169:12
177:16,20
186:18 192:17
positions 92:17
positive 91:22
possession
118:20 121:25
123:22,23
possibility 121:11
193:12
possible 17:4
132:23 148:16
posting 100:1
postpartum
19:20 88:19
122:9 193:16
193:20,21
194:6 195:4,21
posttraumatic
193:13,14,19
potentially 40:20
pounds 139:20
power 28:14
practical 103:10
precautions
175:8
prefer 37:12
pregnancy 19:19
19:22 55:17,20
55:23 56:5,20
115:4 125:5,21
126:1,11,13,21
128:6 150:6
151:21 159:19
173:5 183:17
184:5 188:16
189:22 192:19
192:21 193:12
pregnant 55:7,12
56:2,4,10

124:22 126:15
126:18 149:22
150:12 162:13
167:3,6,15
168:11,15
169:1,5,6,11,14
169:23 170:24
185:15
prematurely
188:23
preparation
59:19 60:1
95:13 109:7
147:3
prepare 19:2,9
19:16 20:16,20
93:16,24 94:1
155:24
prepared 19:23
39:23 158:10
158:11,24
159:1
preparing 94:17
129:25
prescribed
176:11
prescription
176:7
Prescriptions
175:6
present 2:13
67:24 77:22
78:4 79:1 83:23
96:16 148:7
179:20 183:8
presented 4:25
119:24 176:22
180:21
preserve 114:7
116:6
presumption
12:8
pretty 174:22
prevent 11:3
17:24

previous 81:9
previously 8:5
94:11 98:15
135:12 183:24
185:18,24
prime 15:8
print 118:14
printed 67:12
printer 121:17
printout 69:23
prior 4:22 7:23
12:22
private 40:24
privately 57:24
privilege 13:23
19:18 130:4
131:15 146:24
privileged 14:3
93:22,24
129:25 197:20
probably 68:20
186:9
problem 105:9
problems 143:22
proceed 4:20
proceeding 72:13
proceedings 78:8
process 11:9
12:25 17:18
18:9 38:8 67:25
69:11,12 89:16
produce 109:21
112:4
produced 4:21
product 130:3
146:24
production 109:8
136:17
professional 48:9
48:17 148:18
196:20
Professionally
57:5
profile 109:4
promoted 52:5

**proper** 136:19,22
**protection** 76:17
76:20 77:6 79:4
85:13 199:7
**protocols** 169:5,7
169:8
**provide** 8:8 14:17
27:15 28:22
38:10,12 65:18
67:11 71:23
90:20 94:10
101:25 104:9
104:21 106:3
111:12 128:17
129:12 136:13
137:1,1,8,10
140:21 171:4
174:1 175:21
177:24 178:7
178:10,12
179:11 180:4
180:18 183:11
184:6,11 194:9
194:14,15
196:1,8 197:16
197:18,19,20
200:11
**provided** 10:17
19:19 32:4
92:15,25
129:16 131:3
136:10 137:18
172:3,8 174:16
176:3,15
177:23 178:25
183:6 185:22
186:11 196:22
197:5
**provides** 97:16
189:10
**providing** 11:14
27:14 94:10
99:5 135:12
138:20 171:15
**psychiatrist**

193:9,23
**psychologist**
193:25
**public** 48:14
92:11 203:6,14
**publicly-availa...**
73:14
**Puerto** 59:15
**pull** 66:10
**punch** 159:12,13
**punching** 159:14
**punctual** 159:9
**purpose** 8:2
100:15 149:22
**pursuant** 79:2
**pursuing** 116:12
**pushing** 10:14
**put** 53:23 61:7,10
61:14 64:23
72:24 85:20
86:2 89:2 99:12
100:11 107:24
107:25 110:4
130:15 138:1
144:4,4 147:15
149:15 151:11
151:12 198:18

_____
**Q**
**queen** 155:2
**question** 10:24
12:2,4,8,9,19
12:22 13:5,14
13:20 14:3,17
17:11,11 19:9
20:10,15,16,18
20:18 21:11
22:5 23:19 25:4
26:19 29:25
30:7,13,14 32:9
32:14,14,22
34:24 37:11,20
38:2,20,21 39:2
39:9,19 42:23
43:6 44:14,23

45:2 49:2,12
52:25 54:11
55:10 56:1
57:11 63:1,20
64:18 67:18
68:3 72:5 74:23
75:24 76:24
81:5 82:6 86:13
86:25 88:16
93:9 94:14,17
94:19,22 95:12
96:14 98:8 99:2
99:8,22 107:2
107:14 109:17
112:9 113:2,5,8
115:12 117:19
118:2,9 119:3,4
119:8 120:6
121:3 123:5
125:6 126:4,24
127:2,5,23,25
130:5,17
131:13,15,18
131:20 133:15
136:20,22
137:6 140:5,10
141:11 142:3
142:11 143:5
145:9 147:1,8
152:21 153:23
155:17 170:11
170:12 176:2
179:11 186:23
191:13,14
193:7 195:1
196:18 198:5
**questioning** 20:1
34:1 57:13
**questions** 3:18
5:20 7:21 11:5
11:9,13,16,23
13:19,23 14:1
15:15 17:4
18:14 19:10
22:12 29:22

30:1,5,6,11
31:11 32:16,24
33:24 34:2,6
40:25 42:20,22
49:10 60:5,9
64:21 67:5,21
68:23 69:1
91:23 95:5,22
95:24 107:3,4
134:25 141:8
152:3 156:2
174:10 194:2
200:15
**quick** 193:7
**quickly** 50:6
186:25
**Quineo** 21:25
22:1,2,9
**quit** 125:22 126:4
150:3 164:6
193:3
**quite** 32:18 41:5

_____
**R**
**R-E-I-N-A** 155:1
**race** 75:23
**raced** 75:7
**racing** 52:20
73:16,23 74:14
75:3,18
**rain** 15:20 16:3
16:10
**rained** 16:1
**raining** 15:19
16:8,9
**raise** 4:13,17
**Ramses** 145:17
146:3,20
**rare** 31:7
**rate** 51:12,14
52:14 59:24
**raw** 158:12
**reach** 91:9
**reached** 29:1
42:25

**read** 23:22,24
96:8 113:10,16
114:22 124:8
128:5 129:17
129:19 135:5
141:15 163:23
170:8,14
174:21 178:23
187:16 200:10
**reading** 79:19
96:21 202:8
**reads** 163:22
187:4
**ready** 91:22
**real** 48:16 90:15
90:18
**realize** 91:15
172:16
**realized** 12:20
**really** 40:17
61:17 64:13
107:14 108:22
117:19 121:20
181:10
**reason** 13:6
17:23 43:11
53:2 54:24
56:11 64:18
65:18 136:8
**reasons** 64:8
158:15
**recall** 65:11 72:4
77:5 86:3
114:20 115:24
123:24 147:17
168:4 199:14
**receive** 36:18,25
37:17 38:15,22
38:24 61:23
90:12 120:8
135:5 136:3
189:21 194:21
**received** 42:19
51:8 121:22
137:7 159:1

174:24 175:1
190:22 193:8
**receiving** 125:11
**recess** 91:19
145:12 171:25
**recognize** 66:20
66:24 129:22
135:20,23
136:1 160:1,6
178:5 184:1
**recognized** 37:6
37:25
**recollection** 78:5
79:7,19 80:18
114:17 122:21
132:10 156:20
187:25 198:13
**recommend**
124:9
**recommended**
102:17,21
**record** 4:6 5:18
6:18 7:4,6 8:10
8:21 9:4,23
10:4,13 13:7
15:6,23 19:25
20:6 23:3,6,11
23:14,16,17,20
23:25 24:1,6,7
24:17,18 26:10
40:6,7,8 57:19
58:12 62:23
66:14,21 69:18
72:15 77:10
79:11 91:17,20
94:10 96:20
107:7 113:10
113:16 117:10
117:16 124:8
127:13,17
128:5,14
129:15 133:8
135:11 137:17
138:9 141:4,15
145:11,13

170:8,14
171:14,24
172:1,2,25
174:2 178:21
178:23 183:23
186:22 191:12
192:2 198:11
200:19,20,25
204:9
**recording** 8:18
8:18,20
**records** 19:14,19
92:11 116:10
116:12 133:13
147:21 158:23
163:2,10 183:7
183:11 193:6
194:16 195:24
196:8,12,15
197:5,5,16
198:8
**recover** 105:17
105:17 110:2
110:23 116:18
116:19
**recuperate**
123:17
**Recurso** 187:5
**reduce** 162:12
**reduced** 159:17
161:1 162:3
163:11
**reduction** 161:19
**refer** 73:5 92:12
96:12 99:17
**referenced** 62:11
81:17
**referred** 175:4
193:12 194:1
**referring** 33:7
47:25 48:17
62:20 90:18,19
96:14 99:18
103:21,23
114:3 138:10

148:23 171:17
175:19
**refills** 175:7
**reflect** 8:10 9:23
10:4,13 15:6,23
19:25 23:17
26:10 57:19
66:14,21 69:18
72:15 77:10
94:10 96:20
117:10,16
128:14 129:15
130:8 133:8
135:11 137:17
141:4 158:23
163:2,11
171:14 172:2
174:3 183:23
186:22 191:12
198:11
**reflecting** 194:10
**reflection** 10:19
**refrain** 26:7
**refresh** 78:5
79:19
**refuse** 32:17
**regarding** 18:15
42:23 64:8
83:13 102:10
158:10 193:7
**regards** 32:8 76:3
132:21 152:3
**registered** 105:16
194:11
**regular** 159:20
**regularly** 33:2
34:11
**Reina** 154:23
155:1,2,3,6,8
155:15
**rejecting** 151:19
**relate** 30:2
**related** 9:22 70:5
72:9,11,11
79:25 93:2

101:1
**relates** 12:7 31:10
33:1 34:10
40:13 70:24
80:14,22 81:3,3
85:7 99:24
107:19 123:18
130:7,25 142:1
**relation** 61:21
167:2
**relationship**
31:19,21 83:17
84:2 153:8
**relative** 38:12
44:8 97:11,18
162:11 204:10
204:12
**relatively** 13:19
**relax** 48:10
**relaxed** 17:4
67:22
**relevant** 32:18
**relinquish** 29:24
30:14
**relinquished**
28:16
**rely** 95:24
**remain** 13:4
145:16
**remains** 30:15
**remember** 12:15
12:17 25:6,7
26:2 27:6 34:18
44:4 45:16,18
46:23 50:18
55:4,16 59:21
62:1 63:8,11,12
65:17 71:6 74:9
78:7 79:21
80:13 82:11
83:14 84:8,12
84:17,18,19,24
84:25 88:2 89:6
90:1,6,8 93:7
100:16,17

103:5 105:15
105:21 106:1
106:14,18,19
106:21 109:6
112:21 116:3
118:11 120:17
122:16,20,25
123:4,9,9
132:12,25
145:20 147:15
147:24 148:11
154:19 156:8,9
156:10,12,12
156:17 158:18
158:19 162:20
167:10 177:14
178:17,25
180:2 181:3
183:14,20
184:10,24
185:7 190:5,23
190:24 195:16
197:24 199:20
**remind** 39:15
**remodeling** 90:20
**rent** 153:14,24
154:2,4
**rental** 91:7
**rented** 29:4 31:15
31:24 32:3
**repeat** 7:2 26:13
38:19 63:2 65:3
65:8 79:21
82:17 86:21,25
89:13 113:6,7,9
115:4 116:10
124:5,6 127:3,5
127:6 141:11
170:7,10
**repeated** 58:2
128:15
**rephrase** 131:17
**report** 106:22
107:16 175:3
204:6

reported 169:16
169:19,22
reporter 4:2,12
4:16,19,23 8:15
9:2 10:6,7,10
11:21 14:9
17:19 23:15
24:1,16,18
30:21 40:8
48:14 67:10
91:17,20 113:6
113:7,9,11
124:6 127:3,6
128:7 137:11
137:13,22
141:10,13
145:11,13
170:12 171:24
172:1 173:22
192:3,6,10
200:18 201:11
201:15 202:1,3
203:5,13 204:1
204:5,19
reporter's 13:8
represaries
149:20
represars 167:20
represent 157:11
159:22 163:1
185:21 199:1
representation
130:13
representative
139:22
represented 13:1
64:22
representing
64:10,19
Reprisals 167:24
167:25
request 31:6
61:16 76:16
77:6 109:8
156:7 166:25

176:8 196:12
requested 76:24
77:4,4 92:16
171:5 176:4
requesting
176:15
requests 112:3
require 14:2
39:17 176:25
required 79:2
112:3 169:13
177:10 189:17
requirement 6:6
requires 14:4
reside 27:25 33:8
36:16 42:1 43:2
43:4,8 63:15,21
residence 154:3
residency 51:8,10
151:16
resident 51:11,21
151:17,17
resign 60:2
190:10 192:18
193:1
resigned 190:13
resigning 190:4
192:16
resources 132:7
139:3,6,9,16,21
140:4,14
141:19 142:2,8
142:9,23 143:9
143:14,17
147:13 148:11
148:13,16,18
148:21,22
149:1 150:13
150:14 164:22
164:24 165:2,2
165:7 166:7
172:11 173:9
173:18 174:17
191:9
respect 17:3

42:15 119:1,2
146:16 173:14
respected 146:17
respectful 40:16
respectfully
30:11 116:22
127:4
respond 5:21,22
5:23 9:15 11:4
11:10,20,23
12:5,7 13:16,18
13:20 14:24
15:11 25:13
26:6 30:12
32:17 36:4
74:25 127:19
129:18 141:8
responded 24:11
88:10
Respondent
72:12 200:7
responding 13:6
20:10 26:8
147:7
response 7:2 8:22
9:18 14:16,21
16:8 30:20
38:18 66:10
88:9 92:19 93:4
100:23 155:6
responses 3:9 9:1
11:14 18:7 20:4
22:14 42:4 66:3
67:4 92:12,15
93:17,21 94:24
96:12 109:8
201:8
responsibilities
28:11 29:22
37:22
responsibility
30:22
responsible 28:20
28:21 138:25
responsive 12:10

32:13 191:14
rest 56:4 125:13
161:5 177:21
179:4,5,7 182:2
182:15 186:20
restated 170:23
restaurant 50:10
50:12 52:7,10
52:21 59:14
87:9 99:11
157:13 166:8
restaurants
52:10,13,18
53:1,1
restrain 85:20
restraining 81:23
restriction 179:8
restroom 17:10
result 79:20 80:4
161:18 162:2
retained 3:16
return 59:5 63:24
63:25 88:20
197:11
returned 58:22
59:11 63:22
90:5 156:22,24
returns 90:2
reveal 93:22
131:11 147:4
revealed 149:22
revealing 93:23
review 24:9
71:15 72:17
120:2 172:6
174:9 204:7
reviewed 22:13
92:11 193:6
reviewing 73:14
Reydel 60:19
64:11 65:12
69:25 71:2
72:12 73:15
77:25 81:6
199:2,11

Rican 59:15
Richard 150:11
159:19 164:20
164:25 165:1,3
165:6,12,13
166:19,22
167:4 170:21
186:12,18,19
right 4:13,17
8:16,19 23:8,10
42:3,7,8 54:5
54:11 58:4
63:21 69:17
77:24 84:2 87:6
92:12 96:4
101:13 108:15
114:20 133:11
145:2 166:5
168:3 176:3
185:1 192:5,13
200:23
rights 28:16
29:24 30:15
risk 51:20 126:11
126:13
road 7:19 153:5
roasted 144:6
role 52:4
room 16:6 153:14
153:24 154:2,4
173:16 174:14
194:2
rude 6:4
rule 8:8
rules 8:6 10:20
10:24 11:7
running 164:7

S

sacred 13:25
sad 106:7
safely 14:5
safety 158:14
salmon 144:5
151:11

Salvatora 154:24
save 118:14,15
  121:18
saw 16:2 138:23
  140:21 161:11
  166:15 184:21
  184:22 195:17
  196:6,7
saying 6:5 37:9
  48:10 111:15
  130:19 159:1
says 6:24 13:3,13
  13:15 72:14
  77:21 78:1,18
  79:6 96:25
  101:1 107:11
  132:9 133:10
  135:21 168:8
  172:12 173:1,7
  178:21 179:18
  181:25,25
  182:17 185:2,8
  186:1,2 191:6,8
  191:9,16,16
  198:15
scarf 40:2
schedule 133:17
  140:18 161:4,5
  176:24 177:4,5
  177:7,7
schedules 140:15
  140:22 150:16
school 45:13,21
  103:13,16,17
screen 168:18
screenplay 10:7
sear 151:10
search 104:10,14
  108:17 109:11
  112:22 121:25
  123:2,10,11,20
searched 107:24
  109:22
searching 108:4
  108:20,22

season 97:20
second 30:15,23
  31:10,20 32:3
  131:18 175:2
  195:10
second-to-last
  95:3 187:3
seconds 173:2
secretarial
  103:21
secretaries 90:10
  90:13
secretary 89:11
  89:19 90:3,9,11
  101:7 103:2,8
section 48:8
  197:6
sections 144:17
security 23:1,6
  23:14 105:15
see 4:24 8:17
  15:16,19,21
  16:3,17 22:13
  33:2 34:17
  42:22 55:12
  58:9 67:23,24
  73:6 77:16,18
  77:21,24 78:22
  91:12 92:20
  94:25 100:23
  103:18 119:5
  129:6,8 131:24
  132:1 136:9
  138:19 140:17
  144:13 146:2
  155:23 163:10
  166:16 177:25
  184:20 185:25
  186:3,5 191:16
  191:17,18
  193:8,23,25
  194:16 196:20
  197:4,18
seek 20:3 188:20
  195:10

seeking 14:1
  189:3
seen 33:5,10
  34:14,20 35:15
  41:5 135:17
  142:16 148:20
  196:25
self- 57:22
send 29:2 31:2
  61:16 105:16
  118:16 143:8
  158:14 172:10
  181:18 190:3
  191:8
sense 8:23 11:14
  11:18 13:16
  14:22 16:4,12
  16:21 48:11
  49:19 92:8
sensitive 40:16
  199:15
sensitivity 41:14
  42:15
sent 104:22 105:4
  139:8 142:22
  147:24 156:17
  156:18 157:5
  168:19 184:15
  184:17 186:1,6
  187:6,11,19
  188:1,1,5,7,8
  190:7,13
  191:10,21
sentence 78:25
separated 34:5
  35:22 151:22
  152:1,5 153:6
  153:11 155:22
separately
  121:14 131:5
  153:2
separations
  153:10
September 91:4
  93:5 132:1,5,8

132:15,19,24
  133:2,10,12,14
  133:20
Sergio 2:14 4:13
  5:5 203:7
series 22:11
serious 42:16
  192:22
served 66:7 112:3
Service 88:24
  89:1
serviced 52:13
services 90:20
  93:1 97:17 99:5
  101:1 103:24
set 13:22 22:15
  66:4 79:3 93:17
  96:13
seven 12:15
  22:25 28:8
  43:25 52:12
  105:25 201:13
seventh 125:5
sexual 143:25
  144:2 151:18
  165:20
sexually 150:10
shake 68:20
shaking 57:20,20
shared 138:5
she'd 147:4
shift 144:20
  159:14,20
  164:5 173:6,9
  173:11,13,16
shifts 163:18
  192:23
shocks 41:6
short 43:19
  102:17 174:22
shoulders 154:12
show 30:2 66:6
  66:13,16 69:19
  71:8,10 72:10
  119:13 120:4

121:15,24
  123:19 133:12
  135:14 171:18
  184:17 198:9
showed 72:9
  92:14 93:16
showing 72:20
  77:11 79:18
  119:25 120:21
  132:14 168:14
  174:3 183:24
  198:12
shown 95:2
shows 107:16
  185:5
sic 9:2,3 39:18
  149:21,23
  167:20
sick 54:24 55:2
sickness 42:18
  169:24 170:24
side 77:24
sides 144:6
sighs 10:9
signature 66:25
  72:10 73:6,7
  95:3
signed 47:5,10
  78:17 79:25
  92:13 93:9
  94:18 200:4
  203:9
signing 202:8
silent 13:4
similar 160:15
similarly 5:19
  6:23 9:21,25
  13:12 16:6
  23:18
simple 13:7
simplify 37:20
simply 12:19
  17:18 37:13
  40:17 45:15
  50:4 56:9 68:3

128:15 177:10
sincerity 67:22
single 152:2
sir 6:16 35:6 63:2
    69:20 70:1
    83:10 85:5,17
    134:25 136:18
    141:7 147:8
    163:23 192:14
sisters 44:9
sit 15:14 24:20
    47:7 48:22
    82:12 106:2
    119:11 127:4
    133:1 140:20
    187:1 190:21
    195:12,18
site 107:22 108:5
    108:9 109:21
sites 104:5,7
    105:4 107:20
    108:20,23
sitting 12:25 14:9
    48:12 148:19
    194:2
situation 19:21
    29:6 31:9 40:13
    56:17 68:9
    82:16,19 84:20
    85:7 148:1
    173:10 176:10
six 22:25 54:9
    84:15 91:1
    105:25 173:23
    201:12,13
sixty 97:19
skip 60:7
sky 15:25
sleepy 194:23
slightly 8:19
slow 33:16 39:8
    65:13
smash 156:18
    157:14
smile 117:8

smiling 117:6,14
Smiling's 117:11
smoother 18:9
sneak 201:1
social 23:1,6,13
solely 14:25
    34:25 57:25
    186:5 191:15
solution 115:7
solve 156:16
    165:9
somebody 11:11
    131:14
son 154:5,5
    188:23,25
    198:16
soon 191:1
sorry 31:16 33:18
    33:18 39:10,10
    42:15,18 61:3
    81:4 83:16
    90:16 128:7
    137:22 138:12
    172:18 178:20
    202:4
sort 8:8 10:12
    11:7 13:22
    14:16 20:18
    40:11 49:18
    57:22 92:4
Sosa-Bruzon
    78:23
sound 8:20
    147:23 199:22
sounds 9:5 34:24
source 16:20
sous-chef 52:6,18
South 1:13 2:9
    76:6
SOUTHERN 1:1
Spanglish 5:25
Spanish 5:7,8,14
    5:17,22 6:1,5,9
    6:12,14 17:6
    39:13 40:3

58:12,14 90:23
    129:2 130:22
    131:3 174:4
speak 5:14,19 6:1
    9:17 17:17
    19:12 20:6,22
    20:25 21:11
    34:11 42:4 77:2
    116:25 164:17
    166:11,14
    169:3
speakers 6:12
speaking 10:2
    11:10 17:15
    35:6 58:14
    62:21 79:11,15
    83:7,8 85:4,17
    94:3 117:12
    125:23 127:10
    127:14 155:10
speaks 10:1
specialist 194:3
    194:17 196:6,7
specialists 175:5
specific 50:20
    69:12 108:21
    115:19 183:16
    187:2
specifically 19:16
    20:20 54:18
    99:10 110:8
    148:25 168:4
speculation
    139:25 144:25
spell 9:2 25:20
    46:2
spelled 25:21,23
    46:3 78:21 93:1
Spencer 78:18
spending 166:7
spends 153:4
spin 56:7,15
spite 83:22
spoke 31:14
    34:11 81:7 82:8

101:7 165:22
spoken 6:9 14:5
    33:7 35:1 156:2
Sport 52:19
spouse 25:18
squeezed 154:12
stamps 61:21,23
stand 7:9 17:7
    66:15
standards 158:13
standing 164:1
stands 78:21
start 27:18 53:15
    96:22 122:17
    143:12,25
    152:4 171:8
started 47:6,11
    49:15 84:2
    91:23 92:4 98:1
    102:14 122:12
    122:14 132:8
    132:10,23
    133:2,19 139:8
    143:18,24
    151:20 152:12
    152:18 153:14
    159:15 164:4
starting 4:6
    53:19 96:16
starts 199:10
Starwood 86:18
state 4:5 7:6 9:9
    10:4 12:3 15:9
    16:2,18 17:15
    19:5 20:11
    33:24 36:7 40:5
    58:8,12 70:17
    75:2 100:24
    131:25 200:4
    203:2,6,14
    204:2
stated 6:14,20
    16:23 31:13
    43:24 60:12
    86:1 89:19

118:8 143:6
    170:23 172:24
    200:11
statement 12:9
    16:16 20:13
    81:16 147:16
statements 6:19
    9:7
states 1:1 6:11
    7:17 26:23
    27:25 28:3,7,12
    28:22 29:17,23
    33:13 42:1,11
    42:13 43:2,5,12
    43:15,24 44:1
    45:5,19 49:9
    50:2,6 72:9
    88:24,25 93:2,4
    103:22 149:7
    176:7 200:5
stating 8:12
    10:13 17:23
    80:2
status 151:16,17
    151:17
Statutes 79:2
stay 56:17 151:2
steamed 68:17
step 181:11,11
Sterling 101:14
    101:17 102:2,9
    102:20,21,25
sticker 138:2
stole 105:8
stolen 111:5
    190:19
stop 117:5,17,24
    128:1 136:23
    141:10 144:12
    146:16 165:22
stopped 53:2
    87:9 137:4
stopping 91:10
storage 113:22
store 11:12

113:25
**Street** 2:4 22:16
22:18,19 59:17
**stress** 12:13
39:16 68:2
88:19 125:10
125:23 193:14
193:19 194:4
**stressful** 176:10
**strike** 19:7 20:7
20:13 21:8 22:6
25:2 29:7 30:3
30:25 32:13
35:5 36:23 37:7
47:12 55:24
64:16 66:1
68:11,13 70:21
76:22 86:11,23
89:17 98:25
101:23 106:9
107:12 108:2
108:12 109:15
110:6 115:9
122:10 126:2
134:16 141:23
142:4,12
147:10,19
150:19 152:15
152:23 163:20
164:9 175:25
176:12 179:9
182:3 190:1
191:13 196:10
**strong** 164:14
**stronger** 149:21
164:20
**studied** 44:21
47:20 103:9
**studies** 46:22
**study** 45:25 46:5
46:25
**studying** 30:24
47:14
**subject** 7:20
199:15

**subsection** 199:8
**substance** 18:16
131:12
**substances** 11:2
**substantial** 17:16
**substantially**
14:19 160:14
163:11
**sue** 86:10
**sued** 86:18
**suffered** 42:17
81:4 122:9
**suffering** 150:15
151:7 167:18
**suggest** 78:4
**suggesting** 82:4
**suggestions** 12:16
**suing** 18:21 86:7
86:14,21
**suit** 114:18
**Suite** 1:13 2:4,9
**summary** 3:12
201:11
**Supervised** 195:7
**supervising**
154:17
**supervision**
154:15
**support** 28:23
32:4 36:18
37:17 38:22
60:23 61:4,14
61:19,22 62:10
62:15 64:11,24
65:6 72:24 73:1
80:3 155:18
**supports** 38:16
**supposed** 85:19
**Supposing** 15:18
**sure** 9:6,16,18
20:19 24:9 44:5
44:6 50:17
58:17 65:17
87:22 94:13
95:6 120:7

133:14 145:9
178:20 183:15
184:15 186:24
200:21
**surface** 160:11
**surprise** 73:4
155:8 160:12
**surprised** 155:18
163:10
**suspensions** 49:5
**SW** 2:4 62:2,5,11
**swear** 4:4
**switch** 7:22 44:10
86:1 192:6
**swore** 11:21
**sworn** 4:22 5:6
5:10 17:19
203:8
**symptoms** 126:1
126:1 164:3,12
**system** 103:15

**T**

**T** 2:6
**table** 8:15 14:9
158:12
**tablets** 175:7,7
**take** 10:12,19,25
17:7,12,16 23:5
39:18,19 47:22
51:20 67:8,19
69:3 78:16
80:23 91:10,13
118:2 136:5
145:4,23
156:14,16
176:9 181:11
181:17 182:19
188:20 189:1
192:23 194:12
194:18,20,22
198:20 201:4
**taken** 91:19
145:12 171:25
**talk** 16:15 42:7

44:11 60:5 87:5
87:7 122:13
148:1 151:1
156:15 164:21
165:2,8 168:5,7
168:9,21,23,25
**talked** 73:24
146:13 167:13
168:6,7 185:6
**talking** 13:10
83:19 84:4 87:8
92:10 109:18
117:17 151:3
185:1
**Tara** 2:11 4:9
**taste** 157:10
**tax** 90:1 137:7
**taxes** 100:12
136:5,7
**tea** 40:1 68:17
**teaching** 56:7
**team** 67:13 69:5
**technically** 14:18
**technology**
113:24
**Tecnologica**
45:23
**telephone** 99:25
168:7 186:19
**tell** 12:3 14:4
17:23 19:6
39:24 102:1,9
139:17 143:13
145:4 146:13
146:15 147:10
154:14 163:9
167:5,15
184:19 186:3
190:25 194:23
**telling** 27:5
145:15 151:15
154:17 165:3
176:9
**temporary** 70:9
78:24

**ten** 25:9,11 28:8
52:17
**tendencies** 82:21
**term** 39:3 58:4
90:17 115:15
115:20
**terminal** 42:8
**terminate** 53:9
**terms** 138:6
157:1
**testified** 5:11 8:5
41:17 53:20
63:22 161:1
181:12 194:19
**testify** 146:5
161:7,10
195:13
**testifying** 34:4
**testimony** 3:2 5:7
7:23,25 13:2
16:16 31:12
38:4 78:12
80:15 81:16,20
95:7,8 127:9
133:6 134:13
140:21,24
156:1 158:2,7
158:23 162:8
196:7
**Texas** 21:15,16
22:20 41:22
48:21,24,25
49:1 55:9,13
56:18,21,23,25
57:2,3,9,15,16
58:20 63:12,15
63:21,22,24
64:1 88:5,6,10
88:17 90:6 91:6
91:7 98:1
152:19 153:21
**text** 3:13 19:15
79:12 119:12
147:25 168:8
168:13 171:16

172:3,8,24
175:19,20
181:18 184:13
184:16 186:5
186:11 187:9
187:13,17
190:3,15,22
191:15,19
192:4 198:8
201:13,13
**texts** 201:10,23
**tfaenza@path...**
2:11
**thank** 4:12,16,19
12:23 15:14
17:14 18:10
44:22 69:13
71:9 78:16
91:21,25
129:21 202:3
**thankful** 168:21
**theft** 106:22
**therapist** 194:21
**therapy** 194:21
195:2 197:3
**thing** 6:8 9:8
12:24 31:18
32:20 39:21
40:23 61:21
76:4 111:8
115:3 133:19
133:20 155:21
161:16
**things** 12:12 40:1
41:5 57:12 58:7
72:2 84:18
90:21 96:8
104:15 122:13
123:16 147:17
149:3 156:2,13
168:22 192:20
199:21
**think** 9:21 27:6
28:8 32:18
34:18 38:3

44:13 45:10,24
47:23,24 51:13
53:14 55:13,16
59:25 60:11
61:6 68:7 74:24
76:10 78:11,15
87:21 88:10
89:3,22 90:6
99:7 105:25
107:20 136:7
146:18 159:5
160:3 173:5
183:14 184:15
197:17 200:13
200:25 201:15
201:23
**third** 38:13 41:15
**third-to-last**
187:4
**Thirty-five**
126:19
**thought** 39:22
110:3 114:13
156:12
**three** 29:18 35:25
52:3 70:3
143:24 159:16
163:19 164:5,8
189:5,7,13
201:8
**thrown** 17:7
**Thursday** 4:2
186:4
**tightly** 154:11
**time** 4:3,4 6:13
7:20 13:18 15:9
15:9 17:16 18:8
21:23 22:3 27:8
28:6,11 29:2
34:5,21 41:18
43:3,18,19
48:10 49:4,14
49:25 50:11
53:18,24 54:16
54:20,25 55:6

56:9,21 57:3,14
59:9,21,22
60:12 63:18
65:3,8,24 75:14
75:17 81:24
82:20 83:1,14
83:25 84:4,19
85:18 91:11,12
96:15 98:5,7,9
99:2 103:25
106:8 115:11
121:13 122:8,8
124:2 126:14
134:10 141:17
144:22 147:16
149:7 150:6
151:23,24
152:5,12,17
153:1,4,6,14
154:9 157:13
159:10,12,13
163:14,17
164:8,11,21
166:15,15
169:1,18,18,25
170:21 171:2,5
171:8,11,18
176:4,6,8,9,15
176:18,25
177:12,16,17
177:18 180:3,4
182:14,15,19
183:7 186:25
188:11,20
189:21 199:14
199:22
**times** 33:5,11
35:16 82:25
83:3,12 116:16
118:25 123:13
123:14 144:9
145:2 156:25
175:23
**tip** 167:24
**title** 50:19 66:22

**titled** 72:8 199:6
**titles** 92:17
**Tito** 163:17 164:4
164:14 167:4
171:10 172:12
172:14 173:11
177:23 178:8
178:13 179:23
180:5,24 184:7
186:12,18,19
188:5,7
**today** 11:5 14:10
14:24 15:14
19:3 21:12
24:20 47:7
48:22 82:12
106:2 119:11
133:1 140:20
166:12,14
173:2,6 174:24
187:1 190:21
195:12,18
**toddler** 35:25
**told** 15:17 16:7
16:10,24 53:3
61:13,18
139:19 141:18
142:17 145:23
149:12,17
150:12,12,13
151:8,8,13,17
162:7 165:1
166:9 167:8,13
167:17 168:3
168:10,14
169:23 170:22
171:7 177:5
190:11 192:19
192:21,22
194:3 195:19
**tomorrow** 173:8
**tongue** 167:24
**top** 70:6 77:19
172:12 187:4
187:16

**total** 121:23
187:22
**totality** 148:23
**touch** 144:3
154:9,10
158:13
**Touching** 144:2
**Tower** 1:13 2:9
**track** 31:16 52:20
**trainer** 56:6,14
**training** 103:10
**transcript** 23:9
202:8 204:7,8
**transferred** 61:22
114:1
**translate** 5:7 8:13
141:12 172:22
178:20 192:1
**translated** 40:3
128:25 131:3,6
172:25 174:12
**translating** 15:4
**translation** 33:17
136:12 143:9
**translator** 30:19
48:13 58:16
129:4 141:12
171:15,18
174:11,19,20
191:25
**transparent**
175:24
**trauma** 88:21
**travel** 21:15
**traveling** 200:22
**treatment** 167:1
192:25 193:9
194:10,20
195:4
**trial** 8:1 119:24
119:25 128:23
129:5 130:8
131:2 147:3
**tried** 71:16 76:19
81:21 110:2

111:15 112:17
118:8 123:14
144:11
**trimester** 175:2
**truck** 48:16
58:25 153:4
**true** 14:13 67:4
191:22 200:11
204:8
**truly** 5:6
**trust** 41:4
**trusted** 168:21
**truth** 19:6
**truthful** 14:16,18
14:21 15:1
**try** 7:19 30:11
68:23 92:8
105:17 107:10
110:23 116:17
**trying** 40:16,18
54:15 62:22
75:18,25 99:9
108:22 115:23
116:23 117:5
119:23,24
121:21 122:14
132:18 133:21
164:7 168:15
169:2 182:14
**turn** 74:4 197:9
197:23
**turned** 120:2,10
132:13 136:8
136:14 141:5
175:12
**turning** 20:1
**twelve** 189:10,18
**Twenty-one**
52:15
**Twenty-seven**
126:16
**twice** 34:13
**two** 13:8 33:1,12
34:10,25 36:10
41:22,25 45:10

46:8 50:8 52:13
53:21 66:16
104:15 134:1
138:13 144:17
158:20 159:16
160:9 173:11
173:12,15
174:5 194:24
**type** 61:2 72:13
90:14 170:4
194:12
**types** 40:24
**typing** 8:16

———

**U**

**U-H-U-H** 9:3
**Uber** 57:23
**uh-** 9:2
**um-hmm** 9:1
21:5 117:6
198:19
**unable** 55:21
70:16 101:25
102:1 106:2
125:3,7,22
126:5
**uncomfortable**
68:1,24 69:11
146:17
**uncommon** 18:1
50:1
**underage** 27:17
**understand** 6:4
6:20 9:20 10:16
10:20,22 11:4
11:15,24 12:2,6
12:9,11,23
13:11,17,21
14:7,8 15:13
16:5,22 17:1,22
18:13,24 30:8
32:25 34:8,9
37:9 38:18,20
39:3 41:2 53:25
54:13 60:8

62:14 63:20
64:3,15 75:19
76:1 79:13
94:21 99:11
104:19 110:13
111:1 113:2,3,6
114:15 118:7,8
126:25 127:1
130:24 132:18
135:4 151:4
177:22 180:8
181:12,13
182:13 199:14
200:6
**understanding**
20:19 31:12,22
40:19 57:5
118:6 165:3,16
181:10
**Understood**
58:20 74:6
99:24 181:17
**unemployed**
53:23 54:2
**unfortunately**
30:6,9 40:15
69:2,8 116:22
122:2 190:18
**United** 1:1 6:11
7:17 26:23
27:25 28:3,7,12
28:22 29:17,23
33:13 42:1,11
42:13 43:2,5,12
43:15,24 44:1
45:5,19 49:9
50:2,5 88:23,25
103:22
**Universidad**
45:23
**university** 44:17
45:6,7,9 46:8
**unknown** 175:5
**unnecessary**
17:25 68:2

82:18
**unusual** 13:12,19
**upset** 145:7 159:6
164:19
**urgent** 173:4
**use** 9:14,14 11:17
17:9 84:1 90:24
98:15 104:7
105:19,22
108:9 109:13
115:15
**username** 109:1
109:20 110:19
**usually** 58:5
160:4
**utmost** 41:4

———

**V**

**V** 25:23 46:3
**valid** 4:21
**validated** 46:11
**Valparaiso** 46:1
46:3
**Vargas** 172:19
174:16 181:18
184:7 191:20
**various** 115:5
144:10 158:20
184:24
**Venezuelan**
160:8
**Vera** 25:19,20,22
25:23,24 36:12
**verbal** 8:22,25
9:18 164:15
**verbally** 147:22
159:7
**verification**
66:16 67:1
**verify** 24:3 67:3
107:11 185:23
**version** 172:7
187:12
**victim** 83:16
**Victor** 25:23 46:3

**view** 14:16 17:2
132:17
**violence** 65:12
70:18 71:1
76:12 79:1 81:3
81:6,10,12,12
82:19 83:2,13
83:16,18,20
84:20 199:4,8,9
**violent** 82:21
83:17,19
**visit** 100:14
174:23
**visits** 196:21
197:12
**voluntarily** 60:2
**volunteer** 41:3
**vs** 69:25
**vs-** 1:7

———

**W**

**W** 59:23 60:3
86:2,4,7,14,18
98:17,18,22
99:3,6,10,12,13
99:17 134:10
134:11 160:1,2
160:6 173:12
**W-2** 100:20,22
**wait** 6:15 39:8
62:4,4 74:22
**waiting** 21:23
**waived** 202:8
204:8
**walk** 66:12,15
68:19 197:3
**wall** 155:22
**want** 11:20 17:5
18:8 23:8 33:20
40:11 51:19,20
58:2,8 68:9
69:8,20 70:11
70:15 72:22
84:24 87:8
91:12 92:5,19

93:22 94:15
110:9 113:1
116:24 119:5
120:4,6,7
130:11 131:17
138:1 141:10
151:1 154:16
171:21 176:7
178:20 181:11
186:24 189:15
189:24 193:7
194:18,22
195:3,8 196:4
200:19,20
201:3
**wanted** 43:15
51:23 61:13
153:16 194:12
**wants** 73:3
**warned** 39:24
**wasn't** 20:5 39:23
62:22 141:2
191:14
**waste** 43:3
**water** 8:17 15:20
17:8 145:10
**way** 12:4 16:14
17:4 19:22 30:9
34:24 46:16
84:3 89:3 95:23
96:17 117:4
124:11,14,23
130:1 135:13
144:6 145:17
151:9,12 157:1
164:18 172:15
189:9 192:8
**we'll** 5:1,15 22:12
27:18 60:5 69:7
69:16 108:14
113:9 119:3,4
127:6 145:9
173:20
**we're** 13:9 18:22
30:2 65:23 84:4

91:22 131:20
131:20 137:11
201:23
**we've** 33:7 35:1
**webpages** 107:25
**website** 108:4,17
109:18 110:22
120:13
**websites** 107:21
120:20
**Wednesday**
186:17
**week** 56:7,15
161:22,23
162:5,6,9 163:3
182:6
**weeks** 143:24
174:25 189:10
189:18
**weird** 34:24
**welcome** 67:20
**went** 52:1 55:9
55:13 91:6
100:6,7 102:14
113:25 124:18
139:5 142:16
143:14 148:19
168:5 171:2
175:23 179:3,6
179:8,15,18
180:3,10,14,21
181:13 182:9,9
182:17 185:5
195:1
**weren't** 54:25
85:13
**wet** 16:1
**WGOAT** 137:20
186:8
**WGOAT15** 1:8
4:11 66:11 96:6
96:12 116:13
136:6 137:19
157:12 159:22
186:13

**Wilmer** 160:7,13
**window** 15:21,22
15:24
**windows** 16:7
**wish** 9:17 68:20
163:23
**withdraw** 68:12
**witness** 4:17 8:1
8:11 10:9,9
13:18 20:2 21:7
22:22 25:13
32:1 33:18
39:10 42:24
61:6 62:25
66:22 67:18
68:7,12 69:13
69:20 70:17,19
71:14 74:24
77:14 79:9,16
90:17 91:25
96:21 104:19
113:18 117:1,2
117:3,5 128:9
128:15 131:22
135:12 141:17
145:10 146:10
146:21 170:10
170:15 171:20
175:10 195:19
200:15
**witnesses** 67:22
67:22 147:3
**woman** 56:3,8
81:10,22
**women** 124:21,22
**word** 8:22 9:19
13:2,3 15:10
83:9 84:1
143:10 149:25
167:21 170:5,9
170:10
**words** 9:5,14
10:11 14:25
172:23
**work** 18:21 49:12

49:18,22 50:4,9
50:16 51:16,19
51:20,25 52:2
52:11,25 53:5
53:19 54:17,22
54:25 55:8,11
55:14,17,21,23
56:2,5,11 57:2
57:6,7,8,11,24
59:1,1,20 60:3
73:20 74:1,10
75:7 76:8 88:13
89:5,13 90:3
91:1 92:8 97:9
97:11,24 98:1,2
98:22 99:3,13
99:19 100:15
102:21 103:7
103:21 104:11
104:22 107:25
108:7 109:22
115:5,6 116:7
122:4,22 124:3
124:10,14,18
124:19,21,22
124:24 125:3,7
125:8,11,13,23
126:5,8 130:3
134:3,9 138:7
138:20,25
139:5,10,11,15
140:2 143:18
146:23 149:4,9
149:9,18
150:18 151:24
152:12 153:11
153:12 160:10
163:19 164:5,7
167:5 169:5
171:1,9 176:23
176:25 177:11
178:14 179:7,8
179:8,15,19
180:1,3,12,15
180:21,23

181:4,5,13
182:1,5,17,20
182:24 187:21
187:23 188:3,4
188:19 189:14
189:18 194:5,7
**Work-related**
64:8
**worked** 49:15
54:16 59:3,14
74:2,7 75:4
76:5 87:8,11,18
88:17 89:3,19
89:24 90:12
91:3 92:6,18
98:5,24 99:10
101:7 102:25
103:2 125:5
135:6 140:5,10
154:5 155:24
159:23 160:19
162:14,16,22
163:2,4,13
164:11 170:2
180:8 181:3,12
182:5,14 183:7
187:22
**working** 49:13,15
49:23 50:1,2,5
50:7 53:3,15,20
54:2,6,7,14,19
54:20 56:10,12
57:13,23,23
58:24 59:13
63:23 74:14,18
74:19 75:9 76:4
87:9 88:18
96:16 97:1
98:14,18
100:13 102:15
112:13 124:13
125:25 131:25
132:5,16,17,23
133:12,13
136:2 137:4

139:22 143:3
143:12,23
148:13,15
149:11 152:18
153:14 154:16
155:15,16,21
157:2 158:20
158:21 160:4
162:8 163:7
188:24
**workmate** 155:4
**workmates** 145:3
145:6
**works** 61:17
142:8 157:3
189:19
**worried** 161:4
**worrying** 160:23
**wouldn't** 27:4
64:20 68:25
144:11
**wrap** 40:12
108:22
**write** 10:8 69:5
**writing** 148:5
168:14
**wrong** 140:9
190:25

**X**

**X** 6:17 118:10

**Y**

**Y** 6:17 118:10
**Y-V-O-N** 93:1
100:25
**Yaro** 60:19 64:11
65:12 69:25
70:13,18 71:2
72:12 73:10,15
73:21 74:3
77:25 81:6,18
81:24 82:7,13
82:16,20 83:1
84:21 199:3,12
199:16

**yeah** 47:22 68:5
94:5 99:22
104:15 115:21
123:14 138:14
160:8 187:6
201:5
**year** 25:15 26:1,4
26:21 34:17
41:10 46:21
50:18 53:15,22
55:16 60:13
64:5 65:11 84:3
84:9 87:23
88:18 89:7
103:9 106:15
122:17,22
123:2,18 136:4
187:23 199:17
**years** 25:8,11,15
27:20,21 28:8
29:18 36:8
43:15,21,25
44:5,6,6 45:7
45:16,20,21
46:25 52:3
53:13 92:16
103:5,7 154:16
154:20
**yesterday** 173:2
**yoga** 197:3
**young** 114:1
148:10 160:3
194:24
**youngest** 41:8,9
**Yvon** 93:1,1
103:24

**Z**

**Z** 6:17 118:10
**zero** 175:7
**Zoom** 78:9

**0**

**0009** 187:3
**0028** 135:14
**01** 62:5

**01/10/24** 175:2
**02/14/29** 203:16
**020** 135:13
**021011-FC-04**
70:11
**06** 184:19

_____

**1**

**1** 3:8,16 5:2,3
185:19 201:6
**1.5** 33:22
**1:00** 91:16
**1:24** 91:13,17
**1:24-cv-24135-...**
1:3
**10** 186:18
**10:19** 1:16 4:4
**100** 68:15 151:1
**1099** 100:20
**10th** 134:3 163:3
170:25 174:5
176:4,15,19
177:11,17
**11** 185:19
**11:00** 23:16
**11:15** 175:2
**11:38** 40:8
**1118** 2:4
**118** 3:19
**11th** 132:15,16
133:25
**12** 3:19 44:6
**129** 3:20
**12th** 124:1,2,3,11
181:22,24
182:1,2,12,24
**13** 51:13
**131** 3:20
**136634417** 69:24
**137** 3:12
**14** 59:25 173:2
**146** 3:21
**149.94** 163:5
**15** 137:21 154:16
**15-** 62:4

**1501** 62:2,11
**152.91** 162:14
**158.84** 163:2
**15th** 71:1 78:22
163:3 171:1
176:5,16,19,24
177:11,18
200:5
**16** 162:5,9
**16th** 114:16,23
115:13
**17** 45:21
**173** 3:13
**178.21** 162:16
**18** 27:15,22 42:25
60:12 178:2
**19** 3:21 27:20,21
**192** 3:14
**198** 3:15
**1988** 7:14

_____

**2**

**2** 1:13 2:9 3:9
67:11,16 94:11
138:10 201:7
**2/5/24** 185:8
**2:38** 91:20
**20** 161:21 162:5,9
178:2
**2001** 60:25
**2001768437**
60:24
**2017** 7:18 25:14
33:6 34:15
35:14,22 43:12
**2018** 53:23
**2019** 53:17 60:13
**2020** 199:10,16
199:17
**2021** 53:14 65:11
65:15 70:8 71:2
78:22 199:13
199:18 200:5
**2021-** 70:10
**2021-021011-F...**

**65:13
**2022** 34:18
**2023** 59:6 132:1,5
132:9,15,16,24
133:2,2,20
134:4 136:4
137:8 147:22
152:6,18
156:19 157:12
**2024** 88:1,12 93:5
106:19 114:16
114:23 115:1
115:14 122:17
122:23 123:2
123:18,25
124:3,11
126:14 136:4
137:8 171:1
179:2 186:2
**2025** 63:6,10 64:6
88:11,13 89:9
90:7 91:3,4
93:6 97:1
106:19 131:1
**2026** 1:16 4:3
35:15 203:8,9
204:15
**20th** 203:9
204:15
**21** 7:14 34:18
**210013342** 72:13
**21007346** 199:3
**2100736** 198:12
**2135** 46:16
**21st** 126:16
**22** 1:16 34:19
**22nd** 4:3,3 203:8
**23** 174:25
**235** 22:20
**24** 3:20 87:25
184:19
**2400** 1:13 2:9
**25** 98:6
**26** 131:25 133:3
**28th** 63:6 131:1

**29** 163:24

---
**3**
---

**3** 3:10,19 71:23
71:24 175:6
**30** 43:15,25
**305** 2:10
**32** 3:19
**33130** 2:5
**33131** 1:14 2:10
**33145** 62:6
**35** 97:14 126:20
**37** 43:21
**379-2425** 2:10
**37th** 62:2,5,12
**38** 43:21

---
**4**
---

**4** 3:11 87:3 96:14
101:4 103:24
131:24 137:23
163:24 199:8
**4:23** 145:11
**4:26** 145:13
**40** 51:16 97:13
**420** 2:4
**4417** 70:6
**45** 171:7,10 173:8
**49** 142:17
**49th** 140:8
148:23

---
**5**
---

**5** 3:3,8,12,20
96:14 98:4
137:11,14,15
137:18 191:6,6
191:8
**5:26** 171:24
**5:31** 172:1
**50** 139:20
**500** 175:6,7
**500-9675** 2:5
**558** 187:4
**5th** 97:1 98:6

---
**6**
---

**6** 3:13 173:22,24
185:2 186:4
192:4
**6:20** 198:4
**6:28** 1:16 202:6
**605377** 1:25
203:15
**627** 187:22
**6550** 22:16,17
**67** 3:9
**6th** 91:7 147:22
151:3,5 156:3
186:2,2

---
**7**
---

**7** 3:14 138:10,15
173:21 192:5,8
192:11 201:20
201:22
**708** 62:6,12
**71** 3:10
**741.30** 79:2
**768437** 61:1
**77081** 22:21
**786** 2:5
**7shifts** 137:3
163:7
**7th** 2:4 156:19
157:12 179:2
179:18 180:10
181:13 182:1,2
182:9,11,24
185:6

---
**8**
---

**8** 3:15 198:22,23
200:3 201:22
202:1
**8:00** 180:11
**87** 3:11
**8th** 59:17 179:18
179:21 180:1
181:19

---
**9**
---

**901** 76:6
**911** 79:7