## DECLARATION OF ERIC GARCIA

I, Eric Garcia, hereby attest as follows:

1. I am over the age of 18 and all of the information in this Declaration I have personal knowledge about.
2. I am a Human Resources Manager at GOAT Hospitality Group, LLC ("GOAT").
3. I am an experienced Human Resources Professional and a member of the Society for Human Resource Management (SHRM).
4. GOAT operates as a consulting group to provide marketing, advertising, cuisine consulting / menu advisement, management consulting, procurement, and outsourced human resources and payroll services.
5. GOAT, in the last two (2) years has not had more than fifteen (15) employees employed for each workday for twenty (20) weeks.
6. The documents attached are true and correct copies of the RT-6 Tax records filed by and reflect the employees who have been employed with GOAT.
7. I have personally reviewed all records and exhibits to the Position Statement, and the Position Statement itself, and swear to the accuracy and truthfulness of the factual statements within.
8. WGOAT15 LLC is not a subsidiary or affiliate of GOAT.
9. WGOAT15 LLC did business under the name of ADDIKT and operated at the ICON Brickell on the 15th floor.
10. ADDIKT was a client of GOAT.
11. GOAT provided consulting to ADDIKT, including human resources and payroll.
12. Carol Alvarez was not employed with GOAT.
13. GOAT made no decisions regarding her employment.
14. ADDIKT controlled the terms and conditions of employment, hiring, firing, rates of pay, title, promotions, demotions, separation.
15. Neither GOAT nor I had any control over Ms. Alvarez's hours, rate(s) of pay, or had any input in her resignation.
16. Ms. Alvarez was hired by ADDIKT on or about October 10, 2023 as a line cook.
17. ADDIKT (also called Mia) provided Ms. Alvarez with the Employee Handbook, detailing the anti-discrimination policies. The attached signed acknowledgement from Ms. Alvarez is the true and correct copy of her acknowledgment of the ADDIKT policies and the handbook.
18. From October 10, 2023 until January 9, 2024, Ms. Alvarez was supervised by Maximilliano Carabello, Head Chef.
19. Less than one (1) month into employment, Ms. Alvarez walked into my office on the 49th floor to complain about Mr. Carabello, on November 6, 2023.
20. Immediately, I accepted Ms. Alvarez's complaint and began my investigation by speaking with her on that date.
21. Ms. Alvarez alleged that she felt Mr. Carabello "wanted her" and complained that his level of supervision was "too close."
22. Ms. Alvarez did not provide details regarding specific comments, although I asked.
23. Ms. Alvarez denied specific comments, stating only she felt he "wanted her."
24. Mr. Alvarez believed that, with 15 years of experience, she required no supervision.
25. Ms. Alvarez conceded that Mr. Carabello assigned *another* cook to review her work, under the belief that he knew that she "didn't want him."
26. Ms. Alvarez complained of this supervision as well.
27. Ms. Alvarez denied sexual comments or inuendo.

{L0147124-1}

ALVAREZ-000014

28. Ms. Alvarez denied any witnesses to the conduct she complained of.
29. Ms. Alvarez denied touching.
30. Ms. Alvarez's complaints were based upon two comments/question, asking if she was married and one offering to rent her a room from Mr. Carabello, in response to her asking multiple employees for help finding a cheap room to rent.
31. Ms. Alvarez's discussions with Mr. Carabello were focused on her cooking techniques and styles, feedback, and supervision of her work.
32. Ms. Alvarez did not inform me that she was pregnant at that time.
33. Ms. Alvarez did not complain about or discuss Richard Fuentes.
34. Richard Fuentes was an independent contractor not a GOAT or ADDIKT employee.
35. Richard Fuentes had no power to hire, discipline, schedule, or fire anyone.
36. Richard Fuentes only visited ADDIKT approximately 1-2X per week.
37. Richard Fuentes was consultant who performed procurement and quality control.
38. I advised Ms. Alvarez that her complaints and this investigation were confidential and no retaliation was tolerated.
39. Two days later, on November 8, 2023, I spoke with Mr. Carabello.
40. Mr. Carabello did not mention any specific or strained relationship with Ms. Alvarez or anyone else.
41. Mr. Carabello mentioned an incident the prior day, November 7, 2023, with Ms. Alvarez, involving uncooked meat (discussed later in this Declaration).
42. I counseled Mr. Carabello to ensure communications with employees are respectful, thoughtful, appropriate, and reminded him about the anti-discrimination policies. I reiterated he was expected to treat all employees equally and with respect.
43. That same day, I spoke with Reina Gutierrez, a female kitchen employee.
44. Ms. Gutierrez spoke highly of Mr. Carabello and responded with surprise at any suggestion that he would be inappropriate.
45. Ms. Gutierrez requested that Mr. Carabello be stronger in leadership and discipline.
46. Ms. Gutierrez stated that there was no inappropriate conduct between Mr. Carabello, no inappropriate conduct at all, or sexual harassment of any kind.
47. At the conclusion of these conversations, I determined that while Ms. Alvarez "had a sense that Mr. Caraballo wanted" her, there was no indication of sexual harassment. Ms. Alvarez had not complained about her schedule, hours, or anything other than wanting to be "left alone" to work without supervision.
48. She did not indicate the statements allegedly made by Mr. Carabello in her Charge.
49. I communicated to Ms. Alvarez that my investigation was complete. I stated she should come to me with further questions or concerns.
50. Attached to this Declaration are the true and accurate copies of the notes that I took during my investigation contemporaneously, pages 1-7. These notes have not been altered in any manner and I have not withheld any notes or other communications regarding Ms. Alvarez's complaints.
51. I also indicated to Ms. Alvarez that, since the GOAT office was in the same building (on a different floor), I would volunteer to come to the ADDIKT restaurant on the 15th floor to ensure no further issues.
52. From November 6, 2023 until Ms. Alvarez's resignation, I visited the ADDIKT location every 1-3 days, specifically checking in on Ms. Alvarez, so that she did not need to excuse herself to the GOAT office on the 49th floor.

53. Ms. Alvarez not only failed to bring to my attention any alleged "harassment" from anyone, she denied any further issues.

54. During her employment of less than four (4) months with ADDIKT, Ms. Alvarez experienced performance issues, including but not limited to: lateness, resistance to coaching/training, objecting to supervision, and competence in food preparation.

55. On November 7, 2023, Ms. Alvarez was requested by a customer to prepare a "smashburger." A "smashburger" is a thick burger which is pressed firmly into a grill or hot surface, creating a charred, burnt crust while maintaining the internal integrity of the meat's texture, juiciness, and fresh flavor. This style of cuisine was specific to ADDIKT's menu.

56. Ms. Alvarez prepared a hamburger which was severely undercooked.

57. I personally observed the hamburger on the customer's plate.

58. The burger was cold to the touch in the center, raw in the center, and bloody.

59. The customer sent it back to be prepared in accordance with the menu.

60. Ms. Alvarez was angry and resistant, insisting that she had prepared the "smashburger" correctly.

61. The customer on that day was the owner, Lisa Gonzalez.

62. As a result of this issue, ADDIKT determined that all line cooks and kitchen staff be retrained on meat preparation to be thoroughly cooked and in accordance with the menu.

63. As a Human Resources Manager, Ms. Alvarez's supervisor has brought to my attention her persistent lateness.

64. When confronted, Ms. Alvarez would respond, "I'm here now, aren't I?" ADDIKT declined to discipline her for this lateness, other than asking her to be timely.

65. Ms. Alvarez did not request any accommodation for lateness.

66. As the Human Resources Manager, I have in my possession the records of the schedules issued by the supervising chef and records of the hours worked by the staff at ADDIKT. Attached to this Declaration are true and complete records of the schedules and hours worked by Ms. Alvarez. These records have not been altered in any manner.

67. Ms. Alvarez's schedule and hours worked were similar to other line cooks. Ms. Alvarez's schedule was not substantially or even appreciably less than other line cooks.

68. Ms. Alvarez's statement in her EEOC Charge that she "began to have her scheduled work hours reduced…. in retaliation for her pregnancy." *See* Charge ¶16, is not supported.

69. Ms. Alvarez did not complain to me at any time that her hours were reduced as a result of her complaint or pregnancy.

70. On January 9, 2024, both Richard Fuentes and Maximiliano Carabello ceased working with ADDIKT. Neither Mr. Fuentes' nor Mr. Carabello's separations were related to any complaint of harassment or discrimination.

71. Beginning in January 9, 2024, Ms. Alvarez was supervised by Abelardo Vargas.

72. Ms. Alvarez declined to perform certain tasks associated with her job.

73. Ms. Alvarez, at no time prior to her resignation, advised me of any pregnancy discrimination, reduction in hours, or of any refused accommodation requested.

74. Ms. Alvarez would decline to perform certain work, leave her post and take a break, without consideration for the rest of the team, take extended breaks, and/or eat in the kitchen where food preparation occurred.

75. Being late, taking lengthy breaks without appropriate coverage, eating instead of working, eating in the food preparation area, being slow – these are performance issues having nothing to do with being pregnant.

76. Neither Mr. Vargas nor ADDIKT had any policies refusing breaks to employees.

{L0147124-1}

ALVAREZ-000016

77. ADDIKT had policies of permitting employees to eat free food during meal breaks in a small area or in another part of the building to be completely unbothered.

78. ADDIKT, like any busy kitchen, must ensure proper coverage during breaks.

79. Ms. Alvarez did not request from me any accommodation regarding bathroom breaks, requiring any specific number of breaks, asking for a chair to sit on, or otherwise advising from any medical professional that she needed breaks during certain intervals.

80. ADDIKT requested Ms. Alvarez to provide medical documentation, like any other employee who is out on medical leave.

81. ADDIKT received a doctor's note from Ms. Alvarez from an Emergency Room visit she had on January 10, 2024, stating Ms. Alvarez could return on January 16, 2024.

82. This doctor's note did not indicate any restrictions upon Ms. Alvarez's work.

83. Attached is a true and correct copy of the doctor's note provided by Ms. Alvarez.

84. ADDIKT accommodated Ms. Alvarez's request for time off.

85. ADDIKT, like many restaurants, does not offer paid time off. Employees who need time off request such from their supervisors, who will adjust schedules and accommodate the time off request, if possible.

86. All employees are required to provide advance notice of time off requests and to call in three (3) hours ahead of their scheduled shifts, to permit ADDIKT to fill in accordingly.

87. All employees are required to provide medical documentation for return from medical leave to ensure that ADDIKT is aware of all restrictions and how much time off the employee needs.

88. Ms. Alvarez's position was a critical role to the restaurant.

89. Ms. Alvarez did not complain, at any time, to me or to Mr. Vargas about being asked to lift "heavy objects."

90. Ms. Alvarez's statement that I told her that she could lift heavy objects, "because she was only seven months pregnant" is patently false.

91. Ms. Alvarez's statement that she was not permitted to have breaks is false.

92. Ms. Alvarez's statement that she was not permitted to eat is also false.

93. When Mr. Vargas began in his role, he observed multiple employees, including Ms. Alvarez, eating while preparing food.

94. Mr. Vargas determined this to be unsanitary and inconsistent with best practices.

95. Mr. Vargas required all employees to refrain from eating while preparing food and to take breaks in the break room on another floor or the small area designated for breaks.

96. ADDIKT does not permit employees to eat while working, cooking, serving, etc.

97. This prohibition is to ensure that food preparation and the entire food preparation area is free of contamination, sanitary, and in accordance with best practices. This policy affects all employees equally.

98. Any employee requiring more meal breaks due to a medical condition or pregnancy was free to present a requested accommodation (e.g. breaks every 2.5 hours, sitting for 10 minutes after 3 hours of standing, or eating no less than every 4 hours). To the extent reasonably possible, ADDIKT would endeavor to accommodate any reasonable request.

99. Compromising the health and safety of customers in the preparation of food is not a reasonable accommodation.

100. ADDIKT, did in fact, accommodate all of Ms. Alvarez's requests for time off from January 10-15, 2024 and February 7-12, 2024.

101. As the payroll and Human Resources Manager outsourced by GOAT, I am aware of the number of employees that ADDIKT had at all times.

102. ADDIKT has never had fifty (50) employees at any time.

{L0147124-1}

ALVAREZ-000017

103. ADDIKT is not required to offer Family Medical Leave Act ("FMLA") time off.
104. Even if ADDIKT was required to offer FMLA leave, Ms. Alvarez was ineligible.
105. Ms. Alvarez requested FMLA time off on or about February 7, 2024.
106. I advised Ms. Alvarez that FMLA was not available due to the size of ADDIKT.
107. Ms. Alvarez did not accept this, demanding I provide an explanation.
108. The FMLA eligibility requires that an employee have worked 1,250+ hours in the last twelve (12) months.
109. Ms. Alvarez had only worked 627 hours.
110. Ms. Alvarez did not ask for more time off than February 7 – 12, 2024, and ADDIKT agreed to her time off request.
111. To my understanding, accidentally, Mr. Vargas contacted Ms. Alvarez to inquire as to her return date.
112. Ms. Alvarez then sent a bizarre text, resigning her employment.
113. Despite that I had been readily available to Ms. Alvarez previously, she did not complain or request any accommodation other than FMLA leave.
114. FMLA leave would only provide Ms. Alvarez with up to twelve (12) weeks of time off, unpaid, and a return to her prior job.
115. Even if Ms. Alvarez did not resign, ADDIKT permanently closed on February 23, 2024, just two (2) weeks after her resignation.
116. ADDIKT currently has no employees and no operations.
117. Had ADDIKT offered Ms. Alvarez twelve (12) weeks of FMLA leave, there is no job or company to return to.
118. ADDIKT took no efforts to terminate Ms. Alvarez.
119. ADDIKT did not attempt to replace Ms. Alvarez.
120. ADDIKT provided time off any time that Ms. Alvarez requested.
121. ADDIKT thoroughly and proactively investigated all complaints and/or requests by Ms. Alvarez.
122. ADDIKT did not, at any time, reject any reasonable accommodation requested by Ms. Alvarez.
123. Ms. Alvarez's requests for time off were last minute.
124. In the role of line cook, the only way to accommodate unplanned, sudden, sporadic, and as much as week-long absences would be to hire another line cook and schedule for the same days as Ms. Alvarez. ADDIKT would have to pay that line cook not to work and/or to assist Ms. Alvarez and/or fill in on days when Ms. Alvarez did not show up.
125. ADDIKT is not a large kitchen with sufficient staff to accommodate such absences, but it still did.
126. ADDIKT continued to place Ms. Alvarez on the schedule.
127. Ms. Alvarez's terms and conditions of employment as it relates to schedule, pay, and title, did not change in the four (4) months she was employed.
128. At no time did any supervisor attempt to demote or fire Ms. Alvarez.
129. At no time did any supervisor deny any request for time off.
130. At no time did ADDIKT decline to investigate any complaints.
131. In the totality of my investigations and review of Ms. Alvarez's file, the only issues were that Ms. Alvarez had personality conflicts with every supervisor she worked with.
132. Ms. Alvarez, during her time with ADDIKT, only complained that she wanted to be "left alone" and that she did not need supervision.

133. This request for "no supervision" was not tenable, especially given the situation with the uncooked meat on November 7, 2023, and was unrelated to her gender or pregnancy and consistent with each supervisor.

134. ADDIKT would have terminated Ms. Alvarez regardless of her gender, pregnancy, or any alleged disability because it ceases to operate at any location and there are no jobs offered.

Under penalties of perjury, I declare that I have read the foregoing Declaration and I swear that the facts stated in it are true.

*[Signature]*

Signature
Name: Eric Garcia
Date: May 31, 2024